UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CIV 10783

———————————————————— x
NECA-IBEW HEALTH & WELFARE FUND,
Individually and On Behalf of All Others
Similarly Situated,

     Plaintiff,

  vs.

GOLDMAN, SACHS & CO., GOLDMAN
SACHS MORTGAGE COMPANY, GS
MORTGAGE SECURITIES CORP., GSAA
HOME EQUITY TRUST 2007-3, GSAA
HOME EQUITY TRUST 2007-4, GSAMP
TRUST 2007-HE2, GSAMP TRUST 2007-
FM2, GSAA HOME EQUITY TRUST 2007-5,
GSAA HOME EQUITY TRUST 2007-6,
GSAA HOME EQUITY TRUST 2007-7,
GSAA HOME EQUITY TRUST 2007-8, GSR
MORTGAGE LOAN TRUST 2007-OA1, GSR
MORTGAGE LOAN TRUST 2007-4F,
GSAMP TRUST 2007-HSBC1, GSAMP
TRUST 2007-HE1, STARM MORTGAGE
LOAN TRUST 2007-4, GSAA HOME
EQUITY TRUST 2007-10, GSR MORTGAGE
LOAN TRUST 2007-5F, GSR MORTGAGE
LOAN TRUST 2007-3F, GSR MORTGAGE
LOAN TRUST 2007-OA2, DANIEL L.
SPARKS, MICHELLE GILL and KEVIN
GASVODA,

     Defendants.
———————————————————— x

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATION OF §§11
AND 15 OF THE SECURITIES ACT OF
1933

DEMAND FOR JURY TRIAL

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons or entities who acquired the Mortgage Pass-Through Certificates or Asset-Backed Certificates (collectively, the "Certificates") of GS Mortgage Securities Corp. ("GS Mortgage" or the "Depositor") pursuant and/or traceable to the false and misleading Registration Statement and Prospectus Supplements issued during 2007 and 2008 (collectively, the "Registration Statement"). This action involves solely strict liability and negligence claims brought pursuant to the Securities Act of 1933 ("1933 Act").

2.      GS Mortgage is a Delaware special purpose corporation formed for the purpose of securitizing mortgage assets to the issuing entity. GS Mortgage is a wholly owned subsidiary of the Sponsor, Goldman Sachs Mortgage Company ("GSMC"), and is an affiliate, through common parent ownership, of the underwriter, Goldman, Sachs & Co. ("Goldman Sachs"). The issuers of the various offerings (the "Defendant Issuers") are the Trusts identified in ¶13, established by GS Mortgage to issue billions of dollars worth of Certificates in 2007 and 2008.

3.      On January 31, 2007, GS Mortgage and the Defendant Issuers caused a Registration Statement to be filed with the Securities and Exchange Commission ("SEC") in connection with and for the purpose of issuing billions of dollars of Certificates. The Certificates were issued pursuant to Prospectus Supplements, each of which was incorporated into the Registration Statement. The Certificates were supported by pools of mortgage loans. The Registration Statement represented that the mortgage pools would primarily consist of conventional, adjustable- and fixed-rate subprime mortgage loans generally secured by first- or second-lien mortgages or deeds of trust on residential real properties.

4.      Investors purchased the Certificates based upon three primary factors: return (in the form of interest payments), timing of principal and interest payments, and safety (risk of default of the underlying mortgage loan assets). The Registration Statement included false statements and/or

omissions about: (i) the underwriting standards purportedly used in connection with the origination of the underlying mortgage loans; (ii) the maximum loan-to-value ratios used to qualify borrowers; (iii) the appraisals of properties underlying the mortgage loans; and (iv) the debt-to-income ratios permitted on the loans.

5.    The true facts that were omitted from the Registration Statement were:

- The originators of the underlying mortgage loans were issuing many of the mortgage loans to borrowers who: (i) were not in compliance with the prudent or maximum debt-to-income ratio purportedly required by the lenders; (ii) did not provide adequate documentation to support the income and assets required to issue the loans pursuant to the lenders' stated guidelines; (iii) were steered to stated income/asset and low documentation mortgage loans by lenders, lenders' correspondents or lenders' agents, such as mortgage brokers, because the borrowers could not qualify for mortgage loans that required full documentation; and (iv) did not have the income or assets required by the lenders' own guidelines to afford the required mortgage loan payments, which resulted in a mismatch between the needs and capacity of the borrowers.

- The lenders or the lenders' agents knew that the borrowers either could not provide the required documentation or the borrowers refused to provide it.

- The underwriting, quality control, and due diligence practices and policies utilized in connection with the approval and funding of the mortgage loans were so weak that borrowers were being extended loans based on stated income in the mortgage loan applications with purported income amounts that could not possibly be reconciled with the jobs claimed on the loan application or through a check of free "online" salary databases such as salary.com.

- The appraisals of many properties were inflated, as appraisers were pressured by lenders, lenders' correspondents and/or their mortgage brokers/agents to provide the desired appraisal value regardless of the actual value of the underlying property so the loans would be approved and funded. In this way many appraisers were rewarded for their willingness to support preconceived or predetermined property values violating USPAP regulations.[1]

---

[1]    The Uniform Standards of Professional Appraisal Practice ("USPAP") are the generally accepted standards for professional appraisal practice in North America. USPAP contain standards

6.    As a result, the Certificates sold to plaintiff and the Class were secured by assets that had a much greater risk profile than represented in the Registration Statement.  In this way, defendants were able to obtain superior ratings on the tranches or classes of Certificates, when in fact these tranches or classes were not equivalent to other investments with the same credit ratings.

7.    By early 2008, the truth about the performance of the mortgage loans that secured the Certificates began to be revealed to the public, increasing the risk of the Certificates receiving less absolute cash flow in the future and the likelihood that investors would not receive it on a timely basis.  The credit rating agencies also began to put negative watch labels on the Certificate tranches or classes, ultimately downgrading many.  As an additional result, the Certificates are no longer marketable at prices anywhere near the price paid by plaintiff and the Class and the holders of the Certificates are exposed to much more risk with respect to both the timing and absolute cash flow to be received than the Registration Statement/Prospectus Supplements represented.

## JURISDICTION AND VENUE

8.    The claims alleged herein arise under §§11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o.  Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act.

9.    The violations of law complained of herein occurred in this District, including the dissemination of materially false and misleading statements complained of herein into this District.  Goldman Sachs and GSMC conduct business in this District.

for all types of appraisal services.  Standards are included for real estate, personal property, business and mass appraisal.

- 3 -

## PARTIES

10.    Plaintiff NECA-IBEW Health & Welfare Fund acquired Certificates pursuant and traceable to the Registration Statement and Prospectus Supplements and has been damaged thereby.

11.    Defendant GS Mortgage is a Delaware corporation.  GS Mortgage engages in securitizing mortgage assets and related activities.  The principal office of GS Mortgage is located at 85 Broad Street, New York, New York.  Defendant GS Mortgage was the Depositor.

