**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
NECA-IBEW HEALTH & WELFARE :
FUND, Individually and on Behalf of All : Case No. 08-CV-10783 (MGC)
Others Similarly Situated, :
 :
     Plaintiff, : **(Dispositive Motion)**
 v. :
 :
GOLDMAN, SACHS & CO., *et al.*, :
 :
     Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Richard H. Klapper
Michael T. Tomaino, Jr.
Patrice A. Rouse
Harsh N. Trivedi
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants Goldman,*
*Sachs & Co., Goldman Sachs*
*Mortgage Company, GS Mortgage*
*Securities Corp., Kevin Gasvoda,*
*Michelle Gill and Daniel L. Sparks*

December 11, 2009

## **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................1

ALLEGATIONS OF THE SECOND AMENDED COMPLAINT................................6

    A.    The Parties and Claims ................................................................6

    B.    The Certificates Plaintiff Purchased ........................................7

    C.    Alleged Misrepresentations in the Offering Documents ........9

STANDARD ON THIS MOTION .............................................................................10

ARGUMENT ..........................................................................................................11

I.      PLAINTIFF LACKS STANDING TO SUE ..................................................11

    A.    Plaintiff Lacks Standing to Assert
          Section 11 Claims as to Securities Offered
          by All But GSAA 2007-5 and GSAA 2007-10 ......................11

    B.    Plaintiff Lacks Standing to Assert
          Section 12(a)(2) Claims Even as to the
          GSAA 2007-5 and GSAA 2007-10 Certificates That It Purchased ......................16

II.    PLAINTIFF DOES NOT PLEAD
        ANY COGNIZABLE ECONOMIC LOSS ....................................................17

III.   THE SECOND AMENDED COMPLAINT DOES NOT
        PLEAD ANY ACTIONABLE MISREPRESENTATIONS ............................20

    A.    The Offering Documents Disclosed
          All Information Plaintiff Alleges Was Required ....................23

          1.    The Offering Documents Disclosed
                 the Originators' Lending Practices ............................23

          2.    The Offering Documents Disclosed
                 the Involvement of Independent
                 Mortgage Brokers and Appraisers ............................25

          3.    The Offering Documents Disclosed
                 the Calculation of Loan-to-Value Ratios ..................26

4.      The Offering Documents Did Not Make Any
        Misrepresentations About Borrowers' Loan Documents .........................27

5.      The Offering Documents Disclosed
        the Certificates' Ratings ............................................................................29

B.      Plaintiff Does Not Adequately Allege
        Materiality or Violation of Any Duty to Disclose ..................................30

IV.     PLAINTIFF'S CLAIMS ARE TIME BARRED................................................34

V.      PLAINTIFF HAS FAILED TO PLEAD A SECTION 15 CLAIM .................................38

CONCLUSION....................................................................................................................39

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft* v. *Iqbal*,
No. 07-CV-1015, 2009 WL 1361536 (U.S. May 18, 2009) ....................................................10

*Basic, Inc.* v. *Levinson*,
485 U.S. 224 (1988)..........................................................................................................21, 30

*Bell Atlantic Corp.* v. *Twombly*,
550 U.S. 544 (2007)..................................................................................................................10

*Conopco, Inc.* v. *Roll Int'l*,
231 F.3d 82 (2d Cir. 2000)........................................................................................................10

*DeBenedictis* v. *Merrill Lynch & Co.*,
492 F.3d 209 (3d Cir. 2007)......................................................................................................38

*DeMaria* v. *Andersen*,
318 F.3d 170 (2d Cir. 2003)......................................................................................................15

*Dodds* v. *Cigna Sec., Inc.*,
12 F.3d 346 (2d Cir. 1993)........................................................................................................34

*Donovan* v. *Am. Skandia Life Assurance Corp.*,
No. 02-CV-9859, 2003 WL 21757260 (S.D.N.Y. July 31, 2003)............................................26

*ECA & Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)......................................................................................................31

*First Nationwide Bank* v. *Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994)..................................................................................................19, 31

*Fishbury, Ltd.* v. *Connectics Corp.*,
No. 06-CV-11496, 2006 WL 3711566 (S.D.N.Y. Dec. 14, 2006) ..........................................12

*Garber* v. *Legg Mason, Inc.*,
537 F. Supp. 2d 597 (S.D.N.Y. 2008)..........................................................................10, 31, 33

*Gustafson* v. *Alloyd Co.*,
513 U.S. 561 (1995)..................................................................................................................16

*GVA Mkt. Neutral Master, Ltd.* v. *Veras Capital Partners Offshore Fund, Ltd.*,
580 F. Supp. 2d 321 (S.D.N.Y. 2008)......................................................................................38

*Herman & MacLean* v. *Huddleston*,
5459 U.S. 375 (1983)................................................................................................................12

*Hoffman* v. *UBS-AG*,
    591 F. Supp. 2d 522 (S.D.N.Y. 2008)....................................................................13

*In re Alstom SA Sec. Litig.*,
    406 F. Supp. 2d 402 (S.D.N.Y. 2005)............................................................34, 25

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004)......................................................10, 11, 20

*In re Broderbund/Learning Co. Sec. Litig.*,
    294 F.3d 1201 (9th Cir. 2002) ...........................................................................20

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...........................................................15, 22

*In re Dynex Capital, Inc. Sec. Litig.* ("*Dynex I*"),
    No. 05-CV-1897, 2006 WL 314524 (S.D.N.Y. Feb. 10, 2006).............................15

*In re Dynex Capital, Inc. Sec. Litig.* ("*Dynex II*"),
    No. 05-CV-1897, 2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009)........................15, 22

*In re Flag Telcom. Holdings, Ltd. Sec. Litig.*,
    308 F. Supp. 2d 249 (S.D.N.Y. 2004)................................................................21

*In re First Union Corp. Sec. Litig.*,
    128 F. Supp. 2d 871 (W.D.N.C. 2001) .............................................................20

*In re Fuwei Films Sec. Litig.*,
    634 F. Supp. 2d 419, 445 (S.D.N.Y. 2009).........................................................15

*In re Initial Public Offering Sec. Litig.*,
    544 F. Supp. 2d 277 (S.D.N.Y. 2008)............................................................17, 34

*In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*,
    850 F. Supp. 1105 (S.D.N.Y. 1993)...............................................................10, 36

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001)................................................................16

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003)......................................................16, 18, 33

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    273 F. Supp. 2d 351 (S.D.N.Y. 2003)................................................................31

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
    No. 02-CV-6153, 2009 WL 256005 (S.D.N.Y. Feb. 2, 2009)..............................32

*In re N2K, Inc. Sec. Litig.*,
    82 F. Supp. 2d 204 (S.D.N.Y. 1999)............................................................32

*In re Openwave Sys. Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007)..................................................... 34-35

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
    441 F. Supp. 2d 579 (S.D.N.Y. 2006)..................................................... 12, 14-15

*In re Starter Corp. Sec. Litig.*,
    No. 02-CV-0718, 1996 WL 406624 (S.D.N.Y. July 19, 1996)........................ 10-11

*In re Ultrafem Inc. Sec. Litig.*,
    91 F. Supp. 2d 678 (S.D.N.Y. 2000)............................................................17

*Ingrassia* v. *County of Sullivan*,
    262 F. Supp. 2d 116 (S.D.N.Y. 2003)........................................................1, 37

*Jackson Nat'l Life Co.* v. *Ligator*,
    949 F. Supp. 200 (S.D.N.Y. 1996)............................................................20

*Korwek* v. *Hunt*,
    646 F. Supp. 953 (S.D.N.Y. 1986)..........................................................35, 38

*La. Mun. Police Employees Ret. Sys.* v. *Merrill Lynch & Co., Inc.*,
    No. 08-CV-9063 (S.D.N.Y., Rakoff, J.)
    (hearing transcript, dated Feb. 17, 2009) ...............................................15

*Luminent Mortg. Cap., Inc.* v. *Merrill Lynch & Co.*,
    No. 07-CV-5423, 2009 WL 2590087 (E.D. Pa. Aug. 20, 2009) ........................19

*Olkey* v. *Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996)........................................................................23

*Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008)................................................10, 21, 29, 30

*Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*,
    No. 09-CV-10446, 2009 WL 3149775 (D. Mass. Sept. 30, 2009) ................ *passim*

*Resnick* v. *Swartz*,
    303 F.3d 147 (2d Cir. 2002)....................................................................33

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004)....................................................................38

*Saslaw* v. *Askari*,
    No. 95-CV-7641, 1997 WL 221208 (S.D.N.Y. Apr. 25, 1997) ............................16

*Simon* v. *E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ................................................................................12, 13

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008) ..........................................................................15

*Weinberg* v. *Atlas Air Worldwide Holdings, Inc.*,
    216 F.R.D. 248 (S.D.N.Y. 2003) ....................................................................12

*Wielgos* v. *Commonwealth Edison Co.*,
    892 F.2d 509 (7th Cir. 1989) .....................................................................31-32

## STATUTES AND RULES

Section 11 of the Securities Act of 1933,
    15 U.S.C. § 77k ............................................................................................12, 17

Section 12(a)(2) of the Securities Act of 1933,
    15 U.S.C. § 77l (a)(2) ........................................................................................17

Section 13 of the Securities Act of 1933,
    15 U.S.C. § 77m .................................................................................................34

Securities Act, Item 512 of Regulation SK
    17 C.F.R. § 229.512 ......................................................................................13, 15

Securities Act, Item 1101 of Regulation AB
    17 C.F.R. § 229.1101(l) ......................................................................................12

Securities Act, Item 1111 of Regulation AB
    17 C.F.R. § 229.1111(a)(3) .................................................................................33

Securities Act Rule 405
    17 C.F.R. § 230.405 ............................................................................................38

Securities Act Rule 415
    17 C.F.R. § 230.415 ............................................................................................13

Securities Act Rule 430
    17 C.F.R. § 230.430B ..........................................................................................13

Securities Act, Rule 436
    17 C.F.R. § 230.436 ............................................................................................30

**OTHER AUTHORITIES**

*Delayed or Continuous Offering and Sale of Securities*,
    Securities Act Release No. 33-6423, 47 Fed. Reg. 39,799 (Sept. 2, 1982) ............................13

*Disclosures of Security Ratings in Registration Statements*,
    SEC Release No. 33-6336, 46 Fed. Reg. 42024 (Aug. 18, 1981)...........................................30

*Asset-Backed Securities*, Securities Act Release No. 8518,
    Exchange Act Release No. 50, 905, 70 Fed. Reg. 1506 (Jan. 7, 2005) .................12, 19, 20, 32

*Securities Offering Reform*,
    Securities Act Release No. 33-8591, 70 Fed. Reg. 44 (July 19, 2005)...................................13

Defendants Goldman, Sachs & Co. ("Goldman Sachs"), Goldman Sachs Mortgage Company ("GSMC"), GS Mortgage Securities Corp. ("GS Mortgage"), Kevin Gasvoda, Michelle Gill and Daniel L. Sparks (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the November 9, 2009 second amended complaint ("SAC") filed by plaintiff NECA-IBEW Health & Welfare Fund ("Plaintiff"), pursuant to FED. R. CIV. P. 12(b)(1), for lack of standing, and 12(b)(6), for failure to state a claim and as barred by the statute of limitations.

## PRELIMINARY STATEMENT

On September 17, 2009, this Court dismissed the amended complaint in this putative securities class action challenging seventeen separate offerings of mortgage-backed securities because (among other things) it did not adequately identify the specific alleged misrepresentations that formed the basis for Plaintiff's claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "1933 Act"). (Trivedi Decl., Ex. T (9/17/09 Transcript) at pp. 29, 38.)[1]  Indeed, the Court observed that the amended complaint was "far, far from a short concise statement of the plaintiff's grievance," and that "it is very hard to find a specific basis on which the suit is brought and it is very hard to determine when what was known was known." (*Id.* at p. 38.) The Court granted Plaintiff "leave to file [a second] amended complaint that is clearer and more specific than the current one." (*Id.*) At the same time, the Court invited briefing on the threshold issue of Plaintiff's standing to maintain these claims, given that Plaintiff did not

---

[1]    Cites to "Trivedi Decl." are to the accompanying Declaration of Harsh N. Trivedi, which attaches decisions and transcripts from recent cases, the offering documents with respect to the certificates that Plaintiff purchased (in excerpted form, where noted, to eliminate unnecessary volume), documents referred to in the SAC and publicly available materials concerning the subprime mortgage industry.  It is well established that in ruling on a motion to dismiss, the Court may also consider "documents attached to the Complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in the plaintiff's possession or of which the plaintiff had knowledge and relied on in bringing suit."  *Ingrassia* v. *County of Sullivan*, 262 F. Supp. 2d 116, 119 (S.D.N.Y. 2003).

purchase securities in most of the offerings at issue and proffered nothing showing that it purchased any securities from Defendants.  (*See* Docket Entry ("D.E.") ## 68, 69.)

