

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

NECA-IBEW HEALTH & WELFARE FUND, :    Civil Action No. 1:08-cv-10783
Individually and On Behalf of All Others :
Similarly Situated, :    <u>CLASS ACTION</u>
                  Plaintiff, :    THIRD AMENDED COMPLAINT FOR
:    VIOLATION OF §§11, 12 AND 15 OF THE
vs. :    SECURITIES ACT OF 1933
:
GOLDMAN, SACHS & CO., et al., :
:
                Defendants. :
:

——————————————————————— x

## INTRODUCTION

1.      This is a securities class action on behalf of all persons or entities who acquired the Asset-Backed Certificates (collectively, the "Certificates") of defendant GS Mortgage Securities Corp. ("GS Mortgage") pursuant and/or traceable to a false and misleading Registration Statement filed January 31, 2007, and two false and misleading Prospectus Supplements filed on April 27, 2007 and October 29, 2007, each of which were expressly incorporated by reference into the Registration Statement (collectively, the "Offering Documents").  This action involves solely strict liability and negligence claims brought pursuant to the Securities Act of 1933 ("1933 Act").

2.      The Certificates were issued, underwritten and/or offered for sale by the defendants. The Certificates are securities backed by pools of residential real estate loans.  Defendants caused the Offering Documents to contain materially false and misleading statements and omissions concerning the Certificates, and the loans underlying them, in violation of the 1933 Act.

3.      In summary, defendants made the following false and misleading statements in the Offering Documents:

- Underwriting standards used to originate the loans supporting the Certificates evaluated a prospective borrower's ability to repay the loan;

- Property appraisers' compensation was not affected by whether or not a loan was approved; appraisals of the properties underlying the loans were based on recent sales of comparable properties; and the appraisals conformed to the Uniform Standards of Professional Appraisal Practice ("USPAP"), Fannie Mae or Freddie Mac standards;

- Documents submitted in connection with the loan underwriting process were not falsified, did not contain untrue statements and were free of fraud;

- The loans underlying the Certificates had certain, specific, loan-to-value ("LTV") ratios; and

- The Certificates had "investment grade" credit ratings.

4.      The true, material facts, which defendants omitted from the Offering Documents, were that:

- Borrowers were not evaluated on their ability to repay the loans; instead, loans were made regardless of a borrower's ability to repay; loan originators made as many loans as possible regardless of repayment ability since they were selling the loans to defendants at a profit; in addition, borrowers and loan originators were routinely inflating borrowers' incomes to falsely high levels to qualify borrowers for loans they could not afford to repay;

- Property appraisers' future compensation was contingent upon providing loan originators with predetermined, inflated property appraisals which allowed borrowers to qualify for loans; in addition, appraisals were not based on recent sales of comparable properties; and appraisals did not conform to USPAP, Fannie Mae or Freddie Mac standards;

- Documents submitted for loan underwriting contained untrue and false statements – potential borrowers and loan originators inflated borrowers' incomes and appraisers submitted falsely inflated property appraisals;

- Because the specified LTV ratios contained in the Offering Documents were based on inaccurate and inflated property appraisals, the LTV ratios specified in the Offering Documents were false, inaccurate and understated;

- The credit ratings of the Certificates were inaccurate and understated the investment risk associated with the Certificates because the rating agencies used outdated assumptions, overly-relaxed rating criteria and inaccurate data in formulating the ratings; and

- At the same time defendants were selling the Certificates to plaintiff and the Class, and representing that the Certificates were "investment grade," defendants were also engaging in credit default swaps and other investments that expected that loans like those underlying the Certificates would not be repaid.

5.      As a result, the Certificates sold to plaintiff and the Class had a much greater risk profile than represented in the Offering Documents.  Instead of being conservative "investment grade" products as defendants represented in the Offering Documents, the Certificates were extremely risky investments that should have actually been rated as "junk."

6.      By mid-2008, the truth about the performance of the mortgage loans that secured the Certificates began to be revealed to the public, disclosing that the Certificates were much riskier than

- 2 -

originally represented, and that holders would likely receive less absolute cash flow in the future and receive it, if at all, on a untimely basis.  The credit rating agencies also put negative watch labels on the Certificates and downgraded previously-assigned ratings.  At present, each of the Certificates plaintiff bought have been downgraded from "AAA" investment grade at the time of purchase to "CCC" junk grade investments.  As an additional result, the Certificates are no longer marketable in the secondary market at prices anywhere near the prices paid by plaintiff and the Class, and the holders of the Certificates are exposed to much more risk than the Offering Documents represented with respect to both the timing and absolute cash flow to be received.

## JURISDICTION AND VENUE

7.     The claims alleged herein arise under §§11, 12(a)(2), and 15 of the 1933 Act, 15 U.S.C. §§77k, 77(l)(a)(2), and 77o.  Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act.

8.     The violations of law complained of herein occurred in this District, including the dissemination of materially false and misleading statements complained of herein into this District.  Defendants conduct business in this District.

## PARTIES

9.     Plaintiff NECA-IBEW Health & Welfare Fund acquired Certificates pursuant and traceable to the Registration Statement and Prospectus Supplements and has been damaged thereby.  Specifically, on October 15, 2007, plaintiff purchased GSAA Home Equity Trust 2007-10 Asset-Backed Certificates, Class A2A, with a face value of $390,000, directly from defendant Goldman Sachs in a public offering.  On May 21, 2008, plaintiff purchased GSAA Home Equity Trust 2007-5 Asset-Backed Certificates, Class 1AV1, with a face value of $49,827.56.  Plaintiff continues to hold the Certificates it purchased.

- 3 -

10.    Defendant Goldman Sachs & Co. ("Goldman Sachs") is a global bank holding company that engages in investment banking, securities and investment management. Goldman Sachs was an underwriter in the sale of the Certificate offerings listed in paragraph 18 below. Defendant Goldman Sachs helped to draft and disseminate the Offering Documents.

11.    Defendant Goldman Sachs Mortgage Company ("GSMC") is a wholly owned subsidiary of defendant Goldman Sachs. GSMC purchased the loans underlying the Certificates from various loan originators and other third-parties. GSMC is the "sponsor" of the Certificate offerings at issue in this action and made certain representations concerning the loans within the Trusts at issue herein.

12.    Defendant GS Mortgage is a wholly owned subsidiary of defendant GSMC. GS Mortgage engages in securitizing mortgage assets and related activities. GS Mortgage securitized the loans at issue in this action, and was the "depositor" and issuer of the Certificates. GS Mortgage issued the Certificates to plaintiff through two New York common law trusts. GS Mortgage issued over one billion dollars worth of Certificates pursuant to the Registration Statement and Prospectus Supplements through the following two Trusts: (1) GSAA Home Equity Trust 2007-5; and (2) GSAA Home Equity Trust 2007-10. In connection with the sale of Certificates for the GSAA Home Equity Trust 2007-5, defendants issued a Prospectus Supplement on April 27, 2007. In connection with the sale of Certificates for the GSAA Home Equity Trust 2007-10, defendants issued a Prospectus Supplement on October 29, 2007.

13.    Defendant Daniel L. Sparks ("Sparks") was Chief Executive Officer ("CEO") and a director of GS Mortgage during the relevant time period. Sparks was also overseeing defendant Goldman Sachs's credit-default swap and other activities alleged herein, betting against the

residential housing market at the same time defendants were offering the Certificates at issue here to plaintiff and the Class.  Defendant Sparks signed the January 31, 2007 Registration Statement.

14.   Defendant Michelle Gill ("Gill") was Vice President, and the Principal Accounting Officer of GS Mortgage during the relevant time period.  Defendant Gill signed the January 31, 2007 Registration Statement.

15.   Defendant Kevin Gasvoda ("Gasvoda") was a director of GS Mortgage during the relevant time period.  Defendant Gasvoda signed the January 31, 2007 Registration Statement.

16.   The defendants identified in ¶¶13-15 are referred to herein as the "Individual Defendants."  The Individual Defendants functioned as directors to the Trusts and to GS Mortgage.

17.   These defendants aided and abetted, and/or participated with and/or conspired with the other named defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

18.   Plaintiff brings this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons or entities who acquired: (1) the Asset-Backed Certificates Series 2007-5 from the GSAA Home Equity Trust 2007-5; and (2) the Asset-Backed Certificates Series 2007-10 from the GSAA Home Equity Trust 2007-10, pursuant and/or traceable to the false and misleading Registration Statement (Registration No. 333-139817) and Prospectus Supplements and who were damaged thereby (the "Class").

19.   Excluded from the Class are defendants, the officers and directors of the defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

20.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are, at least, hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by defendants or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  The Registration Statement issued billions of dollars worth of Certificates.

21.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal securities laws complained of herein.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether defendants violated the 1933 Act; whether the Registration Statement and Prospectus Supplements issued by defendants to the investing public negligently omitted and/or misrepresented material facts about the Certificates and the underlying mortgage loans comprising the pools; to what extent the members of the Class have sustained damages; and the proper measure of damages.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## PLAINTIFF'S INVESTIGATION

25.    Plaintiff alleges the facts herein based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by defendants.  Plaintiff's counsel has also reviewed other regulatory filings and reports, securities analysts reports, and advisories about defendants, the Trusts, the Certificates and the loans underlying the Certificates.  Plaintiff's counsel has further reviewed media reports about the defendants, the Certificates, the agencies that rated the Certificates, and the loan originators alleged in this Complaint.  In addition, plaintiff's counsel has conducted interviews of former employees of the defendants, former employees of the loan originators, former employees of companies defendants used in connection with the loans, and others knowledgeable about the matters set forth herein.  Plaintiff's counsel has also retained and consulted with experts specializing in the real estate lending and mortgage industry.  Plaintiff's counsel believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## BACKGROUND

26.    The Certificates provide their holders an ownership interest in principal and/or interest payments from various pools of residential real estate loans contained within the Trusts.  The loans within the Trusts were purchased by defendant GSMC from various loan originators, bundled together, and then securitized.  GSMC, along with fellow defendant GS Mortgage, bundled the loans together into the Trusts and then offered the Certificates for sale to the public via the Offering Documents.

