MANDATE

**UNITED STATES COURT OF APPEALS
FOR THE
SECOND CIRCUIT**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 6th day of September, two thousand twelve.

Before: BARRINGTON D. PARKER,
 REENA RAGGI,
 RAYMOND J. LOHIER, JR.,
 *Circuit Judges.*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _September 28, 2012_

NECA-IBEW HEALTH & WELFARE FUND, individually
and on behalf of all others similarly situated,

     Plaintiff-Appellant,

     v.

GOLDMAN SACHS & CO., GOLDMAN SACHS MORTAGAGE
COMPANY, DANIEL L. SPARKS, MICHELLE GILL, GS
MORTGAGE SECURITIES CORP., KEVIN GASVODA,

     Defendants - Appellees,

GS MORTGAGE SECURITIES CORP., GSAA HOME EQUITY
TRUST 2007-3, GSAA HOME EQUITY TRUST 2007-4, GSAMP
TRUST 2007-HE2, GSAMP TRUST 2007-FM2, GSAA HOME
EQUITY TRUST 2007-5, GSAA HOME EQUITY TRUST 2007-6,
GSAA HOME EQUITY TRUST 2007-7, GSAA HOME EQUITY
TRUST 2007-8, GSR MORTGAGE LOAN TRUST 2007-4F,
GSAMP TRUST 2007-HSBC1, GSAMP TRUST 2007-HEI,
STARM MORTGAGE LOAN TRUST 2007-5F, GSR MORTGAGE
LOAN TRUST 2007-3F, GSR MORTGAGE LOAN TRUST
2007-OA2, SUNTRUST ROBINSON HUMPHREY, INC.,

     Defendants,

THE POLICE AND FIRE RETIRMENT SYSTEM OF THE
CITY OF DETROIT,

     Intervenor.

JUDGMENT
Docket No.: 11-2762

MANDATE ISSUED ON 09/28/2012

The appeal in the above captioned case from a judgment of the United States District Court for the Southern District of New York was argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is AFFIRMED in part and VACATED in part, and the case is REMANDED in accordance with the opinion of this court.

For The Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

11-2762-cv
NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

————————————

August Term, 2011

(Argued: February 3, 2012                    Decided: September 6, 2012)

Docket No. 11-2762-cv

————————————

NECA-IBEW HEALTH & WELFARE FUND, individually and on behalf of all others similarly
situated,

*Plaintiff-Appellant*,

v.

GOLDMAN SACHS & CO., GOLDMAN SACHS MORTGAGE COMPANY, DANIEL L. SPARKS,
MICHELLE GILL, GS MORTGAGE SECURITIES CORP., KEVIN GASVODA,

*Defendants-Appellees*,

GS MORTGAGE SECURITIES CORP., GSAA HOME EQUITY TRUST 2007-3, GSAA HOME EQUITY
TRUST 2007-4, GSAMP TRUST 2007-HE2, GSAMP TRUST 2007-FM2, GSAA HOME EQUITY
TRUST 2007-5, GSAA HOME EQUITY TRUST 2007-6, GSAA HOME EQUITY TRUST 2007-7, GSAA
HOME EQUITY TRUST 2007-8, GSR MORTGAGE LOAN TRUST 2007-4F, GSAMP TRUST
2007-HSBC1, GSAMP TRUST 2007-HEI, STARM MORTGAGE LOAN TRUST 2007-4, GSAA HOME
EQUITY TRUST 2007-10, GSR MORTGAGE LOAN TRUST 2007-5F, GSR MORTGAGE LOAN TRUST
2007-3F, GSR MORTGAGE LOAN TRUST 2007-OA2, SUNTRUST ROBINSON HUMPHREY, INC.,

*Defendants*,

THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT,

*Intervenor*.

Before: B.D. PARKER, RAGGI, and LOHIER, *Circuit Judges*.

————————————

Appeal from a judgment of the United States District Court for the Southern District of New York (Cedarbaum, *J.*) dismissing a putative securities class action brought under §§ 11, 12(a)(2), and 15 of the Securities Act on behalf of all persons who acquired certain mortgage-backed certificates issued under the same allegedly false and misleading shelf registration statement, but sold in 17 separate offerings by 17 unique prospectus supplements. The district court dismissed plaintiff's class action for lack of standing and for failure to allege a cognizable injury under § 11. We hold that plaintiff has class standing to assert the claims of purchasers of certificates backed by mortgages originated by the same lenders that originated the mortgages backing plaintiff's certificates, because such claims implicate "the same set of concerns" as plaintiff's claims. *Gratz v. Bollinger*, 539 U.S. 244, 267 (2003). We further hold that plaintiff need not plead an out-of-pocket loss in order to allege a cognizable diminution in the value of an illiquid security under § 11.

**AFFIRMED** in part, **VACATED** in part, and **REMANDED**.

_____

JOSEPH D. DALEY, Robbins Geller Rudman & Dowd LLP, San Diego, CA (ARTHUR C. LEAHY, Robbins Geller Rudman & Dowd LLP, San Diego, CA, SAMUEL H. RUDMAN, DAVID A. ROSENFELD, CAROLINA C. TORRES, Robbins Geller Rudman & Dowd LLP, Melville, NY, PATRICK J. O'HARA, Cavanagh & O'Hara, Springfield, IL, *on the briefs*), *for Plaintiff-Appellant*.

RICHARD H. KLAPPER, Sullivan & Cromwell LLP, New York, NY (THEODORE EDELMAN, MICHAEL T. TOMAINO, JR., DAVID M.J. REIN, Sullivan & Cromwell LLP, New York, NY, *on the brief*), *for Defendants-Appellees*.

BARRINGTON D. PARKER, *Circuit Judge*:

Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 impose essentially strict liability for material misstatements contained in registered securities offerings. *See* 15 U.S.C. § 77k, *l*(a)(2), o. This appeal requires us to consider a plaintiff's standing to assert claims on

1   behalf of purchasers of securities issued under the same allegedly false and misleading SEC

2   Form S-3 and base prospectus (together, the "Shelf Registration Statement"), but sold in separate

3   offerings by unique prospectus supplements and free writing prospectuses (together, the

4   "Prospectus Supplements") (collectively, the "Offering Documents").

5       We hold that plaintiff has class standing to assert the claims of purchasers of certificates

6   backed by mortgages originated by the same lenders that originated the mortgages backing

7   plaintiff's certificates, because such claims implicate "the same set of concerns" as plaintiff's

8   claims. *Gratz v. Bollinger*, 539 U.S. 244, 267 (2003).  We further hold that plaintiff need not

9   plead an out-of-pocket loss in order to allege a cognizable diminution in the value of an illiquid

10  security under § 11.  Accordingly, we affirm in part and vacate in part the judgment of the

11  district court and remand with instructions to reinstate plaintiff's §§ 11, 12(a)(2), and 15 claims

12  to the extent they are based on similar or identical misrepresentations in the Offering Documents

13  associated with certificates backed by mortgages originated by the same lenders that originated

14  the mortgages backing plaintiff's certificates.

15                          **BACKGROUND**[1]

16      Plaintiff NECA-IBEW Health & Welfare Fund ("NECA" or the "Fund") sued alleging

17  violations of §§ 11, 12(a)(2), and 15 of the Securities Act on behalf of a putative class consisting

---

[1] The following facts, viewed in the light most favorable to plaintiff, are drawn from the Third Amended Complaint (unless otherwise noted), documents incorporated by reference into it, and matters of which we may take judicial notice.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). We assume those facts to be true unless conclusory or contradicted by more specific allegations or documentary evidence.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).

3

1    of all persons who acquired certain mortgage-backed certificates (the "Certificates")

2    underwritten by defendant Goldman Sachs & Co. and issued by defendant GS Mortgage

3    Securities Corp. ("GS Mortgage").  The Certificates were sold in 17 separate Offerings through

4    17 separate Trusts pursuant to the same Shelf Registration Statement, but using 17 separate

5    Prospectus Supplements.  NECA alleges that the Shelf Registration Statement contained false

6    and misleading statements that were essentially repeated in the Prospectus Supplements.  NECA

7    bought Certificates issued from only two of the Offerings, but asserts class claims putatively on

8    behalf of purchasers of Certificates from each tranche of all 17 Offerings.[2]

9    **The Certificates**

10          The Certificates are securities backed by pools of residential real estate loans acquired by

11    GSMC through two primary channels: (1) the "Goldman Sachs Mortgage Conduit Program" (the

12    "Conduit Program"), and (2) bulk acquisitions in the secondary market.  Under the Conduit

13    Program, GSMC acquired loans from a variety of sources, including banks, savings-and-loans

14    associations, and mortgage brokers.  Major originators of the loans in the Trusts included

15    National City Mortgage Co. ("National City") (six Trusts); Countrywide Home Loans

---

[2] Defendants include Goldman Sachs, which underwrote the Certificate Offerings and helped draft and disseminate the Offering Documents; Goldman Sachs Mortgage Company ("GSMC"), a wholly-owned subsidiary of Goldman Sachs that purchased the loans underlying the Certificates from various loan originators and other third-parties, and then pooled and conveyed those loans to GS Mortgage; GS Mortgage, a wholly-owned subsidiary of GSMC that securitized the loans and issued the Certificates through the 17 Trusts; and three current or former officers of GS Mortgage.  Plaintiff asserts § 11 claims against all defendants; § 12(a)(2) claims against Goldman Sachs as underwriter and GS Mortgage as issuer; and § 15 claims against Goldman Sachs, GSMC, and the three officers as "control persons."