12.    Defendant GSMC is a Delaware corporation with its headquarters located at 85 Broad Street, New York, New York.  GSMC was formed in 1984.  GSMC's general partner is Goldman Sachs Real Estate Funding Corp. and its limited partner is The Goldman Sachs Group, Inc.  GSMC purchases closed, independently funded, first- and subordinate-lien residential mortgage loans for its own investment, securitization, or resale.  Additionally, GSMC provides warehouse and repurchase financing to mortgage lenders.  GSMC does not service loans.  GSMC contracts with another entity to service the loans on its behalf.  GSMC also may engage in the secondary market activities noted above for non-real estate-secured loans in certain jurisdictions and other activities, but its principal business activity involves real estate-secured assets.  GSMC is a wholly owned subsidiary of Goldman Sachs.  GSMC was the Sponsor.

13.    The Defendant Issuers of the various Certificates are each New York common law trusts.  Each of these Trusts issued hundreds of million of dollars worth of Certificates pursuant to a Prospectus Supplement which listed numerous classes of the Certificates.  The Defendant Issuers are:

| | |
|---|---|
| GSAMP Trust 2007-FM2 | GSR Mortgage Loan Trust 2007-4F |
| GSAMP Trust 2007-HE1 | GSAA Home Equity Trust 2007-7 |
| GSAA Home Equity Trust 2007-3 | GSAA Home Equity Trust 2007-8 |
| GSAA Home Equity Trust 2007-4 | GSAMP Trust 2007-HSBC1 |

GSAMP Trust 2007-HE2                          STARM Mortgage Loan Trust 2007-4

GSR Mortgage Loan Trust 2007-3F              GSR Mortgage Loan Trust 2007-OA2

GSAA Home Equity Trust 2007-5                GSAA Home Equity Trust 2007-10

GSR Mortgage Loan Trust 2007-OA1             GSR Mortgage Loan Trust 2007-5F

GSAA Home Equity Trust 2007-6

14.     Defendant Goldman Sachs is a global bank holding company that engages in investment banking, securities and investment management. Goldman Sachs was founded in 1869 and is based in New York, New York. Goldman Sachs acted as the underwriter in the sale of all the GS Mortgage offerings, helping to draft and disseminate the offering documents. Goldman Sachs was the underwriter for all of the Trusts.

15.     Defendant Daniel L. Sparks ("Sparks") was Chief Executive Officer ("CEO") and a director of GS Mortgage during the relevant time period. Defendant Sparks signed the January 31, 2007 Registration Statement.

16.     Defendant Michelle Gill ("Gill") was Vice President, Principal Accounting Officer of GS Mortgage during the relevant time period. Defendant Gill signed the January 31, 2007 Registration Statement.

17.     Defendant Kevin Gasvoda ("Gasvoda") was a director of GS Mortgage during the relevant time period. Defendant Gasvoda signed the January 31, 2007 Registration Statement.

18.     The defendants identified in ¶¶15-17 are referred to herein as the "Individual Defendants." The Individual Defendants functioned as directors to the Trusts as they were directors to GS Mortgage and signed the Registration Statement for the registration of the securities issued by the Trusts.

19.     These defendants aided and abetted, and/or participated with and/or conspired with the other named defendants in the wrongful acts and course of conduct or otherwise caused the

damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

20.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons or entities who acquired the following Certificates pursuant and/or traceable to the false and misleading Registration Statement (Registration No. 333-139817) and who were damaged thereby (the "Class"):

| | |
|---|---|
| Mortgage Pass-Through Certificates, Series 2007-FM2 | Asset-Backed Certificates, Series 2007-7 |
| Mortgage Pass-Through Certificates, Series 2007-HE1 | Mortgage Pass-Through Certificates, Series 2007-4F |
| Asset-Backed Certificates, Series 2007-3 | Asset-Backed Certificates, Series 2007-8 |
| Asset-Backed Certificates, Series 2007-4 | Mortgage Pass-Through Certificates, Series 2007-HSBC1 |
| Mortgage Pass-Through Certificates, Series 2007-HE2 | Mortgage Pass-Through Certificates, Series 2007-4 |
| Mortgage Pass-Through Certificates, Series 2007-3F | Mortgage Pass-Through Certificates, Series 2007-OA2 |
| Asset-Backed Certificates, Series 2007-5 | Asset-Backed Certificates, Series 2007-10 |
| Mortgage Pass-Through Certificates, Series 2007-OA1 | Mortgage Pass-Through Certificates, Series 2007-5F |
| Asset-Backed Certificates, Series 2007-6 | |

Excluded from the Class are defendants, the officers and directors of the defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

21.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and

can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by GS Mortgage or GSMC or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. The Registration Statement issued billions of dollars worth of Certificates.

22.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

23.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

24.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: whether defendants violated the 1933 Act; whether the Registration Statement issued by defendants to the investing public negligently omitted and/or misrepresented material facts about the underlying mortgage loans comprising the pools; and to what extent the members of the Class have sustained damages and the proper measure of damages.

25.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

- 7 -

## BACKGROUND

26.     GS Mortgage was the Depositor of the Trusts from which the Certificates of various classes were sold to investors pursuant to the Registration Statement and Prospectus Supplements. While these offering documents contained data about the mortgage loans, some of the most important information for plaintiff and the other members of the Class, which was omitted from the Registration Statement and Prospectus Supplements, actually involved the underwriting, quality control, due diligence, approval and funding practices and policies for the mortgage loans and the likelihood and ability of borrowers to repay the mortgage loans according to the terms of the mortgage note and the mortgage or the deed of trust. This depended on several factors, including creditworthiness of borrowers, debt-to-income levels, loan-to-value ratios, assets of the borrower, occupancy of the property securing the mortgage loan, and the accuracy of other data collected during the origination of the mortgage loans.

## THE FALSE AND MISLEADING REGISTRATION
## STATEMENT/PROSPECTUS SUPPLEMENTS

27.     Defendants caused the Registration Statement/Prospectus Supplements to be filed with the SEC during 2007 and 2008 in connection with the issuance of billions of dollars in Certificates. The Registration Statement/Prospectus Supplements were false and misleading. The Registration Statement incorporated by reference the subsequently filed Prospectus Supplements. The January 31, 2007 Registration Statement represented that:

> All documents (other than Annual Reports on Form 10-K) filed by us with respect to a trust fund referred to in the accompanying prospectus supplement and the related series of securities after the date of this prospectus and before the end of the related offering pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, are incorporated by reference in this prospectus and are a part of this prospectus from the date of their filing. Any statement contained in a document incorporated by reference in this prospectus is modified or superseded for all purposes of this prospectus to the extent that a statement contained in this prospectus (or in the accompanying prospectus supplement) or in any other subsequently filed document that also is incorporated by reference differs from that

statement. Any statement so modified or superseded shall not, except as so modified or superseded, constitute a part of this prospectus. If so specified in any such document, such document shall also be deemed to be incorporated by reference in the registration statement of which this prospectus forms a part.

28.    The Trusts were the "Issuers" that caused the Registration Statement, dated January 31, 2007, to be filed with the SEC, which Registration Statement discussed the mortgage loans contained in the mortgage pools held by the Defendant Issuers. Defendants represented that the loans underlying the Certificates were loans made to borrowers whose income documentation was not subject to quite as rigorous a set of standards as for other borrowers, but that the loans were made based on the value of the underlying properties, as confirmed by the appraisals of the properties.