The SAC does not cure the deficiencies that led this Court to dismiss Plaintiff's prior pleading.  While shorter than Plaintiff's prior complaint, the SAC still does little more than parrot allegations from dozens of similar putative class actions that have been brought against issuers and underwriters of mortgage-backed securities, based on supposed systemic problems associated with the subprime mortgage industry.  Indeed, although the SAC continues to challenge the disclosures relating to seventeen offerings of mortgage pass-through certificates backed by pools of loans originated by companies that are not affiliated with Defendants, it still fails to identify any actionable misrepresentations from the offering documents or provide any specifics about the *actual* loans underlying any of the *actual* certificates at issue here.  The result is another complaint that essentially blames Defendants for failing to predict the global housing and economic meltdown and the downturn's impact on these inherently risky pass-through securities.

This Court is not alone in rejecting generic allegations of systemic problems in the subprime mortgage industry as a basis for attacking specific offerings.  Two weeks after this Court did so, another federal court dismissed (with prejudice) a similar mortgage-backed securities suit brought by the same Plaintiff here (and others) against Goldman Sachs and other defendants.  *Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, No. 08-CV-10446, 2009 WL 3149775 (D. Mass. Sept. 30, 2009).  (Trivedi Decl., Ex. V.)  The Court should now dismiss the SAC, this time with prejudice, for several reasons.

*First*, as a threshold matter, Plaintiff continues to challenge seventeen different offerings of certificates issued by seventeen different trusts, even though Plaintiff claims to have purchased certificates issued by *only two* of those trusts:  GSAA Home Equity Trust 2007-5

("GSAA 2007-5") and GSAA Home Equity Trust 2007-10 ("GSAA 2007-10"). During the September 17, 2009 argument on Defendants' motion to dismiss Plaintiff's prior complaint, this Court properly focused on the GSAA 2007-5 and GSAA 2007-10 certificates that Plaintiff bought, observing that "you have to stay with the trusts that plaintiff bought . . . . I only care about what the plaintiff bought at the moment." (Trivedi Decl., Ex. T at p. 15.) As Defendants' supplemental standing brief demonstrated (D.E. # 69), a plaintiff lacks standing to assert claims under Section 11 or 12(a)(2) with respect to securities it did not buy; Plaintiff's claims based on the fifteen trusts from which it did not purchase certificates should be dismissed on that basis alone.

       Moreover, Plaintiff lacks standing to assert a Section 12(a)(2) claim as to all of the offerings, including the offerings of the two certificates that it allegedly purchased. When this Court granted Plaintiff leave to replead, it specifically instructed Plaintiff to identify "whom [it] bought [its certificates] from." (Trivedi Decl., Ex. T at p. 40.) The SAC, however, fails to identify from whom Plaintiff bought its GSAA 2007-5 certificates, and although it now baldly alleges (for the first time) that "Plaintiff purchased its Certificates for the GSAA Home Equity Trust 2007-10 directly from Goldman Sachs" (SAC ¶ 111), neither the SAC nor the certification Plaintiff filed with its initial complaint provides any facts to support this wholly conclusory assertion. Plaintiff therefore has not adequately established standing. Further, Plaintiff again fails to allege that it purchased its certificates *in* the initial public offering, which is a separate requirement for bringing a Section 12(a)(2) claim.

       *Second*, Plaintiff still fails to plead a cognizable economic loss, an essential element of its Section 11 and 12(a)(2) claims. Plaintiff has not even attempted to cure this deficiency in its prior pleading. The relevant offering documents clearly disclosed that the certificates entitle holders to pass-through principal and interest payments from pools of non-traditional mortgage

loans originated under programs that required limited or no documentation of the borrowers' income, assets or employment. Yet Plaintiff has never alleged that there has been a single missed or late payment, let alone a default, on any of these certificates, or that certificateholders have failed to receive any pass-through payments.

*Third*, the SAC still does not identify any actionable misstatement or omission. Much of the SAC simply repeats Plaintiff's previously dismissed assertions that the offering documents understated the risk of borrower default — and hence diminished pass-through payments — by failing to describe accurately the originators' underwriting guidelines for the inherently risky subprime loans held by the trusts and the methods employed by the third party agencies that rated the certificates. Like the prior amended complaint, however, the SAC ignores that the offering documents provided thousands of pages of detail about the actual underlying loans, including that they were riskier because they were not underwritten to the same standards as traditional mortgage loans. No reasonable investor could have mistaken the subprime nature of the loans or their likely performance in a dramatic housing downturn.

Unable to identify any actionable misrepresentations in the operative disclosure documents (namely, the GSAA 2007-5 and GSAA 2007-10 prospectus supplements), Plaintiff now alleges — contrary to its assurances at the argument on the original motion to dismiss — that the underlying shelf registration statement itself contained misrepresentations in its general descriptions of securitization processes. These newly-minted allegations, however, concern disclosures that were far too generic and untethered to the actual offerings to be material to investors (as compared to the actual detail in the later-filed prospectus supplements), and are demonstrably unfounded in all events.

Further, the SAC does not allege any facts tied to the *actual* loans or certificates at issue here, one of the deficiencies that caused this Court to dismiss Plaintiff's prior pleading. Instead, the SAC continues to borrow generalized allegations from other mortgage-backed securities lawsuits, which in turn collected snippets from various public reports criticizing mortgage originators and rating agencies.  Although Plaintiff now alleges that it has undertaken an "investigation" by interviewing, among others, "at least one of the [D]efendants" (SAC ¶ 25), the SAC does not identify the interviewees or what they said, and instead relies on the same secondary sources Plaintiff cited in its prior pleading.  As the *Plumbers' Union* court held, such allegations "untied" to the securitizations and loans at issue here cannot support Plaintiff's assertion that the alleged industry-wide practices must have been employed here.  *Plumbers' Union*, 2009 WL 3149775 at *5 n.5 ("Plaintiffs offer nothing in the Consolidated Amended Complaint to tie the alleged conduct to the loans at issue in this litigation.")

Moreover, even if originators deviated in undisclosed ways from their underwriting guidelines in connection with the underlying loans at issue here, SEC Regulation AB required disclosure only of *known* deviations from originators' underwriting guidelines, and Plaintiff has never alleged such knowledge by any of the Defendants — which did not originate any of the underlying loans.  To the contrary, Plaintiff continues to *expressly disclaim* any such knowledge, no doubt to avoid the heightened pleading strictures of FED. R. CIV. P. 9(b) and the Private Securities Litigation Reform Act.  (SAC ¶¶ 98, 110, 115.)

*Fourth*, the applicable statute of limitations bars Plaintiff's claims because the sea of public information — much of which Plaintiff cited in its prior pleading — makes clear that Plaintiff had at least inquiry notice of its purported claims more than one year before it filed this action. Plaintiff's tactical decision to delete much of that same information from the SAC does not change

the fact that the SAC is still based entirely on generalized public information. If that public commentary is sufficient to state a claim here, then it was also sufficient to trigger notice of the claim.

 *Finally*, Plaintiff's "control person" claim under Section 15 fails because Plaintiff has not adequately pleaded any underlying Section 11 or 12(a)(2) violation, and because Plaintiff's conclusory Section 15 allegations are insufficient to support an inference that Goldman Sachs, GSMC or the individual defendants "controlled" any of the alleged primary violators.

## ALLEGATIONS OF THE SECOND AMENDED COMPLAINT

### A. The Parties and Claims

 Despite the Court's prior observations as to standing, Plaintiff still purports to represent a putative class of investors who purchased mortgage pass-through certificates issued by seventeen separate trusts in seventeen different securities offerings, even though it allegedly purchased certificates issued by *only two* of those trusts: GSAA 2007-5 and GSAA 2007-10. (*Id.* ¶¶ 1, 9, 18.) Plaintiff also asserts the same claims as in its prior pleading: (i) a claim under Section 11 of the 1933 Act against all Defendants (*id.* ¶¶ 98-109); (ii) a claim under Section 12(a)(2) of the 1933 Act against Goldman Sachs and GS Mortgage (*id.* ¶¶ 110-14); and (iii) a claim under Section 15 of the 1933 Act against Goldman Sachs, GSMC and the three individual defendants (who are current or former officers of GS Mortgage) as "control persons" (*id.* ¶¶ 13-17, 115-20).

 Plaintiff has also not materially changed its allegations concerning the securitization process. GSMC was the sponsor of all seventeen offerings, but originated none of the underlying mortgage loans. (*See id.* ¶ 11.) Instead, GSMC purchased the loans at arm's length from third party originators, and then pooled and conveyed those loans to the depositor, GS Mortgage. (*Id.* ¶¶ 1, 11, 12, 26-28.) GS Mortgage then conveyed the loan pool to the trusts. (*Id.* ¶¶ 12, 26.) In exchange for the loan pool, the trust transferred certificates to GS Mortgage.

(*Id.* ¶¶ 26, 27.)  GS Mortgage then sold these certificates to investors through an underwriter, Goldman Sachs.  (*Id.* ¶ 10.)

## B.    The Certificates Plaintiff Purchased

The SAC's allegations about Plaintiff's investments and the offering documents are likewise substantially the same as in Plaintiff's prior complaint.  Plaintiff alleges that it purchased only GSAA 2007-5 and GSAA 2007-10 certificates; it does not allege that it purchased certificates from the other fifteen challenged offerings.  (*Id.* ¶ 9.)  Plaintiff alleges that it purchased its GSAA 2007-5 certificates on May 21, 2008 — more than a year after the initial public offering of those certificates pursuant to the prospectus supplement dated April 27, 2007.  (*Id.*; Trivedi Decl., Ex. A.)

The materials pursuant to which Plaintiff's GSAA 2007-5 and GSAA 2007-10 certificates were offered and issued consist of:  (i) a registration statement filed with the SEC on January 31, 2007; (ii) a base prospectus, dated February 13, 2007; (iii) prospectus supplements, dated April 27, 2007 (for GSAA 2007-5) and October 29, 2007 (for GSAA 2007-10); and (iv) free writing prospectuses filed contemporaneously with the respective prospectus supplements.  (*See* SAC ¶ 1; Trivedi Decl., Exs. A, B, R.)  The offering documents disclosed that the certificates are backed by pools of alternative mortgage loans owned by the issuing trusts.[2] (SAC ¶¶ 2, 26.)  As borrowers make their monthly mortgage payments, the trusts "pass-through" a portion of these payments to certificateholders based on the certificates' class.[3]  (SAC ¶ 26.)  Like

---

[2]    *See* Trivedi Decl., Ex. A at S-55 – S-59; Ex. B at S-46 – S-50; Ex. C at S-50 – S-57; Ex. D at S-42 – S-53; Ex. E at S-48 – S-68; Ex. F at S-49 – S-54; Ex. G at S-47 – S-50; Ex. H at S-36 – S-43; Exs. I and J at S-38 – S-45; Ex. K at S-37 – S-42; Ex. L at  S-40 – S-44; Ex. M at S-34 – S-36; Ex. N at S-53 – S-58; Ex. O at S-48 – S-53; Ex. P at S-37 – S-39; Ex. Q at S-35 – S-39.

[3]    *See* Trivedi Decl., Ex. A at S-12 – S-15, S-91 – S-93; Ex. B at S-11; Ex. C at S-10 – S-17; Ex. D at S-8 – S-13; Ex. E at S-10 – S-16; Ex. F at S-10 – S-16; Ex. G at S-10 – S-14; Ex. H at S-8 – S-11; Ex. I at S-8 – S-11; Ex. J at S-7 – S-11; Ex. K at S-10 – S-15; Ex. L at S-11 – S-17; Ex. M at S-9 – S-12; Ex. N at S-14 – S-18; Ex. O at S-13 – S-20; Ex. P at S-8 – S-11; Ex. Q at S-10 – S-14.