27.    Defendants created the Offering Documents in connection with the sale of the Certificates.  In the Registration Statement, defendants disclosed that GSMC acquired loans for the Trusts through two primary channels: (1) the "Goldman Sachs Mortgage Conduit Program" ("Conduit Program"); and (2) by bulk acquisitions in the secondary market.  In connection with the loans GSMC purchased and which were put into the Trusts, the Offering Documents described the underwriting guidelines purportedly used in the origination of those loans and, in some cases, identified the specific loan originators who sold the loans to GSMC and purported to describe those originators' specific underwriting guidelines.  The Offering Documents also described the property appraisal practices supposedly used in connection with the loan originations.   The Offering Documents further affirmatively represented that specific loan originators and defendant GSMC warranted that none of the documents submitted in connection with the loan underwriting process contained untrue or false information and/or that such documents were free of fraud.  In addition, the Offering Documents represented that loans within the Trusts had specific LTV ratios.  The Offering Documents further stated that the Certificates had "investment grade" credit ratings from well-known (and, at the time, well-respected) rating agencies.  Defendants' representations about the loan underwriting standards, appraisal practices, loan origination documents, LTV ratios and credit ratings were all false and misleading, and omitted material information about these topics, as set forth in detail below.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### Defendants Misrepresented That Borrowers Were
### Evaluated on Their Ability to Repay The Loans

28.    The January 31, 2007 Registration Statement and the Prospectus Supplements for the GSAA Home Equity Trusts 2007-5 and 2007-10 indicated that GSMC acquired loans for the Trusts through the Conduit Program and by bulk acquisitions in the secondary market.  Under the Conduit

- 8 -

Program, GSMC acquired loans from a variety of banks, savings and loans associations, mortgage bankers and other mortgage loan originators and purchasers of loans in the secondary market. With respect to the GSAA Home Equity Trust 2007-5, approximately 75.18% of the "Group I" loans and 29.11% of the "Group II" loans were acquired through the Conduit Program. A large number of loans in the GSAA Home Equity Trust 2007-10 were also acquired through the Conduit Program.

29.     The Offering Documents repeatedly emphasized that the originators of loans in the Trusts checked to make sure borrowers could repay the loans that were being made. For example, the Registration Statement represented that with respect to loans purchased under the Conduit Program, "***the originating lender makes a determination about whether the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property***."[1] The Registration Statement also represented that "***[t]he lender or an agent acting on the lender's behalf applies the underwriting standards to evaluate the borrower's . . . repayment ability***" and that "***the lender makes a determination as to whether the prospective borrower has sufficient monthly income available (as to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the mortgaged property such as property taxes and hazard insurance)***." The Registration Statement further represented that certain other types of loans "***are underwritten on the basis of a judgment that mortgagors or obligors will have the ability to make the monthly payments required initially***."

30.     Similarly, the Prospectus Supplement for the GSAA Home Equity Trust 2007-10 stated "***the originating lender makes a determination about whether the borrower's monthly***

---

[1]     All emphasis in this Complaint is added unless otherwise stated.

512860_1

*income (when verified or stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan*."

31.     The Prospectus Supplement for the GSAA Home Equity Trust 2007-5 contained nearly identical language: "*the originating lender makes a determination about whether the borrower's monthly income (when verified or stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan*."

32.     The Prospectus Supplements for the GSAA Home Equity Trust 2007-10 and GSAA Home Equity Trust 2007-5 also set forth the lending guidelines used by the originators of loans in those Trusts.   Both Prospectus Supplements stated that loan originator GreenPoint Mortgage Funding, Inc.'s ("GreenPoint") underwriting guidelines "*are applied to evaluate the prospective borrower's . . . repayment ability*."  GreenPoint originated nearly 25% of the loans in "Group I" of the GSAA Home Equity Trust 2007-5 and was also a major originator of loans in the GSAA Home Equity Trust 2007-10.

33.     The Prospectus Supplement for the GSAA Home Equity Trust 2007-10 identified Wells Fargo Bank as a loan originator for that Trust and represented that its "*underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's . . . ability to repay the loan*."  Wells Fargo Bank also originated loans for the GSAA Home Equity Trust 2007-5.

34.     The Prospectus Supplement for the GSAA Home Equity Trust 2007-5 represented that another of the loan originators, Countrywide Home Loans's ("Countrywide") "*underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's . . . repayment ability*."  Countrywide originated over 61% of the loans in  "Group II" of the GSAA Home Equity Trust 2007-5.

- 10 -

35.     The foregoing representations alleged in ¶¶29-34, to the effect that loan originators evaluated a borrower's repayment ability or determined whether a borrower could afford to repay the loan, were false and misleading.  Loan originators did not make loans based on whether a borrower's actual monthly income was sufficient to repay the loan.  Rather, these originators simply made as many loans as they possibly could, regardless of the borrowers' ability to repay the loan.  Indeed, in 2006 and 2007, at the time the loans in the Trusts were originated, there were wide-spread, systematic problems in the residential lending industry wherein loans were made to numerous persons who could not afford them.  Loan originators knew that Wall Street firms such as defendants were purchasing large quantities of home loans to be securitized and resold to the investing public without regard to whether borrowers could repay the loans.  In order to meet that demand, and to profit by originating loans that could then be sold to defendants for a profit, loan originators began lending money to nearly anyone – even if they could not afford to repay the loans – ignoring their own stated lending underwriting guidelines set forth in the Offering Documents as well as those of defendants' Conduit Program.

36.     Contrary to the representations in the Offering Documents, neither defendants Goldman Sachs, GSMC, GS Mortgage, nor the loan originators they used through the Conduit Program, employed standards aimed at determining whether borrowers' income was sufficient to meet the loan payments.  Nor did they evaluate the borrowers' ability to repay their loans.  In fact, the foregoing defendants were investigated by the Massachusetts Attorney General concerning such activities.  Defendants settled with the Commonwealth of Massachusetts, paying it $10 million. Defendants were also required to forgive all or portions of the balances on many loans they had bought and securitized, which resulted in tens of millions of dollars in additional expenses to these defendants.  These very defendants were investigated for, were involved in, and settled some of the

- 11 -

very conduct alleged in this action – failing to ascertain whether loans complied with originators' underwriting guidelines, failing to keep problem loans out of securitization pools, failing to correct inaccurate information, and failing to make investors aware of information concerning problem loans which were securitized.  Goldman Sach's, GSMC's and GS Mortgage's settlement agreement with Massachusetts is attached hereto as Exhibit A.

37.     According to a former Goldman Sachs Client Relations Manager from 2005 to 2008, who served as a liaison between Goldman Sachs' personnel who bought loans to be securitized and the loan originators, defendants freely purchased loans for securitization that they knew were "bad loans."  According to this former employee, defendants did so because they knew they would be able to pass the risk of default or non-payment to the buyers of the Certificates, thereby making a profit while avoiding the risk.  Defendants also freely bought loans that could not be repaid because defendants had "insurance" in place, via credit default swaps with American International Group ("A.I.G."), which would require A.I.G. to eventually pay Goldman Sachs tens of billions of dollars when the "bad loans" defaulted.

38.     At the time the loans were originated and transferred to the Trusts, the originators were not reviewing loan applications in order to determine whether borrowers had sufficient income to meet their monthly mortgage obligations.  Rather, the originators had implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage.  This conduct resulted in originators:

(a)     Coaching borrowers to falsely inflate their income on loan applications to appear to qualify for mortgage loans the borrowers could not afford to repay;

(b)     Falsely inflating a prospective borrower's income to qualify the borrower for a loan he or she could not afford to repay;

- 12 -

(c)     Steering borrowers to loans that exceeded their borrowing capacity;

(d)     Encouraging borrowers to borrow more than they could afford by guiding them to "stated income" loans – loans on which the borrowers could simply make up, or "state," inflated incomes that would not be verified;

(e)     Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the payment when the loan rate adjusted; and

(f)     Allowing non-qualifying borrowers to be approved for loans they could not afford under exceptions to the underwriting standards based on so-called "compensating factors" when such "compensating factors" did not in fact exist or did not justify the loans.

39.    As a result, borrowers who were required to submit income information routinely included income levels which were falsely inflated to extreme levels relative to their stated job titles. While they were successful in obtaining the loans by falsely inflating their incomes, borrowers could not afford to actually repay the loans, evidenced now by the sky-rocketing default and foreclosure rates on the loans within the Trusts. The false inflation of stated income was systematic and commonplace – a study cited by Mortgage Asset Research Institute found that almost all stated-income loans exaggerated the borrower's actual income by at least 5%, *and more than half increased the amount by more than 50%*.

40.    At least two thirds of the loans in each of the Trusts were "stated income" loans, and the vast majority of the loans required borrowers to disclose their incomes.

41.    The originators' blatant disregard for their stated underwriting guidelines encouraged this type of income inflation. For instance, many stated income borrowers were wage earners who could have supplied Forms W-2 or other income-verifying documentation, but did not and were not required to. In addition, numerous mortgages transferred to the Trusts were issued without requiring

- 13 -

the borrowers to execute a Form 4506 – which would have allowed the lender to access the borrower's tax returns from the Internal Revenue Service ("IRS") to verify income.

42.     Countrywide was a major originator of loans in the GSAA Home Equity Trust 2007-5.  The representation in the Prospectus Supplement for that Trust, that Countrywide "*evaluate[d] the prospective borrower's . . . repayment ability*" was completely false and misleading.  This was so because Countrywide's underwriting standards were actually designed to originate as many mortgage loans as possible without regard to the ability of its borrowers to repay such mortgages.  Countrywide's loan underwriting focus was not on the ability of borrowers to repay, but rather, on the amount of fees that Countrywide could generate from making loans and then selling them to Wall Street firms such as defendants.  Former Countrywide employees have admitted that Countrywide originated loans that did not meet its underwriting criteria because Countrywide employees were incentivized to increase the number of loan originations without concern for whether the borrowers were able to repay the loans.  Instead of evaluating a borrower's ability to repay the loan, Countrywide's Sales Training Facilitator Guide instructed originators to "look for ways to make the loan rather than turn it down."  According to a former Countrywide manager, "[i]f you had a pulse, [Countrywide] gave you a loan."