4

1    ("Countrywide") (five Trusts); GreenPoint Mortgage Funding, Inc. ("GreenPoint") (five Trusts);

2    Wells Fargo Bank ("Wells Fargo") (four Trusts); SunTrust Mortgage ("SunTrust") (three

3    Trusts); and Washington Mutual Bank ("WaMu") (two trusts).

4            Each Certificate represents a "tranche" of a particular Offering, providing its holder with

5    an ownership interest in principal and/or interest payments from the pool of loans within the

6    Trust through which it was issued.  Each tranche has a different risk profile, paying a different

7    rate of interest depending on the expected time to maturity and the degree of subordination, or

8    protection against the risk of default.

9            In October 2007, NECA purchased $390,000 of the Class A2A Certificates of the GSAA

10   Home Equity Trust 2007-10 (the "2007-10 Certificates") directly from Goldman Sachs in a

11   public offering.  In May 2008, it purchased approximately $50,000 of the Class 1AV1

12   Certificates from Group 1 of the GSAA Home Equity Trust 2007-5 (the "2007-5 Certificates").[3]

13   The Certificates' Offering Documents contained numerous disclaimers, including one which

14   warned that:

15           **Your Investment May Not Be Liquid[.]**  The underwriter intends to
16           make a secondary market in the offered certificates, but it will have no
17           obligation to do so.  We cannot assure you that such a secondary market
18           will develop or, if it develops, that it will continue.  Consequently, you
19           may not be able to sell your certificates readily or at prices that will enable
20           you to realize your desired yield.

21   2007-05 Prospectus Supplement at S-50; 2007-10 Prospectus Supplement at S-35.

---

[3] The Prospectus Supplement for the 2007-5 Offering offered 42 separate classes of Certificates, divided into "Group 1" and "Group 2," with each group backed by a different loan pool.  The Class 1AV1 Certificates purchased by NECA were in Group 1.

5

1    **Shelf Registrations**

2        The shelf registration process enables qualified issuers to offer securities on a continuous

3    basis by first filing a shelf registration statement and then subsequently filing separate prospectus

4    supplements for each offering.  *See* 17 C.F.R. § 230.415.  The shelf registration statement

5    includes a "base" or "core" prospectus that typically contains general information, including the

6    types of securities to be offered and a description of the risk factors of the offering.  *See* 17

7    C.F.R. § 230.430B; Securities Offering Reform, Securities Act Release No. 33-8591, 70 Fed.

8    Reg. 44,722, 44,770-44,774 (Aug. 3, 2005).  It will generally not include transaction-specific

9    details – such as pricing information, or information regarding the specific assets to be included

10    in the vehicle from which the securities are issued – which is contained instead in the prospectus

11    supplements.  *See* 17 C.F.R. § 229.512(a)(1).

12        By regulation, each new issuance requires amending the shelf registration statement,

13    thereby creating a "new registration statement" for each issuance, *id.* § 229.512(a)(2), that is

14    "deemed effective only as to the securities specified therein as proposed to be offered," 15

15    U.S.C. § 77f(a).  "Amendments" to the shelf registration statement include the prospectus

16    supplements unique to each offering.  *See* 17 C.F.R. § 229.512(a)(2) ("[E]ach . . . post-effective

17    amendment [to the shelf registration statement, such as a prospectus supplement] shall be

18    deemed to be a new registration statement relating to the securities offered therein, and the

19    offering of such securities at that time shall be deemed to be the initial bona fide offering

20    thereof."); *Finkel v. Stratton Corp.,* 962 F.2d 169, 174 (2d Cir. 1992) ("[Section] 229.512(a)(2),

21    operating in the context of securities offered pursuant to the post-effective registration, deems

the offering date to be the post-effective registration date, not the initial [shelf] registration date.").  The representations in the shelf registration statement are simply deemed to be made again at the effective date.  Thus, each of the 17 Offerings that NECA seeks to challenge is registered pursuant to a separate registration statement consisting of the same Shelf Registration Statement and a unique Prospectus Supplement.

**The Misrepresentations**

In this suit, commenced in December 2008, NECA alleges that the Offering Documents contained false and misleading information about the underwriting guidelines of the mortgage loan originators, the property appraisals of the loans backing the Trusts, and the risks associated with the Certificates.[4]  For example, NECA alleges that the following statements, contained within the Shelf Registration Statement common to the registration statements of all 17 Trusts' Certificates, were materially misleading:

- That for the mortgage loans generally, "[t]he lender . . . applies the underwriting standards to evaluate the borrower's credit standing and repayment ability" and "makes a determination as to whether the prospective borrower has sufficient monthly income available (as to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the mortgaged property . . .)" and that certain other types of loans "are underwritten on the basis of a judgment that mortgagors or obligors will have the ability to make the monthly payments required initially."

---

[4] NECA also alleges that the Shelf Registration Statement's assurance that defendants "reasonably believe[] that . . . the [Certificates] will be investment grade securities at the time of sale" was misleading because the ratings – which were based on outdated assumptions, relaxed ratings criteria, and inaccurate loan information – were themselves inaccurate, false, and misleading.  It further alleges that defendants should have disclosed that, at the same time they were selling the Certificates as "investment grade" instruments, Goldman Sachs was placing exotic bets via credit-default swaps that residential mortgages similar to those backing the Certificates would default.

- • That for loans purchased through the Conduit Program, "the originating lender makes a determination about whether the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property."

- • That loan originators represented to GS Mortgage that the "documents . . . submitted for loan underwriting were not falsified and contain no untrue statement of material fact" and that "[n]o fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a mortgage loan has taken place on the part of any person."

- • That loan originators represented to GS Mortgage that "[each] mortgage file contains an appraisal . . . by a qualified appraiser . . . whose compensation is not affected by the approval or disapproval of the mortgage loan" and that "[a]ll appraisals must . . . conform to the Uniform Standards of Professional Appraisal Practice [("USPAP")] adopted by the Appraisal Standards Board of the Appraisal Foundation" and that "[t]he appraisal generally will be based upon a market data analysis of recent sales of comparable properties."

The Prospectus Supplements for many of the individual Offerings contained similar, generic misrepresentations.  For example, the Prospectus Supplement for the 2007-10 Trust stated, with respect to the Conduit Program, that "[t]o the best of [GSMC's] knowledge, there was no fraud involved in the origination of any Mortgage Loan by the mortgagee or the mortgagor, any appraiser or any other party involved in the origination of the Mortgage Loan."  2007-10 Prospectus Supplement at S-77.

Contrary to these representations, plaintiff alleges, neither defendants nor the loan originators they used through the Conduit Program employed standards aimed at determining the borrowers' ability to repay their loans.  Instead, at the time the loans in the Trusts were originated (2006-2007), "there were wide-spread, systematic problems in the residential lending industry" wherein "loan originators began lending money to nearly anyone – even if they could not afford to repay the loans – ignoring their own stated lending underwriting guidelines . . . as

1   well as those of defendants' Conduit program." J.A. at 214.  The statements in the Shelf

2   Registration Statement were rendered misleading, NECA alleges, by the Offering Documents'

3   failure to disclose that the originators of the loans backing the Trusts falsely inflated (or coached

4   borrowers falsely to inflate) their income; steered borrowers to loans exceeding their borrowing

5   capacity; and approved borrowers based on "teaser rates" knowing they would be unable to

6   afford payments once the rates adjusted.  NECA further alleges that the originators allowed non-

7   qualifying borrowers to be approved for loans they could not afford under exceptions to the

8   underwriting standards based on so-called "compensating factors" when such "compensating

9   factors" did not exist or did not justify the loans.  Nor, allegedly, did the Offering Documents

10  disclose that appraisers were ordered by loan originators to give predetermined, inflated

11  appraisals to ensure loan approval; that the "comparable properties" used to generate appraisals

12  were not comparable; and that property appraisals did not, in fact, conform to USPAP.[5]  As a

13  result of these abusive practices, NECA alleges, approximately 35%-40% of the loans in the

14  2007-5 Trust and 30-35% of the loans in the 2007-10 Trust were made with no determination of

15  the borrower's ability to repay.  And at least 47% of the loans in the 2007-5 Trust, and at least

16  41% of those in the 2007-10 Trust, were based on property value appraisals that were inflated by

17  9% or more.