**Omitted Verification Data**

29.    The Registration Statement/Prospectus Supplements emphasized the underwriting standards utilized to generate the underlying mortgage loans held by the Defendant Issuers, but omitted material facts related thereto. The Registration Statement stated that with respect to each mortgage loan, underwriting standards were applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. The Registration Statement further stated that in many cases an employment verification was obtained from an independent source, typically the borrower's employer. The verification purportedly confirmed, among other things, the length of employment with an organization, the borrower's actual salary and whether it was expected that the borrower would continue employment in the future. Where a prospective borrower was self-employed, the Registration Statement/Prospectus Supplements stated that the borrower was required to submit other verification materials.

30.    These representations were materially false and misleading because they omitted the fact that the lenders (and the lenders' agents, such as mortgage brokers) that transferred loans to the Trusts, which were then placed into the Defendant Issuers, had become so aggressive in approving and funding the mortgage loans that many of the mortgage loans were made to borrowers who had either not submitted or had altered the required documentation.  Similarly, those self-employed borrowers who were actually required to submit stated income applications would include income levels which were routinely inflated to extreme levels and objectively unreasonable relative to the stated job titles. These practices had the effect of both dramatically increasing the risk profile of the Certificates and substantially diminishing their actual value.

**Defective Appraisals**

31.    The Registration Statement and Prospectus Supplements also represented that in determining the adequacy of the property to be used as collateral, an appraisal was made of each property considered for financing.  In instances where appraisals were conducted, the appraisers were purportedly required to inspect the property to verify that it was in good repair and that, if new, construction had been completed.  The Registration Statement asserted that appraisals were purportedly based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home, and adhered to USPAP regulations and requirements.

32.    These representations were materially false and misleading in that they omitted to state that the appraisals were inaccurate due to: (i) a complete lack of controls at the originators and the Depositor; and (ii) the lenders and/or their agents, such as mortgage brokers, exerted pressure on appraisers to come back with pre-determined, preconceived – and false – appraisal values. Appraisers were secretly pressured to appraise properties at artificial levels or they would not be

hired again, resulting in appraisals being done on a "drive-by" basis, where appraisers issued their

appraisals without reasonable bases for doing so.

**The Prospectus Supplements Contained False Statements**
**About the Originators' Underwriting Practices**

### Countrywide Home Loans, Inc.

33.    The Registration Statement and Prospectus Supplements contained false statements

about the underwriting practices of Countrywide Home Loans, Inc. ("Countrywide"), a key

originator in the following Trusts:

> GSAA Home Equity Trust 2007-3
> GSR Mortgage Loan Trust 2007-4F
> GSAA Home Equity Trust 2007-5
> GSR Mortgage Loan Trust 2007-OA1
> GSAA Home Equity Trust 2007-6

34.    For example, the GSAA Home Equity Trust 2007-6 Prospectus Supplement, dated

May 25, 2007, addressed underwriting standards utilized by Countrywide, which originated all of the

mortgage loans in Series 2007-6:

> Under those standards, a prospective borrower must generally demonstrate that the
> ratio of the borrower's monthly housing expenses (including principal and interest on
> the proposed mortgage loan and, as applicable, the related monthly portion of
> property taxes, hazard insurance and mortgage insurance) to the borrower's monthly
> gross income and the ratio of total monthly debt to the monthly gross income (the
> "debt-to-income" ratios) are within acceptable limits. . . . The maximum acceptable
> debt-to-income ratio, which is determined on a loan-by-loan basis varies depending
> on a number of underwriting criteria, including the Loan-to-Value Ratio, loan
> purpose, loan amount and credit history of the borrower. In addition to meeting the
> debt-to-income ratio guidelines, each prospective borrower is required to have
> sufficient cash resources to pay the down payment and closing costs. Exceptions to
> Countrywide Home Loans' underwriting guidelines may be made if compensating
> factors are demonstrated by a prospective borrower.

***Omitted Information***:  Countrywide was issuing or acquiring mortgages with limited documentation

and/or excessive loan-to-value ratios even where compensating factors were not demonstrated.

- 11 -

Some borrowers with "No Doc" mortgage loans were wage earners who could have provided employment, income and asset verification, but were not required to do so because their actual income and assets would have been insufficient for the mortgage amounts. As Countrywide has reported increasing foreclosures and delinquencies, analysts who follow Countrywide closely have indicated they were not surprised given Countrywide's past practices. As *MarketWatch* reported on February 15, 2008:

> Analysts were not surprised to see the increases, pointing to past lending practices popularized by the lending industry during the height of the housing boom as an underlying problem that will continue to play out in 2008.
>
> "It is certainly not a big surprise that we are seeing more [delinquencies], as many of these loans came about because of poor underwriting practices," [said] Gary Gordon, an analyst for Portales Partners who has been following Countrywide for almost two decades.
>
> Gordon said he expected the number to rise throughout this year as many borrowers crack under the pressure of paying off loans for which they should not [sic] originally received.
>
> "The delinquencies for these kinds of loans are then likely to come out early in the lifecycle of the loan, which is happening now," he said.

35.    The GSAA Home Equity Trust 2007-6 Prospectus Supplement also stated with respect to Countrywide:

> Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively.

***Omitted Information***:    Countrywide's appraisals were frequently inflated, reckless, contained predetermined values or were otherwise unreliable, which caused the loan-to-value ratios to be misstated. This caused mortgages to be issued for borrowers with higher than 38% debt-to-income

ratios even though the loan-to-value ratio was higher than 80% of what the property would appraise for under a legitimate appraisal.

36.    The GSAA Home Equity Trust 2007-5 Prospectus Supplement, dated April 27, 2007, stated with respect to the underwriting practices of Countrywide, which accounted for approximately 61.96% of the group II mortgage loans in the 2007-5 Trust:

> The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.

> Expanded Underwriting Guidelines

> Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines.

> Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000.

*    *    *

The same documentation and verification requirements apply to mortgage loans documented under the Alternative Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Alternative Documentation Program, mortgage loans that have been underwritten pursuant to the Expanded Underwriting Guidelines may have higher loan balances and Loan-to-Value Ratios than those permitted under the Standard Underwriting Guidelines.

Similarly, the same documentation and verification requirements apply to mortgage loans documented under the Reduced Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Reduced Documentation Program, higher loan balances and Loan-to-Value Ratios are permitted for mortgage loans underwritten pursuant to the Expanded Underwriting Guidelines than those permitted under the Standard Underwriting Guidelines. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 90%. The borrower is not required to disclose any income information for some mortgage loans originated under the Reduced Documentation Program, and accordingly debt-to-income ratios are not calculated or included in the underwriting analysis. The maximum Loan-to-Value Ratio, including secondary financing, for those mortgage loans ranges up to 85%.

Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. This program is limited to borrowers with excellent credit histories. Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%. Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income. The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%. Mortgage loans originated under the Stated Income/Stated Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

***Omitted Information***:  These non-traditional mortgage loans were increasingly being widely used by

Countrywide and its brokers where the loan-to-value ratios were over the stated limit due to "silent

second" liens.  In fact, for the mortgage loans generated under the Streamlined Documentation

Program, appraisals were not obtained at all, even though the mortgage loans obtained did, in fact, exceed 80% of the actual value of the subject property. The importance of legitimate appraisals was even more important under the Expanded Underwriting Guidelines because these mortgage loans provided for loan amounts which reached 90%, 95% or even 100% in some cases.  Given the inflated appraisals frequently provided, the undisclosed risk of mortgages exceeding home values was extreme.  Countrywide's appraisal practices were intended to inflate the property value so that loans would close.  Countrywide was recently sued for inflated appraisals in connection with Countrywide's joint venture with KB Homes.  In fact, stated income amounts far in excess of those reasonable for the borrowers' employment were regularly ignored in order to approve loans under the stated income and stated asset documentation programs.  Countrywide was offering stated income loans up to 100% loan-to-value until March 2007.  In fact, in March 2007, Countrywide assured borrowers that 100% financing was still available:

> "We want to assure homeowners that there is still an extensive selection of mortgage loans to suit a multitude of personal and financial circumstances," said Tom Hunt, managing director of Countrywide Home Loans. "We recognize it's been widely reported that some major lenders, like Countrywide, no longer offer 100% financing.  In fact, we have made changes to certain subprime and other special mortgage programs, but we have not eliminated 100% financing.  We still offer one of the widest selections of low-and no-downpayment options to qualified customers, including those with less-than-perfect credit."

37.     The Prospectus Supplement for GSAA Home Equity Trust 2007-3, dated February 22, 2007, stated:

> For all mortgage loans originated or acquired by Countrywide Home Loans, Countrywide Home Loans obtains a credit report relating to the applicant from a credit reporting company. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.

***Omitted Information***:  In fact, lending officers were regularly satisfied about adverse information in a borrower's credit report by ignoring such adverse information.  Lending officers and originators also knew that borrowers frequently complained to credit rating agencies about adverse information that was in fact true, knowing that the rating agencies, if they could not confirm the adverse information within a specified time period, would remove the adverse information from the report.  Moreover, loan applications frequently included inflated borrower income levels which Countrywide executives overlooked.  As *The Wall Street Journal* reported on May 7, 2008:

> [P]rosecutors in the Central District of California in Los Angeles, near Countrywide's headquarters, are investigating possible fraud in the company's origination of loans.  Representatives for the prosecutors' offices declined to comment.
>
> People involved in the California inquiry say the Federal Bureau of Investigation, which has carried out the probes under the direction of prosecutors, has seen evidence of ***extensive fraud during loan origination, with sales executives deliberately overlooking inflated income figures for many borrowers***.

38.    The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement, dated May 7, 2007, stated:

> (a)    Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

***Omitted Information***:  In fact, Countrywide's home loan appraisals were not obtained from truly independent appraisers or appraisal services, but rather were obtained from appraisers who understood that unless appraisals were generated at predetermined amounts that would enable a loan to be approved, they would no longer continue to get business from Countrywide or brokers working

with Countrywide. The effect was that purportedly independent appraisals generated in connection with Countrywide home loans were not prepared in conformance with Fannie Mae or Freddie Mac appraisal standards. Countrywide failed to confirm that appraisers were following the guidelines described, and this, combined with the implied or express pressures placed on appraisers to appraise to the desired value, created enormous upward pressure on appraisal values, distorting loan-to-value ratios and making the mortgage loans in the pool much riskier than suggested by the Prospectus Supplements/Registration Statement. This was particularly true in 2006 and 2007 when real estate values in many of the areas where the mortgage pools were located had stopped increasing at the rapid pace of 2004-2005. Thus, the aggressive lending practices introduced during those years (where borrowers were granted large mortgages in excess of their ability to pay with the assurance that refinancing would be possible in a short time) were extremely risky and likely to lead to significant defaults in years when real estate prices did not increase or even decreased.

> (b)    Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%.

***Omitted Information***:    Countrywide's debt-to-income ratios were misstated (understated) by the manipulation of reported income levels on loan applications, many times with the knowledge of the mortgage broker. The broker would get paid if the loan went through – even with false information – but would not get paid if they questioned obviously distorted income levels. Countrywide took no meaningful steps to prevent these practices as Countrywide was highly motivated to close and securitize loans – regardless of the underlying risk profile. In fact, during the summer of 2007, when there was increasing publicity about suspect lending practices, Countrywide did an audit of lending practices by certain mortgage brokers and found many inconsistencies in loan applications, but did nothing about it.

**American Mortgage Network, Inc.**

39.     The Registration Statement and Prospectus Supplements contained false statements about the underwriting practices of American Mortgage Network, Inc. ("AmNet"), a key originator in the following Trusts:

GSR Mortgage Loan Trust 2007-4F

GSR Mortgage Loan Trust 2007-5F

40.     For example, the GSR Mortgage Loan Trust 2007-4F Prospectus Supplement dated June 27, 2007, addressed underwriting standards utilized by GSMC in acquiring loans from originators, which included AmNet, which was an originator in the mortgage loans in Series 2007-4F:

> Based on the data referred to above (and verification of that data, to the extent required), the originating lender makes a determination about whether the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed and revolving obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first twelve months of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months may equal no more than a specified percentage of the prospective borrower's gross income. The permitted percentage is determined on the basis of various underwriting criteria, including the LTV ratio of the mortgage loan and, in certain instances, the amount of liquid assets available to the borrower after origination.

***Omitted Information***:  AmNet, a subsidiary of Wachovia Bank, started doing more subprime lending in 2005, but claimed to have ceased the practice in early 2006, although the Company's website continued for a long time to include information about subprime loans.  In fact, one of AmNet's officers stated in 2005 that "[w]e've never seen how [some new products] perform . . . . We are making edge-of-the-envelope loans [and if rates jump], is there a price to be paid."

### Fifth Third Mortgage Company

41.    The Registration Statement and Prospectus Supplements contained false statements about the underwriting practices of Fifth Third Mortgage Company ("Fifth Third"), an originator in the following Trusts:

> GSAA Home Equity Trust 2007-8
> GSR Mortgage Loan Trust 2007-4F

42.    For example, the Prospectus Supplement for GSAA Home Equity Trust 2007-8, dated July 27, 2007, stated:

(a)    Fifth Third's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations. Exceptions to the underwriting standards may be permitted where compensating factors are present.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources. With respect to second homes and vacation properties, no income derived from the property will have been considered for underwriting purposes.  Because each loan is different, Fifth Third expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.

Fifth Third underwrites a borrower's creditworthiness based solely on information that Fifth Third believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

***Omitted Information***:  Fifth Third was using poor lending practices which increased volumes but dramatically increased the risk of default.  When Fifth Third announced its September 30, 2008 results, one analyst, Richard Bove of Ladenburg Thalman, commented that the results "showed the bank was pursuing poor lending habits and that is why it got into so much trouble."

(b)    In addition to reviewing the borrower's credit history and credit score, Fifth Third underwriters closely review the borrower's housing payment history.  In general, for non-conforming loans the borrower should not have made any mortgage payments over 30 days after the due date for the most recent twelve months.  In

general, for Alt-A loans, the borrower may have no more than one payment that was made over 30 days after the due date for the most recent twelve months.

In order to determine if a borrower qualifies for a non-conforming loan, the loans have been either approved by Fannie Mae's Desktop Underwriter, Freddie Mac's Loan Prospector automated underwriting systems, or they have been manually underwritten by Fifth Third's underwriters, or by contract underwriters provided by certain mortgage insurance companies. For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis. Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter is required to be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

**Omitted Information**: Mortgage underwriters reported that Fifth Third did not seek to ensure that a borrower's income would support the housing expense but primarily sought to increase loan volume irrespective of the borrower's ability to pay. Management would frequently override underwriters to allow risky loans to close.