Plaintiff's prior pleading, the SAC does not allege that any certificateholders have failed to receive any payments to which they are entitled.

Collectively, the offering documents for the certificates that Plaintiff bought comprised thousands of pages of factual disclosures regarding the trusts' structure, the certificates issued by each trust, the nature and credit quality of the loans underlying the certificates and the risks associated with investing in residential mortgage-backed securities.  (*See* Trivedi Decl., Exs. A-Q.)  They disclosed the fact that the mortgage lenders that originated the mortgage loans in the trusts' loan pools used a variety of lending programs, including programs that did not require borrowers to provide evidence of their income, assets or employment, and that loans made pursuant to these alternative programs posed a greater risk of default than traditional mortgage loans extended in accordance with more conservative standards.[4]

The offering documents also warned investors that the certificates backed by these loan pools were risky, that their ratings could change, and that they were potentially illiquid instruments for which there might *never* be any secondary market:

> **Your Investment May Not Be Liquid.**  The underwriter intends to make a secondary market in the offered certificates, but it will have no obligation to do so. We cannot assure you that such a secondary market will develop or, if it develops, that it will continue.  Consequently, you may not be able to sell your certificates readily or at prices that will enable you to realize your desired yield.

(Trivedi Decl., Ex. A at S-50.)[5]  Further, the GSAA 2007-5 and GSAA 2007-10 offering documents disclosed that "exceptions" to the originators' underwriting guidelines were permitted.

---

[4]      *See* Trivedi Decl., Ex. A at S-32, S-56, S-63 – S-70; Ex. B at S-53 – S-73; Ex. C at S-59 – S-72; Ex. D at S-46 – S-53; Ex. E at S-58 – S-68; Ex. F at S-75 – S-80; Ex. G at S-51 – S-62; Ex. H at S-44 – S-49; Ex. I at S-54 – S-58; Ex. J at S-47 – S-51; Ex. K at S-44 – S-62; Ex. L at S-46 – S-69; Ex. M at S-37 – S-43; Ex. N at S-58 – S-65; Ex. O at S-54 – S-61; Ex. P at S-41 – S-44; Ex. Q at S-39 – S-41.

[5]      Substantially similar disclosures were made in the prospectus supplements for the other offerings. (*See* Trivedi Decl., Ex. B at S-35 – S-36; Ex. C at 12; Exs. C, D, E, F and G at 12; Ex. H at S-32 – S-33;

(*continued on next page*)

(*Id.*, Ex. A at S-61, S-65; Ex. B at S-55.)[6]  It could not have been clearer that all seventeen trusts held subprime loans that would be particularly impacted by a downturn in the housing market or the economy in general.[7]

## C.    Alleged Misrepresentations in the Offering Documents

Despite these detailed disclosures, Plaintiff still asserts that the offering documents failed to provide adequate information about the underwriting guidelines of certain mortgage loan originators, the risks associated with the certificates and methodologies used by the rating agencies.  (SAC ¶¶ 3-5, 27, 41, 77, 81, 88; *see also id.* 6, 29-56, 82-87, 89-93, 96.)  Not only do the offering documents refute these assertions, but the SAC — like Plaintiff's prior pleadings in this action and in *Plumbers' Union* — fails to provide a single fact about the *actual* loans underlying the specific certificates at issue in this case, the *actual* underwriting practices used for those loans or the *actual* ratings methodologies employed for those certificates.  Instead, Plaintiff's allegations continue to refer to the subprime mortgage and securitization markets as a whole, and are derived from little more than the widespread public attention that those industries have received for at least two years amid the ongoing economic crisis.  Even then, the SAC does not allege that the loans at issue performed any differently than similar loans in the context of a nationwide housing crash of unprecedented proportion.

---

Ex. I at S-34; Ex. J at 12; Ex. K at S-29 – S-30; Ex. L at S-33 – S-34; Ex. M at S-27 – S-28; Ex. N at S-48; Ex. O at S-43; Ex. P at S-33; Ex. Q at 12.)

[6]    Substantially similar disclosures were made in the prospectus supplements for the other offerings. (*See* Trivedi Decl., Ex. C at S-59; Ex. D at S-48; Ex. E at S-60; Ex. F at S-78; Ex. G at S-54 – S-56; Ex. H at S-49; Ex. I at S-54, S-58; Ex. J at S-48 – S-49; Ex. K at S-45, S-53; Ex. L at S-52, S-65; Ex. M at S-41; Ex. N at S-60, S-67; Ex. O at S-54; Ex. P at S-44; Ex. Q at S-40, 30-31.)

[7]    *See* Trivedi Decl., Ex. A at S-32 – S-33; Ex. B at S-93; Ex. D at S-19 – S-20; Ex. E at S-24 – S-26; Ex. F at S-24 – S-26; Ex. G at S-21 – S-23; Ex. H at S-17 – S-18; Ex. I at S-17 – S-18; Ex. J at S-19 – S-21; Ex. K at S-20 – S-21; Ex. L at S-23 – S-24; Ex. M at S-17 – S-19; Ex. Q at S-19 – S-21.

## STANDARD ON THIS MOTION

When a plaintiff lacks standing to bring a claim, the court should dismiss that claim under FED. R. CIV. P. 12(b)(1) because a defect in standing deprives the court of subject matter jurisdiction. *See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 245-46 (S.D.N.Y. 2004). A complaint should also be dismissed pursuant to FED. R. CIV. P. 12(b)(6) for failure to state a claim if a plaintiff fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 555-56, 570 (2007). Thus, a plaintiff must establish the elements of each claim through specific, factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56, 570; *see also Panther Partners Inc.* v. *Ikanos Commc'ns, Inc.*, No. 08-CV-3398, 2009 WL 2959883, at *1-2 (2d Cir. Sept. 17, 2009) (amended complaint must "meet the plausibility requirements of *Twombly*"). Accordingly, the possibility that a plaintiff might prove *some* facts in support of its claim is insufficient to survive a second motion to dismiss; "a formulaic recitation of the elements of a cause of action will not do." *Ashcroft* v. *Iqbal*, No. 07-CV-1015, 2009 WL 1361536, at *12 (U.S. May 18, 2009). Furthermore, where "it is clear from the face of the complaint and matters of which the court may take judicial notice," that a plaintiff's claims are time barred, dismissal under Rule 12(b)(6) is proper. *Conopco, Inc.* v. *Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000); *Garber* v. *Legg Mason, Inc.*, No. 08-CV-1831, 2009 WL 3109914, at *3-4 (2d Cir. Sept. 30, 2009) (affirming dismissal of plaintiffs' consolidated amended complaint). In that respect, a plaintiff "may not, by amending [its] Complaint, undo the inquiry notice and resulting obligations conceded by [its] first complaint." *In re Integrated Resources Real Estate Ltd. P'ships Sec. Litig.*, 850 F. Supp. 1105, 1332 n.47 (S.D.N.Y. 1993). Finally, when it is evident that a plaintiff "had ample opportunity to specify [its] claims" in a prior complaint, "leave to further

- 10 -

amend the complaint will not be allowed." *In re Starter Corp. Sec. Litig.*, No. 94-CV-0718, 1996

WL 406624, at *7 (S.D.N.Y. July 19, 1996).

## ARGUMENT

## I.    PLAINTIFF LACKS STANDING TO SUE.

To establish a claim under Section 11 or 12(a)(2) of the 1933 Act, a plaintiff must

have standing. *In re AOL*, 381 F. Supp. at 245. "The burden to establish standing rests on the

party asserting its existence." *Id.* Thus, at the pleading stage, the plaintiff must "clearly . . . allege

facts demonstrating that [it] is a proper party to invoke judicial resolution of the dispute." *Id.*

### A.    Plaintiff Lacks Standing to Assert Section 11 Claims as to Securities Offered by All But GSAA 2007-5 and GSAA 2007-10.

During the September 17, 2009 argument on Defendants' motion to dismiss

Plaintiff's prior complaint, this Court properly focused on the GSAA 2007-5 and GSAA 2007-10

offerings, in which Plaintiff allegedly purchased certificates, rather than the fifteen other offerings

in which Plaintiff never invested. (Trivedi Decl., Ex. T at p. 15 ("You have to stay with the trusts

that plaintiff bought . . . .  I only care about what the plaintiff bought at the moment.").)

Defendants' separate brief addressing standing — submitted in response to the Court's request at

the September 17, 2009 argument — demonstrated that a plaintiff lacks standing to assert

Section 11 (and 12(a)(2)) claims for securities it has not purchased. (D.E. # 69.) The *Plumbers'*

*Union* court likewise found that the "overwhelming weight of authority" holds that a plaintiff

lacks standing to assert Section 11 (and 12)(a)(2)) claims with respect to certificates issued in

securitization offerings in which it did not purchase securities. *Plumbers' Union*, 2009 WL

3149775 at *3-4 ("the named plaintiffs are incompetent to allege an injury caused by the purchase of Certificates they themselves never purchased") (collecting cases).[8]

      As discussed in Defendant's separate submission on standing (D.E. # 69), Section 11 embodies a congressionally mandated trade-off in which would-be plaintiffs, in order to have standing to sue under Section 11 (which does not require proof of scienter), must have purchased the specific securities on which they base their claim. *In re Salomon Smith Barney*, 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006) ("With regard to the [68] funds of which Plaintiffs own no shares, Plaintiffs do not have standing to assert any claims . . . ."). In addition, to assert a Section 11 claim on behalf of a class, at least one named plaintiff must have purchased securities traceable to each challenged offering.[9] *Simon* v. *E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976). Where (as here) no named plaintiff purchased securities issued in certain of the challenged offerings, Section 11 claims based on those offerings must be dismissed for lack of standing.[10]

---

[8]    Although Plaintiff alleges Section 11 claims "Against All Defendants," Plaintiff cannot assert a Section 11 claim against the "sponsor" of a securitization (such as GSMC here). Section 11 permits purchasers to sue only "certain enumerated parties," namely the issuer of the securities, individuals who signed the registration statement, directors or principal officers of the issuer, underwriters and experts who helped prepare the registration statement. 15 U.S.C. §§ 77k(a)(1)-(5); *see also Herman & MacLean* v. *Huddleston*, 459 U.S. 375, 381-82 & n.13 (1983). A securitization's "sponsor" is not among the "enumerated parties," and a plaintiff cannot somehow bring it within Section 11's ambit by pleading that the sponsor participated in the offering (but not the distribution) of the securities. *See* Regulation AB, 17 C.F.R. § 229.1101(*l*) ("*Sponsor* means the person who organizes and initiates an asset-backed securities transaction by selling or transferring assets . . . to the issuing entity.") (emphasis added); *Asset-Backed Securities*, 70 Fed. Reg. 1506, 1534 (Jan. 7, 2005) (defining "sponsor" as a separate party in asset-backed transactions that makes an intermediate transfer of assets).

[9]    Courts have recognized that although the "lead plaintiff in a securities class action need not have standing to sue on all causes of action," standing defects under Section 11 must be cured by including "other members of the purported class as named plaintiffs or class representatives" that have purchased securities in those offerings. *See, e.g., Fishbury, Ltd.* v. *Connectics Corp.*, No. 06-CV-11496, 2006 WL 3711566, at *4 (S.D.N.Y. Dec. 14, 2006); *Weinberg* v. *Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 252, 253 (S.D.N.Y. 2003).