43.     Countrywide's loan originators systematically manipulated the income, assets and employment status of borrowers in order to qualify them for mortgages they could not afford.  Countrywide loan officers would "coach" borrowers as to what level of inflated income they should state to qualify for a loan they could not otherwise afford.  Countrywide itself also inflated borrowers' stated income, or facilitated income inflation, by encouraging ineligible borrowers to resort to "stated income loans."  According to a former Countrywide account manager, the company

- 14 -

was "infested" with employees that ignored company underwriting standards requiring them to determine if the borrowers could repay the loans.

44.    Former Countrywide employees have revealed that as many as 80% of the loans originated by a Countrywide office in Florida – a state from which many of the loans in both Trusts originated – did not meet loan underwriting guidelines.  According to another former Countrywide employee, approximately 90% of all reduced documentation loans sold out of a Chicago office had inflated incomes, and one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications in order to qualify borrowers for loans they could not afford.  A large number of loans in the GSAA Home Equity Trust 2007-5 were originated in Illinois by Countrywide.

45.    Moreover, even in the few cases when Countrywide employees actually obtained income documentation (*i.e.*, a Form W-2 ) demonstrating that the borrower did not qualify for a loan, the documentation was ignored by Countrywide and the loan was re-submitted as a stated income loan with an inflated income number so as to obtain approval of the loan – one which the borrower could not afford to repay.  These problems were systemic within the residential loan industry at the time the loans in the Trusts were originated.

46.    The defective loans were then bundled together and sold to defendants, who ultimately resold them to plaintiff and the Class via the Certificates.

47.    Countrywide's deliberate actions of ignoring of its own loan underwriting guidelines and routinely inflating borrowers' incomes resulted in the company being charged with fraud by numerous state Attorneys General and settling with them by paying a huge sum – *$8.4 billion dollars*.  Countrywide settled with the following states: Alaska, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Maryland, Maine, Michigan,

Mississippi, Montana, Nevada, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Virginia, Washington, West Virginia, Wyoming, and the Hawaii Office of Consumer Protection.  Nearly all of the loans in the Trusts were originated in these states.

48.     With respect to GreenPoint, an originator of loans in both Trusts, the representation that its "***underwriting guidelines are applied to evaluate the prospective borrower's . . . repayment ability***" was also false and misleading.  GreenPoint's underwriting guidelines – like most, if not all, loan originators – were not applied to evaluate the prospective borrower's repayment ability.  Rather, GreenPoint used guidelines supplied by Wall Street, *i.e.*, Goldman Sachs, that were not based upon sound loan underwriting standards but were merely the minimum standards that Goldman Sachs would accept for loans they would purchase and later securitize.  As a former GreenPoint VP/Wholesale Branch Operations Manager – who worked for GreenPoint from July 2003 to January 2008 – explained, the fact that a borrower was unlikely to re-pay his or her loan was irrelevant; what mattered was whether "the loans were within the underwriting guidelines set forth by [Wall Street firms such as defendants]."

49.     Many of the loans in the Trusts were originated in the State of New York, a place where Greenpoint did business.  GreenPoint's Wall Street-driven underwriting guidelines were woefully inadequate to evaluate whether a borrower was able to repay his or her loan.  As described by a former GreenPoint Account Executive – who worked in the Queens, New York branch from July 2003 through September 2007 – starting in 2005 and continuing into future years, GreenPoint's underwriting standards became increasingly lenient.  GreenPoint extended many loans to "people who probably couldn't repay their loans," according to this former Account Executive and other former employees of GreenPoint.

- 16 -

50.     Wells Fargo originated loans for both of the Trusts.  The representation that Wells Fargo's "**underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's . . . ability to repay the loan**" was false and misleading because Wells Fargo viewed as unnecessary the need to verify a borrower's income to see if he or she could repay the loan.  In fact, Wells Fargo's mortgage underwriting department was a "production based shop" where underwriters were required to make a certain amount of loans regardless of the repayment ability of the borrower.  Underwriters were expected to "find a way" to deem the loans as acceptable even when they did not meet the underwriting standards.  During 2006 and 2007 – the time period when the loans in the Trusts were originated – Wells Fargo began to completely ignore its loan underwriting standards and began lending to persons who could not afford to repay the loans.  When Wells Fargo employees objected to this practice they were fired.

51.     After analyzing information from actual loans within the GSAA Home Equity Trust 2007-5 and the attendant borrowers, plaintiff estimates that no determination as to whether a borrower could afford to repay his or her loan occurred in at least 35%-40% of the loans in the Trust.  And it is highly likely, after discovery is conducted, that an even higher percentage of loans will be found to be so affected.  Similarly, with respect to the loans within GSAA Home Equity Trust 2007-10, after analyzing information from actual loans within that Trust and the attendant borrowers, plaintiff estimates that no determination as to whether a borrower could afford to repay the loan was made in at least 30%-35% of the loans therein and that it is highly likely the actual percentage was higher.

**Defendants Misrepresented That: (1) Appraisers' Compensation
Was Not Affected by Approval or Disapproval of the Loans;
(2) Appraisals were Performed in Conformity with USPAP;
(3) Appraisals Conformed to Fannie Mae or Freddie Mac Standards; and/or
(4) Appraisals were Based on Recent Sales of Comparable Properties**

52.     The Registration Statement represented that each mortgage file contained a property appraisal by a qualified appraiser "*whose compensation is not affected by the approval or disapproval of the mortgage loan*."  In the Prospectus Supplements for the GSAA Home Equity Trusts 2007-5 and 2007-10, defendant GSMC made a similar representation with respect to loans from the Conduit Program: "*The mortgage file contains an appraisal . . . by an appraiser. . . whose compensation is not affected by the approval or disapproval of the mortgage loan*."

53.     The Registration Statement  and the Prospectus Supplements for the GSAA Home Equity Trusts 2007-5 and 2007-10 also each represented, with respect to loans acquired through the Conduit Program, that "*[a]ll appraisals must . . . conform to the [USPAP] adopted by the Appraisal Standards Board of the Appraisal Foundation*" and that "*[t]he appraisal generally will be based upon a market data analysis of recent sales of comparable properties*."

54.     The Prospectus Supplements for the GSAA Home Equity Trust 2007-5 and GSAA Home Equity Trust 2007-10 also stated, in connection with loan originator GreenPoint, that "*[a]ll [its] appraisals are required to conform [to the USPAP] adopted by the Appraisal Standard Board of the Appraisal Foundation*" and that "*[t]he appraisal generally will have been based on prices obtained on recent sales of comparable properties*."

55.     Similarly, Countrywide was an originator of numerous loans in the GSAA Home Equity Trust 2007-5.  With respect to loans Countrywide originated, the Prospectus Supplement for the GSAA Home Equity Trust 2007-5 stated that the appraisals for such loans were "*required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect*."

- 18 -

56.     The foregoing representations in ¶52, that appraisals were done by qualified appraisers "*whose compensation is not affected by the approval or disapproval of the mortgage loan*," were false and misleading.  Appraisers were ordered by loan originators to give pre-determined, inflated appraisals that would result in approval of the loan.  If the appraiser objected to the inflated appraisal number, they would be threatened with being black-balled within the industry.  Appraisers were frequently threatened by being told to provide a predetermined appraisal value justifying a loan or face never doing business again.  Thus, contrary to representations in the Offering Documents, appraisers' compensation was in fact affected by whether or not a loan was approved.

57.     In addition, the representations in ¶¶54-55 that "*[a]ll appraisals must . . . conform to the [USPAP] adopted by the Appraisal Standards Board of the Appraisal Foundation*" or "*Fannie Mae or Freddie Mac appraisal standards*" were false and misleading because the appraisals did not conform to either the USPAP, Fannie Mae or Freddie Mac standards.  This was so because the USPAP required that:

(a)     An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests;

(b)     In appraisal practice, an appraiser must not perform as an advocate for any party or issue;

(c)     An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions; and

(d)     It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

(i)     The reporting of a predetermined result (*e.g.*, opinion of value);

- 19 -

     (ii)       A direction in assignment results that favors the cause of the client;

     (iii)      The amount of a value opinion;

     (iv)      The attainment of a stipulated result; or

     (v)      The occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

58.    Furthermore, both Fannie Mae and Freddie Mac standards required that appraisals comply with the USPAP and that appraisers not be influenced in any way to provide a particular result.

59.    The representations that appraisals conformed to USPAP, Fannie Mae or Freddie Mac standards, were materially false and misleading because, contrary to the USPAP, Fannie Mae and/or Freddie Mac standards, appraisers were ordered to come back with pre-determined, preconceived, inflated and false appraisal values.

60.    Most lenders allowed the sales personnel or account executives to order and control appraisals. These sales personnel were typically on a commission-only pay structure and were therefore motivated to close as many loans as possible at the highest possible loan amounts. These sales personnel and account executives would pressure appraisers to appraise properties at pre-set, artificially high levels to justify the loans the lenders wanted to make. If appraisers did not comply with the lenders' demands, the appraisers would not be hired again.

61.    This dynamic caused appraisers to experience systemic problems of coercion, as many were ordered to doctor their reports or face never seeing work from lenders again. Appraisers were routinely threatened with being put on exclusionary "do-not-use" lists. This pressure succeeded in generating false, artificially inflated appraisals of the properties connected to the loans in the Trusts.

- 20 -

62.     A 2007 survey of 1,200 appraisers conducted by October Research Corp. – a firm in Richfield, Ohio that publishes *Valuation Review* – found that **90% of appraisers** reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through.  The study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation."