18          Although NECA's claims are based in part on these general allegations of an industry-

19  wide deterioration in loan origination practices, its most particularized allegations tie the abusive

---

[5] Because the loan-to-value ("LTV") ratios reported in the Prospectus Supplements were calculated using these false and inflated property appraisals, plaintiff alleges, the LTV ratios were also inaccurate, false, and misleading.

1    practices outlined above to the 17 Trusts' six major loan originators: National City,

2    Countrywide, GreenPoint, Wells Fargo, SunTrust, and WaMu.  For example, with respect to

3    Countrywide, NECA alleges that former Countrywide employees have admitted that they were

4    incentivized to increase loan origination without concern for whether borrowers were able to

5    repay the loans.  Countrywide's Sales Training Facilitator Guide actually instructed originators

6    to "look for ways to make the loan rather than turn it down." *Id.* at 217.  According to former

7    managers, Countrywide was "infested" with employees that ignored company underwriting

8    standards, and "[i]f you had a pulse, [Countrywide] gave you a loan." *Id.* at 217-218.  In the

9    "few cases" when Countrywide employees actually obtained income documentation

10    demonstrating a borrower's inability to qualify for a loan, Countrywide ignored the

11    documentation and the loan was re-submitted as a stated income loan – with an inflated income

12    number – that the borrower could not afford to repay. *Id.* at 218.  The Second Amended

13    Complaint contains similar, if somewhat weaker, allegations with respect to National City's,

14    GreenPoint's, Wells Fargo's, SunTrust's, and WaMu's origination practices.

15        Notwithstanding its detailed allegations about Countrywide, NECA does not specifically

16    allege Countrywide originated any of the loans backing either of the Certificates it purchased.

17    Instead, NECA alleges that GreenPoint and Wells Fargo did.  Indeed, according to the Second

18    Amended Complaint, the originators of the loans backing each of the 17 Trusts – or, in the case

19    of the 2007-5 Trust, the two "Groups" therein – varied dramatically.  For example, National City

20    is alleged to have originated a significant number of loans in only six of the Trusts, Countrywide

21    and GreenPoint in only five, Wells Fargo in only four, SunTrust in only three, and WaMu in just

1    two.  For five of the Trusts, none of these originators is alleged to have originated any loans; for

2    one of the Trusts, SunTrust is alleged to have originated them all.  As to Group 1 versus Group 2

3    of the 2007-5 Offering, each was backed by a different loan pool.  Countrywide is alleged to

4    have originated over 61% of the loans backing Group 2 of the 2007-5 Trust, but none of the

5    loans backing Group 1.  National City is also alleged to have originated loans in Group 2 of the

6    2007-5 Trust (8%), but none in Group 1.  By contrast, as we have seen, GreenPoint originated

7    loans backing Certificates in Group 1 of the 2007-5 Trust – the Group to which NECA's

8    Certificates belong – but, according to the Second Amended Complaint, none in Group 2.  It is

9    unclear from the pleadings whether Wells Fargo originated loans in both Groups of the 2007-5

10    Offering, but the prospectus associated with that Offering estimates that 0.09% of the loans in

11    Group 1, and 1.02% of the loans in Group 2, were originated by Wells Fargo.

12          Not surprisingly in light of this variation in loan composition among the Trusts, only the

13    Prospectus Supplements unique to each individual Offering identified the originators of the loans

14    in the Trusts and set forth their respective lending guidelines – the descriptions of which,

15    plaintiff alleges, were similarly misleading.  For example, the Prospectus Supplements for the

16    2007-5 and 2007-10 Trusts stated that GreenPoint's underwriting guidelines "are applied to

17    evaluate the prospective borrower's . . . repayment ability" and that "[e]xceptions to the

18    guidelines are permitted where compensating factors are present."  2007-5 Prospectus

19    Supplement at S-61; 2007-10 Prospectus Supplement at S-55; *see also* 2007-10 Prospectus

20    Supplement at S-60 (alleging similar representations by Wells Fargo).  The Supplements also

21    stated that GreenPoint's underwriting standards required appraisals to conform to USPAP,

1    appraisals that "generally will have been based on prices obtained on recent sales of comparable

2    properties." 2007-5 Prospectus Supplement at S-63; 2007-10 Prospectus Supplement at S-56.

3    The Second Amended Complaint alleges similar representations in the other Trusts' Prospectus

4    Supplements about Countrywide's, National City's, SunTrust's, and WaMu's underwriting

5    practices.

6            Plaintiff alleges that the truth about the Certificates' risk came to light in mid-2008.[6] As

7    a result, NECA alleges (in its Second Amended Complaint) that the rating agencies "put

8    negative watch labels on the Certificate[s] . . . and downgraded previously-assigned ratings,"

9    J.A. at 110; that "delinquency rates on the underlying mortgage loans . . . skyrocketed," *id.* at

10   138; that the Certificates were "no longer marketable at prices anywhere near the prices paid by

11   plaintiff and the Class," *id.* at 110; and that "holders would likely receive less absolute cash flow

12   in the future and receive it, if at all, on an untimely basis" given that they were "exposed to much

13   more risk with respect to both the timing and absolute cash flow to be received than the Offering

14   Documents represented," *id.* In short, NECA alleges that "the value of the [C]ertificates ha[d]

15   diminished greatly since their original offering, as ha[d] the price at which members of the Class

16   could dispose of them[,] . . . caus[ing] damages to [NECA] and the Class." *Id.* at 139. At the

17   time of its filing of this lawsuit, NECA continued to hold the Certificates.

18

19

---

[6] The Second Amended Complaint alleges that "[d]owngrades to the overwhelming majority of Trusts did not occur until 2008." J.A. at 138.

1

2      **Procedural History**

3              In September 2009 the district court granted defendants' motion to dismiss NECA's First

4      Amended Complaint, with leave to amend.  In a January 2010 oral ruling, it granted defendants'

5      motion to dismiss the Second Amended Complaint.  The court held, first, that NECA lacked

6      standing to bring claims under §§ 11 and 12(a)(2) on behalf of purchasers of Certificates from

7      any of the 15 other Trusts because it did not purchase Certificates from Trusts other than 2007-

8      10 and 2007-5 Trusts and "has not shown that the injuries it alleges based upon purchases of

9      [Certificates from] those two [T]rusts are the same . . . as those allegedly suffered by purchasers

10     of [Certificates from] outlying [T]rusts backed by distinct sets of loans."  *Id.* at 198.

11             The court rejected NECA's argument that, because all of the purchasers were subject to

12     the same misrepresentations from the same Shelf Registration Statement with respect to the same

13     types of securities, their injuries were sufficiently similar to confer standing upon NECA to

14     assert claims on behalf of all.  While acknowledging that "[i]n a class action, a plaintiff who was

15     injured who was practically identically situated with other people who did exactly what he did

16     can be a class representative," the court concluded that "that is . . . only when th[o]se other

17     people bought the same securities that the plaintiff bought."  *Id.*. at 162.  The court granted

18     NECA leave to amend, but "only with respect to the [C]ertificates that [NECA] purchased," and

19     directed plaintiff to "tie any alleged misstatements that are actionable on these [C]ertificates

20     regarding loan underwriting or appraisal practices to the loans actually underlying the

13

1    [C]ertificates from which it purchased."[7]  *Id.* at 200.  Plaintiff "understood [the district court's]

2    order" to mean that it could still "su[e] on behalf of all purchasers of the [T]rust, all tranches."

3    *Id.* at 259.  But as the district court clarified in a subsequent oral ruling, its "understanding of

4    how [it] ruled" was that NECA could "only represent the class of persons or entities that

5    purchased the particular . . . [C]ertificate from the particular tranche from the particular [T]rust"

6    from which NECA purchased its Certificates.  *Id.* at 259-60.

7          Second, the district court held that NECA failed to allege "a cognizable loss" under § 11.

8    It reasoned that NECA's allegation that it was exposed to greatly enhanced risk with respect to

9    both the timing and amount of cash flow under the Certificates was insufficient to plead injury

10    because of the Offering Documents' "specific warning . . . about the possibility . . . that the

11    [C]ertificates may not be resalable."  *Id.* at 199.