(c)    Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by an underwriter of Fifth Third or a mortgage insurance company contract underwriter.

**Omitted Information**: Fifth Third did not have adequate controls in place to ensure that appraisals were performed to the standards represented. As a result, Fifth Third was the victim of an extensive fraudulent mortgage loan scheme involving inflated appraisals.

### Goldman Sachs Mortgage Conduit Program

43.    The Registration Statement and Prospectus Supplements contained false statements about the underwriting practices of Goldman Sachs Mortgage Conduit Program, which was an originator in the following Trusts:

| | |
|---|---|
| GSR Mortgage Loan Trust 2007-OA2 | GSAA Home Equity Trust 2007-4 |
| GSAA Home Equity Trust 2007-8 | GSR Mortgage Loan Trust 2007-4F |
| GSAA Home Equity Trust 2007-7 | GSAA Home Equity Trust 2007-5 |
| GSAA Home Equity Trust 2007-3 | GSAA Home Equity Trust 2007-6 |
| GSAA Home Equity Trust 2007-10 | GSR Mortgage Loan Trust 2007-5F |

44.    For example, the GSAA Home Equity Trust 2007-10 Prospectus Supplement, dated October 29, 2007, stated:

(a)    Generally, the ratio of total monthly obligations divided by total monthly gross income is less than or equal to 50%, with exceptions on a case by case basis. The exceptions are determined on the basis of various underwriting criteria, often including the amount of liquid assets available to the borrower after origination, and the borrower's prior credit history and demonstrated payment capacity.

In addition to its "full" documentation program, loans acquired by GSMC through its conduit program may also be originated under the following documentation programs: "alt doc," "stated income/verified assets", "stated income/stated assets", "no ratio", "no income/verified assets" and "no doc." These documentation programs are designed to streamline the underwriting process.

***Omitted Information***:  GSMC failed to implement controls to prevent it from acquiring defective loans through its conduit program.  This ultimately resulted in GSMC having the highest cumulative loss rates for 2006 second-lien residential mortgage-backed securities by 2008.

(b)    An appraisal is generally conducted on each mortgaged property by the originating lender. The appraisal must be conducted in accordance with established appraisal procedure guidelines acceptable to the originator in order to

determine the adequacy of the mortgaged property as security for repayment of the related mortgage loan. All appraisals must be on forms acceptable to Fannie Mae and/or Freddie Mac and conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation. Appraisers may be staff licensed appraisers employed by the originator or independent licensed appraisers selected in accordance with established appraisal procedure guidelines acceptable to the originator. Generally, the appraisal procedure guidelines require the appraiser or an agent on its behalf to inspect the property personally and verify whether the property is in good condition and that, if new, construction has been substantially completed. The appraisal generally will be based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

***Omitted Information***:  GSMC had inadequate procedures in place to ensure that appropriate appraisals were performed permitting loans to be funded where the loan to value was excessive for the borrowers. GSMC has been accused by the City of Cleveland of routinely making loans to borrowers who had no ability to pay them back.

### GreenPoint Mortgage Funding, Inc.

45.    The Registration Statement and Prospectus Supplements omitted material facts about the underwriting practices of GreenPoint Mortgage Funding, Inc. ("GreenPoint"), which was an originator in the following Trusts:

| | |
|---|---|
| GSAA Home Equity Trust 2007-10 | GSAA Home Equity Trust 2007-7 |
| GSAA Home Equity Trust 2007-6 | GSAA Home Equity Trust 2007-5 |
| GSAA Home Equity Trust 2007-4 | GSAA Home Equity Trust 2007-3 |

46.    For example, the Prospectus Supplement, dated March 27, 2007, for GSAA Home Equity Trust 2007-4, stated:

(a)    Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Exceptions to the guidelines are permitted where compensating factors are present.

***Omitted Information***: Exceptions to guidelines were granted in many circumstances – not just where compensating factors existed. The exceptions were granted when the borrower could not qualify. Many of the loans were granted by the over 18,000 brokers that were approved to transact with GreenPoint – a large enough number that GreenPoint could not exercise any degree of realistic control. Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved.

> (b)    GreenPoint acquires or originates many mortgage loans under "limited documentation" or "no documentation" programs. Under limited documentation programs, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower, than on verified income of the borrower. Mortgage loans underwritten under this type of program are generally limited to borrowers with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion, and certain credit underwriting documentation concerning income or income verification and/or employment verification is waived. Mortgage loans originated and acquired with limited documentation programs include cash-out refinance loans, super-jumbo mortgage loans and mortgage loans secured by investor-owned properties. Permitted maximum loan-to-value ratios (including secondary financing) under limited documentation programs are generally more restrictive than mortgage loans originated with full documentation requirements. Under no documentation programs, income ratios for the prospective borrower are not calculated. Emphasis is placed on the value and adequacy of the mortgaged property as collateral and the credit history of the prospective borrower, rather than on verified income and assets of the borrower.

***Omitted Information***: These deficiencies in income documentation made accurate and reliable appraisals essential since so much emphasis was placed on the value of the mortgaged property. However, appraisers were in fact pressured to appraise to certain levels. Appraisers knew if they appraised under certain levels they would not be hired again. Thus, the appraisals were inherently unreliable and there was little to support the value and adequacy of the mortgaged property.

> (c)    In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing. All appraisals are required to conform [to] the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. The requirements of Fannie Mae and Freddie Mac require, among other things,

that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property is in a good condition and verify that construction, if new, has been substantially completed. The appraisal generally will have been based on prices obtained on recent sales of comparable properties determined in accordance with Fannie Mae and Freddie Mac guidelines. In certain cases, an analysis based on income generated by the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property may be used.

***Omitted Information***: The documents failed to describe GreenPoint's practice of allowing its staff or outside brokers to push appraisal values, which distorted the loan-to-value ratios referred to in the Prospectus Supplement.

     (d)     As part of its evaluation of potential borrowers, GreenPoint generally requires a description of the borrower's income. If required by its underwriting guidelines, GreenPoint obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Employment verification may be obtained through analysis of the prospective borrower's recent pay stubs and/or W-2 forms for the most recent two years or relevant portions of the borrower's most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the borrower's length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

***Omitted Information***: GreenPoint did not verify the income of borrowers as represented but had a reputation in the industry for cutting corners on underwriting. Many of GreenPoint's Alt-A loans were actually subprime loans, an innovation later copied by others. GreenPoint was very liberal with terms, even to borrowers with low credit scores. As a result of GreenPoint's poor underwriting practices, GreenPoint's parent, Capital One, recently took an $860 million charge.

## SouthStar Funding LLC

47.     The Registration Statement and Prospectus Supplements contained false statements about the underwriting practices of SouthStar Funding LLC ("SouthStar"), a key originator for the GSAMP Trust 2007-HE1.

48.     The GSAMP Trust 2007-HE1 Prospectus Supplement, dated February 22, 2007, stated:

- 24 -

SouthStar's guidelines are intended to evaluate the borrower's ability to repay the mortgage loan, evaluate the borrower's credit and evaluate the value and adequacy of the collateral. SouthStar does not approve mortgage loans based solely on the value of the collateral.