[10]    "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury

(*continued on next page*)

Moreover, as *Plumbers' Union* held, a plaintiff cannot establish Section 11 standing with respect to certificates that it did not purchase by arguing that the challenged, separate offerings derive from a common underlying shelf registration statement.  (SAC ¶¶ 1, 9, 18.)  *Plumbers' Union*, 2009 WL 3149775 at *3-4.  The shelf registration process enables qualified issuers to offer securities periodically by first filing a "base" registration statement and then subsequently filing separate prospectus supplements for each offering.[11]  *See* 17 C.F.R. § 230.415; *Delayed or Continuous Offering and Sale of Securities*, Securities Act Release No. 33-6423, 47 Fed. Reg. 39,799 (Sept. 2, 1982).  These required supplements add specific information about the securities offered and *alone* contain the descriptions of loan underwriting standards, loan characteristics and features of the securities offered in that offering.  *See* 17 C.F.R. § 229.512(a)(1).  In recognition of this structure, the SEC has provided by regulation that "for the purpose of determining any liability under the [1933 Act], each . . . post-effective amendment [to a shelf registration statement, such as a prospectus supplement,] shall be deemed to be *a new registration statement* relating to the securities offered therein."  17 C.F.R. § 229.512(a)(2) (emphasis added).  Therefore, each of the seventeen offerings is deemed subject to a *separate* "registration statement" — consisting of the original shelf registration statement and prospectus, as well as the applicable prospectus supplement.

Plaintiff does not deny that — consistent with these rules — its own certificates were issued in *two* separate offerings, each of which used a different prospectus supplement

---

has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."  *Simon*, 426 U.S. at 40; *Hoffman* v. *UBS-AG*, 591 F. Supp. 2d 522, 530-31 (S.D.N.Y. 2008).

[11]    The shelf registration statement is functionally a "base prospectus" that need not contain complete information regarding the terms of the securities to be offered and is, therefore, not a "final prospectus" under the 1933 Act.  *See* 17 C.F.R. § 230.430B; *Securities Offering Reform*, Securities Act Release No. 33-8591, 70 Fed. Reg. 44,722 , at 194-99 (July 19, 2005).

incorporated into the generic shelf registration statement.  (*See* SAC ¶ 1.)  In fact, Plaintiff has

acknowledged that the GSAA 2007-5 and GSAA 2007-10 prospectus supplements governed its

certificates and conceded to this Court that the misrepresentations it challenges are contained

within "[o]nly the prospectus supplements":

> THE COURT:  Then you are not suing on anything specifically said just in the registration statement?  That's what I started with.  Are you suing on the supplement?
>
> MR. LEAHY:  The misrepresentations are contained within the prospectus supplements which were incorporated by reference.
>
> THE COURT:  Only the prospectus supplements?
>
> MR. LEAHY:  That's correct.
>
> THE COURT:  You are not pointing to anything in the registration statement --
>
> MR. LEAHY:  That's correct.
>
> THE COURT:  -- that was specifically false.  Good.  That was my understanding.  I just want to understand it.  Thank you. . . .

(Trivedi Decl., Ex. T at 4-5.)

Despite these prior assurances in open court, Plaintiff now tries to conflate separate

offerings for standing purposes and back-track in the SAC by alleging that the underlying shelf

registration statement contained actionable misrepresentations.  Even if the registration statement

itself contained deficiencies, however, that would not change the legal reality that each of the

seventeen offerings was distinct, pursuant to separate prospectus supplements (regardless of

whether they incorporated a supposedly tainted underlying registration statement), and that

Plaintiff invested in only two of the offerings.[12]  *See* 17 C.F.R. § 229.512(a)(2); *see also In re*

---

[12]    If Plaintiff's theory were accepted, Plaintiff would have a claim based on alleged wrongdoing in offerings in which it did not participate, against issuers different from the two trusts that issued the certificates Plaintiff actually did purchase, and involving collateral assets against which Plaintiff has no claim.  Because the prospectus supplement for each offering was made part of the shelf registration statement *only* for one distinct offering of specified certificates, the two prospectus supplements pursuant to which Plaintiff purchased certificates were *not* part of the shelf registration statement for the fifteen

(*continued on next page*)

*Salomon Smith Barney*, 441 F. Supp. 2d at 607 (plaintiffs lack Section 11 standing for securities they did not purchase).  In all events (as demonstrated below, *see* p. 20-22 & n.19, *infra*), none of the purported misrepresentations in the registration statement had anything to do with any specific originator, loan or security at issue here, was not specific enough to affect any investment decision and, therefore, cannot conceivably be the basis for Plaintiff's Section 11 claim.  Indeed, the *actual* disclosure language used in connection with *actual* offerings of mortgage-backed certificates is found exclusively in the later-filed prospectus supplements.  (Trivedi Decl., Exs. A-Q.)

The Court should therefore reject Plaintiff's theory that it may conflate seventeen separate offerings to confer universal standing.  At most, Plaintiff has standing to assert a Section 11 claim relating to the GSAA 2007-5 and GSAA 2007-10 certificates it allegedly purchased; its Section 11 claims relating to the other fifteen offerings should be dismissed.[13]

---

offerings in which Plaintiff did not participate, and the issuers and underwriters in those fifteen offerings did not use the shelf registration statement to sell Plaintiff anything.

[13]    Plaintiff has previously attempted to overcome its standing hurdle by pointing to *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008).  *Countrywide* has been discredited by at least one judge in this District, was expressly limited to its narrow facts by the *Countrywide* court and involved offerings by the same issuer (Countrywide) — not multiple, separate issuing trusts — through the same underwriters deriving from a common registration statement.  (Trivedi Decl., Ex. S (Transcript of Hearing in *La. Mun. Police Employees Ret. Sys.* v. *Merrill Lynch & Co., Inc.*, No. 08-CV-9063 (S.D.N.Y., Rakoff, J.), dated Feb. 17, 2009 at pp. 21-22, 61).)

Nor is Plaintiff assisted by the recent holding in *Dynex*, in which the court held that plaintiffs asserting claims under Section 10(b) and Rule 10b-5 of the Securities and Exchange Act of 1934 ("1934 Act") may have "standing to proceed on behalf of purchasers" of classes of securities that plaintiffs did not purchase.  *In re Dynex Capital, Inc. Sec. Litig.* ("*Dynex II*"), No. 05-CV-1897, 2009 WL 3380621, at *18 (S.D.N.Y. Oct. 19, 2009); *see also In re Dynex Capital, Inc. Sec. Litig.*("*Dynex I*"), No. 05-CV-1897, 2006 WL 314524, at *12 (S.D.N.Y. Feb 10, 2006), *vacated on other grounds sub nom Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Capital, Inc.*, 531 F.3d 190 (2d Cir. 2008).  *Dynex* is entirely inapposite because, unlike in *Dynex*:  (i) the certificates in the seventeen distinct offerings here were issued by seventeen *different issuer-trusts*; (ii) each of the seventeen offerings here involved *entirely different* underlying pools of loans made by *different* loan originators; and (iii) the offering documents here contained disclosures about the various originators' *different* underwriting guidelines.  Moreover, *Dynex* did not involve claims under Sections 11 and 12(a)(2) of the 1933 Act, which have unique statutory standing requirements.  *See DeMaria* v. *Andersen*, 318 F.3d 170, 175 (2d Cir. 2003) (Section 11 standing); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 445 (S.D.N.Y. 2009) (Section 12(a)(2) standing).

**B.    Plaintiff Lacks Standing to Assert Section 12(a)(2) Claims Even as to the GSAA 2007-5 and GSAA 2007-10 Certificates That It Purchased.**

Plaintiff continues to assert Section 12(a)(2) claims against Goldman Sachs and GS Mortgage as to all seventeen offerings.  As explained in Defendants' supplemental standing brief, a plaintiff may maintain a Section 12(a)(2) claim only with respect to securities that it purchased (i) *from* the defendant being sued and (ii) *in* the public offering (*i.e.*, not in the secondary market).  *See Gustafson* v. *Alloyd Co.*, 513 U.S. 561 (1995).  Indeed, since the Supreme Court's decision in *Gustafson*, courts have consistently held that Section 12(a)(2) applies only to direct purchases *from* sellers *in* public offerings.[14]  This Court similarly agreed that it is "clear" that Section 12(a)(2) applies only to direct purchasers and instructed Plaintiff to plead "whom [it] bought [its certificates] from."  (Trivedi Decl., Ex. T at p. 40.)  Here, Plaintiff lacks Section 12(a)(2) standing because it does not adequately allege that it purchased any certificates (including the GSAA 2007-5 and GSAA 2007-10 certificates) *from* Goldman Sachs, or *in* the public offerings.  *Plumbers' Union*, 2009 WL 3149775 at *4 (dismissing similar Section 12(a)(2) claims).

The SAC attempts to finesse the Section 12(a)(2) standing hurdle by asserting — for the first time, and in wholly conclusory fashion — that "Plaintiff purchased its Certificates for the GSAA Home Equity Trust 2007-10 directly from Goldman Sachs" (SAC ¶ 111), without identifying from whom Plaintiff purchased its GSAA 2007-5 certificates on May 21, 2008 (pursuant to the prospectus supplement dated April 27, 2007).  Tellingly, the certification Plaintiff

---

[14]    *See, e.g., In re Merrill Lynch & Co, Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003) ("Under Section 12(a)(2), only a defendant from whom the plaintiff purchased securities may be liable.") (quotation marks omitted); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 435 (S.D.N.Y. 2001) ("Section 12 . . . limit[s] the plaintiffs allowed to sue under the statute to those who purchased the security directly from the issuer of the prospectus."); *Saslaw* v. *Askari*, No. 95-CV-7641, 1997 WL 221208, at *6 (S.D.N.Y. Apr. 25, 1997) ("Courts within this circuit have consistently interpreted *Gustafson* to exclude purchasers in private or secondary market offerings from bringing actions under 12[(a)](2).").

filed with its complaint does not support this naked assertion, and Plaintiff has not filed an amended certification.  Nor has Plaintiff provided any factual support for its "direct purchase" allegation, which leaves open whether Plaintiff's "direct" purchase was as principal from Goldman Sachs, through a broker or advisor or by some other means.  That sort of evasiveness, without requisite certification, is insufficient.  *See Plumbers' Union*, 2009 WL 3149775 at *4 ("If plaintiffs did in fact purchase the Certificates directly from the defendants, they should have said so.  An evasive circumlocution does not suffice as a substitute.").[15]

Additionally, Plaintiff nowhere alleges that it bought any certificates in the public offerings (as opposed to the secondary market), and concedes that it bought its GSAA 2007-5 certificates more than a year after the public offering.  The absence of an allegation that the purchases were made in the public offering is an independently sufficient ground for dismissal of its Section 12(a)(2) claim.  *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 693 (S.D.N.Y. 2000) ("Purchasers in . . . secondary market offerings do not have standing to bring actions under Section 12[(a)](2).").

## II.    PLAINTIFF DOES NOT PLEAD ANY COGNIZABLE ECONOMIC LOSS.

The SAC should also be dismissed because — like the prior complaint — it does not plead that Plaintiff (or the putative class) has suffered any legally cognizable economic loss, an essential element of its claims for damages under Sections 11 and 12(a)(2) of the 1933 Act.  *See* 15 U.S.C. §§ 77k(e), 77l(a)(2); *In re Initial Pub. Offering Sec. Litig.* ("*IPO*"), 544 F. Supp. 2d 277, 299 (S.D.N.Y. 2008) ("If a plaintiff has no conceivable damages under Section 11[(e)], [it]

---

[15]    Plaintiff's Section 12(a)(2) allegations against GS Mortgage are also deficient.  The SAC merely alleges in circular fashion that "GS Mortgage solicited sales of the Certificates for financial gain, as [it] benefitted financially from the sale of the Certificates."  (SAC ¶ 111.)  This falls well short of alleging that Plaintiff purchased certificates *from* GS Mortgage.  *See Plumbers' Union*, 2009 WL 3149775 at *4.

cannot state a claim upon which relief can be granted and [its] Section 11 claims must be dismissed."); *In re Merrill Lynch*, 272 F. Supp. 2d at 253 ("Where it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses, dismissal of the complaint pursuant to Fed. R. Civ. P. 12(b)(6) is proper.").  As Defendants explained in their prior motion to dismiss, given the pass-through structure of the certificates, investors have received precisely what they bargained for and have suffered no cognizable economic loss.

Plaintiff has repeatedly stated that it (and other investors) purchased the certificates based upon:  (i) the "absolute cash flow" or return (in the form of interest payments); (ii) the "timing" of principal and interest payments; and (iii) safety (*i.e.*, risk of default of the underlying mortgage loan assets).  (*See* SAC ¶ 6.)  Plaintiff has *never* alleged even a *single* late or missed payment, let alone any default, on any of the certificates.  Instead, Plaintiff continues to allege only that the certificates are illiquid and cannot be sold in the secondary market "at prices anywhere near the prices paid by plaintiff and the Class, and the holders of the Certificates are exposed to much more risk with respect to both the timing and absolute cash flow to be received than the Offering Documents represented."  (SAC ¶ 6; *see also id*. ¶¶ 96, 108.)  This conclusory statement fails to allege a cognizable loss for several reasons.