63.     Starting in 2000 and continuing until 2009, 11,000 appraisers signed a petition addressed to the Appraisal Subcommittee of the Federal Financial Institutions Examination Council, an agency of the of United States Government whose "mission is to ensure that real estate appraisers, who perform appraisals in real estate transactions that could expose the United States government to financial loss, are sufficiently trained and tested to assure competency and independent judgment according to uniform high professional standards and ethics."  In the petition, the 11,000 appraisers wrote:

> We, the undersigned, represent a large number of licensed and certified real estate appraisers in the United States, who *seek your assistance in solving a problem facing us on a daily basis. Lenders (meaning any and all of the following: banks, savings and loans, mortgage brokers, credit unions and loan officers in general; not to mention real estate agents) have individuals within their ranks, who, as a normal course of business, apply pressure on appraisers to hit or exceed a predetermined value*.
>
> This pressure comes in many forms and includes the following:
>
> •     the withholding of business if we refuse to inflate values,
>
> •     the withholding of business if we refuse to guarantee a predetermined value,
>
> •     the withholding of business if we refuse to ignore deficiencies in the property,
>
> •     refusing to pay for an appraisal that does not give them what they want,
>
> •     black listing honest appraisers in order to use "rubber stamp" appraisers, etc.
>
>      We request that action be taken to hold the lenders responsible for this type of violation and provide for a penalty on any person or business who engages in the practice of pressuring appraisers to do dishonest appraisals that do not provide for

- 21 -

independent judgment. We believe that this practice has adverse effects on our local and national economies and that the potential for great financial loss exists. We also believe that many individuals have been adversely affected by the purchase of homes which have been over-valued.

64.     Numerous appraisers have confirmed that the inflation of appraisals was systemic and commonplace.  For example, the case of an owner of a small Midwest residential real estate appraisal firm in Illinois is indicative of the landscape at the times the loans in the Trusts were originated.  This appraiser was approved and/or utilized in approximately 200 transactions by originators of loans in Trusts at issue herein, including Countrywide and Wells Fargo.  The appraiser related that mortgage brokers frequently threatened him with "either give us this home value or you will never do business for us again."  A large number of loans in the GSAA Home Equity Trust 2007-5 were originated in Illinois by Countrywide and Wells Fargo.

65.     In addition, an independent appraiser from Florida, who was approved by Countrywide and other originators, was told by brokers and lenders that: "WE NEED THIS NUMBER, OR YOU WILL NEVER WORK FOR US AGAIN."  Numerous loans in both Trusts were originated in Florida.

66.     A real estate appraiser in Las Vegas stated that when "the Vegas market had peaked, Countrywide and Wells Fargo were requiring appraisers to come up with real estate appraisals reflecting escalating values or they would black ball them."  This appraiser conducted over 300 inflated appraisals for Countrywide, Wells Fargo, and other originators of loans in the Trusts.  According to this appraiser, the appraisals demanded by these lenders were typically 15% to 25% higher than the actual market values.  Loans in both Trusts were originated in Nevada.

67.     Another independent appraiser stated that Wells Fargo mortgage brokers and Countrywide in-house and outside loan officers demanded inflated numbers from him in two Southern California cities – Compton and Watts, California.  Hundreds of loans in the Trusts were

- 22 -

made by Countrywide and Wells Fargo on homes located in Southern California.  The lenders told this appraiser to either give them the appraisal numbers they wanted or that he would be "done" and that he would be blackballed by every lender doing business in California.  According to this appraiser, he did over 100 inflated appraisals just for Wells Fargo and Countrywide alone.  In some cases, he was appraising houses that he described as "crack houses" that should have been bulldozed, at $100,000 more than they were worth.

68.     The representations in ¶¶53 and 54 that "*[t]he appraisal[s] generally will be based upon a market data analysis of recent sales of comparable properties*" was false and misleading. In many cases the appraisals were based on purportedly "comparable properties" which really were not comparable.  As an independent appraiser in Florida related that, in order to stay in business, she gave inflated appraisals even if it required driving 20 miles away for "comparable" sales that really were not comparable.  During the relevant period, this appraiser completed 100+ appraisals for Countrywide and other originators that were inflated and based on sales that were not "comparable." Appraisers routinely used more expensive properties with larger lots or square footages, or which had other amenities the appraised property did not have, in order to inflate the value of the appraised property.  Numerous loans in both Trusts were originated in Florida and Countrywide was the originator of many loans in the GSAA Home Equity Trust 2007-5.

69.     After analyzing information from actual loans within the GSAA Home Equity Trust 2007-5 and the attendant properties, plaintiff estimates that at least 47% of the loans therein had appraisals inflated by 9% or more compared to the true value of the property.  Another 31% of the loans in that Trust had appraisals that were inflated by less than 9% of the true value.  Plaintiff estimates that, after discovery is conducted, a higher percentage of loans will be found to be so affected.  Similarly, with respect to the loans within GSAA Home Equity Trust 2007-10, after

- 23 -

analyzing information from actual loans within that Trust and the attendant properties, plaintiff estimates that at least 41% of the loans therein had appraisals inflated by 9% or more compared to the true value of the property, and an additional 25% of the loans in the Trust had appraisals inflated by less than 9% of the true value.  Plaintiff estimates that after discovery is conducted, it will be revealed that a higher percentage of loans were so affected.

**Defendants Misrepresented that the Loan Documents**
**Were Not Falsified and Did Not Contain Any Untrue Statements**

70.    The January 31, 2007 Registration Statement represented that loan originators had warranted the following:

> *The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact* or omit to state a material fact required to be stated in them or necessary to make the information and statements in the documents, instruments and agreements not misleading.  *No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a mortgage loan has taken place on the part of any person, (including without limitation, the mortgagor, any appraiser, any builder or developer, or any other party involved in the origination or servicing of the mortgage loan)*.

*        *        *

> All documents executed in connection with the Mortgage Loan … *are free of fraud and any misrepresentation* . . . .

71.    Similarly, in the Prospectus Supplement for the GSAA Home Equity Trust 2007-10, defendant GSMC represented, with respect to the Conduit Program, that "[t]o the best of [its] knowledge, *there was no fraud involved in the origination of any Mortgage Loan by the mortgagee or the mortgagor, any appraiser or any other party involved in the origination of the Mortgage Loan*."

72.    The foregoing statements were false and misleading because, as alleged above, borrowers and loan originators were systematically and routinely falsifying the incomes of the borrowers in order to qualify them for loans they could not otherwise qualify for or afford to pay.  In

- 24 -

addition, property appraisals were systematically inflated by appraisers who were being pressured by loan originators. The loan documentation also contained other misrepresentations understating borrowers' assets and debts, and misrepresenting borrowers' employment status and the occupancy of the purchased properties. Defendant GSMC and the other defendants were aware of the misrepresentations and fraud in the loan documents prior to offering the Certificates for sale. GSMC and GS Mortgage performed due diligence on the loans before purchasing them from originators and, thus, they and the other defendants became aware of the misrepresentations and omissions at that time.

73.     Based on an analysis of information from and related to the actual loans within the Trusts, plaintiff estimates that at least 90% of the loan files were falsified and/or contained misrepresentations.

**The LTV Ratios Stated in the Offering Documents Were False**

74.     The Prospectus Supplement for each Trust contained detailed, voluminous information concerning the LTV ratios of the loans within the Trust. Such information is very material to investors, as a lower LTV ratio indicates less risk with respect to the loans, while a higher LTV ratio indicates riskier loans. Information about the LTV ratios was spread throughout the Offering Documents. For example, the Prospectus Supplement for the GSAA Home Equity Trust 2007-5 represented that the "Weighted Average Original LTV Ratio" for "Group I" loans was 74.47% while the "Weighted Average Combined Original LTV Ratio" was 84.39%. With respect to "Group II" loans, the Prospectus Supplement stated that the "Weighted Average Original LTV Ratio" was 76.35% while the "Weighted Average Combined Original LTV Ratio" was 85.75%. The Prospectus Supplement further stated that "[a]pproximately 3.10% of the Group I Mortgage Loans and approximately 4.40% of the Group II Mortgage Loans had [LTV] ratios in excess of 80%." An

- 25 -

example of the extensive LTV ratio information contained within the Prospectus Supplement for the

GSAA Home Equity Trust 2007-5 is set forth below in an excerpt from page A-1-27 of Schedule A-

1 of the Prospectus Supplement:

## Distribution by Current Principal Balance

| Current Principal Balance | Number of Loans | Principal Balance | Pct. Of Pool by Principal Balance | Weighted Avg. Gross Coupon | Weighted Avg. Current FICO | Avg. Principal Balance | Weighted Avg. Original LTV | Weighted Avg. Combined LTV | Pct. Full Doc | Pct. Owner Occupied |
|---|---|---|---|---|---|---|---|---|---|---|
| 50,000 & $ Below | 9 | $412,275 | 0.12% | 7.631% | 677 | $45,808 | 63.01% | 74.40% | 12.11% | 24.19% |
| 50,001-$75,000 | 61 | 4,039,466 | 1.19 | 7.246 | 697 | 66,221 | 69.42 | 79.04 | 32.74 | 58.11 |
| 75,001-$100,000 | 84 | 7,464,432 | 2.20 | 7.216 | 701 | 88,862 | 70.61 | 81.32 | 29.58 | 71.05 |
| 100,001-$125,000 | 112 | 12,703,637 | 3.74 | 7.060 | 699 | 113,425 | 71.29 | 81.82 | 27.64 | 75.73 |
| 125,001-$150,000 | 121 | 16,733,055 | 4.93 | 6.980 | 694 | 138,290 | 72.52 | 83.32 | 32.23 | 83.09 |
| 150,001-$200,000 | 187 | 32,549,853 | 9.59 | 6.938 | 696 | 174,063 | 74.72 | 84.29 | 25.66 | 88.23 |
| 200,001-$250,000 | 148 | 33,370,785 | 9.83 | 6.800 | 704 | 225,478 | 73.82 | 82.13 | 23.91 | 84.88 |
| 250,001-$300,000 | 100 | 27,570,107 | 8.12 | 6.718 | 700 | 275,701 | 71.93 | 82.31 | 17.97 | 86.22 |
| 300,001-$350,000 | 75 | 24,496,198 | 7.22 | 6.864 | 701 | 326,616 | 76.31 | 86.93 | 10.64 | 85.40 |
| 350,001-$400,000 | 52 | 19,414,008 | 5.72 | 6.697 | 706 | 373,346 | 73.54 | 81.25 | 11.80 | 80.65 |
| 400,001-$450,000 | 58 | 24,716,634 | 7.28 | 6.770 | 701 | 426,149 | 75.89 | 87.37 | 11.94 | 96.68 |
| 450,001-$500,000 | 53 | 25,311,880 | 7.46 | 6.786 | 716 | 477,583 | 78.60 | 89.36 | 18.93 | 100.00 |
| 500,001-$550,000 | 42 | 22,245,632 | 6.55 | 6.688 | 722 | 529,658 | 75.52 | 83.43 | 16.42 | 95.15 |
| 550,001-$600,000 | 39 | 22,492,620 | 6.63 | 6.695 | 721 | 576,734 | 77.12 | 87.63 | 23.20 | 97.49 |
| 600,001-$650,000 | 22 | 13,858,123 | 4.08 | 6.844 | 722 | 629,915 | 76.82 | 91.24 | 18.39 | 100.00 |
| 650,001-$700,000 | 13 | 8,768,557 | 2.58 | 6.827 | 701 | 674,504 | 74.46 | 83.20 | 7.75 | 84.45 |
| 700,001-$750,000 | 12 | 8,721,337 | 2.57 | 6.975 | 710 | 726,778 | 78.10 | 88.03 | 16.83 | 100.00 |
| 750,001-$800,000 | 8 | 6,205,789 | 1.83 | 6.564 | 717 | 775,724 | 72.49 | 80.98 | 24.97 | 87.19 |
| 800,001-$850,000 | 6 | 4,957,624 | 1.46 | 6.854 | 730 | 826,271 | 70.64 | 78.88 | 0.00 | 100.00 |
| 850,001-$900,000 | 4 | 3,523,261 | 1.04 | 7.031 | 675 | 880,815 | 70.92 | 75.91 | 0.00 | 100.00 |
| 950,001-$1,000,000,000 | 5 | 4,890,414 | 1.44 | 7.254 | 710 | 978,083 | 73.43 | 86.74 | 0.00 | 79.55 |
| $1,000,001 & Above | 12 | 14,957,835 | 4.41 | 6.947 | 706 | 1,246,486 | 70.74 | 79.89 | 8.02 | 91.98 |
| **Total:** | **1,223** | **339,403,522** | **100.00%** | **6.841%** | **706** | **$277,517** | **74.47%** | **84.39%** | **18.48%** | **89.12%** |

75.     The purported LTV ratios of the loans in the Trust were set forth extensively and repeatedly throughout the GSAA Home Equity Trust 2007-5 Prospectus Supplement.  *See, e.g.*, pages S-26, S-55, A-1-1, A-1-27 through A-1-32, and A-2-24 through A-2-31 of the Prospectus Supplement (numerous pages setting forth purported LTV ratios).

76.     Similarly, the Prospectus Supplement for the GSAA Home Equity Trust 2007-10 also contained voluminous, detailed, similar information on the LTV ratios for the loans within that Trust.  An example of the LTV ratio information contained within the Prospectus Supplement for the GSAA Home Equity Trust 2007-10 is set forth below in an excerpt from page B-1 of Appendix B of the Prospectus Supplement:

## Distribution by Current Principal Balance – Collateral Group 1

| Current Principal balance | Number of Loans | Principal Balance | Pct. Of Pool by Principal Balance | Weighted Avg. Gross Coupon | Weighted Avg. Current FICO | Avg. Principal Balance(1) | Weighted Avg. Original LTV | Weighted Avg. Combined LTV | Pct. Full Doc | Pct. Owner Occupied |
|---|---|---|---|---|---|---|---|---|---|---|
| 50,001-$75,000 | 1 | $74,649 | 0.16% | 5.750% | 730 | $74,649 | **34.09%** | **34.09%** | 0.00% | 100.00% |
| 75,001-$100,000 | 2 | 53,299 | 0.11 | 6.705 | 738 | 85,834 | **64.58** | **64.58** | 100.00 | 100.00 |
| 100,001-$125,000 | 4 | 230,653 | 0.48 | 6.658 | 693 | 115,398 | **81.76** | **86.58** | 87.56 | 87.11 |
| 125,001-$150,000 | 10 | 1,081,391 | 2.25 | 6.196 | 716 | 139,739 | **52.61** | **52.61** | 33.82 | 46.50 |
| 150,001-$200,000 | 12 | 1,237,002 | 2.57 | 6.470 | 735 | 179,920 | **82.35** | **86.79** | 38.77 | 89.42 |
| 200,001-$250,000 | 9 | 1,224,033 | 2.54 | 6.280 | 704 | 221,434 | **67.85** | **73.71** | 42.20 | 80.45 |
| 250,001-$300,000 | 7 | 1,254,600 | 2.61 | 6.395 | 714 | 285,610 | **79.60** | **96.65** | 7.30 | 100.00 |
| 300,001-$350,000 | 15 | 2,453,462 | 5.10 | 6.449 | 734 | 318,361 | **78.02** | **95.31** | 6.34 | 87.43 |
| 350,001-$400,000 | 15 | 3,317,450 | 6.89 | 6.362 | 726 | 380,537 | **77.34** | **87.74** | 0.00 | 80.05 |
| 400,001-$450,000 | 2 | 768,703 | 1.60 | 6.157 | 760 | 438,101 | **76.23** | **82.03** | 41.95 | 58.05 |
| 450,001-$500,000 | 17 | 5,349,922 | 11.11 | 6.310 | 736 | 482,564 | **70.62** | **73.12** | 18.31 | 24.06 |
| 500,001-$550,000 | 16 | 5,414,376 | 11.25 | 6.356 | 749 | 527,251 | **74.91** | **79.01** | 9.76 | 51.79 |
| 550,001-$600,0001 | 11 | 4,263,980 | 8.86 | 6.202 | 748 | 570,752 | **71.50** | **76.09** | 0.00 | 33.15 |
| 600,001-$650,000 | 4 | 1,923,536 | 4.00 | 6.333 | 702 | 640,504 | **66.14** | **77.83** | 0.00 | 33.19 |
| 650,001-$700,000 | 10 | 5,370,857 | 11.16 | 6.261 | 745 | 686,992 | **67.66** | **69.65** | 6.83 | 45.55 |
| 700,001-$750,000 | 5 | 2,170,103 | 4.51 | 6.437 | 766 | 721,394 | **77.80** | **81.05** | 0.00 | 32.99 |

- 27 -

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 750,001-$800,000 | 1 | 752,000 | 1.56 | 5.875 | 786 | 752,000 | **80.00** | **90.00** | 0.00 | 100.00 |
| 800,001-$850,000 | 1 | 844,780 | 1.75 | 6.250 | 784 | 844,780 | **54.52** | **54.52** | 0.00 | 0.00 |
| 850,001 $900,000 | 2 | 1,321,093 | 2.74 | 6.164 | 779 | 877,329 | **67.25** | **67.25** | 32.82 | 0.00 |
| 950,001 $1,000,000 ,000 | 3 | 1,480,729 | 3.08 | 6.458 | 731 | 987,457 | **64.27** | **64.27** | 0.00 | 16.88 |
| $1,000,001 & Above | 7 | 7,558,000 | 15.70 | 6.266 | 771 | 1,449,999 | **57.45** | **58.55** | 12.75 | 0.000 |
| Total: | 154 | $48,144,617 | 100.00% | 6.305% | 745 | $467,771 | **69.48%** | **74.31%** | **11.34%** | **40.98%** |

**(1) This Column represents the average of the scheduled principal balance of the mortgage loans contributing cash flows to this Collateral Group (even if such mortgage loans also contribute to another collateral Group).**

77.     The purported LTV ratios were set forth extensively and repeatedly in the GSAA Home Equity Trust 2007-10 Prospectus Supplement as well.  *See, e.g.*, pages S-10, and B-1 through B-12 of the Prospectus Supplement (numerous pages representing the loans' purported LTV ratios).

78.     The foregoing LTV ratios in the Offering Documents were inaccurate, false and misleading because they were calculated using the false and inflated property appraisals alleged herein.  Incorporating an inflated appraisal into the LTV calculation will result in a lower LTV ratio.  For example, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000 or 90%.  If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to 75 % ($90,000/$120,000).  Because the LTV ratio can only be calculated by using the appraisal value of the property, and because the property values in the appraisals were inflated, this resulted in false, lower LTV ratios for the loans in the Trusts.  Thus, the LTV ratios, as represented in the Offering Documents, were understated while the actual (undisclosed) LTV ratios were much higher.  The Offering Documents made it appear to investors that the Certificates were much safer and less risky than they actually were because a lower LTV ratio indicated there was more equity in the property, thereby protecting the loan holder in the event of a default or foreclosure, and making it appear that borrowers would not likely default on the loans since they had equity in the properties.

- 28 -

**The Credit Ratings Assigned to the Certificates Falsely**
**Portrayed The Certificates as Much Safer Investments**
**Than They Really Were**

79.     The January 31, 2007 Registration Statement represented that the Certificates would receive "investment grade" ratings from Standard & Poors Rating Services ("S&P") or Moody's Investor Service, Inc. ("Moody's").  Eventually, all of the Certificates in all of the Trusts were given "investment grade" ratings.  For example, the Certificates for the GSAA Home Equity Trust 2007-5 were all rated at "investment grade" – AAA to BBB – by S&P in the Prospectus Supplement for those Certificates.  Similarly, each of the Certificates in the GSAA Home Equity Trust 2007-10 also received "investment grade" ratings from S&P, and/or Moody's.

80.     The ratings, which defendants voluntarily chose to include in the Registration Statement and Prospectus Supplements, were inaccurate, false and misleading because they were based on outdated assumptions, relaxed ratings criteria, and inaccurate loan information.  These flaws produced artificially high credit ratings for the Certificates, making them appear safer and less risky than they actually were.