12          NECA then filed a Third Amended Complaint, adding the following allegations:

13          There is a secondary market for the purchase and sale of the Certificates.
14          There has been a market for the resale of investments like the Certificates

---

[7] In a subsequent oral ruling, the court also appeared to reject defendants' arguments (1) that none of the six categories of alleged misstatements set forth in NECA's complaint constituted material misrepresentations; and (2) that NECA's claims were time-barred because the Fund was on notice, or inquiry notice, of its claims more than a year before filing suit, *see* 15 U.S.C. § 77m (establishing a one-year statute of limitations for §§ 11 and 12(a)(2) claims which begins to run upon "the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence").  *See* J.A. at 291-292 (district court expressing preliminary view that "the only allegation here of any real substance . . . has to do with the standards that were followed and would be followed in valuing the loans, in valuing the mortgages" and that "there is enough here with respect to . . . Countrywide" but indicating that the court "may want [NECA] to replead to allege specifically which allegations [it is] really relying on"); *id.* at 305-306 (rejecting defendants' argument that NECA could, as a matter of law, be deemed to have been on notice of its claims prior to the "reduction in ratings" on the "particular [C]ertificates" it purchased).  We decline to reach these potential alternative grounds for affirmance urged by defendants on appeal due to a lack of clarity about whether and how the district court ruled on them.

since at least 2007.  The trading volume of Certificates like those at issue
was at least $1-$1.5 billion during December 2008, the time at which the
first of the actions asserting the claims herein was filed.  In a non-forced
sale in the secondary market in December 2008, the [Fund] and the Class
would have netted, at most, between 35 and 45 cents on the dollar.  In
other words, a sale on the date the first lawsuit was filed would have
resulted in a loss of at least 55 to 65 cents on each dollar amount
purchased.

*Id.* at 236.

Defendants again moved to dismiss and, in October 2010, the district court again

concluded that the allegations were insufficient to allege injury.  The court reasoned that,

because the Fund knew the Certificates might not be liquid, it could not allege injury based on

the hypothetical price of the Certificates in a secondary market at the time of suit.  *NECA-IBEW*

*Health & Welfare Fund v. Goldman, Sachs & Co.*, 743 F. Supp. 2d 288, 292 (S.D.N.Y. 2010).

Even assuming a decline in market price could provide factual support for the contention that the

Certificates declined in value, the court reasoned, "the complaint lacks any factual enhancement

of the bare assertion that a secondary market for their Certificates actually exists" or to "allege

any facts regarding the *actual market price* for the Certificates at the time of suit."  *Id.* (emphasis

added).  The court rejected NECA's argument that "the risk of diminished cash flow in the future

establishes a present injury cognizable under [§] 11," reasoning that "[§] 11 does not permit

recovery for increased risk."  *Id.*  Observing that asset-backed securities are "'primarily serviced

by the cash flows of a discrete pool of receivables or other financial assets, either fixed or

revolving, that by their terms convert into cash within a finite time period,'" the court held that

"NECA must allege the actual failure to receive payments due under the Certificates" in order to

1    "allege an injury cognizable under Section 11."  *Id.* (quoting 17 C.F.R. § 229.1101(c)).  In an

2    earlier oral ruling, the district court had sustained plaintiff's § 12(a)(2) claims against similar

3    attacks, finding that NECA pleaded a viable claim for rescission (as opposed to damages)

4    because it continued to hold its Certificates.  However, because NECA failed to allege that it

5    bought the 2007-5 Certificates directly from Goldman Sachs in a public offering, the Fund

6    subsequently abandoned its claim under § 12(a)(2) as to those Certificates.  *See In re Morgan*

7    *Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (explaining that proper

8    defendants in § 12(a)(2) cases are certain "statutory sellers" who, *inter alia*, "successfully

9    solicited the purchase of a security" (quotation marks and brackets omitted)).

10    Accordingly, all that remained after these rulings was a single claim for rescission under

11    § 12(a)(2) based on NECA's purchase of the 2007-10 Certificates.  However, counsel for

12    plaintiff subsequently learned that in November 2010, in the normal course of its investment

13    activities, NECA had sold the 2007-10 Certificates at a 32% loss.  Because that sale eliminated

14    NECA's ability to rescind its purchase, but seemingly provided the realized loss the district court

15    deemed necessary to allege injury under § 11, the Fund moved for leave to amend its complaint

16    and for relief from the dismissal order under Rule 60(b).  The district court denied the motion as

17    "just too late," J.A. at 381, thereby extinguishing all of NECA's claims.  The court entered

18    judgment and NECA appealed.  Its main contentions are that the district court erred (1) in

19    dismissing for lack of standing its class claims asserted on behalf of purchasers of Certificates

20    from different tranches and from other Offerings, and (2) in requiring it to plead an out-of-pocket

21    loss in order to allege injury under § 11.  We review *de novo* a district court's dismissal for lack

16

1    of standing and for failure to state a claim. *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d

2    Cir. 2009). In so doing, we accept as true all non-conclusory factual allegations in the complaint

3    and draw all reasonable inferences in plaintiff's favor to determine whether the allegations

4    plausibly give rise to an entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009);

5    *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008).

6                                  **DISCUSSION**

7          Sections 11 and 12(a)(2) impose liability on certain participants in a registered securities

8    offering when the registration statement or prospectus associated with that offering contains

9    material misstatements or omissions. 15 U.S.C. § 77k, *l*(a)(2). The provisions are "notable both

10    for the limitations on their scope as well as the *interrorem* nature of the liability they create." *In*

11    *re Morgan Stanley Info. Fund*, 592 F.3d at 359. Section 11 imposes strict liability on issuers and

12    signatories, and negligence liability on underwriters, "[i]n case any part of the registration

13    statement, when such part became effective, contained an untrue statement of a material fact or

14    omitted to state a material fact required to be stated therein or necessary to make the statements

15    therein not misleading." 15 U.S.C. § 77k(a). A claim under § 11 belongs to "any person

16    acquiring such security." *Id.* Section 12(a)(2) imposes liability under similar circumstances

17    against certain "statutory sellers" for misstatements or omissions in a prospectus. *See id.* §

18    77*l*(a)(2); *In re Morgan Stanley Info. Fund*, 592 F.3d at 359. And § 15 imposes liability on

19    individuals or entities that "control[ ] any person liable" under §§ 11 or 12. 15 U.S.C. § 77o.

20          Neither scienter, reliance, nor loss causation is an element of § 11 or § 12(a)(2) claims

21    which – unless they are premised on allegations of fraud – need not satisfy the heightened

1    particularity requirements of Rule 9(b).[8]  *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681

2    F.3d 114, 120 (2d Cir. 2012).  Nor do the heightened pleading standards of the Private Securities

3    Litigation Reform Act apply to such non-fraud claims.  *See* 15 U.S.C. § 78u-4(b)(1)-(2).  Thus,

4    the provisions "'place[] a relatively minimal burden on a plaintiff.'"  *Litwin v. Blackstone Grp.,*

5    *L.P.*, 634 F.3d 706, 716 (2d Cir.), *cert. denied*, 132 S. Ct. 242 (2011) (quoting  *Herman &*

6    *MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983)); *see also id.* at 715 (observing that §§ 11

7    and 12(a)(2) claims not premised on allegations of fraud are "ordinary notice pleading case[s],

8    subject only to the 'short and plain statement' requirements of Federal Rule of Civil Procedure

9    8(a)"); *In re Morgan Stanley Info. Fund*, 592 F.3d at 359, 360 (observing that  §§ 11 and

10   12(a)(2) "apply more narrowly but give rise to liability more readily" than § 10(b) of the

11   Securities Exchange Act of 1934, 15 U.S.C. § 77j(b)).

12        We first address NECA's argument that the district court erred in holding that it lacked

13   standing to assert class claims with respect to Certificates from the 15 Offerings, and from

14   tranches of the 2007-5 and 2007-10 Offerings, from which it did not purchase Certificates.

15   NECA argues that the single Shelf Registration Statement common to all the purchasers'

16   Certificates was "rife with misstatements," so "there was no reason to require the Fund to buy

17   Certificates from each Trust in order to establish its standing."  Appellant's Br. 57-58.  As to the

---

[8] Although §§ 11 and 12(a)(2) make certain due diligence and "reasonable care" defenses available to certain defendants, *see* 15 U.S.C. § 77k(b), *l*(a)(2), and although defendants may avoid liability under both provisions for damages not caused by the alleged misrepresentations or omissions, *see id.* § 77k(e), *l*(b), "defendants bear the burden of demonstrating the applicability of each of these defenses, which are therefore unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6)," *In re Morgan Stanley Info. Fund*, 592 F.3d at 359 n.7.

1    allegedly false and misleading Prospectus Supplements unique to each Offering, because each

2    was "expressly incorporated" into the same false and misleading Shelf Registration Statement,

3    NECA argues its standing to sue for misrepresentations in all 17 Prospectus Supplements is

4    "secure." *Id.* at 55.  In short, according to plaintiff, "the common [Shelf] Registration Statement

5    provides the glue that binds together the absent Class Members' purchases of Certificates, as

6    well as the additionally misleading [Prospectus] Supplements that defendants expressly

7    incorporated into it." *Id.* at 58.