Underwriters are required to approve mortgage loans based on the applicable guidelines. Underwriters may on a case by case basis, based on compensating factors, approve mortgage loans that do not strictly comply with the guidelines. In all instances, the borrowers must show the ability to repay the mortgage loan, have acceptable credit, and acceptable collateral.

*Omitted Information*:  In fact, SouthStar was one of the riskiest lenders in the business.  In late 2007, SMR Research published a 250-page study comparing the 163 largest U.S. mortgage lenders against a national average of 1,000 for risky practices.  Lenders with higher scores were more risky. Lenders with scores above 1,750 did not survive.  SouthStar was deemed the riskiest of all companies reviewed with a score of 2,704.  SouthStar permitted borrowers with credit scores as low as 540 to get 100% loan-to-value mortgages.

### SunTrust Mortgage, Inc.

49.     The Registration Statement and Prospectus Supplements contained false statements about the underwriting practices of SunTrust Mortgage, Inc. ("SunTrust"), a key originator in the following Trusts:

> GSR Mortgage Loan Trust 2007-5F
> STARM Mortgage Loan Trust 2007-4
> GSR Mortgage Loan Trust 2007-4F

50.     With respect to the STARM Mortgage Loan Trust 2007-4 Prospectus Supplement, dated September 21, 2007, which originated or acquired all of the mortgage loans that were to be sold, the Prospectus Supplement represented:

SunTrust underwriting guidelines are designed to evaluate the borrower's capacity to repay the loan, to evaluate the credit history of the borrower, to verify the availability of funds required for closing and cash reserves for fully documented loans, and to evaluate the acceptability and marketability of the property to be used as collateral. SunTrust may consider a loan to have met underwriting guidelines

- 25 -

where specific criteria or documentation are not met if, upon analyzing the overall qualitative evaluation of the loan package, there are acceptable compensating factors that can be used. SunTrust also offers reduced documentation loans that eliminate the verification of income and assets or disclosure and verification of income and assets when specific underwriting criteria are met. Disclosure and verification of employment may also be waived within specific program parameters. SunTrust continuously updates and enhances its underwriting guidelines to comply with secondary market investor guidelines and to reflect changes required for new mortgage products.

***Omitted Information***: SunTrust did not limit alternative documentation situations to those where "acceptable compensating factors" existed. In fact, SunTrust's practice of granting a relatively high level of stated income and low documentation mortgage loans attracted mortgage brokers, correspondents and borrowers who were more inclined to provide misrepresentations, or "liar loans" as they were known in the industry. SunTrust contributed to the problem further by requiring only minimal data to approve new mortgage brokers and then doing little monitoring on an ongoing basis of the thousands of approved mortgage brokers and the mortgage brokers' practices for originating mortgage loans. Moreover, SunTrust emphasized speeding up the origination process and cutting costs – using technology to get more Alt-A mortgage loans approved at a faster rate. This de-emphasized the quality control and due diligence of the loan origination process. SunTrust compensated its loan officers based primarily on the volume of mortgage loans produced, which discouraged significant due diligence, which would have protected Certificate holders. SunTrust was also becoming more aggressive in granting pay-option adjustable rate mortgages ("ARMs"), which were much more likely to default.

### Wells Fargo Bank, N.A.

51.    The Registration Statement and Prospectus Supplements made false statements about the loans originated by Wells Fargo Bank, N.A. ("Wells Fargo"), which was an originator for the following Trusts:

GSAA Home Equity Trust 2007-10       GSAA Home Equity Trust 2007-7

GSAA Home Equity Trust 2007-6        GSAA Home Equity Trust 2007-5

GSR Mortgage Loan Trust 2007-3F      GSR Mortgage Loan Trust 2007-4F

52.     The Prospectus Supplement dated June 26, 2007, for GSAA Home Equity Trust

2007-7, stated in part:

> With respect to all mortgage loans underwritten by Wells Fargo Bank, Wells
> Fargo Bank's underwriting of a mortgage loan may be based on data obtained by
> parties other than Wells Fargo Bank that are involved at various stages in the
> mortgage origination or acquisition process.   This typically occurs under
> circumstances in which loans are subject to an alternative approval process, as when
> Correspondents, certain mortgage brokers or similar entities that have been approved
> by Wells Fargo Bank to process loans on its behalf, or independent contractors hired
> by Wells Fargo Bank to perform underwriting services on its behalf ("CONTRACT
> UNDERWRITERS") make initial determinations as to the consistency of loans with
> Wells Fargo Bank underwriting guidelines. Wells Fargo Bank may also permit these
> third parties to utilize scoring systems in connection with their underwriting process.
> The underwriting of mortgage loans acquired by Wells Fargo Bank pursuant to a
> Delegated Underwriting arrangement with a Correspondent is not reviewed prior to
> acquisition of the mortgage loan by Wells Fargo Bank although the mortgage loan
> file is reviewed by Wells Fargo Bank to confirm that certain documents are included
> in the file.  In addition, in order to be eligible to sell mortgage loans to Wells Fargo
> Bank pursuant to a Delegated Underwriting arrangement, the originator must meet
> certain requirements including, among other things, certain quality, operational and
> financial guidelines.

***Omitted Information***:  In fact, Wells Fargo did not attempt to confirm the standards actually used by

mortgage brokers, correspondents and other third parties from which Wells Fargo acquired

mortgages.  These third parties were able to engage in serious underwriting deficiencies without

review or correction by Wells Fargo.  Wells Fargo has subsequently attributed much of its $1.3

billion mortgage-related write-down to loans it held which were originated by third parties.

### GMAC Mortgage, LLC

53.     The Registration Statement and Prospectus Supplements made false statements about

loans originated by GMAC Mortgage, LLC ("GMACM"), a component of Res Cap and an affiliate

of GMAC Residential Funding ("GMAC-RFC"), which was an originator for the GSR Mortgage

Loan Trust 2007-4F, dated June 27, 2007:

     (a)     All mortgage loans that GMAC Mortgage, LLC originates and most of the mortgage loans that GMAC Mortgage, LLC purchases are subject to its underwriting guidelines and loan origination standards. When originating mortgage loans directly through retail branches or by internet or telephone, or indirectly through mortgage brokers, GMAC Mortgage, LLC follows established lending policies and procedures that require consideration of a variety of factors, including:

     o   the borrower's capacity to repay the loan;

     o   the borrower's credit history;

     o   the relative size and characteristics of the proposed loan; and

     o   the amount of equity in the borrower's property (as measured by the borrower's loan-to-value ratio).

     GMAC Mortgage, LLC's underwriting standards have been designed to produce loans that meet the credit needs and profiles of GMAC Mortgage, LLC borrowers, thereby creating more consistent performance characteristics for investors in GMAC Mortgage, LLC's loans. When purchasing mortgage loans from correspondent lenders, GMAC Mortgage, LLC either re-underwrites the loan prior to purchase or delegates underwriting responsibility to the correspondent lender originating the mortgage loan.

***Omitted Information***:  GMACM was extremely aggressive in granting loans and in accepting loans

from correspondent lenders even where borrowers did not show an ability to pay the mortgage loan

once the initial teaser rate ended.  Ultimately, this aggressiveness resulted in GMAC and GMAC-

RFC having the highest foreclosure rate (17.01%) by 2008 among the top-10 2005 subprime issuers.