*First*, Plaintiff cannot properly plead a cognizable "loss" based on the illiquidity of the certificates because investors were explicitly warned that a secondary market for the certificates did not, and *might never*, exist.[16]

*Second*, Plaintiff's supposed concern that certificateholders *might* "receive less absolute cash flow in the future" (*id*. ¶ 6), is abstract speculation, especially in light of the certificates' extensive and clearly disclosed credit enhancement features that safeguard payment

---

[16]    *See* p. 8 & n.5, *supra*.

on the certificates even if defaults on the underlying mortgage loans increase.[17]  *See First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994) ("[Plaintiff] does not allege actual injury by simply claiming that it incurred additional risk of loss as a consequence of the fraud.  Thus, we reject [plaintiff's] novel theory that it was damaged simply by being undersecured when, with respect to those loans not yet foreclosed, the actual damages it will suffer, if any, are yet to be determined.") (citation omitted).

   *Third*, Plaintiff has yet to plead a single fact to support its assertion that the "value" or "prices" of the certificates have declined.  (*See* SAC ¶¶ 6, 96, 108.)  Plaintiff's apparent theory that a reduction in ratings is equivalent to a drop in the price of a stock ignores that credit ratings purport to measure risk of loss, not price.  Moreover, Plaintiff not only has failed to allege any meaningful facts about the supposed ratings downgrades, but also has completely ignored the difference between mortgage-backed securities and equity investments (such as stock).  As explained by the SEC, investors in asset-backed securities ("ABS") differ from investors in stocks in that "ABS investors are generally interested in the characteristics and quality of the underlying assets, the standards for their servicing, the timing and receipt of cash flows from those assets and the structure for distribution of those cash flows."  *Asset-Backed Securities*, Securities Act Release No. 8518, Exchange Act Release No. 50, 905, 70 Fed. Reg. 1506, 1508, 1510-11 (Jan. 7, 2005); *Luminent Mortg. Cap., Inc.* v. *Merrill Lynch & Co.*, No. 07-CV-5423, 2009 WL 2590087, at *1 (E.D. Pa. Aug. 20, 2009) ("[M]ortgage-backed securities are long-term debt instruments that represent the income stream from the underlying pool of mortgage loans.").  Investors in stocks hope that the shares they buy will appreciate over time, and that they will profit by selling the

---

[17] *See* Trivedi Decl., Ex. A at S-25; Ex. B at S-15 – S-17; Exs. C, D, E, F and G at 45; Ex. H at S-11; Ex. I at S-11; Ex. J at 45; Ex. K at S-15 – S-17; Ex. L at S-17 – S-19; Ex. M at S-12 – S-13; Ex. N at S-18 – S-19; Ex. O at S-20 – S-21; Ex. P at S-11; Ex. Q at 45.

shares at a price higher than the purchase price. *Asset-Backed Securities*, 70 Fed. Reg. at 1508-11.

By contrast, mortgage-backed securities are contractual rights to a portion of principal and interest

payments from underlying loan pools. *Id*. at 1508, 1510-11; *In re First Union Corp. Sec. Litig.*,

128 F. Supp. 2d 871, 894 n.22 (W.D.N.C. 2001) ("Valuation of mortgage-backed securities such

as those at issue here essentially is an exercise in estimating future cash flows.").

       Investors in mortgage-backed securities accordingly can suffer "damages" only

when they do not receive the "pass-through" cash flow payments to which they are entitled.

Plaintiff has never alleged any such failure.  In similar situations, courts have routinely dismissed

Section 11 and 12(a)(2) claims for failure to plead an economic loss; this Court should do so

here.[18]  *See Jackson Nat'l Life Co.* v. *Ligator*, 949 F. Supp. 200, 207-08 (S.D.N.Y. 1996) (because

the notes were not due and the plaintiffs had not pleaded "the extent of their loss at the time," it

was "impossible to determine the award that would make [plaintiffs] whole" and that "a mere

'unlikelihood' [was] simply not sufficient to support an action at the time."); *In re Broderbund/*

*Learning Co. Sec. Litig.*, 294 F.3d 1201, 1203-05 (9th Cir. 2002) (dismissing Section 11 and

12(a)(2) claims for failure to plead a cognizable loss).

## III.    THE SECOND AMENDED COMPLAINT DOES NOT PLEAD ANY ACTIONABLE MISREPRESENTATIONS.

       Despite the Court's instruction "to file [a second] amended complaint that is clearer

and more specific" about the alleged misrepresentations Plaintiff challenges (Trivedi Decl., Ex. S

at p. 38), the SAC contains all of the deficiencies that infected the amended complaint.  Plaintiff

---

[18]    Plaintiff's failure to plead the required element of economic loss also warrants dismissal under FED. R. CIV. P. 12(b)(1) for lack of constitutional or statutory standing.  *See AOL Time Warner*, 381 F. Supp. 2d at 246 ("Absent any losses under Section 11(e), plaintiffs lack [constitutional and] statutory standing to assert their Section 11 claim against the Underwriter defendants"); *Plumbers' Union*, 2009 WL 3149775 at *4 n.3 ("The court notes that plaintiffs lack statutory as well as constitutional standing to bring claims against the six Trusts from which they did not purchase securities.").

has merely added a few out-of-context snippets from attachments to the shelf registration

statement, which do not reference the originators, loan underwriting standards, loan characteristics

or securities in any actual offering.  (SAC ¶¶ 29, 30, 57, 58, 76, 82; Trivedi Decl., Ex. R ("Reg.

St.") at S-45, 29, S-42, S-47, S-37 – S-38, S-51, "Signature" page.)[19]  Accordingly, the SAC fails

to satisfy the requirement of Sections 11 and 12(a)(2) that a plaintiff allege that (i) the offering

documents contained a material misrepresentation, and (ii) the defendants had a duty to disclose

the allegedly misrepresented information.  *Basic, Inc*. v. *Levinson*, 485 U.S. 224, 232 (1988);

*Panther Partners*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008); *In re Flag Telcom. Holdings, Ltd.*

*Sec. Litig.*, 308 F. Supp. 2d 249, 255 (S.D.N.Y. 2004).

---

[19]    The SAC's attempt to manufacture misrepresentations in the underlying shelf registration statement does not survive scrutiny.  As discussed in greater length *infra* pp. 27-28, of the six purported misrepresentations alleged in the SAC, four were taken from three *forms* of prospectus supplements included in the registration statement with the explanation that they *might* be used in *future* offerings, and which did not reference any particular originator, loan or security.  Of those four, two refer to representations and warranties that *originators* might make about the loans they were selling (SAC ¶ 57 (representations on appraiser compensation (Trivedi Decl., Ex. R ("Reg. St.") at S-42)); SAC ¶ 76 (representation on lack of fraud in loan documents (Reg. St. at S-51, S-38 )), while two contain basic descriptions of the loan origination process (SAC ¶ 29 (Reg. St. at  S- 45)) and the appraisal process (SAC ¶ 58 (Reg. St. at S-47)), without reference to any originator or loans.  The other two references are in the base prospectus:  one merely describes the origination process in general terms (SAC ¶ 30 (Reg. St. at 29)), while the other states that securities would be rated (SAC ¶ 82 (Reg. St. at "Signature" page)), which they were.  Recognizing that the information in the base prospectus did not, and could not, describe an actual offering that had not yet been structured or offered, the base prospectus stated:

> We provide information to you about the certificates and notes in two separate documents that provide progressively more detail:
>
> - this prospectus, which provides general information, some of which may not apply to your series of certificates or notes; and
> - the accompanying prospectus supplement, which describes the specific terms of your series of certificates or notes.
>
> You should rely primarily on the description of your certificates or notes in the accompanying prospectus supplement.  This prospectus may not be used to consummate sales of any certificates or any notes unless it is accompanied by a prospectus supplement relating to the certificates or notes being sold.

(Reg. St. at 1.)

Like its predecessor pleading, the SAC focuses on allegations that the offering documents misrepresented or omitted certain information about the originators' underwriting guidelines, even though the offering documents plainly contained detailed disclosures accurately describing those guidelines.[20]  The SAC contains no allegations whatsoever about any of the *actual* loans held by the trusts issuing *these* certificates, and hence no allegations that any of the supposedly misrepresented underwriting practices affected any (no less a material number) of the loans held by the seventeen trusts.[21]  Nor does the SAC allege that Defendants knew of the unaffiliated originators' supposed deviations from the standards disclosed in the offering documents.

Confronted with nearly identical allegations from Plaintiff, the *Plumbers' Union* court dismissed the complaint in that case because (i) the prospectus supplements disclosed the information that Plaintiff alleged was missing, *Plumbers' Union*, 2009 WL 3149775 at *4-9, (ii) Plaintiff "failed to allege a sufficient factual basis to support [its] claims of [1933 Act] violations," *id.* at *9, and (iii) Plaintiff "failed to offer any facts to support a finding that the misrepresentations were material," *id.* at *7.  The court further observed:

> That questionable appraisal practices were a common problem in the industry as a whole, without more, tells nothing about the Trusts' underlying loans.  To permit a plaintiff, on such a skimpy foundation, to drag a defendant past the pleading threshold would be to invite litigation by hunch and to open [defendants] to the most unrestrained of fishing expeditions.

*Id.* at *6.  This Court should similarly dismiss this fishing expedition.

---

[20]    *See* Trivedi Decl., Ex. A at S-61, S-65; Ex. B at S-51, S-55; Ex. C at S-59; Ex. D at S-48; Ex. E at S-60; Ex. F at S-78; Ex. G at S-52, S-54, S-56; Ex. H at S-49; Ex. I at S-54 – S-58; Ex. J at S-48 – S-49; Ex. K at S-45, S-53; Ex. L at S-52, S-65; Ex. M at S-41; Ex. N at S-60, S-67; Ex. O at S-54; Ex. P at S-44; Ex. Q at S-40, 30-31.

[21]    Plaintiff's reliance here on generic sources contrasts sharply with the allegations in *Dynex*, which were supported by specific, factual statements from identifiable, confidential witnesses as well as actual reports released by defendants regarding the particular loans at issue.  *See Dynex II*, 2009 WL 3380621 at *4, 7.

## A.    The Offering Documents Disclosed
## All Information Plaintiff Alleges Was Required.

The alleged misrepresentations and omissions underlying Plaintiff's claims are recycled from Plaintiff's prior complaint.  The detailed disclosures in the offering documents refute these allegations and demonstrate that investors were provided all material information about the certificates and the inherently risky loan pools that backed them.  *See Olkey* v. *Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5, 9 (2d Cir. 1996) (dismissing 1933 Act claims involving mortgage-backed securities because "the prospectuses warn investors of exactly the risk plaintiffs claim was not disclosed"); *Plumbers' Union*, 2009 WL 3149775 at *4-9.

### 1.    The Offering Documents Disclosed
### the Originators' Lending Practices.

The thrust of Plaintiff's allegations continues to be that the offering documents failed to disclose that originators could issue loans pursuant to alternative lending programs that reduced or eliminated documentation and verification requirements.  (SAC ¶¶ 3, 4, 27, 43, 45, 47; *see also id.* ¶¶ 29-42, 44, 46, 48-56.)[22]  Yet the offering documents provided detailed descriptions of these programs.  For example, the GSAA 2007-5 prospectus supplement devoted nearly *eight*

---

[22]    The only new allegations in the SAC concerning originators' practices refer to general statements in the shelf registration statement that for loan originators generally — without any reference to any particular originator or category of loans — "certain types of loans '[were] underwritten on the basis of a judgment that mortgagors or obligors will have the ability to make the monthly payments required initially'" (*id.* ¶ 30 (Trivedi Decl., Ex. R ("Reg. St.") at 29 (omitting the next sentence, which stated that "[i]n some instances, however, a mortgagor's or obligor's income may not be sufficient to permit continued loan payments as such payments increase"))), and that "the originating lender makes a determination about whether the borrower's monthly income (*if required to be stated*) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property" (SAC ¶ 29 (Reg. St. at S-45 (emphasis added)).  By their very nature, these general statements about lending practices could not possibly be false unless lenders generally failed to assess whether borrowers could repay loans, and, in any event, were superseded by the respective prospectus supplements.  *See* p. 21, n.19, *supra*.