81.     Moody's and S&P used models to produce the ratings for the Certificates.  The models were based upon loan performance *prior* to the year 2000.  However, an unprecedented decline and deterioration in mortgage lending standards occurred *after* 2000 which the models did not account for.  This decline in lending standards and an increase in riskier exotic mortgage products during the 2001 through 2005 time period rendered Moody's and S&P's pre-2000 loan performance data obsolete.  Thus, by the time the agencies provided "investment grade" ratings to the Certificates, their historical data no longer reflected the reality that mortgage credit quality was rapidly deteriorating.

82.     In addition to using flawed models to generate ratings, Moody's and S&P repeatedly eased their ratings standards in order to capture more market share of the ratings business. This easing of ratings standards was due in large part to the fact that rating agencies like Moody's and S&P were compensated by the very entities, *i.e.,* the defendants, that they provided ratings to, and the fact that those entities were free to shop around for the rating agency that would provide them with the highest ratings.

83.     In addition to the eroding rating standards and the flawed rating models alleged above, Moody's and S&P's ratings were also based on inaccurate information. The rating agencies rated the Certificates based in large part on data about each of the mortgage loans that defendants provided to them – including borrowers' incomes, property appraisal values and LTV ratios. As alleged above, this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation and falsification, and the other facets of defective underwriting alleged herein. Neither Moody's nor S&P engaged in any due diligence or otherwise sought to verify the accuracy or quality of the loan data underlying the loan pools they rated. Nor did they seek representations from defendants that due diligence was performed.

84.     Because Moody's and S&P were using flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk. Certificates were given "investment grade" ratings when in reality they were not of investment grade quality but actually were much riskier, junk grade investments. As such, the Offering Documents, which affirmatively set forth the false and misleading ratings, were themselves false and misleading.

512860_1

**Defendants Did Not Disclose That at the Same Time They**
**Were Selling the Certificates They Were Betting That**
**Loans Like Those in the Trusts Would Not Be Repaid**

85.     In December 2006, Goldman Sachs decided that it was becoming much too risky to

own residential real estate mortgage loans like those in the Trusts.  Thus, in early 2007, defendants

filed the Registration Statement with the SEC and began selling the Certificates to plaintiff and the

Class.  Defendants also simultaneously began making exotic bets against the housing market, betting

that borrowers would default on the very same kinds of loans underlying the Certificates.

86.     Goldman Sachs engaged in "credit-default swaps," which were bets that residential

mortgage borrowers would default on their loans – loans just like those in the Trusts.  Defendants

made these bets at the same time defendants were selling the purportedly "investment grade"

Certificates to plaintiff and the Class.

87.     Goldman Sachs also bet heavily against the housing market in early 2007 via a year-

old subprime index on a private London swap exchange at the same time defendants were selling the

Certificates to plaintiff and the Class.

88.     Defendant Sparks, who was CEO of defendant GS Mortgage when the Certificates

were sold, was also simultaneously overseeing Goldman Sachs' credit-default swaps and other bets

against the housing market at the same time he signed the Registration Statement.

89.     Defendants did not disclose, in violation of the 1933 Act, that they were engaged in

such activities at the same time they were offering the Certificates to the investing public.  Indeed,

the Chairman and CEO of defendant Goldman Sachs, Lloyd Blankfein, subsequently admitted to the

Financial Crisis Inquiry Commission on January 13, 2010, that defendants' conduct of selling the

Certificates while simultaneously purchasing credit-default swaps was "improper."  Defendants

made absolutely no disclosure that they were *actually then engaged* in this activity in either the

- 31 -

Registration Statement or the Prospectus Supplements for the GSAA Home Equity Trusts 2007-5 or 2007-10.  Indeed, in light of their ***then-current engagement*** in such activities while simultaneously selling the Certificates, defendants' representations in the Prospectus Supplements that they "***may***" or ***might*** engage in such activity was itself a false and misleading statement.

## DISCLOSURES EMERGE ABOUT PROBLEMS WITH
## LOANS UNDERLYING THE CERTIFICATES

90.     After the Certificates were issued, the ratings on nearly all of the Certificates within each of the Trusts were downgraded.  Downgrades to the Certificates plaintiff purchased did not occur until 2008.  In some instances, Certificates that received the highest rating of AAA at issuance have fallen many notches and are now rated CCC – a rating many levels below the threshold for "junk" status.  In fact, the Certificates plaintiff purchased experienced just such downgrades.

91.     These downgrades occurred because the original ratings did not accurately reflect the risk associated with the assets (the loans) underlying the Certificates.  Further, the delinquency rates on the underlying mortgage loans have skyrocketed.  For example, the total percentage of delinquent and foreclosed loans, and bank-owned and sold properties, in the GSAA Home Equity Trust 2007-5 ***exceeded 48% of the total loan pool as of February 2010***.  Similarly, for the GSAA Home Equity Trust 2007-10, the total percentage of delinquent/foreclosed and bank owned/sold loans ***exceeded 30% of the total loan pool as of February 2010***.  These massive foreclosure rates and extraordinary delinquencies have further confirmed defendants' misrepresentations detailed above.

92.     Because of the downgrades, as well as other information that was unknown to investors at the time the Certificates were issued, the value of the Certificates has diminished greatly since their original offering, as has the price at which members of the Class can dispose of them in the secondary market for these Certificates.  These diminutions in value and price have caused damages to the plaintiff and the Class.

93.     There is a secondary market for the purchase and sale of the Certificates.  There has been a market for the resale of investments like the Certificates since at least 2007.  The trading volume of Certificates like those at issue was at least $1-$1.5 billion during December 2008, the time at which the first of the actions asserting the claims herein was filed.  In a non-forced sale in the secondary market in December 2008, plaintiff and the Class would have netted, at most, between 35 and 45 cents on the dollar.  In other words, a sale on the date the first lawsuit was filed would have resulted in a loss of at least 55 to 65 cents on each dollar amount purchased.

94.     Defendant Goldman Sachs, however, fared much better.  After selling the Certificates to plaintiff and the Class at inflated prices caused by defendants' misrepresentations, and pocketing a hefty profit, Goldman Sachs made tens of billions of dollars in additional profits on its undisclosed credit default swap bets it made against the loans underlying the Certificates.  Plaintiff and the Class, on the other hand, have watched their Certificates plummet in value.

## COUNT I

### Violations of §11 of the 1933 Act
### Against All Defendants

95.     Plaintiff repeats and re-alleges the allegations set forth above as if set forth fully herein.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

96.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of plaintiff and the Class, against all defendants.

97.     The Registration Statement for the Certificate offerings was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to

make the statements made not misleading, and omitted to state material facts required to be stated therein.

98.     Defendant GS Mortgage, as Issuer of the Certificates, is strictly liable to plaintiff and the Class for the misstatements and omissions complained of herein, even if such misstatements and omissions were innocent.

99.     Defendant Goldman Sachs was an underwriter for each of the offerings and failed to perform adequate due diligence, thereby permitting the false and misleading statements and omissions included in the Registration Statement to be disseminated.

100.    Defendant GSMC was the Sponsor and an underwriter of the Certificate Offerings and made misrepresentations and omissions in the Registration Statement as alleged herein.

101.    The Individual Defendants signed the Registration Statement, which was false due to the misstatements and omissions described above.

102.    None of these defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were not false and misleading or did not omit material facts that rendered statements made therein not false and misleading.

103.    By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, §11 of the 1933 Act.

104.    Defendant Goldman Sachs was the underwriter for the following issuances:

(1)     Asset-Backed Certificates, Series 2007-5 from the GSAA Home Equity Trust 2007-5; and

(2)     Asset-Backed Certificates, Series 2007-10 from the GSAA Home Equity Trust 2007-10.

105.    Plaintiff acquired the Certificates pursuant and/or traceable to the Registration Statement.  Plaintiff and the Class have sustained damages as the value of the Certificates has declined substantially subsequent to the disclosures of defendants' wrongdoing.

106.    At the time of their purchases of the Certificates, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the middle of 2008.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that the initial complaint in this matter was filed.  Less than three years has elapsed between the time that the securities upon which this claim is brought were offered to the public and the time the initial complaint was filed.

## COUNT II

### Violations of §12(a)(2) of the 1933 Act
### Against Defendants Goldman Sachs and GS Mortgage

107.    Plaintiff repeats and re-alleges the allegations above as if set forth fully herein.  For purposes of this cause of action, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act.

108.    By means of the defective Offering Documents, defendants Goldman Sachs and GS Mortgage promoted and sold the Certificates to plaintiff and other members of the Class.  Plaintiff purchased its Certificates for the GSAA Home Equity Trust 2007-10 directly from Goldman Sachs, with GS Mortgage as the Issuer, in a public offering.  Defendants Goldman Sachs and GS Mortgage solicited sales of the Certificates for financial gain, as they benefitted financially from the sale of the Certificates.

- 35 -

109.     The Offering Documents contained untrue statements of material fact, and concealed and failed to disclose material facts, as alleged above.  Goldman Sachs and GS Mortgage owed plaintiff and the other members of the Class who purchased the Certificates pursuant to the Offering Documents the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Goldman Sachs and GS Mortgage, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Offering Documents, as set forth above.

110.     Plaintiff did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Documents at the time it acquired the Certificates.

111.     By reason of the conduct alleged herein, Goldman Sachs and GS Mortgage violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased the Certificates pursuant to the Offering Documents sustained substantial damages in connection with their purchases of the Certificates.  Accordingly, plaintiff and the other members of the Class who hold the Certificates issued pursuant to the Offering Documents have the right to rescind and recover the consideration paid for their shares, with interest thereon, and hereby tender their Certificates to Goldman Sachs and GS Mortgage.  Class members who have sold their Certificates seek damages to the extent permitted by law.

### COUNT III

**Violations of §15 of the 1933 Act**
**Against Defendants Goldman Sachs, GSMC and the Individual Defendants**

112.     Plaintiff repeats and realleges each and every allegation contained above.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be

construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

113.    This Count is brought pursuant to §15 of the 1933 Act against Goldman Sachs, GSMC and the Individual Defendants.

114.    GSMC owns GS Mortgage, the Issuer of the Certificates.  Goldman Sachs, in turn, owns GSMC.  By virtue of their complete ownership of GS Mortgage, defendants Goldman Sachs and GSMC had the power to, and did, direct GS Mortgage, and were control persons of GS Mortgage.