8          Defendants, on the other hand, contend that the fact that each Offering was issued

9    pursuant to a different "registration statement" under SEC regulations dooms NECA's textual

10   standing argument, because "*the* registration statement" referred to in § 11 is different for each

11   Offering – even if every Offering's registration statement includes the same Shelf Registration

12   Statement.  Appellees' Br. 18 (quotation marks omitted).  Moreover, defendants observe, the

13   Shelf Registration Statement common to all the Certificates contained no information about the

14   loan originators or mortgage collateral underlying them.  That information was instead contained

15   in the Prospectus Supplements unique to each Offering, without which the Certificates could not

16   have been issued – and which contained "unique" representations "focused on the specific loans

17   underlying each offering and the specific underwriting standards and origination practices in

18   effect at the time those specific loans were originated." *Id.* at 19 (quotation marks omitted).

19         As to tranche-level standing, defendants argue that, despite the fact that the Certificates

20   in every tranche of a given Offering *are* registered pursuant to the same registration statement,

21   NECA lacks standing to represent Certificate-holders outside the specific tranche from which it

1    purchased because "different [C]ertificates have different investment characteristics and may

2    suffer different harm based on the non- or under-performance of sometimes differing underlying

3    loans." *Id.* at 25. Just as "the downgrade in credit ratings, the particular guidelines used by the

4    mortgage originator for that pool of loans, and the default and delinquency rates all differ based

5    on the particular [O]ffering," defendants argue, "these variances [also] exist at the [tranche]

6    level." *Id.* at 23. The district court, as noted above, essentially agreed with defendants'

7    arguments, concluding that while a class representative may represent people practically

8    identically situated to her, they must have purchased the same securities she purchased.

9        NECA has Article III standing to sue defendants in its own right because it plausibly

10   alleged (1) a diminution in the value of the 2007-5 and 2007-10 Certificates (2) as a result of

11   defendants' inclusion of misleading statements in the 2007-5 and 2007-10 registration statements

12   and associated prospectuses that is (3) redressable through rights of action for damages under §§

13   11 and 12(a)(2). *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (holding that a

14   plaintiff must allege (1) an injury in fact (2) fairly traceable to defendants' actions that is (3)

15   redressable by the requested relief to demonstrate Article III standing).

16       NECA also has statutory standing in its own right, having purchased the 2007-5 and

17   2007-10 Certificates pursuant to registration statements, parts of which are alleged to have

18   contained materially misleading statements, and having purchased the 2007-10 Certificates

19   "directly from Goldman Sachs, with GS Mortgage as the Issuer, in a public offering" pursuant to

20   the Offering Documents – with both entities' "solicit[ing] sales of the Certificates for financial

20

1   gain." J.A. at 238; *see* 15 U.S.C. § 77k(a), *l*(a)(2); *In re Morgan Stanley Info. Fund*, 592 F.3d at

2   359.

3          But whether NECA has "class standing" – that is, standing to assert claims *on behalf of*

4   purchasers of Certificates from other Offerings, or from different tranches of the same Offering –

5   does not turn on whether NECA would have statutory or Article III standing to seek recovery for

6   misleading statements in those Certificates' Offering Documents.  NECA clearly lacks standing

7   to assert such claims on its behalf because it did not purchase those Certificates.  Because the

8   class standing analysis is different, the district court erred in concluding, based on the fact that

9   NECA purchased just two "particular . . . [C]ertificate[s] from . . . particular tranche[s] from . . .

10  particular [T]rust[s]" that it necessarily lacked standing to assert claims *on behalf of* purchasers

11  of Certificates from other Trusts and from other tranches within the 2007-10 and 2007-5 Trusts.[9]

12  J.A. at 260.

13         According to NECA, "[b]ecause the Fund's purchases of Certificates afforded [it]

14  statutory standing under the Securities Act, and the case presented a genuine 'case or

15  controversy' under Article III, it then became a matter of whether Rule 23 considerations could

16  be satisfied at the proper time – not at this motion-to-dismiss stage."  Appellant's Br. 62.

_____

[9] It also erred to the extent it based its conclusion on the (mistaken) assumption that "only when . . . other people bought the same securities that the plaintiff bought" may a "practically identically situated" plaintiff serve as their "class representative."  J.A. at 162; *see Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82-83 (2d Cir. 2004) (observing that "a class representative can establish the requisite typicality under Rule 23 if the defendants committed the same wrongful acts in the same manner against all members of the class," even if the class representative lacks standing to sue on every claim asserted by the class).  In any event, NECA's standing to assert claims on others' behalf is an inquiry separate from its ability to represent the interests of absent class members under Fed. R. Civ. P. Rule 23(a).  *See* Appellant's Br. 62 ("What the district court thought was a 'standing' issue was in reality a class certification issue." (emphasis omitted)).

1     Indeed, we have said that, "[t]o establish Article III standing in a class action . . . for every

2     named defendant there must be at least one named plaintiff who can assert a claim directly

3     against that defendant, and at that point standing is satisfied and only then will the inquiry shift

4     to a class action analysis." *Cent. States Se. & Sw. Areas Health & Welfare Fund v.*

5     *Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007) (quotation marks

6     omitted).  There is support for that proposition in earlier decisions of the Supreme Court.  *See*

7     *Sosna v. Iowa*, 419 U.S. 393, 403 (1975) ("Th[e] conclusion [that a named plaintiff has a case or

8     controversy] does not automatically establish that [she] is entitled to litigate the interests of the

9     class she seeks to represent, but it does shift the focus of examination from the elements of

10    justiciability to the ability of the named representative to 'fairly and adequately protect the

11    interests of the class.'" (quoting Fed. R. Civ. P. 23(a))).[10]

---

[10] *See also Lewis v. Casey*, 518 U.S. 343, 395-96 (1996) (Souter, *J.*, concurring in part, dissenting in part, and concurring in the judgment) ("Whether or not the named plaintiff who meets individual standing requirements may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions." (quotation marks omitted)); *id.* at 396 (Souter, *J.*, concurring in part, dissenting in part, and concurring in the judgment) ("As long as the representative parties have a direct and substantial interest, they have standing; the question whether they may be allowed to present claims on behalf of others . . . depends not on standing, but on an assessment of typicality and adequacy of representation." (quotation marks omitted); *id.* at 408 n.4 (Stevens, *J.*, dissenting) ("If named class plaintiffs have standing, the standing of the class members is satisfied by the requirements for class certification."); *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 159 & n.15 (1982) (Mexican-American employee passed over for promotion could not represent class of Mexican-Americans whose applications had been denied because, under Rule 23(a)'s typicality and adequacy requirements – but not as a matter of standing – the promotion-base injuries were too dissimilar from the application-based injuries); *Payton v. Cnty. of Kane*, 308 F.3d 673, 677 (7th Cir. 2002), *cert. denied*, 540 U.S. 812 (2003) (reversing district court's dismissal of putative class action on grounds that plaintiffs-arrestees, allegedly injured by two counties' implementation of a state bond-posting statute, lacked standing to sue on behalf of arrestees from seventeen other counties; "putting to one side the problem inherent in conflating the standing inquiry with the inquiry under Rule 23 about the suitability of a plaintiff to serve as a class representative, the proper remedy for this shortcoming is not dismissal of the entire action, but rather an order denying class certification and permitting the case to continue as an individual suit"); *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410,

1          However, as the Supreme Court has acknowledged, there is some "tension" in its case

2    law as to whether "variation" between (1) a named plaintiff's claims and (2) the claims of

3    putative class members "is a matter of Article III standing . . . or whether it goes to the propriety

4    of class certification pursuant to [Fed. R. Civ. P. 23(a)]."  *Gratz v. Bollinger*, 539 U.S. 244, 263

5    & n.15 (2003) (citing *Gen. Tel. Co.*, 457 U.S. at 149 and *Blum v. Yaretsky*, 457 U.S. 991 (1982));

6    *see also Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632

7    F.3d 762, 768 (1st Cir. 2011) ("The issue looks straightforward and one would expect it to be

8    well settled; neither assumption is entirely true.").  For example, in *Blum v. Yaretsky*, where the

9    Court found class standing to be lacking, two New York state nursing home residents challenged

10   decisions by the nursing home's utilization review committee to transfer them, without adequate

11   notice or a hearing, to lower levels of care.  After certifying a class, the district court expanded it

12   to include patients transferred to *higher* levels of care without adequate procedural safeguards.