     (b)     The underwriting standards set forth in the GMAC Mortgage, LLC underwriting guidelines may be varied for certain refinance transactions, including "limited documentation" or "reduced documentation" mortgage loan refinances. Limited or reduced documentation refinances, including the programs "Streamline" and "Express," generally permit fewer supporting documents to be obtained or waive income, appraisal, asset, credit score and employment documentation requirements. Limited or reduced documentation refinances generally compensate for increased credit risk by placing greater emphasis on the borrower's payment history. Generally, in order to be eligible for a limited or reduced documentation refinance, the borrower must be an existing customer of GMAC Mortgage, LLC, have a good credit history and the mortgage loan must demonstrate other compensating factors, such as a

- 28 -

relatively low loan-to-value ratio, stable employment or other favorable underwriting factors.

***Omitted Information***:  In many respects, these reduced documentation programs were abused to place borrowers in mortgage loans they could not afford.  These practices would eventually result in problems with GMAC mortgages.  Ultimately, GMAC's Res Cap division would have to "sharply" reduce its non-prime origination volume due to problems it experienced with these mortgage loans.

## DISCLOSURES EMERGE ABOUT PROBLEMS WITH
## LOANS UNDERLYING THE CERTIFICATES

54.     On January 9, 2008, Moody's Investors Service announced it had taken negative action on many of the Certificates.

55.     On January 30, 2008, Standard & Poor's also announced it was considering slashing its ratings on more than $500 billion of investments tied to bad mortgage loans, including those at issue here.

56.     By October 2008, the rating agencies had downgraded classes of many of these trusts and had put many others on negative watch.

57.     These downgrades have occurred because the original ratings did not accurately reflect the risk associated with the assets underlying the Certificates.  The delinquency rates on the underlying mortgage loans have skyrocketed, with some mortgage pool 60-day delinquency rates (including foreclosures, 60+ day delinquencies and real estate owned) totaling more than 30% of the underlying mortgage pools.  The massive foreclosure rate and extraordinary delinquencies have further confirmed defendants' misrepresentations concerning the lending practices detailed above.

## COUNT I

### Violations of §11 of the 1933 Act Against
### All Defendants Except GS Mortgage and GSMC

58.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

59.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except GS Mortgage and GSMC.

60.     The Registration Statement for the Certificate offerings was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

61.     Each of the Defendant Issuers listed in ¶13 are strictly liable to plaintiff and the Class for the misstatements and omissions complained of herein.

62.     Defendant Goldman Sachs was an underwriter of the offerings and failed to perform adequate due diligence thereby permitting the false and misleading statements included in the Registration Statement to be disseminated.

63.     The Individual Defendants signed the Registration Statement which was false due to the misstatements described above.

64.     None of these defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were not false and misleading or did not omit material facts that rendered statements made therein not false and misleading.

65.     By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, §11 of the 1933 Act.

66.     Plaintiff acquired the Certificates pursuant and/or traceable to the Registration Statement.

67.     Plaintiff and the Class have sustained damages as the value of the Certificates has declined substantially subsequent to the disclosures of defendants' misconduct.

68.     At the time of their purchases of the Certificates, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to early 2008. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint. Less than three years has elapsed between the time that the securities upon which this claim is brought were offered to the public and the time plaintiff filed this complaint.

## COUNT II

### Violations of §15 of the 1933 Act
### Against the Individual Defendants, GS Mortgage and GSMC

69.     Plaintiff repeats and realleges each and every allegation contained above. For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

70.     This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants, GS Mortgage and GSMC.

71.     Each of the Individual Defendants was a control person of GS Mortgage and of the Trusts by virtue of his or her position as a director and/or senior officer of GS Mortgage. The

Individual Defendants were responsible for the preparation and contents of the Registration Statement which incorporated by reference the statements in the Prospectus Supplements.

72.     Each of the Individual Defendants was a participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statement and having otherwise participated in the consummation of the offerings detailed herein.

73.     GS Mortgage was the Depositor for the offerings.  GSMC was the Sponsor for the offerings.  The defendants named herein were responsible for overseeing the formation of the Defendant Issuers as well as the operations of the Defendant Issuers, including routing payments from the borrowers to investors.

74.     GS Mortgage, GSMC and the Individual Defendant prepared, reviewed and/or caused the Registration Statement and Prospectus Supplements to be filed and disseminated.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying plaintiff as Class representative;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: _____, 2008

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

_____
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

- 33 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

NECA-IBEW HEALTH & WELFARE FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., et al., No. 08-cv-10446 (D. Mass.)*

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

GOLDMAN SACHS

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this *10th* day of *December*, 2008.

NECA-IBEW HEALTH & WELFARE FUND

By: _____

Its: *ADMINISTRATOR*

- 2 -

GOLDMAN SACHS

08 CV 10783

JS 44C/SDNY
REV. 1/2008

**CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of
pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the
Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of
initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| NECA-IBEW HEALTH & WELFARE FUND, Individually and On Behalf of All Others Similarly Situated, | GOLDMAN, SACHS & CO., GOLDMAN SACHS MORTGAGE COMPANY, et al. Please see attached Schedule A for additional defendants |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Coughlin Stoia Geller Rudman & Robbins, 58 So. Service Road, Suite 200, Melville, NY 11747 (631) 367-7100 | DEC 11 2008 |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

The claims alleged herein arise under §§11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o.

Has this or a similar case been previously filed in SDNY at any time? No? [✓] Yes? [ ] Judge Previously Assigned _____

If yes, was this case Vol.[ ] Invol. [ ] Dismissed. No[ ] Yes [ ] If yes, give date _____ & Case No. _____