*pages* to Countrywide's lending practices (Trivedi Decl., Ex. A at S-63 – S-70),[23] explaining that the "information that a borrower is required to disclose and whether the information is verified depends, in part, on the documentation program used in the origination process," and that "[a] prospective borrower may be eligible for a loan approval process that limits or eliminates Countrywide['s] standard disclosure or verification requirements or both" (*id.* at S-66). It also disclosed that under Countrywide's "Standard Underwriting Guidelines":

> The Alternative Documentation Program . . . permits alternative methods of employment verification. . . . Under the Reduced Documentation Program . . . information relating to a prospective borrower's income and employment is not verified . . . . The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification . . . . [U]nder the Streamlined Documentation Program, . . . only a limited credit review is conducted, no income or asset verification is required . . . .

(*Id.* at S-67 – S-68.) It further disclosed that under Countrywide's "Expanded Underwriting Guidelines," "the borrower is not required to disclose any income information [under certain programs,]" and that "[u]nder the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required." (*Id.* at S-68 – S-70).[24] Thus, the offering documents clearly explained that several of Countrywide's loan programs required limited or no documentation. (*Id.* at S-63 – S-70.)[25]

---

[23]    Substantially similar disclosures were made in the prospectus supplements for the other offerings. (*See* Trivedi Decl., Ex. B at S-50 – S-73; Ex. C at S-62 – S-68; Ex. D at S-46 – S-50; Ex. E at S-58 – S-64; Ex. F at S-58 – S-80; Ex. G at S-51 – S-58; Ex. H at S-44 – S-49; Ex. I at S-54 – S-58; Ex. J at S-47 – S-51; Ex. K at S-42 – S-62; Ex. L at S-50 – S-57; Ex. M at S-40 – S-43; Ex. N at S-58 – S-65; Ex. O at S-54 – S-63; Ex. P at S-41 – S-44; Ex. Q at S-39 – S-41.)

[24]    Substantially similar disclosures were made in the prospectus supplements for the other offerings. (*See* Trivedi Decl., Ex. B at S-51 – S-52, S-56, S-61; Ex. C at S-67 – S-68; Ex. D at S-51 – S-53; Ex. E at S-62 – S-63; Ex. F at S-66, S-79; Ex. G at S-57 – S-58; Ex. H at S-45, S-48; Ex. I at  S-54 – S-58; Ex. J at S-49; Ex. K at S-48, S-52 – S-53; Ex. L at S-52 – S-57; Ex. M at S-37 – S-43; Ex. N at S-61 – S-65; Ex. O at S-56; Ex. P at S-41 – S-44; Ex. Q at S-40, 30-31.)

[25]    Substantially similar disclosures were made in the prospectus supplements for the other offerings. (*See* Trivedi Decl., Ex. B at S-50 – S-73; Ex. C at S-62 – S-68; Ex. D S-46 – S-50; Ex. E at S-57 – S-63;

(*continued on next page*)

Moreover, the offering documents made clear that the underwriting policies were "guidelines" from which originators had discretion to deviate. (*See id.* at S-65 ("Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.").)[26] These and other similar disclosures refute Plaintiff's claim that investors were misled about originators' lending practices and the resulting riskiness of the loans and certificates.[27] *See Plumbers' Union*, 2009 WL 3149775 at *4-6 (dismissing similar allegations because the offering documents described originators' "permissive underwriting practices" in disclosures nearly identical to those here).

### 2. The Offering Documents Disclosed the Involvement of Independent Mortgage Brokers and Appraisers.

The SAC continues to allege that the offering documents did not disclose sufficiently that third parties may not have followed originators' appraisal procedures. (SAC ¶¶ 3, 4, 27, 61-62, 75; *see also id.* ¶¶ 57-60, 63, 66-74.)[28] The prospectus supplements, however, fully disclosed that third parties conducted property appraisals. For example, with respect to

---

Ex. F at S-58 – S-71; Ex. G at S-54; Ex. H at S-45 – S-48; Ex. I at S-58; Ex. J at 47 – S-51; Ex. K at S-47 – S-48, S-52 – S-53, S-58 – S-59; Ex. L at S-50 – S-57; Ex. M at S-40 – S-43; Ex. N at S-58 – S-65; Ex. O at S-54 – S-61; Ex. P at S-41 – S-44; Ex. Q at S-39 – S-40, S-57, 30-31.)

[26]    Substantially similar disclosures were made in the prospectus supplements for the other offerings. (*See* Trivedi Decl., Ex. B at S-51, S-55; Ex. C at S-59; Ex. D at S-48; Ex. E at S-60; Ex. F at S-78; Ex. G at S-52, S-54, S-56; Ex. H at S-49; Ex. I at S-58; Ex. J at S-48 – S-49; Ex. K at S-45, S-53; Ex. L at S-52; Ex. M at S-41; Ex. N at S-60, S-67; Ex. O at S-54; Ex. P at S-44; Ex. Q at S-40, 30-31.)

[27]    The offering documents also cautioned investors that these relaxed underwriting standards could affect the certificates' risk and yield. (*See* Trivedi Decl., Ex. A at S-32 ("Less Stringent Underwriting Standards and the Resultant Potential for Delinquencies on the Mortgage Loans Could Lead to Losses on Your Certificates."), Ex. B at S-21; Ex. C at S-25; Ex. D at 10; Exs. E, F and G at 10 – 11; Ex. H at S-17; Ex. I at S-17; Exs. J, K, L, M and N at 10-11; Ex. O at S-54; Ex. P at S-16 – S-17; Ex. Q at 10-11, 30.)

[28]    The SAC's only "new" appraisal allegation — that the shelf registration statement misrepresented that an appraiser's "compensation is not affected by the approval or disapproval of the mortgage loan" (SAC ¶ 57 (Trivedi Decl., Ex. R ("Reg. St.") at S-42)) — in fact refers to potential representations and warranties that an originator *might* make "with respect to each mortgage loan transferred by it" to the sponsor (GSMC) in future transactions (Reg. St. at S-39).

Countrywide, the GSAA 2007-5 prospectus supplement disclosed that "the underwriting analysis may be obtained by a third party" and the "underwriting of a mortgage loan may not have been reviewed by Countrywide." (*See* Trivedi Decl., Ex. A at S-65.)[29] A reasonable investor would have understood that neither Defendants nor any originator controlled third party underwriting activities (like appraisals), and that these third parties might deviate from originators' guidelines. *See Donovan* v. *Am. Skandia Life Assurance Corp*., No. 02-CV-9859, 2003 WL 21757260, at *2 (S.D.N.Y. July 31, 2003) ("Liability does not arise from the failure to disclose that which should be obvious to the average investor."); *see also Plumbers' Union*, 2009 WL 3149775 at *6 (dismissing similar claims because allegations said "nothing about the Trusts' underlying loans" and disclosures warned that third party appraisers might deviate from standard guidelines).

### 3. The Offering Documents Disclosed the Calculation of Loan-to-Value Ratios.

There is nothing new in the SAC's loan-to-value allegations; Plaintiff continues to allege that the offering documents did not disclose that originators could deviate from their standard loan-to-value guidelines. (SAC ¶¶ 3, 4, 27, 81; *see also id.* ¶¶ 78-80.) These allegations are duplicative of, and derived entirely from, Plaintiff's flawed appraisal allegations. To construct its loan-to-value theory, Plaintiff starts with its unsupported assertion that appraisals were "inflated" (*see*, *e.g.*, *id.* ¶¶ 4, 81), adds a layer of speculation by referring generally to "misleading" sales prices due to "systematic" pressure and coercion on appraisers (*see*, *e.g.*, *id.* ¶¶ 67-75), and then extrapolates that a ratio of appraisal value to sales price must have

---

[29]    Substantially similar disclosures were made in the prospectus supplements for the other offerings. (*See* Trivedi Decl., Ex. B at S-56, S-59, S-63 – S-64; Ex. C at S-62 – S-68; Ex. D at S-51 – S-53; Ex. E at S-59; Ex. F at S-66, S-79; Ex. G at S-54, S-58; Ex. H at S-48; Ex. I at S-54; Ex. J at S-49; Ex. K at S-45 – S-46, S-52, S-60; Ex. L at S-51; Ex. M at S-43; Ex. N at S-60; Ex. O at S-56 – S-57; Ex. P at S-44; Ex. Q at S-41.)

misrepresented a borrower's equity (*see, e.g., id.* ¶ 81).[30]  These allegations involve multiple

layers of speculation and are as flawed as the underlying appraisal allegations.

Moreover, these allegations are based on the erroneous premise that an "inflated"

appraisal "will result in a lower [loan-to-value] ratio."  (*Id.* ¶ 81.)  The offering documents defined

"loan-to-value" as the ratio between the principal balance of the mortgage loan and the *lesser* of

(i) the selling price of the property *or* (ii) its appraised value at the time of the sale.  (Trivedi Decl.,

Ex. A at S-64.)[31]  An "inflated" appraisal thus would not necessarily alter the loan-to-value ratio

for a mortgage loan, much less cause it to overstate a borrower's equity.  Plaintiff's boot-strapped

loan-to-value ratio claim is therefore deficient.  *See Plumbers' Union*, 2009 WL 3149775 at *7

(dismissing similar loan-to-value claim "for the evident reason that it is dependent upon plaintiffs'

unsubstantiated allegations that the offering materials were misleading with regard to the appraisal

methods utilized").

### 4.    The Offering Documents Did Not Make Any Misrepresentations About Borrowers' Loan Documents.

In response to this Court's rejection of its prior allegations as to borrowers' loan

documentation, Plaintiff baldly alleges in the SAC that the registration statement "represented" to

investors that *none* of the documents submitted by borrowers, appraisers and others in connection

with the underlying mortgage loans, contained *any* material misrepresentations.  (SAC ¶¶ 3, 4, 27,

76, 77.)  That is incorrect.  No such representation was ever made *to investors* (in the registration

---

[30]    The offering documents make clear that one component of the "loan-to-value" ratio was the "appraised value."  (*See* Trivedi Decl., Ex. A at S-64; Ex. B at S-63; Ex. C at S-62; Exs. D, E, F and G at 17; Ex. H at S-37; Ex. I at S-54 – S-55; Ex. J at 17; Ex. K at S-60; Ex. L at S-50; Ex. M at 17; Ex. N at S-58 – S-59; Ex. O at S-57 – S-58; Ex. P at S-37; Ex. Q at 17.)

[31]    Substantially similar disclosures were made in the prospectus supplements for the other offerings. (Ex. B at S-63; Ex. C at S-62; Exs. D, E, F and G at 17; Ex. H at S-37; Ex. I at S-54 – S-55; Ex. J at 17; Ex. K at S-60; Ex. L at S-50; Ex. M at 17; Ex. N at S-58 – S-59; Ex. O at S-57 – S-58; Ex. P at S-37; Ex. Q at 17.)

statement or otherwise).  Instead, the language that the SAC mischaracterizes as a "representation"
*to investors* comes from examples of representations and warranties that *loan originators* in the
future *might* make *to purchasers of loans* in connection with securitizations yet to be structured or
offered to investors.[32]  The SAC does not allege that loan originators failed to make any such
representations as part of the actual purchase of the loans that went into loan pools underlying the
certificates that were ultimately offered to investors.  But more importantly, these were not
representations made *to potential investors* in the certificates.  Accordingly, this language cannot
be the basis for a Section 11 or 12(a)(2) claim by an investor, like Plaintiff.

Moreover, contrary to Plaintiff's allegations, the offering documents expressly
disclosed that originators were not required to verify income for certain programs (Trivedi Decl.,
Ex. A at  S-68 ("under the Streamlined Documentation Program, . . . only a limited credit review
is conducted, no income or asset verification is required")),[33] and that originators could deviate
from their guidelines concerning borrowers' debt-to-income ratios (*id*. at  S-65 ("The maximum
acceptable debt-to-income ratio, which is determined on a loan-by-loan basis, varies . . . .
Exceptions . . . may be made if compensating factors are demonstrated . . . .")).[34]  Thus, the
offering documents disclosed precisely what Plaintiff alleges was misrepresented or omitted.