115.    Each of the Individual Defendants was a control person of GS Mortgage and of the Trusts by virtue of his or her position as a director and/or senior officer of GS Mortgage.  The Individual Defendants were responsible for the preparation and contents of the Registration Statement and signed the Registration Statement, which incorporated by reference the statements in the Prospectus Supplements.

116.    Defendants Goldman Sachs, GSMC and the Individual Defendants prepared, reviewed and/or caused the Registration Statement and Prospectus Supplements to be filed and disseminated.

117.    Thus, Goldman Sachs, GSMC and the Individual Defendants were each participants in the violations alleged herein, based on their ownership of GS Mortgage and their having prepared, signed or authorized the signing of the Registration Statement and having otherwise participated in the consummation of the offerings detailed herein.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying plaintiff as Class representative;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

118.    Plaintiff hereby demands a trial by jury.

DATED: March 31, 2010                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                         ARTHUR C. LEAHY
                                         THOMAS E. EGLER
                                         SCOTT H. SAHAM
                                         SUSAN G. TAYLOR
                                         NATHAN R. LINDELL
                                         MATTHEW I. ALPERT

                                         _____
                                                 ARTHUR C. LEAHY

                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101
                                         Telephone: 619/231-1058
                                         619/231-7423 (fax)

- 38 -

512860_1

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
CAROLINA C. TORRES
JARRETT S. CHARO
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Lead Counsel for Plaintiff

CAVANAGH & O'HARA
PATRICK J. O'HARA
407 East Adams Street
Springfield, IL  62701
Telephone:  217/544-1771
217/544-9894 (fax)

Additional Counsel for Plaintiff

- 39 -

# EXHIBIT A

## SETTLEMENT AGREEMENT

The Attorney General of the Commonwealth of Massachusetts, Martha Coakley (the "Attorney General"), and Goldman, Sachs & Co., on behalf of itself and its affiliates Goldman Sachs Mortgage Company and GS Mortgage Securities Corp., have made and entered into this Settlement Agreement on May 7, 2009, in order to conclude and resolve all issues arising from the Attorney General's investigation described in Section B of this Settlement Agreement.

### A. Definitions

1.     "CLTV" means combined loan to value ratio, defined as the ratio of the unpaid principal balance of the first lien loan and any second lien loan that may exist (as of the date of modification, refinance, or sale) to the then most current appraised value of the property.

2.     "Interim Modification Rate" means the weekly Freddie Mac Primary Mortgage Market Survey ("PMMS") rate for 30-year fixed-rate conforming loans.

3.     "First-Lien Massachusetts Loan" means a first-lien non-agency loan owned by the Goldman Sachs Mortgage Desk as of April 1, 2009 and secured by residential real property located in Massachusetts. These loans are identified in Exhibits A and B.

4.     "Goldman Sachs" means collectively Goldman, Sachs & Co., Goldman Sachs Mortgage Company, and GS Mortgage Securities Corp.

5.     "LTV" means the loan to value ratio, defined as the ratio of the unpaid principal balance of the loan (as of the date of modification, refinance, or sale) to the then most current appraised value of the property.

6.     "Performing" means less than 60 days delinquent as of April 1, 2009 under the so-called Mortgage Bankers Association's calculation method.

7.     "Second-Lien Massachusetts Loan" means a second-lien non-agency loan owned by the Goldman Sachs Mortgage Desk as of April 1, 2009 and secured by residential real property located in Massachusetts. These loans are identified in Exhibits C, D, and E.

8.     "UPB" means the unpaid principal balance of the loan.

9.     "Write Off" means that the loan is forgiven and the lien is released.

10.     "Best Efforts" means activities performed in good faith to achieve the indicated outcome.

## B. The Attorney General's Investigation

In late 2007, the Attorney General commenced an investigation into the financing, purchase, and securitization of allegedly unfair residential mortgage loans during the period through 2007. This ongoing investigation concerns:

> a)      whether securitizers may have facilitated the origination by others of "unfair" loans under Massachusetts law;

> b)      whether securitizers may have failed to ascertain whether loans purchased from originators complied with the originators' stated underwriting guidelines;

> c)      whether securitizers may have failed to take sufficient steps to avoid placing problem loans in securitization pools;

> d)      whether securitizers may have been aware of allegedly unfair or problem loans;

> e)      whether securitizers may have failed to correct inaccurate information in securitization trustee reports concerning repurchases of loans; and

> f)      whether securitizers may have failed to make available to potential investors certain information concerning allegedly unfair or problem loans, including information obtained during loan diligence and the pre-securitization process, as well as information concerning their practices in making repurchase claims relating to loans both in and out of securitizations.

## C. Resolution

The Attorney General and Goldman Sachs have agreed to resolve any and all concerns relating to Goldman Sachs arising from the Attorney General's investigation in accordance with the following terms and conditions:

1.      Goldman Sachs will pay the Commonwealth $9.025 million by a check payable to the Commonwealth c/o Diana Hooley at the Office of the Attorney General, Insurance & Financial Services Division, One Ashburton Place, Room 1813, Boston, Massachusetts 02108. This check shall be provided to the Attorney General's Office within five (5) days of the date of this Settlement Agreement.

2.      Goldman Sachs will provide $975,000 to the Office of the Attorney General pursuant to G.L. c. 12, sec. 4A. This payment shall be made by a check payable to the Office of the Attorney General, shall be delivered to the Office of the Attorney General, Insurance & Financial Services Division, c/o Diana Hooley, One Ashburton Place, Room 1813, Boston, Massachusetts 02108, shall be held in accordance with state

law, and shall be used prior to January 1, 2012 for administering the terms of this Settlement Agreement, monitoring Goldman Sachs's compliance with the terms of this Settlement Agreement, assisting in the implementation of the relief programs described in this Settlement Agreement, and supporting the Attorney General's continuing investigation of the financing, purchase, and securitization of allegedly unfair residential mortgage loans. This check shall be provided to the Attorney General's Office within five (5) days of the date of this Agreement.

3.     For First-Lien Massachusetts Loans that are Performing, which are identified in Exhibit A, Goldman Sachs will provide an incentive for the borrower to obtain alternative financing, through lenders with Federal Housing Authority (FHA) and other lending programs, by forgiving in a refinancing (a) 25% of the UPB or (b) so much of the UPB as is sufficient to bring the LTV to 96.5%, whichever reduction in UPB is smaller. Similarly, in order to facilitate an arm's length short sale, Goldman Sachs will offer to forgive in connection with an arm's length short sale (a) 25% of the UPB or (b) so much of the UPB as is sufficient to bring the LTV to 96.5%, whichever reduction in UPB is smaller. If the borrower has a second lien loan on the property not owned by the Goldman Sachs Mortgage Desk, Goldman Sachs, on its own behalf or through its agents will, with the borrower's consent, contact the second lien lender and use its Best Efforts to facilitate principal forgiveness by the second lien lender to reduce the UPB of the second lien loan such that the CLTV of the loans is reduced in a refinancing or arm's length short sale to 96.5% (given the reduced UPBs of the first and second lien loans), subject to the limit on the reduction of UPB for the first lien loan of 25%.

4.     For First-Lien Massachusetts Loans that are not Performing, which are identified in Exhibit B, Goldman Sachs will offer to forgive so much of the UPB as is necessary, up to 35% of the UPB, to facilitate a refinancing or arm's length short sale of the property. Goldman Sachs will instruct each relevant loan's servicer to forgo for six (6) months from the date of this Settlement Agreement taking steps to complete foreclosure with respect to any borrower who (i) makes good faith efforts to achieve a refinancing or arm's length short sale, and (ii) during the six-month period makes monthly payments at the Interim Modification Rate applied to the UPB of each first-lien loan reduced by (a) 30% of the UPB; or (b) so much of UPB as is sufficient to bring the LTV of the loan (using the most recent broker price opinion ("BPO") or appraisal obtained by Goldman Sachs) to 90%, whichever reduction in UPB is smaller. For any borrower seeking refinancing who makes six (6) consecutive monthly payments in the amounts defined in subsection (ii) of this Paragraph, Goldman Sachs will modify the terms of the loan to forgive (a) 30% of the UPB or (b) so much of the UPB as is sufficient to bring the LTV to 90%, whichever reduction is smaller.

5.     For Second-Lien Massachusetts Loans that are Performing, which are identified in Exhibit C, Goldman Sachs will offer to forgive up to 50% of the UPB in exchange for full satisfaction of the remainder of the balance of the loan through payoff, refinancing, or arm's length short sale.

6.      For Second-Lien Massachusetts Loans that are more than 180 days delinquent as of April 1, 2009, which are identified in Exhibit D, as well as the loans identified in Exhibit E, Goldman Sachs will Write Off the loans.

7.      In order to determine the current LTV or CLTV of the property for purposes of calculating the principal forgiveness pursuant to this Settlement Agreement, other than for refinancings which are addressed in Paragraph 8 of Section C of this Settlement Agreement, Goldman Sachs, on its own behalf or through its agents, will obtain and pay the reasonable costs of a BPO or appraisal of the property by an independent third party, unless a BPO was obtained or an appraisal was performed on or after January 1, 2009.

8.      Goldman Sachs, on its own behalf or through its agents, will pay reasonable closing costs up to 2% of UPB for any refinancing of any First-Lien Massachusetts Loan or Second-Lien Massachusetts Loan referred to in Paragraphs 3 through 5 of Section C of this Settlement Agreement.  These closing costs will include the costs of any appraisal of the property necessary to achieve the refinancing referred to in Paragraphs 3 and 4 of Section C of this Settlement Agreement.