13   The Supreme Court held that the district court "exceeded its authority in adjudicating the

14   procedures governing transfers to higher levels of care" because the threat of such transfers

15   lacked "sufficient immediacy and reality" for plaintiffs, who therefore lacked "standing to seek

16   an adjudication of the procedures attending such transfers."  457 U.S. at 1001-02 (quotation

17   marks omitted).  As the Court explained, "a plaintiff who has been subject to injurious conduct

---

422-23 (6th Cir. 1998) ("Once his standing has been established, whether a plaintiff will be able to
represent the putative class, including absent class members, depends solely on whether he is able to meet
the additional criteria encompassed in [Fed. R. Civ. P. 23(a)].");  *Gratsy v. Amalgamated Clothing &
Textile Workers Union*, 828 F.2d 123, 130 n.8 (3d Cir. 1987), *abrogated on other grounds by Reed v.
United Transp. Union*, 488 U.S. 319 (1989) (because named plaintiffs alleged personal injury,
defendants' contentions that they "do not have standing to raise the claims of the class . . . confuse
standing and the typicality requirement of Rule 23(a)(3).").

23

1  of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of

2  another kind, although similar, to which he has not been subject." *Id.* at 999.  Because the

3  conditions under which transfers to higher versus lower levels of care occurred were

4  "sufficiently different," and because plaintiffs' attack "presuppose[d] a *deprivation* of protected

5  property interests" – in contrast to the *increase* in Medicaid benefits attendant upon transfers to

6  *higher* levels of care – any judicial assessment of the procedural adequacy of the latter "would be

7  wholly gratuitous and advisory." *Id.* at 1001-02.

8        The Court also found class standing lacking in *Lewis v. Casey*, where 22 inmates of

9  various prisons operated by the Arizona Department of Corrections ("ADOC") filed a class

10  action "on behalf of all adult prisoners who are or will be incarcerated by [ADOC]" alleging that

11  the ADOC was depriving them of their rights of access to the courts and counsel.  518 U.S. at

12  346 (quotation marks omitted).  The district court found actual injury on the part of only one

13  named plaintiff, who was illiterate.  *Id.* at 358.  Nevertheless, it issued a 25-page injunction

14  mandating sweeping changes to the ADOC system.  *Id.* at 346-47.  The Supreme Court

15  "eliminate[d] from the proper scope of th[e] injunction provisions directed" at inadequacies not

16  "found to have harmed any plaintiff in this lawsuit." *Id.* at 358.  The Court explained that a

17  plaintiff's demonstration of "harm from one particular inadequacy in government

18  administration" does not authorize a court "to remedy *all* inadequacies in that administration."

19  *Id.* at 357.  Rather "[t]he remedy must . . . be limited to the inadequacy that produced the injury

20  in fact that the plaintiff has established." *Id.*  The majority expressly rejected Justice Stevens's

21  suggestion that its holding amounted to "a conclusion that the class was improper," asserting that

24

1    "[t]he standing determination is quite separate from certification of the class." *Id.* at 358 n.6

2    (pointing to the Court's failure to "disturb the class definition" in *Blum* while simultaneously

3    holding that plaintiffs lacked standing to challenge transfers to higher levels of care).

4              By contrast, the Court in *Gratz v. Bollinger* found the claims of the designated class

5    representative, Hamacher, sufficiently similar to those of the class to support class standing.

6    Hamacher, a white male, alleged that the University of Michigan's use of race in undergraduate

7    admissions denied him the opportunity to compete for admission on an equal basis.  539 U.S. at

8    262.  After being denied admission and enrolling at another school, Hamacher demonstrated that

9    he was "able and ready" to apply as a transfer student should the University cease to use race in

10   undergraduate admissions.  *Id.* (quotation marks omitted).  In a dissenting opinion, Justice

11   Stevens argued that, because Hamacher had enrolled at another institution, he lacked standing to

12   represent class members challenging the University's use of race in undergraduate *freshman*

13   admissions (as opposed to *transfer* admissions).  *Id.* at 286 (Stevens, *J.*, dissenting).  The criteria

14   used to evaluate transfer applications at Michigan "differ[ed] significantly from the criteria used

15   to evaluate freshman undergraduate applications," Justice Stevens concluded.  *Id.* at 286.  For

16   example, the University's 2000 freshman admissions policy provided for 20 points to be added

17   to the selection index scores of minority applicants, whereas the University did not use points in

18   its transfer policy.  *Id.*  Citing *Lewis* and *Blum*, Justice Stevens concluded that "Hamacher cannot

19   base his right to complain about the *freshman* admissions policy on his hypothetical injury under

20   a wholly separate *transfer* policy."  *Id.*  "At bottom," he concluded,

1  [Hamacher's] interest in obtaining an injunction for the benefit of younger
2  third parties is comparable to . . . that of the Medicaid patients transferred
3  to less intensive care who had no standing to litigate on behalf of patients
4  objecting to transfers to more intensive care facilities in *Blum*[], 457
5  U.S.[] at 1001[].  To have standing, it is elementary that [Hamacher's]
6  own interests must be implicated.  Because [he] has [no] personal stake in
7  this suit for prospective relief, [he lacks] standing.

9  *Id.* at 289.

10        But a majority of the Court rejected Justice Stevens's view, finding that "the University's

11  use of race in undergraduate transfer admissions does not implicate *a significantly different set of*

12  *concerns* than does its use of race in undergraduate freshman admissions."  *Id.* at 265 (emphasis

13  added).  "[T]he *only* difference between the University's use of race in considering freshman and

14  transfer applicants," the majority observed, was that all underrepresented minority freshman

15  applicants received 20 points and "virtually" all who were minimally qualified were admitted,

16  while "generally" all minimally qualified minority transfer applicants were admitted outright.

17  *Id.* at 266.  "While this difference might be relevant to a narrow tailoring analysis," the majority

18  observed, "it clearly has no effect on [Hamacher's] standing to challenge the University's use of

19  race in undergraduate admissions and [the University's] assertion that diversity [was] a

20  compelling state interest that justifies its consideration of the race of its undergraduate

21  applicants."  *Id.*  Whereas in *Blum* "transfers to lower levels of care involved *a number of*

22  *fundamentally different concerns* than did transfers to higher ones," in *Gratz* "*the same set of*

23  *concerns* is implicated by the University's use of race in evaluating all undergraduate admissions

24  applications under the guidelines."  *Id.* at 264, 267 (emphases added).

1        Admittedly, constitutional litigation seeking injunctive relief does not map all that neatly

2    onto statutorily based securities litigation seeking monetary damages.  But distilling these cases

3    down to a broad standard for class standing, we believe they stand collectively for the

4    proposition that, in a putative class action, a plaintiff has class standing if he plausibly alleges (1)

5    that he "personally has suffered some actual . . . injury as a result of the putatively illegal

6    conduct of the defendant," *Blum*, 457 U.S. at 999 (quotation marks omitted), and (2) that such

7    conduct implicates "the same set of concerns" as the conduct alleged to have caused injury to

8    other members of the putative class by the same defendants, *Gratz*, 539 U.S. at 267.  Therefore,

9    the district court's requirement that NECA "show[] that [its] injuries . . . are *the same* . . . as

10   those allegedly suffered by purchasers of [Certificates from] outlying [T]rusts backed by distinct

11   sets of loans" was error.  J.A. at 198 (emphasis added).  We note that, in the context of claims

12   alleging injury based on misrepresentations, the misconduct alleged will almost always be the

13   same: the making of a false or misleading statement.  Whether that conduct implicates the same

14   set of concerns for distinct sets of plaintiffs, however, will depend on the nature and content of

15   the specific misrepresentation alleged.

16        We have already held that NECA personally suffered injury as a result of defendants'

17   inclusion of allegedly misleading statements in the Offering Documents associated with the

18   Certificates it purchased.  But whether that conduct by defendants implicates the same set of

19   concerns as their inclusion of similar if not identical statements in the Offering Documents

20   associated with other Certificates – whether from different Offerings or from different tranches

21   of the same Offering – is much harder to answer.  Here, it bears emphasizing that NECA is not

1    suing GreenPoint and Wells Fargo for abandoning their underwriting standards; it is suing the

2    three Goldman Sachs entities that issued, underwrote, and sponsored every Certificate from all

3    17 Trusts.  Moreover, the same three defendants are alleged to have inserted nearly identical

4    misrepresentations into the Offering Documents associated with *all* of the Certificates, whose

5    purchasers plaintiff seeks to represent.  For example, the Shelf Registration Statement common

6    to every Certificate's registration statement represents that, for loans purchased under the

7    Conduit Program, "the originating lender makes a determination about whether the borrower's

8    monthly income . . . will be sufficient to enable the borrower to meet its monthly obligations on

9    the mortgage loan and other expenses related to the property."  It similarly represented that, for

10   mortgage loans generally, "[t]he lender . . . applies the underwriting standards to evaluate the

11   borrower's credit standing and repayment ability" and "makes a determination as to whether the

12   prospective borrower has sufficient monthly income available (as to meet the borrower's

13   monthly obligations . . . )."  The fact that those representations appeared in separate Offering

14   Documents (a point emphasized heavily by defendants) does not by itself raise "a number of

15   fundamentally different concerns," *Gratz*, 539 U.S. at 264, because the location of the

16   representations has no effect on a given purchaser's assertion that the representation was

17   misleading (the source of the injury) – just as the difference in the University of Michigan's

18   transfer and freshman admissions policies had no effect on the University's assertion that

19   diversity was a compelling state interest.  Indeed, one could imagine a series of corporate debt

20   offerings, issued over the course of a year, all of which contained an identical misrepresentation

21   about the issuing company's impending insolvency.  Sections 11 and 12(a)(2) claims brought by

28

1     a purchaser of debt from one offering would raise a "set of concerns" nearly identical to that of a

2     purchaser from another offering: the misrepresentation would infect the debt issued from every

3     offering in like manner, given that all of it is backed by the same company whose solvency has

4     been called into question.  In that case, the inappropriateness of denying class standing on the

5     happenstance of the misrepresentation's location in one offering versus another seems patent.