*(PLACE AN [x] IN ONE BOX ONLY)*        NATURE OF SUIT

**TORTS**                                                        **ACTIONS UNDER STATUTES**

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | [ ] 362 PERSONAL INJURY - MED MALPRACTICE | [ ] 610 AGRICULTURE | [ ] 422 APPEAL 28 USC 158 | [ ] 400 STATE REAPPORTIONMENT |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT LIABILITY | | [ ] 620 OTHER FOOD & DRUG | [ ] 423 WITHDRAWAL 28 USC 157 | [ ] 410 ANTITRUST |
| [ ] 130 MILLER ACT | [ ] 320 ASSAULT, LIBEL & SLANDER | [ ] 365 PERSONAL INJURY PRODUCT LIABILITY | [ ] 625 DRUG RELATED SEIZURE OF | | [ ] 430 BANKS & BANKING |
| [ ] 140 NEGOTIABLE INSTRUMENT | | [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY | PROPERTY 21 USC 881 | **PROPERTY RIGHTS** | [ ] 450 COMMERCE |
| [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT | [ ] 330 FEDERAL EMPLOYERS' LIABILITY | | [ ] 630 LIQUOR LAWS | [ ] 820 COPYRIGHTS | [ ] 460 DEPORTATION |
| | [ ] 340 MARINE | **PERSONAL PROPERTY** | [ ] 640 RR & TRUCK | [ ] 830 PATENT | [ ] 470 RACKETEER INFLUENCED & CORRUPT ORGANIZATION ACT (RICO) |
| [ ] 151 MEDICARE ACT | [ ] 345 MARINE PRODUCT LIABILITY | [ ] 370 OTHER FRAUD | [ ] 650 AIRLINE REGS | [ ] 840 TRADEMARK | |
| [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS) | [ ] 350 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING | [ ] 660 OCCUPATIONAL SAFETY/HEALTH | | [ ] 480 CONSUMER CREDIT |
| | [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY | [ ] 380 OTHER PERSONAL PROPERTY DAMAGE | [ ] 690 OTHER | **SOCIAL SECURITY** | [ ] 490 CABLE/SATELLITE TV |
| [ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS | [ ] 360 OTHER PERSONAL INJURY | [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY | | [ ] 861 HIA (1395ff) | [ ] 810 SELECTIVE SERVICE |
| | | | **LABOR** | [ ] 862 BLACK LUNG (923) | k] 850 SECURITIES/ COMMODITIES/ EXCHANGE |
| [ ] 160 STOCKHOLDERS SUITS | | | [ ] 710 FAIR LABOR STANDARDS ACT | [ ] 863 DIWC/DIWW (405(g)) | [ ] 875 CUSTOMER CHALLENGE 12 USC 3410 |
| [ ] 190 OTHER CONTRACT | | | [ ] 720 LABOR/MGMT RELATIONS | [ ] 864 SSID TITLE XVI | |
| [ ] 195 CONTRACT PRODUCT LIABILITY | | | [ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT | [ ] 865 RSI (405(g)) | [ ] 890 OTHER STATUTORY ACTIONS |
| [ ] 196 FRANCHISE | **ACTIONS UNDER STATUTES** | | [ ] 740 RAILWAY LABOR ACT | **FEDERAL TAX SUITS** | [ ] 891 AGRICULTURAL ACTS |
| | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790 OTHER LABOR LITIGATION | [ ] 870 TAXES (U.S. Plaintiff or Defendant) | [ ] 892 ECONOMIC STABILIZATION ACT |
| | [ ] 441 VOTING | [ ] 510 MOTIONS TO VACATE SENTENCE 20 USC 2255 | [ ] 791 EMPL RET INC SECURITY ACT | [ ] 871 IRS-THIRD PARTY 26 USC 7609 | [ ] 893 ENVIRONMENTAL MATTERS |
| **REAL PROPERTY** | [ ] 442 EMPLOYMENT | | | | [ ] 894 ENERGY ALLOCATION ACT |
| [ ] 210 LAND CONDEMNATION | [ ] 443 HOUSING/ ACCOMMODATIONS | [ ] 530 HABEAS CORPUS | **IMMIGRATION** | | [ ] 895 FREEDOM OF INFORMATION ACT |
| [ ] 220 FORECLOSURE | [ ] 444 WELFARE | [ ] 535 DEATH PENALTY | | | [ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE |
| [ ] 230 RENT LEASE & EJECTMENT | [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT | [ ] 540 MANDAMUS & OTHER | [ ] 462 NATURALIZATION APPLICATION | | |
| [ ] 240 TORTS TO LAND | [ ] 446 AMERICANS WITH DISABILITIES -OTHER | [ ] 550 CIVIL RIGHTS | [ ] 463 HABEAS CORPUS- ALIEN DETAINEE | | [ ] 950 CONSTITUTIONALITY OF STATE STATUTES |
| [ ] 245 TORT PRODUCT LIABILITY | [ ] 440 OTHER CIVIL RIGHTS | [ ] 555 PRISON CONDITION | [ ] 465 OTHER IMMIGRATION ACTIONS | | |
| [ ] 290 ALL OTHER REAL PROPERTY | | | | | |

072186

*Check if demanded in complaint:*

[X] CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

DEMAND $_____ OTHER _____        JUDGE _____ DOCKET NUMBER_____

*Check YES only if demanded in complaint*
JURY DEMAND: [✓] YES [ ] NO        NOTE: Please submit at the time of filing an explanation of why cases are deemed related.

| *(PLACE AN x IN ONE BOX ONLY)* | | **ORIGIN** | | | | |
|---|---|---|---|---|---|---|
| ☑ 1 Original Proceeding | ☐ 2a. Removed from State Court ☐ 2b.Removed from State Court **AND** at least one party is pro se. | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from (Specify District) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judge Judgment |

| *(PLACE AN x IN ONE BOX ONLY)* | **BASIS OF JURISDICTION** | | *IF DIVERSITY, INDICATE CITIZENSHIP BELOW.* |
|---|---|---|---|
| ☐ 1 U.S. PLAINTIFF  ☐ 2 U.S. DEFENDANT | ☑ 3 FEDERAL QUESTION (U.S. NOT A PARTY) | ☐ 4 DIVERSITY | *(28 USC 1322, 1441)* |

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF | DEF | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ]1 | [ ]1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ]3 | [ ]3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ]5 | [ ]5 |
| CITIZEN OF ANOTHER STATE | [ ]2 | [ ]2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ]4 | [ ]4 | FOREIGN NATION | [ ]6 | [ ]6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

        2120 Hubbard Drive
        Decatur, IL 62526
        (Macon County)

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

        Please see attached schedule A for defendants' addresses

DEFENDANT(S) ADDRESS UNKNOWN
    REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

| Check one: | THIS ACTION SHOULD BE ASSIGNED TO: (DO NOT check either box if this a PRISONER PETITION.) | ☐ WHITE PLAINS | ☑ MANHATTAN |
|---|---|---|---|

| DATE 12/11/08  SIGNATURE OF ATTORNEY OF RECORD | ADMITTED TO PRACTICE IN THIS DISTRICT |
|---|---|
| RECEIPT # | [ ] NO [X] YES (DATE ADMITTED Mo. 05  Yr. 1995 ) Attorney Bar Code # SR7957 |

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

J. Michael McMahon, Clerk of Court by _____ GORENSTEIN _____ Deputy Clerk DATE.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

Schedule A

Goldman, Sachs & Co.
85 Broad Street
New York, NY 10004
(New York City)

Goldman Sachs Mortgage Company
1 New York Plaza, 37th Floor General Counsel
New York, NY 10004
(New York City)

GS Mortgage Securities Corp.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

GSAA HOME EQUITY TRUST 2007-3
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

GSAA HOME EQUITY TRUST 2007-4
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

GSAMP TRUST 2007-HE2
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

GSAMP TRUST 2007-FM2
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

GSAA HOME EQUITY TRUST 2007-5
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

GSAA HOME EQUITY TRUST 2007-6
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

gsaa HOME equity trust 2007-7
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

gsaa home equity trust 2007-8
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

GSR MORTGAGE LOAN TRUST 2007-OA1
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

GSR MORTGAGE LOAN TRUST 2007-4f
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

gsamp trust 2007-hsbc1
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

gsamp trust 2007-he1
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

starm mortgage loan trust 2007-4
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

gsaa home equity trust 2007-10
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

gsr mortgage loan trust 2007-5F
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

gsr mortgage loan trust 2007-3f
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

gsr mortgage loan trust 2007-oa2
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801
(New York City)

Daniel L. Sparks
94 Parade Hill Lane
New Canaan, CT 06840
(Fairfield County)

Michelle Gill
2025 Broadway, Apt. 18D
New York, NY 10002
(New York City)

Kevin Gasvoda
21 Birch Road
Darien, CT 06820
(Fairfield County)