---

[32]    These sample representations included statements such as:  (i) "[t]he documents, instruments and
agreements submitted for loan underwriting were not falsified and contain no untrue statement of material
fact or omit to state a material fact" (SAC ¶ 76 (Trivedi Decl., Ex. R ("Reg. St.") at S-37 – S-38)); and
(ii) "[a]ll documents executed in connection with the Mortgage Loan . . . are free of fraud" (SAC ¶ 76
(alteration in quote) (Reg. St. at S-51)).

[33]    Substantially similar disclosures were made in the prospectus supplements for the other offerings.
(*See* Trivedi Decl., Ex. B at S-56; Ex. C at S-66; Ex. D at S-52; Ex. E at S-62; Ex. F at S-79; Ex. G at
S-57 – S-58; Ex. H at S-45, S-48; Ex. I at S-54, S-58; Ex. J at S-49; Ex. K at S-48, S-52 – S-53, S-58 –
S-59; Ex. L at S-55; Ex. M at S-43; Ex. N at S-60, S-67; Ex. O at S-54, S-56; Ex. P at S-43 – S-44;
Ex. Q at S-40, S-57, 30-31.)

[34]    Substantially similar disclosures were made in the prospectus supplements for the other offerings.
(*See* Trivedi Decl., Ex. B at S-51, S-55; Ex. C at S-59; Ex. D at S-48; Ex. E at S-60; Ex. F at S-78;

(*continued on next page*)

**5.      The Offering Documents Disclosed the Certificates' Ratings.**

There is nothing new in the SAC's ratings allegations; Plaintiff continues to allege a failure to disclose that the ratings Moody's Investors Service ("Moody's") and Standard & Poor's Ratings Services ("S&P") assigned to the certificates could be inaccurate and were based on supposedly "outdated" models.  (SAC ¶¶ 3, 4, 27, 82-88.)  That allegation still fails to state a claim.

*First*, Plaintiff's allegation is premised on the assertion that the rating agencies' models used inaccurate loan data, including inflated property values and loan-to-value ratios. (*See id*. ¶¶ 84, 87.)  Plaintiff, however, has never identified *any* inaccurate data concerning the *actual* loans in the trusts.

*Second*, the offering documents accurately disclosed the ratings assigned by Moody's and S&P and warned that those ratings could change:  "The Ratings on Your Certificates Could be Reduced or Withdrawn."[35]  That Moody's and S&P later downgraded their initial ratings does not mean that the ratings were false when made.  *See Panther Partners*, 538 F. Supp. 2d at 669 (allegation implying "that what only became clear due to subsequent events was somehow known [to defendants] far earlier" is speculative hindsight pleading that fails to satisfy the *Twombly* notice pleading standard).  Hindsight pleading is especially deficient here given the unprecedented collapse of the residential real estate market in the period following these offerings.

---

Ex. G at S-52, S-54, S-56; Ex. H at S-49; Ex. I at S-54, S-58; Ex. J at S-48 – S-49; Ex. K at S-45, S-53; Ex. L at S-52; Ex. M at S-41; Ex. N at S-60, S-67; Ex. O at S-54; Ex. P at S-44; Ex. Q at S-40, 30-31.)

[35]      Trivedi Decl., Ex. A at S-51; *see also* Ex. B at S-42; Ex. C at 13; Ex. D at S-37; Ex. E at 13; Ex. F at S-44; Ex. G at S-42 – S-43; Ex. H at S-33; Ex. I at S-35; Ex. J at 13; Ex. K at 13; Ex. L at 33; Ex. M at 13; Ex. N at S-46; Ex. O at S-41; Ex. P at S-34; Ex. Q at S-27.

*Third*, the certificates' ratings cannot, in all events, give rise to liability under the 1933 Act because ratings are not considered part of the offering documents. 17 C.F.R. § 230.436(g)(1). SEC Rule 436(g)(1) provides that:

> [T]he security rating assigned to a class of debt securities, a class of convertible debt securities, or a class of preferred stock by a nationally recognized statistical rating organization . . . shall not be considered a part of the registration statement prepared or certified by a person within the meaning of sections 7 and 11 of the [1933] Act.

The SEC has explained that it promulgated Rule 436(g)(1) to address its concern that without such an exemption, rating agencies would be unlikely to give "due attention" to their ratings. *Disclosure of Securities Ratings in Registration Statements*, SEC Release No. 33-6336, 46 Fed. Reg. 42024, 42027 (Aug. 18, 1981). The SEC therefore crafted a rule that not only exempts rating agencies from liability under the 1933 Act, but also deems their ratings not part of the offering documents. *Id.* at 42024 ("a security rating is not a part of a registration statement"). Plaintiff's ratings disclosure claims should therefore be dismissed. *See Plumbers' Union*, 2009 WL 3149775 at *8-9 (dismissing similar ratings claims).

**B.    Plaintiff Does Not Adequately Allege
        Materiality or Violation of Any Duty to Disclose.**

Sections 11 and 12(a)(2) require a plaintiff to allege that (i) the offering documents contained a *material* misrepresentation, and (ii) the defendants were under a *duty to disclose* the allegedly misrepresented information. *Basic*, 485 U.S. at 231-32; *Panther Partners*, 538 F. Supp. 2d at 668.

The SAC fails to allege that any purported misrepresentations were material, or that Defendants violated any duty to disclose, because none of Plaintiff's allegations has ever tied the industry-wide practices Plaintiff alleges to any of the specific loans or certificates at issue here (much less established a material impact on them). *See Plumbers' Union*, 2009 WL 3149775

at *7 (dismissing similar claims because plaintiffs "failed to offer any facts to support a finding that the misrepresentations were material").

        *First*, despite having access to publicly filed documents describing the characteristics of *all* the loans conveyed to the trusts, Plaintiff still has not alleged that any of *those* loans (i) violated any originators' underwriting guidelines, (ii) had an inaccurate property appraisal or loan-to-value ratio, (iii) were issued based on inaccurate loan documentation or (iv) contributed to inaccurate ratings for the certificates. Even assuming that some such "improper" loans were included in the loan pools, Plaintiff has never alleged any facts suggesting that inclusion of those loans was material — either in light of the huge number of loans held by the trusts (*e.g.*, approximately 4,224 in the GSAA 2007-5 and GSAA 2007-10 trusts) or in comparison to how similar loans performed in the housing meltdown. As this Court warned, Plaintiff cannot state a claim without such allegations to establish materiality. (Trivedi Decl., Ex. T at pp. 29, 33.) *See ECA & Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206-07 (2d Cir. 2009) (dismissing Section 11 claim for lack of materiality); *Garber* v. *Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613-14 (S.D.N.Y. 2008) (same).

        Plaintiff also cannot state a claim by continuing to parrot conclusory allegations found in public sources and relying on unidentified hearsay about general market practices or concerning other unrelated offerings. *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 374 (S.D.N.Y. 2003) ("snippets of e-mails and conclusions of [the regulator] . . . [fail] to constitute well-pleaded facts"); *First Nationwide Bank*, 27 F.3d at 771 (rejecting "unsupported claims regarding the 'actual' value of the collateral properties when the loans were made" because "[u]nder Rule 12(b)(6) . . . unwarranted deductions of fact are not admitted"); *cf. Wielgos* v. *Commonwealth Edison Co.*, 892 F.2d 509, 515 (7th Cir. 1989)

("Securities laws require issuers to disclose *firm-specific* information . . . . [They] needn't disclose the hazards of its business, hazards apparent to all serious observers and most casual ones.") (emphasis in original; citation omitted).

Further, the information Plaintiff alleges regarding the practices of certain originators, which purportedly came from its "investigation" of former employees of Defendants, unaffiliated originators and appraisers, is insufficient.  (SAC ¶¶ 25, 46-56, 70-75.)  *None* of the information in the SAC purports to come from employees of Defendants; rather, Plaintiff merely recycled allegations from the secondary sources cited in Plaintiff's prior complaints, which are not "tied" to Defendants, the certificates or the underlying loans at issue here.  Such "untied" allegations are insufficient to state a claim.  *See Plumbers' Union*, 2009 WL 3149775 at *5 n.5 ("However, most of plaintiffs' allegations — which are all uncited, unsubstantiated hearsay — refer to conduct at [one originator] that is alleged to have occurred in the 1990's.  Plaintiffs offer nothing in the Consolidated Amended Complaint to tie the alleged conduct to the loans at issue in this litigation.").

*Second*, as noted in Defendants' original motion to dismiss, under the SEC regulations applicable to mortgage-backed securities, Defendants had a duty to disclose only *known* exceptions to an originator's underwriting guidelines and the manner in which the loans were selected.[36]  Section 1111 of Regulation AB — which "comprehensively" "provid[es] tailored disclosure requirements and guidance for [1933 Act] filings involving asset-backed securities," *Asset-Backed Securities*, 70 Fed. Reg. at 1581 — addresses the "[i]nformation [r]egarding [p]ool [a]sset [t]ypes and [s]election [c]riteria" Defendants were required to disclose:

---

[36]    *See In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 207 (S.D.N.Y. 2000) ("The relevant SEC regulations answer the question as to what material facts are required to be stated in an issuer's [offering documents]."), *aff'd*, 202 F.3d 81 (2d Cir. 2000); *In re Morgan Stanley Tech. Fund Sec. Litig.*, No. 02-CV-6153, 2009 WL 256005, at *7 (S.D.N.Y. Feb. 2, 2009) ("[I]t is well established that there is no liability in the absence of a duty to disclose, even if the information would have been material.").

A description of the solicitation, credit-granting or underwriting criteria used to originate or purchase the pool assets, including, *to the extent known*, any changes in such criteria and the extent to which such policies and criteria are or could be overridden.

17 C.F.R. § 229.1111(a)(3) (emphasis added).

Not only has Plaintiff *not* alleged that Defendants had *any* knowledge that any originator was deviating from its underwriting guidelines, it continues to insist that Defendants had *no* such knowledge and did *not* recklessly disregard any such deviations. (SAC ¶¶ 98, 110, 115.) Where (as here) an SEC regulation requires that defendants disclose only *known* information, a plaintiff must allege that defendants *knew* about the purportedly misrepresented or omitted information to state a claim for a disclosure violation. *See Garber*, 537 F. Supp. 2d at 611, 613 (dismissing Section 11 claim where regulation required knowledge of "known trends" and plaintiff failed to make such allegations). Because Plaintiff has not only failed to do so, but has repeatedly done the opposite — no doubt to avoid the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA — its claims should be dismissed.[37]

---

[37] The SAC includes a new purported "omission" claim that did not appear in Plaintiff's prior pleadings: Plaintiff now asserts that the offering documents should have disclosed that Goldman Sachs entered into various unspecified "credit default swaps" that amounted to "bets against the housing market" (SAC ¶ 89) and "bets that residential mortgage borrowers would default on their loans — loans just like those in the Trusts" (SAC ¶ 90). Contrary to Plaintiff's assertion, however, the offering documents expressly disclosed this possibility — even though, as a rule, offering documents do not have to disclose matters that have no bearing on the investments at issue or strategies or alleged conflicts of interest that are well known. *See Resnik* v. *Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) ("Disclosure of an item of information is not required, however, simply because it may be relevant or of interest to a reasonable investor."); *In re Merrill Lynch*, 272 F. Supp. 2d at 246, 250 (dismissing 1933 Act claims because "[t]he alleged conflict of interest between brokerage firms, investment bankers and research analysts that underlies the entire complaint was a matter of public knowledge"). For example:

- The GSAA 2007-5 prospectus supplement disclosed that: "We and our affiliates, officers, directors, partners and employees, including persons involved in the preparation or issuance of this material may, from time to time, have long or short positions in, and buy or sell, the securities mentioned in this material or derivatives of those securities (including options)." (Trivedi Decl., Ex. A at A-1-1 – A-2-31.)