9.      The offers in Paragraphs 3 and 5 of Section C of this Settlement Agreement will remain open until November 30, 2009.  The offer in Paragraph 4 of Section C of this Settlement Agreement will remain open through the later of November 30, 2009 or the period during which the borrower is making the six consecutive payments provided for in the last sentence of Paragraph 4, but only for borrowers (i) who contact the servicer of the loan or Goldman Sachs in response to the communications provided for in Paragraph 10 of Section C of this Settlement Agreement and concerning such communications, but in no event later than one (1) week after the visit to the borrowers' residence provided for in Paragraph 10, and (ii) who meet the conditions in subsections (i) and (ii) of Paragraph 4.

10.     Goldman Sachs will use its Best Efforts to cause the servicer of the loan to communicate the offers referred to in Paragraphs 3 through 6 of Section C of this Settlement Agreement in a letter to each borrower.  With respect to each borrower who has not contacted the servicer or Goldman Sachs (concerning these offers), Goldman Sachs will use its Best Efforts to cause the servicer of the loan to make at least five (5) telephone calls to the borrower in order to communicate the terms of the offer orally.  With respect to each borrower who has not contacted the servicer or Goldman Sachs (concerning these offers) within two (2) weeks of the date of the initial letter, Goldman Sachs will use its Best Efforts to cause the servicer of the loan to send a second letter to the borrower.  With respect to each borrower who has not contacted the servicer or Goldman Sachs (concerning these offers) within three (3) weeks of the date of the initial letter, Goldman Sachs will use its Best Efforts to cause a representative of the servicer of the loan (or a contractor on the servicer's behalf) to visit the borrower's residence during a time of day reasonably calculated to find the borrower at home in order to communicate the terms of the offer to the borrower orally and in writing.  For all loans serviced by its affiliate Litton Loan Servicing, LP ("Litton"), Goldman Sachs will cause Litton to

comply with the provisions of this Paragraph.  For all loans serviced by a servicer other than Litton, if the servicer does not undertake to take the actions required by this Paragraph, Goldman Sachs, on its own behalf or through its agents, will take those actions.

11.    Goldman Sachs agrees that Litton will hold sessions to meet with borrowers who have loans owned by Goldman Sachs or serviced by Litton to help qualified borrowers understand and take advantage of the offers in Paragraphs 3 through 6 of Section C of this Settlement Agreement or to develop other loss mitigation alternatives.  Within two (2) months of the date of this Settlement Agreement, Litton will hold at least three (3) meetings for borrowers in at least three (3) different Massachusetts locations to be designated by the Attorney General within seven (7) days of the date of this Settlement Agreement.  During or after these meetings, Litton will make available representatives to hold one-on-one sessions with borrowers.  Litton will schedule each meeting at least three (3) weeks in advance of the meeting and will communicate the schedule in writing to borrowers.

12.    The letter required in Paragraph 10 of Section C of this Settlement Agreement shall contain any information requested by the Attorney General and consistent with this Settlement Agreement, and shall be subject to the approval of the Attorney General.  Drafts of the letters shall be submitted to the Attorney General within seven (7) days of the date of this Settlement Agreement.  The Attorney General will provide her comments or approval within seven (7) days of receipt of draft letters from Goldman Sachs.  Goldman Sachs shall cause the letters to be sent to borrowers within seven (7) days of mutual approval by Goldman Sachs and the Attorney General.  The letters shall be sent by a delivery method that confirms the delivery, and Goldman Sachs shall provide confirmation of the delivery of all such letters to the Attorney General. Where such letters communicate an offer by Goldman Sachs, each letter shall include clear instructions for acceptance of the offer.  All such letters shall also include a dedicated toll free telephone number that a borrower may call for advice, assistance and answers to questions concerning the terms set forth in the letter.  Goldman Sachs shall cause a log of all calls received at such telephone number to be maintained and shall provide a copy of such log to the Attorney General.

13.    Within five (5) days of the date of this Settlement Agreement, Goldman Sachs shall provide to the Attorney General a list of the borrowers eligible for each of the offers in Paragraphs 3 through 6 of Section C of this Settlement Agreement, along with, to the extent available:

   a)    the current UPB of each borrower's loan;

   b)    the current servicer of each borrower's loan;

   c)    the address of the property securing each borrower's loan;

   d)    the current lien status of each borrower's loan;

    e)      the current delinquency status of each borrower's loan;

    f)      to Goldman Sachs' knowledge, the most recent appraised value of the property securing each borrower's loan; and

    g)      the most recent telephone numbers and addresses for each borrower.

This information will be provided as part of the Attorney General's ongoing investigation under Massachusetts General Laws chapter 93A and will be subject to the confidentiality provisions of that chapter.

    14.     During the months June through December 2009, on the fifth business day of each month, Goldman Sachs will provide the Attorney General with a report that provides monthly and cumulative information concerning the refinancing referred to in Paragraphs 3 through 6 of Section C of this Settlement Agreement. Goldman Sachs will include in the monthly reports a description of all activities undertaken by Goldman Sachs that constitute Best Efforts under Paragraphs 3 and 10 of Section C of this Settlement Agreement.

### D. Ongoing Cooperation

    1.     Goldman Sachs agrees to provide reasonable cooperation to the Attorney General in the implementation of this Settlement Agreement.

    2.     Goldman Sachs agrees to provide reasonable cooperation to the Attorney General in connection with her continuing investigation into the origination, financing, purchase and securitization of allegedly unfair residential mortgage loans.

    3.     Goldman Sachs will comply with all reasonable requests by the Attorney General for documents or information related to the origination and securitization of residential mortgage loans, including but not limited to the sale of residential mortgage backed securities or derivatives referencing such securities to the Commonwealth and/or any political subdivision thereof. Goldman Sachs will provide such documents and information to the Attorney General within such time as the Attorney General and Goldman Sachs agree is reasonable.

    4.     Goldman Sachs will use its Best Efforts to make available current and former officers, directors, employees, and agents of Goldman Sachs for interviews by the Attorney General within such time as the Attorney General and Goldman Sachs agree is reasonable.

    5.     The Attorney General represents that her requests to Goldman Sachs pursuant to Paragraphs 3 and 4 above shall be made with due regard to the expense and inconvenience that Goldman Sachs will incur in complying with them, and will discuss with Goldman Sachs ways to reduce the expense and inconvenience of compliance. To the extent possible, Goldman Sachs will make the materials and/or persons requested

pursuant to Paragraphs 3 and 4 above available voluntarily and will provide all requested information that is not privileged. With respect to any document withheld or redacted on the ground of privilege, Goldman Sachs shall submit a written log indicating: (i) the type of document; (ii) the date of the document; (iii) the author and each recipient of the document; (iv) the general subject matter of the document; (v) the reason for withholding or redacting the document; and (vi) the Bates number or range of any redacted document. The Attorney General will return any privileged documents or information inadvertently provided to the Attorney General and later identified by Goldman Sachs as privileged. The Attorney General and Goldman Sachs will work cooperatively to resolve any legitimate confidentiality concerns related to requested information.

### E. Implementation

1.      Nothing contained herein shall be deemed to constitute an admission by Goldman Sachs of any wrongdoing in connection with any matter. Nor shall this Settlement Agreement or any negotiations, transactions, or proceedings connected in any way with this Settlement Agreement be offered or received in evidence in any proceeding to prove any liability, any wrongdoing, or an admission on the part of any party hereto, by any individual or entity not a party hereto; provided, however, that nothing herein shall prevent this Settlement Agreement from being used, offered, or received in evidence in any proceeding to enforce any or all of the terms of this Settlement Agreement.

2.      The Attorney General will not seek further payments from Goldman Sachs or bring an enforcement action against Goldman Sachs related to the investigation described in Section B of this Settlement Agreement.

3.      The persons executing this document represent and warrant that they have the full legal power, capacity, and authority to bind the parties for whom they are acting, and that this Settlement Agreement constitutes a legal, binding obligation of each party hereto, enforceable in accordance with its terms. Each person or attorney signing represents and warrants that he/she has obtained the authorization and direction of his/her clients to agree to all terms and provisions of this Settlement Agreement, and that his/her signature is affixed below with the full knowledge and understanding of his/her clients. Further, each party represents and warrants by its execution hereof that it has the right, power, legal capacity and authority to enter into and perform all of its obligations arising under this Settlement Agreement, including, as to Goldman, Sachs & Co., Goldman Sachs Mortgage Company, GS Mortgage Securities Corp., and the obligations of Litton Loan Servicing LP arising under this Settlement Agreement. Further, each party represents and warrants by its execution hereof that it has conferred with legal counsel of its choosing as to the significance and legal effect of this Settlement Agreement.

4.      This Settlement Agreement constitutes the entire agreement among the parties with respect to the subject matter of this Settlement Agreement, and no prior oral or written statement concerning that subject matter shall have any force or effect, and shall not be relied upon to interpret this Settlement Agreement. No representations,

warranties, or inducements have been made by any party concerning this Settlement Agreement other than those contained and memorialized herein.

     5.     This Settlement Agreement shall be governed solely by the laws of the Commonwealth of Massachusetts.

     6.     This Settlement Agreement may be executed in signed counterparts, and the signatures in those signed counterparts may be delivered to the other party by fax or electronic means.

Signed:  May 7, 2009

OFFICE OF THE ATTORNEY GENERAL FOR
THE COMMONWEALTH OF MASSACHUSETTS

By: _____
Name: Glenn Kaplan
Title:  Assistant Attorney General

GOLDMAN, SACHS & CO. (on behalf of itself and
its affiliates Goldman Sachs Mortgage Company and
GS Mortgage Securities Corp.)

By: _____
Name:  Gregory K. Palm
Title:  General Counsel

- 8 -

<u>CERTIFICATE OF SERVICE</u>

I, Jamie Eagen, hereby certify that, on March 31, 2010, I caused a true and correct copy of the attached:

**THIRD AMENDED COMPLAINT FOR VIOLATION OF §§11, 12 AND 15 OF THE SECURITIES ACT OF 1933**

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail to:

>Richard Howard Klapper
>Patrice Alecia Rouse
>Michael Thomas Tomaino, Jr.
>Sullivan and Cromwell, LLP
>New York, NY 10004

Jamie Eagen

512860_1