6            But that is not this case.  The putative class members here did not all purchase debt

7     backed by a single company through offering documents tainted by a single misstatement about

8     that company.  They bought Certificates issued through 17 separate Offerings, each backed by a

9     distinct set of loans issued by a distinct set of originators.  For at least one of those Offerings –

10    the 2007-5 Offering – the Certificates were divided further into two separate Groups, each of

11    which was backed by a distinct set of loans issued in large part by a distinct set of originators.

12    And within each Offering (and within the two Groups of the 2007-5 Offering), the Certificates

13    were divided further into separate tranches offering various priorities of entitlement to the cash

14    flows from the loans backing them.  In the context of §§ 11 and 12(a)(2) claims alleging

15    misstatements about *origination guidelines*, we think that differences in the identity of the

16    originators backing the Certificates matters for the purposes of assessing whether those claims

17    raise the same set of concerns.  That is because, to the extent the representations in the Offering

18    Documents were misleading with respect to one Certificate, they were not necessarily

19    misleading with respect to others.  Thus, while the alleged injury suffered by each Offering's

20    Certificate-holder may "flow from" the same Shelf Registration Statement or from nearly

21    identical misstatements contained in distinct Prospectus Supplements, each of those alleged

1    injuries has the potential to be very different – and could turn on very different proof.  That proof

2    would center on whether the particular originators of the loans backing the particular Offering

3    from which a Certificate-holder purchased a security had in fact abandoned its underwriting

4    guidelines, rendering defendants' Offering Documents false or misleading.

5           The Second and Third Amended Complaints' emphasis on the abandonment by specific

6    loan originators of their stated underwriting guidelines reinforces this principle.  The originator-

7    specific allegations provide the necessary link between (1) the Offering Documents'

8    representations in a vacuum and (2) the *falsity* of those representations.  Indeed, after the district

9    court dismissed for lack of standing plaintiff's claims on behalf of purchasers of Certificates

10   from other Offerings, NECA eliminated from its complaint any discussion of the allegedly

11   abusive underwriting practices of National City, SunTrust, and WaMu, none of whose loans are

12   alleged to have backed *plaintiff's* Certificates.[11]  Thus, while NECA and purchasers of

13   Certificates from National City-, SunTrust-, and WaMu-backed Offerings may both have

14   suffered injuries, those suffered due to misstatements in the latter group of Offerings were

15   sufficiently different in character and origin, as NECA itself appears, based on its pleadings, to

16   appreciate.

---

[11] However, notwithstanding that Countrywide loans back neither the 2007-10 nor 2007-5 Group 1 Certificates, the Third Amended Complaint retains extensive allegations concerning that originator's abandonment of its stated underwriting guidelines.  Perhaps that is because, plaintiff reasoned, Countrywide loans *did* back the 2007-5 Group 2 Certificates, which were registered and offered pursuant to identical Offering Documents as the 2007-5 Group 1 Certificates.  Or perhaps it is because the allegations pertaining to Countrywide were the ones the district court specifically found "enough" of to prevent it from "throw[ing]. . . out" the complaint.  J.A. at 291.  Either way, for the reasons that follow, we do not see the relevance of those allegations to the claims plaintiff has standing to assert.

1        However, to the extent certain Offerings were backed by loans originated by originators

2    common to those backing the 2007-5 and 2007-10 Offerings, NECA's claims raise a sufficiently

3    similar set of concerns to permit it to purport to represent Certificate-holders from those

4    Offerings.  Therefore, under the Second Amended Complaint, plaintiff has class standing to

5    assert the claims of purchasers of Certificates from the 5 additional Trusts containing loans

6    originated by GreenPoint, Wells Fargo, or both.  Based on the allegations in that complaint,

7    those Trusts include the GSAA Home Equity Trust 2007-3 (29% GreenPoint-originated loans),

8    2007-4 (36% GreenPoint-originated loans), 2007-6 (9% GreenPoint-originated loans), and

9    2007-7 (23% GreenPoint-originated and 67% Wells Fargo-originated loans) and the GSR

10   Mortgage Loan Trust 2007-3F (47% Wells Fargo-originated loans).  Plaintiff also has standing

11   to assert claims on behalf of purchasers of Certificates from Group 2 of the 2007-5 Trust

12   because, according to the 2007-5 prospectus, those Certificates contained at least some loans

13   originated by Wells Fargo.  However, plaintiff lacks standing to assert claims on behalf of

14   purchasers of Certificates from the other 10 Trusts.[12]

15       Turning to the question of tranche-level standing, we do not believe the Certificates'

16   varying levels of payment priority raise such a "fundamentally different set of concerns" as to

17   defeat class standing.  *Gratz*, 539 U.S. at 264.  Within any given Offering (or within any given

18   Group of a particular Offering), some Certificates may be entitled to cash flows from the loans

19   backing them earlier than others.  But that does not alter the fact that all of the Certificate-

---

[12] Those Trusts are the GSAA Home Equity Trust 2007-8; the GSAMP Trust 2007-FM2, 2007-HEI, 2007-HE2, and 2007-HSBC1; the GSR Mortgage Loan Trust 2007-OA1, 2007-OA2, 2007-4F, and 2007-5F; and the STARM Mortgage Loan Trust 2007-4.

1    holders' cash flows within any such Offering or Group derive from loans originated by some of

2    the same originators.  Regardless of their level of subordination, each Certificate-holder within

3    an Offering or Group backed by loans originated by similar lenders has the same "necessary

4    stake in litigating" whether those lenders in fact abandoned their underwriting guidelines.  *Blum*,

5    457 U.S. at 999; *see also Nomura Asset*, 632 F.3d at 770 (reserving decision on future case

6    where "the claims of the named plaintiffs necessarily give them – not just their lawyers –

7    essentially the same incentive to litigate the counterpart claims of the class members because the

8    establishment of the named plaintiffs' claims necessarily establishes those of other class

9    members").  Their ultimate damages will of course vary depending on their level of

10   subordination, but "it is well-established that the fact that damages may have to be ascertained

11   on an individual basis is not sufficient to defeat class certification" under Rule 23(a), let alone

12   class standing.  *Seijas v. Republic of Argentina,* 606 F.3d 53, 58 (2d Cir. 2010).  We emphasize

13   that it is by no means a foregone conclusion that, because plaintiff has standing to assert §§ 11

14   and 12(a)(2) claims on behalf of Certificate-holders from different tranches of Offerings (or

15   within Offerings) backed by loans originated by the same originators, a putative class comprised

16   of such Certificate-holders should be certified.  The district court, after reviewing all of the Rule

17   23 factors, retains broad discretion to make that determination.[13]

---

[13] *Compare N.J. Carpenters Health Fund v. Rali Series 2006-QO1 Trust*, Nos. 11-1683-cv, 11-1684-cv, 2012 WL 1481519, at *4 (2d Cir. Apr. 30, 2012) (summary order) (finding no abuse of discretion in district court's denial of class certification in §§ 11 and 12(a)(2) MBS action on grounds that, although separate tranches did not defeat adequacy or typicality, individual, not common, issues relating to defendants' knowledge defenses would predominate and class adjudication would not be superior to individual actions), *with Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 280 F.R.D. 130, 134 (S.D.N.Y. 2012) ("The invocation of tranches as a means to defeat class certification has

1      We turn now to NECA's contention that the district erred in concluding that it failed to

2  allege cognizable damages under § 11.  While a plaintiff need not plead damages under § 11, it

3  must satisfy the court that it has suffered a cognizable injury under the statute.  Section 11

4  permits a successful plaintiff to recover "the difference between the amount paid for the

5  security" and either

6          (1) *the value thereof as of the time such suit was brought*, or (2) the price
7          at which such security shall have been disposed of in the market before
8          suit, or (3) the price at which such security shall have been disposed of
9          after suit but before judgment if such damages shall be less than [the
10         measure of damages defined in subsection (1)].
11

12  15 U.S.C. § 77k(e) (emphasis added).[14]  In *McMahan & Co. v. Wherehouse Entertainment, Inc.*,

13  65 F.3d 1044 (2d Cir. 1995), this Court provided guidance on the meaning of "value" in § 11(e):

14  First, "the term . . . was intended to mean the security's true value after the alleged

15  misrepresentations are made public."  *Id.* at 1048.  Second, although "in a market economy,

16  when market value is available and reliable, market value will always be the primary gauge of a[

17  security's] worth,"

18         the value of a security may not be equivalent to its market price.
19         Congress' use of the term "value," as distinguished from the terms

---

failed in similar cases and fails here."), *and Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 108 (S.D.N.Y. 2011) (concluding that, because "the representations in each Offering apply equally to all tranches within that Offering," any variation in tranches' repayment rights did not "present a fundamental conflict within the class" (quotation marks omitted)).