*(continued on next page)*

## IV.     <u>PLAINTIFF'S CLAIMS ARE TIME BARRED.</u>

Plaintiff's artful deletions from the SAC cannot insulate its amended pleading from the applicable statute of limitations.  Plaintiff was on notice of its claims contemporaneously with the numerous public sources cited in its prior pleading, whether or not those sources are now explicitly spelled out in the SAC.  *See In re IPO*, 544 F. Supp. 2d at 291 n.96 ("When a pleading is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission; but it still remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated, though controvertible, like any other extrajudicial admission made by a party or his agent.") (citation and quotation marks omitted).

Section 13 of the 1933 Act requires that claims based on Sections 11 and 12(a)(2) of the Act be filed within "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  The one-year period begins to run when a plaintiff has either actual notice or "inquiry notice" of the alleged misrepresentations.  *Dodds* v. *Cigna Sec., Inc.*, 12 F.3d 346, 349-50 (2d Cir. 1993).  A plaintiff does not need "notice of the entire wrongdoing" to trigger its duty to investigate whether it has possible Section 11 and 12(a)(2) claims.  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005).  Instead, a plaintiff is on inquiry notice when "the exercise of reasonable diligence[ ] would have led to actual knowledge."  *In re Openwave Sys. Sec. Litig.*, 528

---

- The GSAA 2007-10 prospectus supplement disclosed that:  "The Sponsor and its affiliates may from time to time have economic interests in the performance of the Mortgage Loans included in the Trust Fund or in other securitization trusts that may include a residual interest, other classes of certificates or interests in the form of derivatives."  (*Id.*, Ex. B at S-108.)

(*See id.*, Ex. C at A-2 – A-63; Ex. D at A-2 – A-30; Ex. E at A-1 – A-54; Ex. G at A-2 – A-31; Ex. H at A-1 – A-21; Ex. I at A-1 – A-21; Ex. J at A-2 – A-21; Ex. K at S-96; Ex. L at S-105; Ex. M at S-70; Ex. N at S-113; Ex. O at S-97; Ex. P at A-1 – A-10.)  Further, Plaintiff does not allege that any such credit default swaps related in any way whatsoever to the certificates or loans at issue here.  (SAC ¶¶ 89-93.)  For all these reasons, Plaintiff's new "omission" allegations are factually erroneous and legally deficient.

F. Supp. 2d 236, 245 (S.D.N.Y. 2007). "Information that may be held to constitute inquiry notice includes any financial, legal, or other data, such as public disclosures in the media . . . that provide the plaintiff with sufficient storm warnings to alert a reasonable person to the probability that there may have been either misleading statements or material omissions involved in the sale of the securities at issue," as well as private lawsuits. *In re Alstom*, 406 F. Supp. 2d at 421; *see also Korwek* v. *Hunt*, 646 F. Supp. 953, 958 (S.D.N.Y. 1986), *aff'd*, 827 F.2d 874 (2d Cir. 1987). "When the facts from which knowledge may be imputed are clear from the pleadings and the papers and filings integral to the complaint, the question of inquiry notice may be properly resolved on a motion to dismiss." *In re Alstom*, 406 F. Supp. 2d at 421-22.

Plaintiff filed this action on December 11, 2008. All of Plaintiff's claims are barred because Plaintiff was on inquiry notice (at a minimum) of the alleged misrepresentations challenged here well before December 11, 2007. The SAC confirms that Plaintiff's claims are time barred because — despite its tactical deletion of certain matters of public record — it continues to rely on information from Plaintiff's prior pleading that established inquiry notice of Plaintiff's potential Section 11 and 12(a)(2) claims:

- At paragraphs 44 and 45, Plaintiff cites an *April 2006* study, concluding that "60% of borrowers had 'exaggerated' their income by more than 50%," which a March 2007 Credit Suisse analyst report cited. Credit Suisse, Mortgage Liquidity Du Jour, Underestimated No More (Mar. 12, 2007). (*Compare* Am. Compl. ¶¶ 60, 61, *with* SAC ¶¶ 44, 45.)

- At paragraph 69, Plaintiff cites *June 2007* Senate testimony that there was a "terrible conflict of interest" where appraisers "experience systemic problems of coercion" and are "ordered to doctor their reports." *Ending Mortgage Abuse: Safeguarding Homebuyers*, Testimony of Alan Hummel, Chair of the Government Relations Committee Appraisal Institute and Senior Vice President and Chief Appraiser of Forsythe Appraisals, LLC, Before the U.S. Senate Subcomm. on Housing, Transportation and Community Development, June 26, 2007. (*Compare* Am. Compl. ¶ 69, *with* SAC ¶ 68.)

- At paragraph 69, Plaintiff refers to a publicly available *February 2007* survey, reporting that "[n]ine out of 10 real estate appraisers say they've been pressured to raise property valuations by mortgage brokers [and] . . . lenders." Kenneth R. Harney, *Appraisers Say*

*Pressure on Them to Fudge Values Is Up Sharply*, REALTY TIMES, Feb. 5, 2007. (*Compare* Am. Compl. ¶ 70, *with* SAC ¶ 69.)

In addition, Plaintiff's prior amended complaint cited several more sources demonstrating that Plaintiff was on inquiry notice of its claims by December 2007, at the latest:

- At paragraph 162, Plaintiff quoted a *May 2005* article in which AmNet and GreenPoint officers discuss their concerns about their companies' origination practices and whether the mortgages they were issuing were risky. Lew Sichelman, *Innovative Home Loans Stir Worries Among Critics*, CHICAGO TRIBUNE, May 22, 2005.

- At paragraph 84, Plaintiff quoted a *May 7, 2007* letter Countrywide publicly submitted to the Office of Thrift Supervision ("OTS"), conceding that "almost 60% of the borrowers who obtained sub-prime hybrid ARMs [from Countrywide] would not have qualified at the fully indexed rate." Letter from Mary Jane M. Seebach (Countrywide) to Chief Counsel's Office, OTS, May 7, 2007.

- At paragraph 96, Plaintiff cites an *August 2007* article about Countrywide's lending practices, which states that "potential borrowers were often led to high cost and sometimes unfavorable loans that resulted in richer commissions for Countrywide's smooth-talking sales force." Gretchen Morgenson, *Inside the Countrywide Lending Spree*, N.Y. TIMES, Aug. 26, 2007.

- At paragraph 169, Plaintiff cited a publicly available *August 2007* study, identifying SouthStar as the "riskiest of all [originators] reviewed." Press Release, SMR Research Corp., *Mortgage Lender Insolvencies Due to Bad Credit Are Nearing an End, Study Finds*, Aug. 22, 2007.

"Plaintiff[] may not, by amending [its] Complaint, undo the inquiry notice and resulting obligations conceded by [its] first complaint." *In re Integrated Res. Real Estate*, 850 F. Supp. at 1132 n.47. Plaintiff's prior pleading demonstrating that it was on inquiry notice is still a judicial admission. *See id.*

Further, Plaintiff's allegations in *Plumbers' Union* demonstrate that it was on notice of alleged problems in the subprime industry no later than the *summer of 2007*. (Trivedi Decl., Ex. U.) In *Plumbers' Union*, Plaintiff alleged:

- "*By the summer of 2007*, the truth about the performance of the mortgage loans that secured the [Nomura] Certificates began to be revealed to the public and the rating agencies began to put negative watch labels on Certificate tranches or classes, ultimately downgrading many." (*Id.* at ¶ 8 (emphasis added).)

- "On *July 17, 2007*, Moody's announced a possible downgrade of Nomura [certificates]." (*Id.* at ¶ 169 (emphasis added).)

- On *November 13, 2007*, Moody's downgraded numerous classes of Certificates of Nomura." (*Id.* at ¶ 173 (emphasis added).)

- "On *December 10, 2007*, Moody's downgraded the ratings of certain investments backed by sub-prime home loans issued by Wells Fargo because borrowers were having problems keeping up with payments, raising concerns that Wells Fargo's underwriting practices were suspect." (*Id.* at ¶ 174 (emphasis added).)

The *Plumbers' Union* complaint thus makes clear that the industry practices Plaintiff challenges were well publicized more than a year before Plaintiff filed its initial complaint here.

Finally, as summarized in Appendix 1 hereto, other public information available prior to December 11, 2007 further disclosed the issues on which Plaintiff bases its SAC. This information disclosed that prior to December 11, 2007:[38]

- **There were problems with subprime underwriting guidelines.** The public record was saturated with news articles, statements from government officials and various lawsuits concerning industry-wide poor lending practices of mortgage originators, including those at issue here — Countrywide, GreenPoint, National City and Wells Fargo.

- **Government officials were concerned about subprime loan origination and due diligence practices.** Congress held numerous hearings on the mortgage crisis, and major figures, such as Senators Dodd and Schumer, then-Treasury Secretary Paulson, Federal Reserve Chairman Bernanke and FDIC Chairman Bair, made multiple public statements on how loose underwriting practices contributed to the subprime crisis.

- **Regulators were investigating subprime mortgage lenders.** Several states issued public statements announcing that they were investigating and securing injunctions against subprime originators because of their underwriting practices.

- **Subprime mortgage lenders were closing because their alternative loan programs had resulted in significant defaults.** Many subprime originators had declared bankruptcy or closed all or substantial parts of their lending businesses because of repurchase and buy-back obligations associated with nonperforming loans they had originated and sold.

- **It was commonly reported that appraisers were being coerced by originators to inflate property values.**

---

[38]     Defendants attach as Appendix 1 a chronology of publicly available information regarding the subprime industry, disclosing the very problems about which Plaintiff complains. The Court may consider this information to determine whether Plaintiff was on inquiry notice of its possible claims without converting this motion to dismiss into a motion for summary judgment. *Ingrassia*, 262 F. Supp. 2d at 119.

- **Problems with the rating agencies were well reported.** News sources reported on alleged conflicts of interest that rating agencies had when evaluating securitizations, which led to the September 2007 Congressional hearings on the rating agencies' role in the subprime crisis.

This information clearly constituted notice of the very "problems" about which Plaintiff now complains. Because Plaintiff filed its action more than one year after this information put it on inquiry notice (at a minimum) of its potential claims, its Sections 11 and 12(a)(2) claims are barred and should be dismissed.[39] *See DeBenedictis* v. *Merrill Lynch & Co.*, 492 F.3d 209, 217-18 (3d Cir. 2007) (articles highlighting industry practice of higher broker fees for certain classes of shares triggered notice); *GVA Mkt. Neutral Master Ltd.* v. *Veras Capital Partners Offshore Fund, Ltd.*, 580 F. Supp. 2d 321, 329 (S.D.N.Y. 2008) (investigations triggered notice); *Korwek*, 646 F. Supp. at 958 (lawsuits, hearings and media coverage triggered notice).

## V.    PLAINTIFF HAS FAILED TO PLEAD A SECTION 15 CLAIM.

Plaintiff's "control person" claim under Section 15 of the 1933 Act fails because Plaintiff has not adequately pleaded an underlying Section 11 or 12(a)(2) violation, nor has it adequately pleaded facts supporting an inference that Goldman Sachs, GSMC or the individual defendants "controlled" any of the alleged primary violators. *See Rombach* v. *Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004). To establish a Section 15 claim, Plaintiff must allege an underlying primary violation, *id.*, and "the power to direct or cause the direction of the management and policies of" the alleged primary violator. 17 C.F.R. § 230.405.

---

[39]     Plaintiff previously argued that it is excused from pleading "diligent effort" because the April 16, 2008 amended prospectus supplement filed with the SEC for GSAA 2007-5 somehow "reassured" it that the abundantly available information cited above did not apply to the certificates it allegedly purchased. But the April 16, 2008 prospectus supplement is the *exact* version of the April 27, *2007* prospectus supplement that was distributed to investors when the certificates were issued. As the Explanatory Note at the beginning of the GSAA 2007-5 prospectus supplement explains, the only reason it was re-filed in April 2008 is because the version that was filed with the SEC was not the April 2007 version that investors received. (Trivedi Decl., Ex. A at S-1.)

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's SAC should be dismissed in its entirety, with prejudice.

Dated:  December 11, 2009                    Respectfully submitted,

/s/  Richard H. Klapper
Richard H. Klapper
Michael T. Tomaino, Jr.
Patrice A. Rouse
Harsh N. Trivedi
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants Goldman,
Sachs & Co., Goldman Sachs
Mortgage Company, GS Mortgage
Securities Corp., Kevin Gasvoda,
Michelle Gill and Daniel L. Sparks*