   [14] A plaintiff asserting a claim under § 12(a)(2) may sue for rescission or, if she no longer owns the security, for "damages."  *Id.* § 77 *l*(a)(2).  Because the district court denied NECA leave to amend its complaint to seek damages rather than rescission following its sale of the 2007-10 Certificates, it did not consider whether plaintiff alleged a cognizable injury under § 12(a)(2), and we have no occasion to do so here.

      "amount paid" and "price" indicates that, under certain circumstances, the market price may not adequately reflect the security's value.

*Id.* at 1048-49 (quotation marks omitted). However, "even where market price is not completely reliable, it serves as a good starting point in determining value." *Id.* at 1049. Thus, under § 11, the key is not, as the district court concluded and as defendants contend, market price; the key is value.

      NECA, as it was required to do, plausibly pled a cognizable injury – a decline in value – under § 11. NECA alleged that "the value of the [C]ertificates ha[d] diminished greatly since their original offering, as ha[d] the price at which members of the Class could dispose of them[,] . . . caus[ing] damages to the plaintiff and the Class." J.A. at 139. It supported this assertion of injury with the following well-pleaded facts: that the rating agencies "put negative watch labels on the Certificate[s] . . . and downgraded previously-assigned ratings" and that holders were "exposed to much more risk with respect to both the timing and absolute cash flow to be received than the Offering Documents represented." *Id.* at 110. The latter allegation was rendered plausible by the complaint's extensive allegations regarding loan originators' failure to determine, in a significant number of cases and contrary to their underwriting guidelines, "whether the borrower's monthly income . . . will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property." J.A. at 116, 212. Drawing the requisite inferences in plaintiff's favor, it is not just plausible – but obvious – that mortgage-backed securities like the Certificates would suffer a decline in value as a result of (1) ratings downgrades and (2) less certain future cash flows. Thus, NECA plausibly

34

1    alleged a "difference between the amount paid for the [Certificates]" and "the value thereof as of

2    the time [its] suit was brought."  15 U.S.C. § 77k(e).

3         Defendants argue, and the district court reasoned, that plaintiff suffered no loss because

4    the Complaint did not allege any missed payment from the Trusts and the Fund admitted that no

5    payments had been missed.  Appellees' Br. 30; *NECA-IBEW*, 743 F. Supp. 2d at 292.  But basic

6    securities valuation principles – discounting future cash flows to their present value using a rate

7    of interest reflecting the cash flows' risk – belie the proposition that a fixed income investor

8    must miss an interest payment before his securities can be said to have declined in "value."  The

9    reasonable inference from NECA's allegations is that, because the loans backing the Certificates

10   were riskier than defendants represented, the future cash flows to which NECA was entitled

11   under the Certificates required a higher discount rate once the Offering Documents' falsity was

12   revealed, resulting in a lower present value.  Put differently, the revelation that borrowers on

13   loans backing the Certificates were less creditworthy than the Offering Documents represented

14   affected the Certificates' "value" immediately, because it increased the Certificates' credit risk

15   profile.  In this analysis, whether Certificate-holders actually missed a scheduled coupon

16   payment is not determinative.  *See also Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d

17   171, 183 (2d Cir. 2007) ("[I]n securities cases there is a presumption that shares are purchased

18   for the purpose of investment and their true value to the investor is the price at which they may

19   later be sold.").

20        Neither is the existence or liquidity of a secondary market.  The district court determined

21   that, because plaintiff "knew [the Certificates] might not be liquid, it [could] not allege an injury

1    based upon the hypothetical price of the Certificates on a secondary market at the time of suit."

2    *NECA-IBEW*, 743 F. Supp. 2d at 292.  We have three problems with this conclusion.  First,

3    NECA alleged the existence of a secondary market.  J.A. at 236.  Second, the district court's

4    analysis conflates liquidity risk and credit risk.  While plaintiff may have assumed liquidity risk

5    when it purchased the Certificates, it did not assume the heightened credit risk associated with

6    mortgage collateral allegedly far riskier than the Offering Documents represented.  Both risks

7    may tend to depress a security's price, but that does not prevent a damages expert from isolating

8    their respective contributions to a given price decline.  And NECA was not required to prove the

9    precise amount of any damages at the pleading stage.  Indeed, § 11 works the other way:  It

10    presumes that any diminution in value is attributable to the alleged misrepresentations, and

11    places the burden on defendants to *disprove* causation.  *See* 15 U.S.C. § 77k(e) ("[I]f the

12    defendant proves that any portion or all of [plaintiff's] damages represents other than the

13    depreciation in value of such security resulting from such part of the registration statement[] with

14    respect to which [defendant's] liability is asserted, . . . such portion of or all such damages shall

15    not be recoverable."); *In re Morgan Stanley Info. Fund*, 592 F.3d at 359 n.7.[15]

16        Third, the district court also conflated the price of a security and its "value."  The absence

17    of an "actual market price for [a security] at the time of suit" does not defeat an investor's

18    plausible claim of injury from misleading statements contained in that security's offering

---

[15] It may well be that, ultimately, the Fund will recover nothing because defendants will prove that any diminution in value is attributable to, *e.g.*, (1) illiquidity, (2) the global financial crisis, or (3) a widening of credit spreads rather than defendants' misrepresentations.  But that is irrelevant to whether plaintiff has alleged, at the pleading stage, a cognizable injury under the statute.

1   documents.  *NECA-IBEW*, 743 F. Supp. 2d at 292.  The value of a security is not unascertainable

2   simply because it trades in an illiquid market and therefore has no "actual market price."  Indeed,

3   valuing illiquid assets is an important (and routine) activity for asset managers, an activity

4   typically guided by Statement 157 of the Financial Accounting Standards Board ("FAS 157").[16]

5   Moreover, the fact that financial valuation may be difficult or "involve[] the exercise of

6   judgment" – as defendants observe to be the case with the "complex asset-backed instruments at

7   issue here" – does not render plaintiff's allegations of loss of value fatally conclusory.  *See*

8   Appellees' Br. 32 (quotation marks omitted).

9       For these reasons, the judgment of the district court dismissing plaintiff's § 11 claims is

10  vacated and the claims are reinstated.  On remand, the court should afford plaintiff leave to

11  replead, *inter alia*, "the price at which [the 2007-10 Class 1AV1 Certificates] shall have been

12  disposed of after suit but before judgment," 15 U.S.C. § 77k(e)(3), and to seek damages rather

13  than rescission for its § 12(a)(2) claim with respect to those Certificates, *see id.* § 77*l*(a)(2).

14
15                              **CONCLUSION**

16      As stated above, the district court erred to the extent it held plaintiffs lacked class

17  standing to assert the claims of purchasers of certificates backed by mortgages originated by the

18  same lenders that originated the mortgages backing plaintiff's certificates.  The district court

---

[16] Under the "fair value hierarchy" established by FAS 157, the highest priority "input" for valuing assets and liabilities is quoted prices in active markets for identical assets or liabilities.  FAS 157 at 12.  If such "Level 1" inputs are not available, "Level 2" inputs, such as quoted prices for similar assets or liabilities in active markets, should be used.  *Id.* at 12-15.  And if "Level 2" inputs are not available – such as when there is "little, if any, market activity for the asset or liability at the measurement date" – "unobservable" "Level 3" inputs, such as model assumptions that take market participant assumptions into account, should be used.  *Id.* at 15.

1    further erred in requiring plaintiff to plead an out-of-pocket loss in order to allege a cognizable

2    diminution in the value of an illiquid security under § 11.  Accordingly, we affirm in part and

3    vacate in part the judgment of the district court dismissing plaintiff's claims and remand with

4    instructions to reinstate plaintiff's §§ 11, 12(a)(2), and 15 claims in respect of the GSAA Home

5    Equity Trust 2007-3, 2007-4, 2007-5, 2007-6, 2007-7, and 2007-10 Offerings, and the GSR

6    Mortgage Loan Trust 2007-3F Offering.

7