UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
NECA-IBEW HEALTH & WELFARE FUND, :    Civil Action No. 1:08-cv-10783-MGC
Individually and On Behalf of All Others : 
Similarly Situated, :    "ECF Case"
: 
                 Plaintiff, :    <u>CLASS ACTION</u>
: 
    vs. :    FOURTH AMENDED COMPLAINT FOR
:    VIOLATION OF §§11, 12 AND 15 OF THE
GOLDMAN, SACHS & CO., et al., :    SECURITIES ACT OF 1933
: 
                 Defendants. : 
: 
———————————————————— x

**INTRODUCTION**

1.      This is a securities class action on behalf of all persons or entities who acquired the Mortgage Pass-Through Certificates or Asset-Backed Certificates (collectively, the "Certificates") of defendant GS Mortgage Securities Corp. ("GS Mortgage") pursuant and/or traceable to a false and misleading Registration Statement filed January 31, 2007, along with false and misleading Prospectus Supplements filed during 2007 and 2008, each of which were expressly incorporated by reference into the Registration Statement (collectively, the "Offering Documents").  This action involves solely strict liability and negligence claims brought pursuant to the Securities Act of 1933 ("1933 Act").

2.      The Certificates were issued, underwritten and/or offered for sale by the defendants. The Certificates are securities backed by pools of residential real estate loans.  Defendants caused the Offering Documents to contain materially false and misleading statements and omissions concerning the Certificates, and the loans underlying them, in violation of the 1933 Act.

3.      In summary, defendants made the following false and misleading statements in the offering documents:

- Loan underwriting standards used to originate the loans underlying the Certificates evaluated a prospective borrower's ability to repay the loan and the adequacy of the mortgaged property as collateral for the loan;

- Property appraisers' compensation was not affected by whether or not a loan was approved; appraisals of the properties underlying the loans were based on recent sales of comparable properties; and the appraisals conformed to the Uniform Standards of Professional Appraisal Practice ("USPAP"), Fannie Mae or Freddie Mac standards;

- Documents submitted in connection with the loan underwriting process were not falsified, did not contain untrue statements and were free of fraud;

- The loans underlying the Certificates had certain, specific, loan-to-value ("LTV") ratios at origination; and

- The Certificates would receive or had investment grade credit ratings.

4.     The true, material, facts, which defendants omitted from the Offering Documents, were that:

- Borrowers were not evaluated on their ability to repay the loans; instead, loans were made regardless of a borrower's ability to repay; loan originators made as many loans as possible regardless of repayment ability since they were selling the loans to defendants at a profit; in addition, borrowers and loan originators were routinely inflating borrowers' incomes to falsely high levels to qualify for loans the borrowers could not afford to repay;

- Property appraisers' future compensation was contingent upon providing loan originators with predetermined inflated property appraisals which allowed borrowers to qualify for loans; in addition, appraisals did not evaluate whether the mortgaged properties were adequate collateral for the loans and were not based on recent sales of comparable properties; and appraisals were not in conformity with USPAP or Fannie Mae or Freddie Mac standards as appraisers improperly inflated appraisal values due to pressure from loan originators;

- Documents submitted for loan underwriting contained untrue and false statements – potential borrowers and loan originators falsely inflated borrowers' incomes and debts, and appraisers submitted falsely inflated property appraisals;

- Because the specified LTV ratios contained in the Offering Documents were based on inaccurate and inflated property appraisals, the LTV ratios specified in the Offering Documents were false, inaccurate and understated;

- The credit ratings of the Certificates were false and understated the risk involved in investing in the Certificates because the rating agencies used outdated assumptions, overly-relaxed rating criteria and inaccurate data in formulating the ratings; and

- At the same time defendants were selling the Certificates to plaintiff and the Class and representing that the Certificates were investment grade, they were engaging in credit default swaps and other investments betting that loans like those underlying the Certificates would not be repaid.

5.     As a result, the Certificates sold to plaintiff and the Class had a much greater risk profile than represented in the Offering Documents. Instead of being conservative investment grade products as defendants represented in the Offering Documents, the Certificates were extremely risky investments that should have actually been rated as "junk" or worse.

6.     By mid 2008, the truth about the performance of the mortgage loans that secured the Certificates began to be revealed to the public, disclosing that the Certificates were much riskier than originally represented, and that holders would likely receive less absolute cash flow in the future and receive it, if at all, on a untimely basis.  The credit rating agencies also put negative watch labels on the Certificates and downgraded previously assigned ratings.

7.     Additional information about the true risk of the Certificates plaintiff and the Class purchased started to come to light in September 2010.  The U.S. Government, acting through the Financial Crisis Inquiry Commission ("FCIC"),[1] released written materials and testimony

---

[1]     The FCIC was created to examine the causes, domestic and global, of the current financial and economic crisis in the United States.  The Commission was established as part of the Fraud Enforcement and Recovery Act of 2009 (Pub. L. No. 111-21) passed by the United States Congress and signed by the President of the United States in May 2009.  This independent, ten-member panel was composed of private citizens with experience in areas such as housing, economics, finance, market regulation, banking and consumer protection.  Six members of the Commission were appointed by the Democratic leadership of Congress and four by the Republican leadership.  The FCIC's statutory instructions set out 22 specific topics for inquiry and called for the examination of the collapse of major financial institutions that failed or would have failed if not for exceptional assistance from the U.S. Government.  These topics included:

- fraud and abuse in the financial sector, including fraud and abuse toward consumers in the mortgage sector;

- credit rating agencies and the financial system, including reliance on credit ratings by financial institutions and federal financial regulators, the use of credit ratings in financial regulation, and the use of credit ratings in the securitization markets;

- lending practices and securitization, including the originate-to-distribute model for extending credit and transferring risk;

- the legal and regulatory structure of the U.S. housing market;

- derivatives and unregulated financial products and practices, including credit default swaps;

- short-selling;

demonstrating that defendants were engaged in a massive, systematic fraudulent scheme to package, rate and sell certificates such as the ones offered and purchased by plaintiff and the Class in this case. The scheme involved defendants originating and buying defective loans from loan originators, using due diligence to detect defects, negotiating lower prices for the defective loans, and then concealing and dumping those defective loans on investors – including plaintiff – without disclosing the defects.

8.      At present, each of the Certificates plaintiff bought have been downgraded from "AAA" investment grade at the time of purchase to "CCC" junk grade investments. As an additional result, the Certificates are no longer marketable in the secondary market at prices anywhere near the prices paid by plaintiff and the Class, and the holders of the Certificates are exposed to much more risk than the Offering Documents represented with respect to both the timing and absolute cash flow to be received.

**JURISDICTION AND VENUE**

9.      The claims alleged herein arise under §§11, 12(a)(2), and 15 of the 1933 Act, 15 U.S.C. §§77k, 77(l)(a)(2), and 77o. Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act.

---

- •      financial institution reliance on numerical models, including risk models and credit ratings; and

- •      the quality of due diligence undertaken by financial institutions.

*See* http://fcic.law.stanford.edu/about/history (last visited Oct. 30, 2012).

783368_1

10.     The violations of law complained of herein occurred in this District, including the dissemination of materially false and misleading statements complained of herein into this District. Defendants conduct business in this District.

## PARTIES

11.     Plaintiff NECA-IBEW Health & Welfare Fund acquired Certificates pursuant and traceable to the Registration Statement and Prospectus Supplements and has been damaged thereby. Specifically, on October 15, 2007, plaintiff purchased GSAA Home Equity Trust 2007-10 Asset-Backed Certificates ("2007-10 Certificates") with a face value of $390,000, at a price of 99.44% of face value, directly from defendant Goldman Sachs in the public offering.  On May 21, 2008, plaintiff purchased GSAA Home Equity Trust 2007-5 Asset-Backed Certificates ("2007-5 Certificates") with a face value of $49,827.56.  On November 22, 2010, plaintiff sold its 2007-10 Certificates for 68% of their remaining face value, recognizing a substantial loss on its investment. Plaintiff continues to hold its 2007-5 Certificates.

12.     Defendant Goldman Sachs & Co. ("Goldman Sachs") is a global bank holding company that engages in investment banking, securities and investment management.  Goldman Sachs was an underwriter in the sale of all of the Certificate offerings listed in paragraph 18 below. Defendant Goldman Sachs helped to draft and disseminate the Offering Documents.

13.     Defendant Goldman Sachs Mortgage Company ("GSMC") is a wholly owned subsidiary of defendant Goldman Sachs.  GSMC purchased the loans underlying the Certificates from various loan originators and other third-parties.  GSMC is the "sponsor" of the Certificate offerings at issue in this action and made certain representations concerning the loans within the Trusts at issue herein.

14.     Defendant GS Mortgage is a wholly owned subsidiary of defendant GSMC.  GS Mortgage engages in securitizing mortgage assets and related activities.  GS Mortgage securitized the loans at issue in this action, and was the "depositor" and issuer of the Certificates.  Under the securities laws, because GS Mortgage is the depositor, it is considered an issuer.  GS Mortgage issued the Certificates through 14 New York common law trusts.  GS Mortgage issued billions of dollars worth of Certificates pursuant to the Registration Statement and Prospectus Supplements through the 14 Trusts listed below:

| | |
|---|---|
| GSAA Home Equity Trust 2007-3 | GSAMP Trust 2007-HE1 |
| GSAA Home Equity Trust 2007-4 | GSAMP Trust 2007-HE2 |
| GSAA Home Equity Trust 2007-5 | GSR Mortgage Loan Trust 2007-OA1 |
| GSAA Home Equity Trust 2007-6 | GSR Mortgage Loan Trust 2007-OA2 |
| GSAA Home Equity Trust 2007-7 | GSR Mortgage Loan Trust 2007-3F |
| GSAA Home Equity Trust 2007-8 | GSR Mortgage Loan Trust 2007-4F |
| GSAA Home Equity Trust 2007-10 | GSR Mortgage Loan Trust 2007-5F |

15.     Defendant Daniel L. Sparks ("Sparks") was Chief Executive Officer ("CEO") and a director of GS Mortgage during the relevant time period.  Sparks was also overseeing defendant Goldman Sachs's credit-default swap and other activities alleged herein, betting against the residential housing market at the same time defendants were offering the Certificates at issue here to plaintiff and the Class.  Defendant Sparks signed the January 31, 2007 Registration Statement.

16.     Defendant Michelle Gill ("Gill") was Vice President, and the Principal Accounting Officer of GS Mortgage during the relevant time period.  Defendant Gill signed the January 31, 2007 Registration Statement.

17.     Defendant Kevin Gasvoda ("Gasvoda") was a director of GS Mortgage during the relevant time period.  Defendant Gasvoda signed the January 31, 2007 Registration Statement.

- 6 -

18.     The defendants identified in ¶¶15-17 are referred to herein as the "Individual Defendants." The Individual Defendants functioned as directors to the Trusts and to GS Mortgage.

19.     These defendants aided and abetted, and/or participated with and/or conspired with the other named defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons or entities who acquired the following Certificates pursuant and/or traceable to the false and misleading Registration Statement (Registration No. 333-139817) and Prospectus Supplements and who were damaged thereby (the "Class"):

| | |
|---|---|
| Asset-Backed Certificates, Series 2007-3 | Mortgage Pass-Through Certificates, Series 2007-HE1 |
| Asset-Backed Certificates, Series 2007-4 | Mortgage Pass-Through Certificates, Series 2007-HE2 |
| Asset-Backed Certificates, Series 2007-5 | Mortgage Pass-Through Certificates, Series 2007-OA1 |
| Asset-Backed Certificates, Series 2007-6 | Mortgage Pass-Through Certificates, Series 2007-OA2 |
| Asset-Backed Certificates, Series 2007-7 | Mortgage Pass-Through Certificates, Series 2007-3F |
| Asset-Backed Certificates, Series 2007-8 | Mortgage Pass-Through Certificates, Series 2007-4F |
| Asset-Backed Certificates, Series 2007-10 | Mortgage Pass-Through Certificates, Series 2007-5F |

21.     Excluded from the Class are defendants, the officers and directors of the defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

- 7 -

22.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are, at least, hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by defendants or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  The Registration Statement issued billions of dollars worth of Certificates.

23.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal securities laws complained of herein.

24.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

25.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether defendants violated the 1933 Act; whether the Registration Statement and Prospectus Supplements issued by defendants to the investing public negligently omitted and/or misrepresented material facts about the Certificates and the underlying mortgage loans comprising the pools; to what extent the members of the Class have sustained damages; and the proper measure of damages.

26.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## PLAINTIFF'S INVESTIGATION

27.     Plaintiff alleges the facts herein based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by defendants.  Plaintiff's counsel has also reviewed other regulatory filings and reports, securities analysts reports and advisories about defendants, the Trusts, the Certificates and the loans underlying the Certificates.  Plaintiff's counsel has further reviewed media reports about the defendants, the Certificates, the agencies that rated the Certificates, and the loan originators alleged in this Complaint.  In addition, plaintiff's counsel has  conducted interviews of former employees of the defendants, former employees of the loan originators, former employees of companies defendants used in connection with the loans, and others knowledgeable about the matters set forth herein. Plaintiff's counsel has also retained and consulted with experts specializing in the real estate lending and mortgage industry.  Plaintiff's counsel believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## BACKGROUND

28.     The Certificates provide the holders an ownership interest in principal and/or interest payments from various pools of residential real estate loans contained within the 14 Trusts.  The loans within the Trusts were purchased by defendant GSMC from various loan originators, bundled together, and then securitized.  GSMC, along with fellow defendant GS Mortgage, bundled the loans together into the Trusts and then offered the Certificates for sale to the public via the Offering Documents.

- 9 -

29.     Defendants created the Offering Documents in connection with the sale of the Certificates.  In the Registration Statement, defendants disclosed that GSMC acquired loans for the Trusts through two primary channels: (1) the "Goldman Sachs Mortgage Conduit Program" ("Conduit Program"); and (2) by bulk acquisitions in the secondary market.  In connection with the loans GSMC purchased and which were put into the Trusts, defendants identified the underwriting guidelines purportedly used in the origination of these loans and, in some cases, identified the specific loan originators who sold the loans to GSMC and purported to describe those originators' specific underwriting guidelines.  The Offering Documents also described the property appraisal practices supposedly used in connection with the loan originations.  The Offering Documents further affirmatively represented that none of the documents submitted in connection with the loan underwriting process contained untrue or false information and/or that such documents were free of fraud.  In addition, the Offering Documents represented that loans within the Trusts had specific LTV ratios.  The Offering Documents further stated that the Certificates had "investment grade" credit ratings from well-known (and, at the time, well-respected) rating agencies.  Defendants' representations about the loan underwriting standards, appraisal practices, loan origination documents, LTV ratios and credit ratings were all false and misleading, and omitted material information about these topics, as set forth in detail below.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

**Defendants Misrepresented That Borrowers Were
Evaluated on Their Ability to Repay The Loans**

30.     The January 31, 2007 Registration Statement and the Prospectus Supplements indicated that GSMC acquired loans for the Trusts through the Conduit Program and by bulk acquisitions in the secondary market.  Under the Conduit Program, GSMC acquired loans from a variety of banks, savings and loans associations, mortgage bankers and other mortgage loan

- 10 -

originators and purchasers of loans in the secondary market.  Loans in the Conduit Program were purchased on a loan by loan basis only from originators who had been qualified by GSMC.

31.     The Offering Documents repeatedly emphasized that the originators of loans in the Trusts checked to make sure borrowers could repay the loans before they were being made.  For example, the Registration Statement represented that with respect to loans purchased under the Conduit Program, "***all of the mortgage loans acquired by GSMC . . . were acquired generally in accordance with the underwriting criteria described in this section***."  GSMC used its own underwriting guidelines when purchasing loans for the Conduit Program from new originators and allowed the originators with which GSMC had an established relationship to use their own underwriting guidelines.  The Registration Statement described the underwriting criteria in the following manner: "***the originating lender makes a determination about whether the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property***."[2]  According to a former Goldman Sachs Transaction Manager and a former Goldman Sachs Vice President of Sales and Trading in the Conduit Group, who held their respective positions through 2006 and 2007, every loan acquired through the Conduit Program was to be reviewed before purchase to ensure each met the underwriting guidelines.

32.     The Registration Statement also represented with respect to all loans that "[t]he lender or an agent acting on the lender's behalf applies the underwriting standards to evaluate the borrower's . . . repayment ability" and that "the lender makes a determination as to whether the prospective borrower has sufficient monthly income available (as to meet the borrower's monthly

---

[2]      All emphasis in this Complaint is added unless otherwise stated.

obligations on the proposed mortgage loan and other expenses related to the mortgaged property such as property taxes and hazard insurance)."  The Registration Statement further represented that certain other types of loans "are underwritten on the basis of a judgment that mortgagors or obligors will have the ability to make the monthly payments required initially."

33.     With respect to describing the mechanics of acquiring loans through the Conduit Program and describing the criteria for purchasing those loans, the Prospectus Supplements for the GSAA Home Equity Trusts 2007-3 and 2007-7 and the GSAMP Trusts 2007-HE1 and HE2 stated that "[p]ursuant to the residential mortgage loan conduit program, the sponsor purchases mortgage loans originated by the original loan sellers if the mortgage loans generally satisfy the sponsor's underwriting guidelines."

34.     Similarly, the Prospectus Supplement for the GSAA Home Equity Trust 2007-10 stated with respect to the underwriting for the Goldman Sachs Mortgage Conduit Program that "*the originating lender makes a determination about whether the borrower's monthly income (when verified or stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan*."

35.     The Prospectus Supplements for the GSAA Home Equity Trusts 2007-3, 2007-4, 2007-5, 2007-6, 2007-7 and 2007-8 each contained nearly identical language regarding the Conduit Program, stating: "*the originating lender makes a determination about whether the borrower's monthly income (when verified or stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan*."  30.88% of the loans in the GSAA Home Equity Trust 2007-3 were originated and acquired through the Conduit Program.  35.98% of the loans in the GSAA Home Equity Trust 2007-4 were originated and acquired through the Conduit Program. 75.18% of the loans in "Group I" and 29.11% of the loans in "Group II" of the GSAA Home Equity

783368_1

Trust 2007-5 were originated and acquired through the Conduit Program. 22.42% of the loans in the GSAA Home Equity Trust 2007-6 were originated and acquired through the Conduit Program. 9.07% of the loans in the GSAA Home Equity Trust 2007-7 were originated and acquired through the Conduit Program. 42.36% of the loans in the GSAA Home Equity Trust 2007-8 were originated and acquired through the Conduit Program.

36.    The Prospectus Supplements for the GSAMP Trusts 2007-HE1 and 2007-HE2 also each included nearly identical language with respect to underwriting for the Conduit Program, stating: "***the originating lender makes a determination about whether the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan***."  0.16% of the loans in the GSAMP Trust 2007-HE1 were originated and acquired through the Conduit Program.  1.71% of the loans in the GSAMP Trust 2007-HE2 were originated and acquired through the Conduit Program.

37.    Similarly, the Prospectus Supplements for the GSR Mortgage Loan Trusts 2007-OA1, 2007-OA2, 2007-4F and 2007-5F each stated that "***the originating lender makes a determination about whether the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan***" when underwriting the loans for the Conduit Program.  0.92% of the loans in the GSR Mortgage Loan Trust 2007-4F were originated and acquired through the Conduit Program.  4.68% of the loans in the GSR Mortgage Loan Trust 2007-5F were originated and acquired through the Conduit Program.

38.    Each of these statements in ¶¶34-37 above appear in the respective prospective supplements under the heading "GOLDMAN SACHS MORTGAGE CONDUIT UNDERWRITING GUIDELINES" or "Mortgage Conduit Underwriting Guidelines" in the "The Goldman Sachs Mortgage Conduit Program" section of the prospective supplements.  Thus, the Offering Documents

- 13 -

state that GSMC engages in underwriting of these loans acquired through the Conduit Program, essentially acting in the same capacity as an additional loan originator.

39.     The Prospectus Supplements for the GSAA Home Equity Trust 2007-10 and GSAA Home Equity Trust 2007-5 Asset-Backed Certificates also set forth the specific lending guidelines used by originators of the loans in those Trusts when they originated over 10% of the total loan pool. For example, loan originator GreenPoint Mortgage Funding, Inc.'s ("GreenPoint") originated nearly 25% of the loans in "Group I" of the GSAA Home Equity Trust 2007-5 and some of the loans in GSAA Home Equity Trust 2007-10, and its underwriting guidelines were described as follows: "***the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's . . . repayment ability*** . . . ."

40.     The above representation regarding GreenPoint was repeated in the Prospectus Supplements for the GSAA Home Equity Trusts 2007-3, 2007-4 and 2007-7 as it originated 28.5%, 36.38% and 23.75% of the loans in those Trusts respectively.  GreenPoint also originated nearly 9% of the loans in the GSAA Home Equity Trust 2007-6.

41.     The Prospectus Supplement for the GSAA Home Equity Trust 2007-10 also identified Wells Fargo Bank as a loan originator and represented that its "***underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's . . . ability to repay the loan*** . . . ."  Identical or nearly identical representations were made concerning Wells Fargo in the Prospectus Supplements for the GSAA Home Equity Trusts 2007-7 and GSR Mortgage Loan Trust 2007-3F.  Wells Fargo was a major originator of loans in the GSAA Home Equity Trust 2007-7, originating over 67% of the loans in that Trust.  It also originated 59.95% of the loans in the GSR Mortgage Loan Trust 2007-3F, 0.09% of the loans in "Group I" and 1.02% of the loans in "Group

II" of the GSAA Home Equity Trust 2007-5, 0.10% of the loans in the GSAA Home Equity Trust 2007-6, and 6.42% of the loans in GSR Mortgage Loan Trust 2007-4F.

42.     The Prospectus Supplement for the GSAA Home Equity Trust 2007-5 represented that another of the loan originators, Countrywide Home Loans's ("Countrywide"), "***underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's . . . repayment ability*** . . . ."  Countrywide originated over 61% of the loans in  "Group II" of the GSAA Home Equity Trust 2007-5.

43.     Identical or nearly identical representations were made concerning Countrywide's underwriting standards in the Prospectus Supplements for the GSAA Home Equity Trusts 2007-3 and 2007-6, as well as GSR Mortgage Loan Trusts 2007-OA1 and 2007-4F.  Countrywide was a major originator of loans within many of the Trusts, as it originated nearly 11% of the loans in GSAA Home Equity Trust 2007-3, over 61%  of the loans in "Group II" of the GSAA Home Equity Trust 2007-5 (as alleged above), almost 64% of the loans in GSAA Home Equity Trust 2007-6 and over 8% of the loans in the GSR Mortgage Loan Trust 2007-4F.  Countrywide was also a major originator of loans in the GSR Mortgage Loan Trust 2007-OA1.

44.     The Prospectus Supplements for the GSAA Home Equity Trust 2007-8, and GSR Mortgage Loan Trusts 2007-4F and 2007-5F represented that another loan originator, National City Mortgage Co.'s ("National City"), "***underwriting standards are applied to evaluate the prospective borrower's . . . repayment ability*** . . . ."  National City originated numerous loans in many of the Trusts, having originated 12.6% of the loans in the GSAA Home Equity Trust 2007-4, nearly 8% of the loans in "Group II" of the GSAA Home Equity Trust 2007-5, nearly 5% of the loans in the GSAA Home Equity Trust 2007-6, over 25% of the loans in the GSAA Home Equity Trust 2007-8,

8.34% of the loans in the GSR Mortgage Loan Trust 2007-4F and over 58% of the loans in the GSR Mortgage Loan Trust 2007-5F.

45.     The Prospectus Supplements for the GSR Mortgage Loan Trust 2007-4F represented that another loan originator, SunTrust Mortgage's ("SunTrust"), "*underwriting guidelines are designed to evaluate the borrower's capacity to repay the loan* . . . ."  SunTrust was a major loan originator in several of the Trusts, originating over 30% of the loans in the GSR Mortgage Loan Trust 2007-4F and over 14% of the loans in the GSR Mortgage Loan Trust 2007-5F.

46.     The Prospectus Supplement for the GSAA Home Equity Trust 2007-8 represented loan originator, Fifth Third Mortgage Company and Fifth Third Bank (collectively "Fifth Third") "*underwrites a borrower's creditworthiness based solely on information that Firth Third believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring*."  Fifth Third originated 32.33% of the loans in the GSAA Home Equity Trust 2007-8 and 6.74% of the loans in the GSR Mortgage Loan Trust 2007-4F.

47.     The foregoing statements alleged in ¶¶31-46, to the effect that loan originators evaluated a borrower's repayment ability or determined whether a borrower could afford to repay the loan, were false and misleading.  Loan originators did not make loans based on whether a borrower's monthly income was sufficient to repay the loan.  Rather, these originators simply made as many loans as they possibly could, regardless of the borrowers' ability to repay the loan.  Indeed, in 2006 and 2007, at the time the loans in the Trusts were originated, there were wide-spread, systematic problems in the residential lending industry wherein loans were made to numerous persons who could not afford them.  Loan originators knew that Wall Street firms such as defendants were purchasing large quantities of home loans to be securitized and resold to the investing public without regard to whether borrowers could repay the loans.  In order to meet that demand, and to profit by

- 16 -

originating loans that could then be sold to defendants, loan originators began lending money to nearly anyone – even if they could not afford to repay the loans – ignoring their own stated lending underwriting guidelines set forth in the Offering Documents as well as those of defendants' Conduit Program.

48.     Contrary to the representations in the Offering Documents, neither defendants Goldman Sachs, GSMC, GS Mortgage, nor the loan originators they used through the Conduit Program or from which they made bulk purchases, employed standards aimed at determining whether borrowers' income was sufficient to meet the loan payments.   Nor did they evaluate borrowers' ability to repay their loans.  In fact, the foregoing defendants were investigated by the Massachusetts Attorney General concerning such activities.    Defendants settled with the Commonwealth of Massachusetts, paying it $10 million.  Defendants were also required to forgive all or portions of the balances on many loans they had bought and securitized, which resulted in tens of millions of dollars in additional expenses to these defendants.   These very defendants were investigated for and were involved in some of the very conduct alleged in this action – failing to ascertain whether loans complied with originators' underwriting guidelines, failing to keep problem loans out of securitization pools, failing to correct inaccurate information, and failing to make investors aware of information concerning problem loans which were securitized.  Goldman Sachs', GSMC's and GS Mortgage's settlement agreement with Massachusetts is attached to Docket No. 88 as Exhibit A.

49.     According to a Senior Due Diligence Credit Underwriter and Credit Manager at Lydian Data Services from 2004 to 2008 who worked exclusively on due diligence reviews of mortgages defendants planned to purchase through the Conduit Program, someone from Goldman Sachs had to approve any mortgage that fell outside of the underwriting guidelines.  He also stated

- 17 -

that the Goldman Sachs representatives frequently commented that loans that fell outside of the accepted underwriting guidelines could be negotiated to a lower price and purchased anyway. Similarly, a former Goldman Sachs Client Relations Manager from 2005 to 2008, who served as a liaison between the lenders that sold loans to the Conduit Program and the Goldman Sachs employees responsible for purchasing such loans, defendants freely purchased loans for securitization that they knew were "bad loans." According to this former employee, however, defendants were not concerned about the poor quality of such loans because they knew they would be able to pass the risk of default or non-payment to the buyers of the Certificates, thereby making a profit while avoiding the risk. Defendants also freely bought loans that could not be repaid because defendants had "insurance" in place, via their "short" bets against RMBS through credit default swaps ("CDS") that they had bought from American International Group ("A.I.G."). The defendants would eventually require A.I.G. and its related entities to pay Goldman Sachs $14 billion when the numerous "bad loans" defaulted.

50.     At the time the loans were originated and transferred to the Trusts, the originators were not reviewing loan applications in order to determine whether borrowers had sufficient income to meet their monthly mortgage obligations. Rather, the originators had implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage. This conduct resulted in originators:

(a)     Coaching borrowers to falsely inflate their income and understate their debts on loan applications to appear to qualify for mortgage loans the borrowers could not afford to repay;

(b)     Falsely inflating a prospective borrower's income and understating the borrower's debts to qualify the borrower for a loan he or she could not afford to repay;

(c)     Steering borrowers to loans that exceeded their borrowing capacity;

- 18 -

(d)     Encouraging borrowers to borrow more than they could afford by guiding them to "stated income" loans – loans on which the borrowers could simply make up, or "state," inflated incomes that would not be verified;

(e)     Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the payment when the loan rate adjusted; and

(f)     Allowing non-qualifying borrowers to be approved for loans they could not afford under exceptions to the underwriting standards based on so-called "compensating factors" when such "compensating factors" did not in fact exist or did not justify the loans.

51.     As a result, borrowers who were required to submit income information routinely included income levels which were falsely inflated to extreme levels relative to their stated job titles. Borrowers also routinely and falsely understated their debts.  While they were successful in obtaining the loans by inflating their incomes, and understating their debts, borrowers could not afford to actually repay the loans, as evidenced by the sky-rocketing default and foreclosure rates on the loans within the Trusts.  The false inflation of stated income and the understatement of debt was systematic and commonplace.  A study cited by Mortgage Asset Research Institute found that almost all stated-income loans exaggerated the borrower's actual income by at least 5%, ***and more than half increased the amount by more than 50%***.

52.     More than half of the loans in each of the Trusts were "stated income" loans, except for GSE Mortgage Loan Trusts 2007-3F, 2007-4F, 2007-5F,  and GSAMP Trust 2007-HE1 (and for these trusts, on average, one third of the loans were "stated income"), and the vast majority of the loans in each of the Trusts required borrowers to disclose their incomes.

53.     The originators' blatant disregard for their stated underwriting guidelines encouraged this type of income inflation.  For instance, many stated income borrowers were actually wage

- 19 -

earners who could have supplied Forms W-2 or other income-verifying documentation, but did not and were not required to.  In addition, numerous mortgages transferred to the Trusts were issued without requiring the borrowers to execute a Form 4506 – which would have allowed the lender to access the borrower's tax returns from the Internal Revenue Service ("IRS") to verify income.

54.     Countrywide was a major originator of loans in the GSAA Home Equity Trust 2007-5 and GSAA Home Equity Trust 2007-6.  Countrywide also originated a smaller percentage of  loans for GSAA Home Equity Trust 2007-3, GSR Mortgage Loan Trust 2007-OA1 and GSR Mortgage Loan Trust 2007-4F.  The representation in the Prospectus Supplements for the above Trusts that Countrywide "***evaluate[d] the prospective borrower's . . . repayment ability***" was completely false and misleading.  Countrywide's underwriting standards were actually designed to originate as many mortgage loans as possible without regard to the ability of its borrowers to repay such mortgages.  Countrywide's loan underwriting focus was not on the ability of borrowers to repay, but rather, on the amount of fees that Countrywide could generate from making loans and then selling them to Wall Street firms such as defendants.

55.     In fact, in June 2009, the SEC initiated a securities fraud action in the United States District Court for the Central District of California against former Countrywide executives Angelo Mozilo ("Mozilo"), David Sambol ("Sambol") and Eric Sieracki ("Sieracki").  On September 16, 2010, the court denied the Countrywide executives' motions for summary judgment and held that ***the SEC had raised genuine issues of fact*** as to whether the defendants had misrepresented the quality of Countrywide's underwriting processes from 2005-2007.  Specifically, the court held that ***the SEC presented evidence that Countrywide "routinely ignored its official underwriting guidelines to such an extent that Countrywide would underwrite <u>any</u> loan it could sell into the secondary mortgage market," and that "a significant percentage (typically in excess of 20%) of***

- 20 -

*Countrywide's loans were issued as exceptions to its official underwriting guidelines*." *SEC v. Mozilo*, No. CV 09-3994-JFW (MANx), 2010 U.S. Dist. LEXIS 98203, at *33-*34 (C.D. Cal. Sept. 16, 2010). *The court held that the evidence presented was such that "a reasonable jury could conclude that Countrywide all but abandoned managing credit risk through its underwriting guidelines*." *Id.* at *35. In 2010, Mozilo, Sambol and Sieracki paid over $73.1 million to settle the SEC action.

56.     The testimony and documents only recently made available to plaintiff by way of the SEC's investigation confirm that Countrywide was systematically abusing "exceptions" and low-documentation processes in order to circumvent its own underwriting guidelines. For example, in an April 13, 2006 e-mail, Mozilo, who was Countrywide's co-founder and Chief Executive Officer ("CEO"), wrote to Sieracki and others that he was concerned that certain subprime loans had been originated "*with serious disregard for process [and] compliance with guidelines*," resulting in the delivery of loans "with deficient documentation." Mozilo further stated that "*I have personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]*."

57.     The testimony and documents produced in the SEC action also show that, on June 28, 2005, Sieracki attended a Corporate Credit Risk Committee meeting, "in which he was informed that *1/3 of the loans which were referred from CLUES [Countrywide's automated underwriting system] violated 'major' underwriting guidelines and 1/3 violated 'minor' guidelines*." At a similar meeting on March 12, 2007, "Risk Management reported that 12% of the loans reviewed through Countrywide's internal quality control process were rated *severely unsatisfactory* or high

- 21 -

risk, and that one of ***the principal causes for such a rating was that loans had debt-to-income, loan to value, or FICO scores outside Countrywide's underwriting guidelines***."

58.     In addition, the FCIC's final report, which was issued in January 2011, also set forth, *inter alia*, findings regarding Countrywide's key role in the financial crisis and the lender's general failure to evaluate its borrowers' repayment abilities.  Specifically, the FCIC Report stated:

> ***Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop***.

*See* FCIC Report at xxii.

59.     According to evidence in the FCIC Report, Countrywide's loan products were simply not designed to evaluate borrowers' repayment abilities.   Indeed, one of Countrywide's loan products was described as "***poison***" by the lender's own co-founder and CEO, Mozilo, who stated in an April 17, 2006 e-mail: "'***In all my years in the business I have never seen a more toxic [product]*** . . . .'"  FCIC Report at 20.  According to information contained in the FCIC Report, the reason Countrywide was willing to offer such products was because its sole focus was "'originating what was salable in the secondary market,'" *i.e.*, to Wall Street banks such as defendants.  *Id.* at 105.  According to the FCIC Report, Countrywide "sold or securitized 87% of the $1.5 trillion in mortgages it originated between 2002 and 2005."  *Id.*

60.     Moreover, former Countrywide employee Eileen Foster ("Foster") confirmed, in an interview with the FCIC, that fraud was rampant in connection with Countrywide's origination of loans.  Foster worked as a mortgage fraud investigator at Countrywide, and confirmed that loans that Countrywide's fraud investigators or underwriters rejected due to fraud or non-conformance with the

- 22 -

underwriting guidelines were routinely overruled and approved by Countrywide's sales unit, as "***the rules were bent and broken and twisted regularly and it was . . . an accepted mode of doing business***." July 30, 2010 FCIC Staff Interview of Eileen Foster. Foster further stated that "all of the fraud that may have been taking place [was] being managed out by the sales units," or in other words, "'***concealed***.'" *Id.* She suspected that "there was quite a bit of fraud taking place" in connection with Countrywide's loan originations, which her audit manager "confirmed to [her]." *Id.*

61.    In fact, according to the FCIC, Countrywide had tens of thousands of internal company referrals of potentially fraudulent activity in connection with its mortgage business during the period from 2005-2007. FCIC Report at 162.

62.    Other former Countrywide employees have confirmed that Countrywide originated loans that did not comply with its stated underwriting criteria because its employees were incentivized to increase the number of loan originations without concern for borrowers' repayment ability. Instead of evaluating repayment ability, ***Countrywide's Sales Training Facilitator Guide instructed originators to "look for ways to make the loan rather than turn it down***."

63.    According to another former Countrywide manager, the mindset at the company was "***if you had a pulse, Countrywide gave you a loan***."

64.    Countrywide's loan originators would "coach" borrowers as to the level of falsely inflated incomes they should claim in order to qualify for loans they could not otherwise afford. Countrywide itself also falsified borrowers' incomes, or facilitated falsified incomes by steering otherwise ineligible borrowers to "stated income" loans. According to a former Countrywide account manager, the company was "infested" with employees that ignored the company's underwriting guidelines.

- 23 -

65.     Former Countrywide employees have revealed that as many as 80% of the loans originated by a Countrywide office in Florida did not meet loan underwriting guidelines.[3]  According to another former Countrywide employee, approximately 90% of all reduced documentation loans sold out of a Chicago office had falsely inflated incomes and one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications in order to qualify borrowers for loans they could not afford.[4]

66.     Moreover, even in the cases when Countrywide employees actually obtained written income documentation (*i.e.*, a Form W-2) demonstrating that the borrower did not qualify for a loan, the documentation was ignored by Countrywide and the loan was re-submitted as a stated income loan with an inflated income number so as to obtain approval of the loan – one which the borrower could not afford to repay.  These problems were systemic within Countrywide at the time the loans in the offerings at issue herein were originated.

67.     Countrywide's general abandonment of its stated underwriting guidelines has also been the subject of numerous civil complaints and investigations by state attorneys general, each of which have alleged facts supporting plaintiff's allegations here that Countrywide's underwriting practices were not intended to evaluate borrowers' repayment abilities.  *See, e.g., In re Countrywide Fin. Corp. Derivative Litig.*, No. 07-CV-06923-MRP (MANx) (C.D. Cal.); *In re Countrywide Fin. Corp. Sec. Litig.*, No. 07-CV-05295 MRP (MANx) (C.D. Cal.); *The People of the State of Illinois v.*

---

[3]     Loans originated in Florida were included in offerings at issue herein where Countrywide was identified as a lender.

[4]     Loans originated in Illinois were included in offerings at issue herein where Countrywide was identified as a lender.

*Countrywide Fin. Corp.*, No. 2008-CH-22994 (Cook Cty. Cir. Ct., Ch. Div. Ill.); *The People of the State of California v. Countrywide Fin. Corp.*, No. LC081846 (Cal. Super. Ct., Los Angeles Cty.); *State of Connecticut, et al. v. Countrywide Fin. Corp., et al.*, No. 08-cv-01301 (D. Conn.) (originally filed in Conn. Super. Ct., Hartford Jud. Dist.); *MBIA Ins. Corp. v. Countrywide*, No. 602825/2008 (N.Y. Sup. Ct., N.Y. Cty.).   The sheer volume of the lawsuits, all alleging that Countrywide systematically abandoned its underwriting guidelines, is strong evidence that is what in fact occurred.

68.   Countrywide, unsurprisingly, made the list of the "Worst Ten in the Worst Ten" report by the U.S. Government's OCC, which identified the lenders with the highest number of foreclosures for loans originated between 2005 and 2007 in the ten metropolitan areas with the highest rates of foreclosures.   The extremely high foreclosure rates for Countrywide's loans corroborate that the company did ***not*** comply with its purported underwriting guideline to evaluate borrowers' repayment ability.   In addition, the U.S. Senate confirmed that Countrywide had abandoned its purported underwriting guidelines stated in the offering documents: ***Countrywide and other "lenders issued billions of dollars in high risk, poor quality home loans***."   Levin-Coburn Report at 239.

69.   Countrywide's abandonment of its underwriting guidelines, in some cases, led to approximately half of the loans Countrywide originated and sold to Wall Street banks which were then securitized, to be subject to repurchase demands because the loans did not comply with Countrywide's underwriting guidelines.   *See id.* at 486-87.   The defendants and others demanded the repurchase of ***billions of dollars*** of defective loans originated by Countrywide, further corroborating that it abandoned its underwriting guidelines.   *Id.* & n.2055.

- 25 -

70.     With respect to GreenPoint, an originator in the GSAA Home Equity Trusts 2007-3, 2007-4, 7007-5, 2007-6, 2007-7, and 2007-10, the representation that its "***underwriting guidelines are applied to evaluate the prospective borrower's . . . repayment ability***" was also false and misleading.  GreenPoint's underwriting guidelines – like most, if not all, loan originators – were not applied to evaluate the prospective borrower's repayment ability.  Rather, GreenPoint used guidelines supplied by Wall Street, *i.e.*, Goldman Sachs, that were not based upon sound loan underwriting standards but were merely the minimum standards that Goldman Sachs would accept for loans they would purchase and later securitize.  As a former VP/Wholesale Branch Operations Manager – who worked for GreenPoint from July 2003 to January 2008 – explained, the fact that a borrower was unlikely to re-pay his or her loan was irrelevant; what mattered was whether "the loans were within the underwriting guidelines set forth by [Wall Street firms such as defendants]."

71.     GreenPoint's Wall Street-based underwriting guidelines were woefully inadequate.  As described by a former GreenPoint Account Executive – who worked in the Queens, New York,[5] branch from July 2003 through September 2007 – beginning in 2005, GreenPoint's underwriting standards became increasingly lenient, especially towards higher-risk borrowers.  This Account Executive characterized GreenPoint's underwriting guidelines as "loose" and becoming progressively "looser" during the 2005-2006 timeframe.  This Account Executive attributed GreenPoint's loosening of its underwriting standards to its desire to remain competitive in the lending market, explaining that as other lenders relaxed their loan underwriting standards and began extending loans to people who were unlikely to repay their loans, GreenPoint had to do the same in

---

[5]     Loans originated in New York were included in offerings at issue herein where GreenPoint was listed as a lender.

order to remain competitive.  These statements were corroborated by a former GreenPoint Senior Vice President of Branch Operations for the Western Wholesale Division who worked for GreenPoint and GreenPoint's predecessor, Headlands Mortgage, from 1992 to August 2007.  This Senior Vice President stated that beginning in 2005 and continuing through 2006, GreenPoint's underwriting guidelines became increasingly lenient and the loans it extended became increasingly risky.  GreenPoint began to significantly relax the requirements that borrowers would have to satisfy to qualify for a given loan program, including relaxing requirements involving documentation of repayment ability, maximum LTV ratios and minimum credit scores.

72.     Additionally, GreenPoint did not limit its granting of exceptions to circumstances where actual compensating factors existed.  Rather, it was systematically granting exceptions even in the absence of any real compensating factors.  Many of the loans were granted by the over 18,000 brokers that were approved to transact with GreenPoint – a large enough number that GreenPoint could not exercise any degree of realistic control or supervision.  Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first ninety days of work.  This lack of monitoring was particularly problematic because, as noted by many regulators, brokers were interested mainly in generating upfront fees triggered by making the loans, and did not determine whether borrowers were actually qualified for the loans or there were exceptions to the guidelines due to having compensating factors.

73.     GreenPoint did not verify the income of borrowers as represented and cut corners on loan underwriting.  In addition, many of GreenPoint's loans were actually subprime loans in disguise, a practice later copied by others.  GreenPoint's practice of disguising subprime loans was confirmed by the former GreenPoint Account Executive mentioned above.  This former Account

- 27 -

Executive stated that GreenPoint offered loans it represented to be of higher quality even though their qualifying requirements were those of "junk" loans.

74.     Additional corroboration of the fact that GreenPoint did not originate loans pursuant to its stated underwriting guidelines and failed to evaluate its borrowers' true repayment abilities comes from a lawsuit filed in February 2009 by U.S. Bank against GreenPoint. *See* Complaint, *U.S. Bank, N.A., et al. v. GreenPoint Mortgage Funding, Inc.*, No. 600352/2009 (N.Y. Sup. Ct., N.Y. Cty. Feb. 5, 2009).  In that case, the trustee of a RMBS trust sued GreenPoint alleging that the loans in the trust, which were originated by GreenPoint, were not originated pursuant to GreenPoint's underwriting guidelines, as previously represented.

75.     That GreenPoint was not complying with the underwriting guidelines set forth in the offering documents is further confirmed by the fact that GreenPoint was one of the lenders on the U.S. Government's OCC's "Worst Ten in the Worst Ten" foreclosure list.  If GreenPoint was truly evaluating its borrowers' repayment abilities, it would not have had so many foreclosures.

76.     Additionally, Wells Fargo originated loans for the following Trusts:  GSAA Home Equity Trust 2007-5, 2007-6, 2007-7, and 2007-10, as well as GSR Mortgage Loan Trust 2007-3F and 2007-4F.  The representation that Wells Fargo's "***underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's . . . ability to repay the loan***" was false and misleading because Wells Fargo viewed as unnecessary the need to verify a borrower's income to see if he or she could repay the loan.

77.     Wells Fargo was a "production based shop," meaning that loan underwriters had to make their loan numbers regardless of loan risk.  Underwriters were expected to "find a way" to deem loans acceptable even when they did not meet the required underwriting standards.  As a result of its poor underwriting, Wells Fargo made and sold loans that it never should have made or sold.

- 28 -

All that was required for acceptance by Wells Fargo was some evidence of a credit score high enough to qualify for the loan product, and then the other loan requirements were either ignored, or "made to fit." Wells Fargo went as far as firing a Senior Underwriter for choosing not to compromise the stated underwriting standards when he was pressured to do so.

78.     As alleged above, all that was required was some evidence of a credit score high enough to qualify for the loan product, while all other requirements were either ignored, or the loan was somehow "made to fit." But even the credit scores were problematic in some cases because they were obviously false. However, this too was ignored, or justified by a loophole in the underwriting guidelines that did not require a thorough examination of whether the credit score matched the borrower's profile in terms of such indicators as age, time on the job, time in the neighborhood, savings history, and other factors. In addition, other loan products required a certain number of "trade lines," meaning the borrower had to have a certain number of credit-related transactions from which to confirm a record of good credit. However, if a prospective borrower did not have enough trade lines, then "alternative measures" of credit were accepted, meaning that almost any credit history would qualify, contrary to Wells Fargo's underwriting guidelines.

79.     During 2006 and into 2007, the number of loans being underwritten and funded by Wells Fargo began to decline. To sustain revenues, Wells Fargo's lending group in Des Moines, Iowa, was required to increase production, and as a result the underwriting standards were distorted even further and/or "ignored" even more. The process practiced in this group was as follows, according to a former employee: Get a file, look at the credit score, and if the credit score is okay, then find any scrap of information concerning income and take it at face value without any investigation, and ignore all negative information on the grounds that it "has no bearing on the file."

80.     In addition, Wells Fargo was well aware that it was extending loans to borrowers whose applications contained falsified information (be it from the borrowers themselves or Wells Fargo loan underwriters).  Darcy Parmer, a former quality assurance and fraud analyst for Wells Fargo, reported to the FCIC that she was aware of "'*hundreds and hundreds and hundreds of fraud cases*'" in Wells Fargo's home equity loan division.  FCIC Report at 162.  She also told the FCIC that "'*at least half of the loans she flagged for fraud were nevertheless funded, over her objections*.'" *Id*.

81.     In fact, a former Wells Fargo loan wholesaler admitted to Bloomberg Businessweek that "he regularly used the copiers at a nearby Kinko's to alter borrowers' pay stubs and bank account statements.  He would embellish job titles – turning a gardener, for instance, into an owner of a landscaping company – and inflate salaries."  This former Wells Fargo employee told the news outlet: "'I knew how to work the system.'"

82.     Wells Fargo's abandonment of its underwriting standards and fraudulent loans are the subjects of substantial litigation.  For example, there is the lawsuit styled *Mayor and City Council of Baltimore v. Wells Fargo Bank, N.A. et al.*, No. 08-cv-00062-JFM (D. Md. 2008) ("*City of Baltimore*").  There, like here, the City of Baltimore alleged that Wells Fargo extended loans without regard to "the borrower's ability to repay."  Third Amended Complaint, *City of Baltimore*, ¶3.  Also, there, like here, it is alleged that falsified borrower incomes are at issue.

83.     In addition, in April 2010, the City of Memphis filed its First Amended Complaint in *City of Memphis v. Wells Fargo Bank N.A.*, No. 09-cv-02857-STA-CGE (W.D. Tenn. Dec. 30, 2009), alleging that Wells Fargo "fail[ed] to underwrite African-American borrowers properly." *Id*., ¶7.

84.     The *City of Memphis* and *City of Baltimore* complaints include sworn declarations from many former Wells Fargo employees which provide evidence of predatory lending and abandonment of underwriting guidelines.  For instance, Camille Thomas, a loan processor at Wells Fargo from January 2004 to January 2008, stated under oath that loans were granted based on inflated appraisals, which allowed borrowers to get larger loans than they could otherwise qualify for due to the inflated appraisals' impacts on the LTV ratio calculations.  Thomas also stated that some loans were granted based on falsified income documents.  Similarly, another affidavit by Doris Dancy, a credit manager at Wells Fargo from July 2007 to January 2008, stated that managers put pressure on employees to convince people to apply for loans, even if the person could not afford the loan or did not qualify for it.  She was also aware that loan applications contained false data, used to qualify customers for loans.

85.     In addition, in a lawsuit styled *Wells Fargo Bank, N.A. v. Quicken Loans Inc.*, No. 08-cv-12408-SJM-SDP (E.D. Mich. 2008), it is alleged that Wells Fargo expected that their borrowers would overstate their income on "stated income" loan applications and that these borrowers would not have the ability to make their monthly mortgage loan payments.

86.     Moreover, in an action alleging similar activities by Wells Fargo with regard to their loan underwriting practices, styled *In re Wells Fargo Mortg. Backed Certificates Litig.*, No. C 09-01376 SI (N.D. Cal.) ("*Wells Fargo*"), on April 22, 2010, the court denied defendants' motion to dismiss the complaint, which alleged a company-wide series of reckless lending practices at Wells Fargo, which, as here, were not disclosed in the offering documents.

87.     As the court found:

Plaintiffs allege that the Offering Documents contained numerous false and misleading statements and omissions.  First, plaintiffs state that the documents misstated Wells Fargo's underwriting process and loan standards.  According to plaintiffs, Wells Fargo often extended loans to borrowers who did not meet its

- 31 -

creditworthiness standards, resulting in a low-quality mortgage pool. *Id.*, ¶¶70, 76. Plaintiffs cite statements by several confidential witnesses ("CWs") who assert that Wells Fargo placed "intense pressure" on its loan officers to close loans, including by coaching borrowers to provide qualifying income information, accepting blatantly implausible or falsified income information, and lowering its standards near the end of the calendar year. *Id.*, ¶¶83-88. Plaintiffs allege that the third-party loan originators disregarded Wells Fargo's stated underwriting standards "in order to approve as many mortgages as possible." *Id.*, ¶94.

. . . One of plaintiff's CWs states that approximately 70% of the loans he signed off on while working as a Wells Fargo underwriter involved mortgages worth more than 95% of the home's value. *Id.*, ¶108.

Order Granting in Part and Denying in Part Defendants' Motions to Dismiss, *Wells Fargo*, at 2-3.  In

May 2011, Wells Fargo agreed to pay $125 million to settle the claims alleged in *Wells Fargo*.

88.     In fact, Wells Fargo acknowledged its deficient loan underwriting practices in its

2007 Annual Report.  In a section entitled "Credit Quality: What We Did Wrong" Wells Fargo

admitted:

> *We made some mistakes*. . . . ***Too many of our home equity loans had 'loan-to-value' ratios that were too high*** . . . .  Sometimes we did not require full documentation for these home equity loans we purchased from brokers because these were prime borrowers who had high credit scores with lower expected risk of default. . . .
>
> ***We should not have offered such lenient loan terms*** . . . , and ***we made the mistake of taking on too much risk***.  We should have known better.

89.     Corroborating the fact that Wells Fargo failed to comply with its underwriting

guidelines, thereby rendering the offering document false and misleading, is the fact that Wells

Fargo appeared on the U.S. Government's OCC's list of lenders with the highest numbers of

foreclosures on loans it originated between 2005 and 2007.  If Wells Fargo was actually attempting

to determine whether its borrowers could afford to repay their loans, it would not have had so many

foreclosures.

90.     Concerning loan originator National City – originator for loans in the GSAA Home

Equity Trust 2007-4, 2007-5, 2007-6, 2007-8, and GSR Mortgage Loan Trust 2007-4F and 2007-5F

-  the representations that its "***underwriting standards are applied to evaluate the prospective borrower's . . . repayment ability***" were false and misleading.  National City's underwriting standards were not applied to evaluate the prospective borrower's repayment ability.  Instead, National City – like GreenPoint – used guidelines supplied by Wall Street investors such as the defendants, which did not evaluate a borrower's ability to repay the loan but rather listed the minimum standards that Wall Street would accept for loans they would purchase and securitize.  According to former underwriters for National City (who worked for the company during the 2006-07 time period when the loans in these Trusts were originated), this led to a situation where National City made as many loans as it could without regard to repayment ability because originators were focused only on meeting the more minimal Wall Street standards, thereby allowing National City to sell such troubled loans to defendants, and ultimately pass along to plaintiff and the Class, the risk that borrowers would not pay the loans off.

91.    Indeed, National City ignored its underwriting guidelines to such an extent that it too became a hotbed of fraudulent lending activities.  In fact, numerous National City employees have engaged in lending activities that not only violated the company's underwriting guidelines but also violated criminal statutes.  For example, in October 2011, in Providence, Rhode Island, National City Loan Officer Juan Hernandez pled guilty to participating in a fraudulent lending scheme.  Hernandez pled guilty to fraudulently obtaining loans from National City and other lenders at issue herein (such as New Century and First NLC) by using "straw purchasers" and providing false information to qualify borrowers for loans they would not have otherwise qualified for.  From October 2006 through August 2007, Hernandez prepared false loan applications for phony borrowers containing falsified borrower incomes and debts, and misrepresenting that the properties would be owner occupied when they were not.

92.     Hernandez had a co-conspirator in the fraud who also was a National City employee. Hernandez was joined in the fraud by Miguel Valerio, a National City Loan Processor.  Valerio also pled guilty to the fraudulent scheme in December 2011.

93.     In the Cleveland, Ohio area, in February 2011, at least two National City employees were indicted for lending fraud, along with 15 other co-conspirators.  Loren Segal and Krystal Hill, both National City employees, were indicted for assisting in a fraudulent lending scheme that spanned the period from March 2005 through November 2007.  The scheme included using straw purchasers, inflated appraisals, falsified borrower incomes, fake bank statements, and false verifications of borrowers' funds.  Both Segal and Hill pled guilty to participating in the scheme.

94.     In New Jersey, in February 2012, an attorney pled guilty to participating in a scheme to fraudulently obtain a loan from National City, by submitting false loan applications containing inflated income and asset information.  One of the attorney's unindicted co-conspirators was a National City loan originator.

95.     National City's systemic failure to follow its underwriting guidelines and evaluate its borrowers' true repayment abilities, and the fraudulent loans that followed, required National City's parent company, National City Corporation, to take a charge of *$4.2 billion* in the first quarter of 2008 for its defective loans.  Moreover, National City's abject failure to follow its underwriting guidelines led to the SEC investigating National City's underwriting standards in 2008.  In addition, in mid-2008, National City's parent company entered into a confidential agreement with the OCC, "effectively putting the bank on probation," according to a *Wall Street Journal* article published on June 6, 2008.  While the terms of the agreement were not made public, *The Wall Street Journal* reported that the OCC's action was a likely result of National City needing to improve its lending

standards.  Indeed, according to securities analyst Frank Barkocy, "[s]ome of their [National City's] underwriting standards got a little lax, and that led to problems."

96.     With regard to loan originator SunTrust, an originator for the GSR Mortgage Loan Trust 2007-4F and 2007-5F, the representation that its "***underwriting guidelines are designed to evaluate the borrower's capacity to repay the loan***" was false and misleading.  SunTrust's underwriting standards were not applied to evaluate the prospective borrower's repayment ability.  Instead, SunTrust, like GreenPoint and National City, used guidelines supplied by Wall Street investors such as the defendants, which did not evaluate a borrower's ability to repay the loan but rather listed the minimum standards that Wall Street would accept for loans they would purchase and securitize.  This incentivized SunTrust to make as many loans as it possibly could without regard to the borrower's ability to repay, as SunTrust knew it could sell the loans to Wall Street as long as they met Wall Street's minimum requirements (which did not evaluate the borrower's ability to repay).

97.     SunTrust's business model was to "get the loans out the door with as little delay as possible," according to a former SunTrust National Retail Underwriting Manager who worked for the company from May of 2007 until January 2008.  This meant that the loans that SunTrust purchased or originated were to be immediately pooled and sold off to entities like the defendants.  According to a former SunTrust contract Senior Underwriter, who worked for the company from 2001 through November 2007, SunTrust's underwriting guidelines were compiled from purchasing guidelines SunTrust received from Wall Street investment banks that bought SunTrust's loans.  According to this former contract employee, starting in 2004, SunTrust greatly de-emphasized quality control and relaxed its underwriting guidelines – guidelines supplied by Wall Street – so much so that it seemed that "nobody was accountable for anything."  This former Senior

- 35 -

Underwriter stated that because demand for loans from Wall Street was so heavy, the quality of the loans did not matter to the Wall Street purchasers.  To this former employee, the rules seemed to have changed to "make the loan so we can sell it, so we can make more money."  As a result, many of SunTrust's loans did not comply with its stated underwriting guidelines.

98.     In order to speed up the underwriting process to meet demand, SunTrust instituted an automated underwriting process, which used various software programs to review and approve loan applications.   According to the former Senior Underwriter, about 75% of SunTrust's loan applications that she saw were processed through the automated system.  If the automated system approved a loan, no further underwriting was done, and the loan was approved, funded and closed, according to both this former employee and to a former SunTrust Branch Operations Manager in 2007.

99.     However, the automated system had flaws.  According to the former SunTrust Branch Operations Manager, the automated system approved loans that had DTI ratios of 60%.  This resulted in risky loans being approved that exceeded the maximum DTI ratios allowed under SunTrust's stated underwriting guidelines.  The former Branch Operation Manager estimated that between 10%-20% of the loans approved by the automated system would have been denied if a manual underwriting review of the loan files would have been undertaken.

100.    The former SunTrust Senior Underwriter also stated that if she or other underwriters rejected a loan application because it did not conform to SunTrust's underwriting guidelines, SunTrust's managers would override her and the other underwriters' decisions and approve the loans.

**Defendants Were Informed by Their Hired
Vendor – Clayton – that the Mortgage Loans
Were Not Originated Pursuant to the Stated
Underwriting Guidelines**

101.     In addition to purportedly ensuring that all loans met the stated underwriting guidelines, defendants retained an outside vendor, Clayton Holdings, Inc. ("Clayton"), to review samples of the loans they were securitizing.  Clayton was hired to determine if the loans complied with the underwriting guidelines stated in the offering documents of had "compensating factore" meriting approval, and to examine the validity of the appraisals/valuations used to support the loans.  In connection with its sampling of loans for defendants, Clayton provided defendants with written reports of its findings.  Clayton provided such reports to defendants as it sampled loans throughout 2006 and 2007.

102.     According to Clayton, Vice President Vicki Beal ("Beal") provided daily reports to defendants from January 1, 2006 through June 30, 2007, the same period within which most of the Certificates at issue herein were sold to plaintiff.  These reports received by defendants showed that *significant numbers of the mortgages defendants submitted to Clayton for review did not comply with the stated underwriting guidelines and did not have compensating factors otherwise justifying approval of the loans*.  Nonetheless, of the mortgages that Clayton found defective, *defendants knowingly and intentionally "waived" back into the offerings at issue herein large numbers of these defective loans and thereby passed them on to unsuspecting investors like plaintiff*.  During this time period, Clayton's testing revealed that it found 22.9% of defective loans in the samples it tested for defendants, and that subsequently defendants "waived" in, *i.e.*, included into the offerings at issue herein, 29.2% of loans which Clayton had found to be defective.

103.     This undisputedly demonstrates that defendants were informed that significant numbers of loans in the offerings did not comply with the stated underwriting guidelines –

- 37 -

defendants were specifically told by Clayton that the loans did not comply – and yet defendants deliberately and intentionally put many of those defective loans into the offerings, while affirmatively representing that the loans complied with the underwriting guidelines.  As the foregoing demonstrates, defendants systematically purchased, and included into their certificate offerings, loans that their own hired vendor had determined – and advised defendants – were not properly underwritten.

104.     In response to Clayton's findings, defendants inexplicably did not improve their practices by excluding the faulty loans from their offerings, or by expanding the number of loans that they tested.  Instead, defendants did no further testing on the vast majority of loans that supported the offerings, ***bought the untested loans sight unseen and put them into their offerings,*** thereby ***ensuring*** there would be large numbers of defective, non-compliant loans in each offering.  Indeed, as the ***FCIC later pointed out, "one could reasonably expect [the untested loans] to have many of the same deficiencies, and at the same rate, as the sampled loans***."  FCIC Report at 170.  Thus, it was certain, given the large defect rates detected in the sampled loans, that the massive numbers of untested loans would have similar defect rates.  Defendants consciously and intentionally avoided confirming this by refusing to expand their testing.  ***The FCIC concluded that the failure by defendants to disclose the Clayton findings in their offering documents or do further testing on the loans "rais[ed] the question of whether [defendants'] disclosures [in the offering documents] were materially misleading, in violation of the securities laws***."  Id.

105.     Moreover, defendants were not content to simply let defective loans pass into their offerings and the unsuspecting hands of plaintiff.  Defendants – in an appalling display of greed and disregard for the interests of plaintiff – took the fraud further, affirmatively seeking to profit from their inside knowledge.  Rather than rejecting the loans that Clayton identified as defective, as they

- 38 -

should have, defendants instead used the evidence of underwriting defects to negotiate lower prices for the loans from the loan originators, and thus boosted defendants' own profits when they resold the loans – via the Certificates – to plaintiff.  According to the September 2010 FCIC testimony of Clayton's former President D. Keith Johnson, defendants used the defect reports to force a lower price for themselves, and not for the benefit of investors:

> I don't think that we added any value to the investor, the end investor.  I mean, if we get down to your point . . . ***I think only our value was done was in negotiating the purchase between the seller and the securitizer. Perhaps the securitizer was able to negotiate a lower price and could maximize their buying*** but we added no value to the investor and to the rating agencies.

September 2, 2010 FCIC Staff Interview of D. Keith Johnson, *available at* http://fcic.law.stanford.edu/resource/interviews ("Johnson Sept. 2 Interview").  Indeed, the U.S. Senate Subcommittee investigating the mortgage crisis specifically identified Goldman Sachs as one of the Wall Street investment banks that operated in this way:

> Goldman or a third party due diligence firm it hired typically examined a sample of the loans.  Based on the number of problem loans found in the sample, Goldman or the due diligence firm extrapolated the total percentage of problem loans likely to be contained in the pool. This information was then factored into the price Goldman paid for the pool.

Levin-Coburn Report at 484 n.2036.

106.    In other words, rather than reject defective loans from loan pools, or cease doing business with consistently failing originators, defendants continued to buy defective loans from suspect originators and instead used the Clayton data simply to insist on a lower price from the loan originators, leaving more room for defendants to profit, while the defective loans were nonetheless included in the offerings, unbeknownst to plaintiff.

107.    Employees of another third-party due diligence firm that Goldman Sachs used, called the Bohan Group ("Bohan"), have also confirmed that Goldman Sachs knew the loans it was buying

- 39 -

did not meet the stated underwriting guidelines.  Melissa Toy and Irma Aninger, two contract risk

analysts who reviewed loan files for Bohan from 2004 to 2006, reported that their supervisors

overrode the majority of their challenges to shaky loans on behalf of Goldman Sachs and other

firms:

> They couldn't recall specific examples involving loans bought by Goldman, but they said their supervisors cleared half-million dollar loans to a gardener, a housekeeper and a hairdresser.

> Aninger, whose job was to review the work of other contract analysts, said that [when] she objected to numerous applications for loans that required no income verification, her supervisor would typically tell her, "You can't call him a liar . . . You have to take (his) word for it."

> "I don't even know why I was there," she said, "because the stuff was gonna get pushed through anyway."

> Toy said she concluded that the reviews were mostly "for appearances," because the Wall Street firms planned to repackage "bogus" loans swiftly and sell them as bonds, passing any future liabilities to the buyers.  The investment banks and mortgage lenders each seemed to be playing "hot potato," trying to pass the risks "before they got burned," she said.

> "***There was nobody involved in this who didn't know what was going on, no matter what they say," she said.  "We all knew***."

Greg Gordon, *Why did Goldman stop scrutinizing loans it bought?*, McClatchy Washington Bureau,

Nov. 1, 2009.

   108. Defendants operated – and made huge profits – on every level of the securitization

process, acting as originators, underwriters, sponsors, sellers and/or depositors.  As a result of this

"vertical integration," defendants were able to maximize profitability while also being informed and

made aware by Clayton of the underwriting failures that permeated the loans underlying the

Certificates.

   109. Indeed, as the FCIC concluded, after its extensive investigation of the facts, which

included reviewing internal documents from defendants and obtaining testimony from numerous

- 40 -

percipient witnesses, *defendants intentionally included loans into their Certificate offerings which they knew did not meet the stated underwriting guidelines*:

> *[M]ajor financial institutions [such as the defendants herein] ineffectively sampled loans they were purchasing to package and sell to investors.  They <u>knew</u> a significant percentage of the sampled loans did not meet their own underwriting standards or those of the originators.  <u>Nonetheless, they sold those securities to investors</u>.  The [FCIC's] review of many prospectuses provided to investors found that this critical information was not disclosed*.

FCIC Report at xxii; *see also id.* at 187 ("The [FCIC] concludes that *firms securitizing mortgages* failed to perform adequate due diligence on the mortgages they purchased and at times *<u>knowingly</u> waived compliance with the underwriting standards.  Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage related securities*.").

110.    Very recently, additional relevant evidence became available concerning Clayton and the work it did for defendants.  On January 21, 2012, in the case titled *Ambac Assurance Corp. v. EMC Mortgage LLC, et al.*, No. 650421/2011 (N.Y. Sup. Ct., N.Y. Cty.), a former Clayton employee was deposed.  Excerpts of his deposition transcript were very recently filed in the case. The former Clayton employee's sworn testimony revealed that *Clayton and Watterson-Prime (another third-party due diligence vendor) were instructed by <u>all</u> of their Wall Street bank clients*[6] *to "approve loans that often did not satisfy the underwriting guidelines," to ignore defects in loan applications, to code defective loans as non-defective and to change many of the grades on loans that were coded as defective to reflect that they were non-defective.  These instructions included ignoring appraisals which did not support the stated value of the properties and applications for*

---

[6]      The Goldman Sachs Defendants here were clients of Clayton.

which a borrower's stated income was "unreasonable" and not supported by documentation.  The former employee testified that the practice of failing to follow underwriting guidelines when re-underwriting loans at both Clayton and Watterson-Prime was pervasive, and that "[d]ue diligence underwriters like myself were forced to find compensating factors for defective loans where none existed."

**Defendants Misrepresented That: (1) Appraisers' Compensation Was Not Affected by Approval or Disapproval of the Loans; (2) Appraisals were Performed in Conformity with USPAP; (3) Appraisals Conformed to Fannie Mae or Freddie Mac Standards; and/or (4) Appraisals were Based on Recent Sales of Comparable Properties**

111.    The Registration Statement represented that each mortgage file contained a property appraisal by a qualified appraiser "*whose compensation is not affected by the approval or disapproval of the mortgage loan*."

112.    With respect to loans purchased through GSMC's Conduit Program, the Registration Statement  and the Prospectus Supplements for the GSAA Home Equity Trusts 2007-3, 2007-4, 2007-5, 2007-6, 2007-7, 2007-8, 2007-10, the GSAMP Trusts 2007-HE1 and 2007-HE2, and the GSR Mortgage Loan Trusts 2007-OA1, 2007-OA2, 2007-4F and 2007-5F each represented that "*[a]ll appraisals must . . . conform to the [USPAP] adopted by the Appraisal Standards Board of the Appraisal Foundation*" and that "*[t]he appraisal generally will be based upon a market data analysis of recent sales of comparable properties* . . . ."

113.    Similarly, the Prospectus Supplements for the GSAA Home Equity Trusts 2007-3, 2007-4, 2007-5, 2007-7 and 2007-10 stated in connection with loan originator GreenPoint that "*[a]ll appraisals are required to conform [to] the [USPAP] adopted by the Appraisal Standards Board of the Appraisal Foundation*" and that "*[t]he appraisal generally will have been based on prices obtained on recent sales of comparable properties* . . . ."

- 42 -

114.   Likewise, with respect to loan originator Washington Mutual Bank ("WaMu"), the Prospectus Supplements for the GSR Mortgage Loan Trust 2007-3F stated that the appraisals on the loans it originated "*are required to conform to the [USPAP] adopted by the Appraisal Standards Board of the Appraisal Foundation*" and that the appraisals were "*based upon a market data analysis of recent sales of comparable properties* . . . ."  WaMu was an originator of loans in both the GSR Mortgage Loan Trust 2007-3F and GSR Mortgage Loan Trust 2007-4F, having originated over 9% and 15% of the loans in each Trust, respectively.

115.   Countrywide was also an originator of numerous loans in many of the Trusts.  With respect to loans Countrywide originated, the Prospectus Supplements for the GSAA Home Equity Trusts 2007-3, 2007-5, 2007-6 and GSR Mortgage Loan Trusts 2007-OA1 and 2007-4F stated that the appraisals for all loans were "*required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect*."  Additionally, those Prospectus Supplements stated that except for loans originated in the Streamlined Documentation Program, Countrywide "*obtains appraisals from independent appraisers or appraisal services*," and that each appraisal "*includes a market data analysis based on recent sales of comparable homes in the area*."

116.   The foregoing representations in ¶111, that appraisals were done by qualified appraisers "*whose compensation is not affected by the approval or disapproval of the mortgage loan*," and in ¶115, that appraisals were obtained "*from independent appraisers or appraisal services*" were false and misleading.  Appraisers were ordered by loan originators to give pre-determined, inflated appraisals that would result in approval of the loan; if the appraiser objected to the inflated appraisal number, they would be threatened with being black-balled within the industry. Appraisers were frequently threatened by being told to provide a predetermined appraisal value justifying a loan or face never doing business again.  In other cases, appraisers were essentially

- 43 -

bribed to provide inflated appraisals.  In such cases, appraisers were paid above-market rates for appraisals that provided a pre-determined inflated valuation that would cause a loan to be approved. Thus, appraisers' compensation was in fact affected by whether or not a loan was approved.

117.    In addition, the representations in ¶¶112-115 that "[a]ll appraisals must . . . conform to the [USPAP] adopted by the Appraisal Standards Board of the Appraisal Foundation" or "Fannie Mae or Freddie Mac appraisal standards" were false and misleading because the appraisals did not conform to either the USPAP, or Fannie Mae or Freddie Mac standards.

118.    The USPAP provides that:

(a)    An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests;

(b)    In appraisal practice, an appraiser must not perform as an advocate for any party or issue;

(c)    An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions; and

(d)    It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

(i)    The reporting of a predetermined result (*e.g.*, opinion of value);

(ii)    A direction in assignment results that favors the cause of the client;

(iii)    The amount of a value opinion;

(iv)    The attainment of a stipulated result; or

(v)    The occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

119.     Furthermore, both Fannie Mae and Freddie Mac standards required that appraisals comply with the USPAP and that appraisers not be influenced in any way to provide a particular result.

120.     The representations that appraisals conformed to the USPAP, or Fannie Mae or Freddie Mac standards, were materially false and misleading because, contrary to the USPAP, Fannie Mae and/or Freddie Mac standards, appraisers were ordered to come back with pre-determined, preconceived, inflated and false appraisal values.

121.     Most lenders allowed the sales personnel or account executives to order and control the appraisals.  These sales personnel were typically on a commission-only pay structure and were therefore motivated to close as many loans as possible at the highest possible loan amounts.  These sales personnel and account executives would pressure appraisers to appraise properties at pre-set, artificially high levels to justify the loans they wanted to make, or they would not be hired again.  In other cases, the sales personnel bribed appraisers who provided inflated appraisals by paying above-market rates for the appraisals and promising lucrative future work if the inflated appraisals were provided.

122.     This dynamic caused appraisers to experience systemic problems of coercion, as many were either bribed or ordered to doctor their reports or face never seeing work from lenders again.  Appraisers were routinely either paid above-market rates or promised future work, or were threatened with being put on exclusionary "do-not-use" lists.  This pressure and coercion succeeded in generating false, artificially inflated appraisals of the properties connected to the loans in the Trusts.

123.     A 2007 survey of 1,200 appraisers conducted by October Research Corp. – a firm in Richfield, Ohio that publishes *Valuation Review* – found that ***90% of appraisers*** reported that

- 45 -

mortgage brokers and others pressured them to raise property valuations to enable deals to go through.  The study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation."

124.    Starting in 2000 and continuing until 2009, 11,000 appraisers signed a petition addressed to the Appraisal Subcommittee of the Federal Financial Institutions Examination Council, an agency of the of United States Government whose "mission is to ensure that real estate appraisers, who perform appraisals in real estate transactions that could expose the United States government to financial loss, are sufficiently trained and tested to assure competency and independent judgment according to uniform high professional standards and ethics."  In the petition, the 11,000 appraisers wrote:

> We, the undersigned, represent a large number of licensed and certified real estate appraisers in the United States, who **seek your assistance in solving a problem facing us on a daily basis. Lenders (meaning any and all of the following: banks, savings and loans, mortgage brokers, credit unions and loan officers in general; not to mention real estate agents) have individuals within their ranks, who, as a normal course of business, apply pressure on appraisers to hit or exceed a predetermined value**.

> This pressure comes in many forms and includes the following:

> •      the withholding of business if we refuse to inflate values,

> •      the withholding of business if we refuse to guarantee a predetermined value,

> •      the withholding of business if we refuse to ignore deficiencies in the property,

> •      refusing to pay for an appraisal that does not give them what they want,

> •      black listing honest appraisers in order to use "rubber stamp" appraisers, etc.

>      We request that action be taken to hold the lenders responsible for this type of violation and provide for a penalty on any person or business who engages in the practice of pressuring appraisers to do dishonest appraisals that do not provide for independent judgment. We believe that this practice has adverse effects on our local and national economies and that the potential for great financial loss exists. We also believe that many individuals have been adversely affected by the purchase of homes which have been over-valued.

- 46 -

125.   Numerous appraisers have confirmed that the inflation of appraisals was systemic and commonplace.   For example, the case of an owner of a small Midwest residential real estate appraisal firm in Illinois is indicative of the landscape at the times the loans in the Trusts were originated.   This appraiser was approved and/or utilized in approximately 200 transactions by originators of loans in Trusts at issue herein, including Countrywide and Wells Fargo.   The appraiser related that mortgage brokers frequently threatened him with "either give us this home value or you will never do business for us again."   Loans originated in Illinois were included in offerings at issue whereby Countrywide and Wells Fargo were identified as originators.

126.   In addition, an independent appraiser from Florida, who was approved by Countrywide and other originators, was told by brokers and lenders that: "WE NEED THIS NUMBER, OR YOU WILL NEVER WORK FOR US AGAIN."   Numerous loans across all of the Trusts were originated in Florida, ranging from 3.96% of the GSR Mortgage Loan Trust 2007-3F loans to 17.4% of the GSR Mortgage Loan Trust 2007-OA2.

127.   A real estate appraiser in Las Vegas stated that when "the Vegas market had peaked, Countrywide and Wells Fargo were requiring appraisers to come up with real estate appraisals reflecting escalating values or they would black ball them."   This appraiser conducted over 300 inflated appraisals for Countrywide, Wells Fargo, and other originators of loans in the Trusts. According to this appraiser, typically the appraisals demanded by these lenders were 15% to 25% higher than the actual market values.   Loans in several offerings were originated in Nevada.

128.   Another independent appraiser stated that Wells Fargo mortgage brokers and Countrywide in-house and outside loan officers demanded inflated numbers from him in two Southern California cities - Compton and Watts, California.   Large numbers of loans in the Trusts where Countrywide and Wells Fargo were listed as originators were originated in Southern

- 47 -

California.  The lenders told this appraiser to either give them the appraisal numbers they wanted or that he would be "done" and that he would be blackballed by every lender doing business in California.  According to this appraiser, he did over 100 inflated appraisals just for Wells Fargo and Countrywide alone.  In some cases, he was appraising houses, that he described as "crack houses" that should have been bulldozed, at $100,000 more than they were worth.

129.    Similarly, many of WaMu's appraisals were prepared by appraisers who WaMu improperly pressured into increasing appraisal values.  Prior to the appraisal, appraisers were provided with a pre-determined value set by WaMu.  If the appraiser did not appraise the property at that value, he or she was pressured by WaMu to provide the pre-determined number.  If the appraiser did not, WaMu stopped hiring them for appraisals.  Due to WaMu's conduct, many appraisals performed for it were not based upon the true values of the homes, but rather based upon the value WaMu and its brokers needed to justify the loans.

130.    The representations in ¶¶112-115 that "***[t]he appraisal[s] generally will be based upon a market data analysis of recent sales of comparable properties***" and "***[t]he appraisal generally will have been based on prices obtained on recent sales of comparable properties***" were false and misleading.  In many cases the appraisals were based on purportedly "comparable properties" which really were not comparable.  As an independent appraiser in Florida related, in order to stay in business, she gave inflated appraisals even if it required driving 20 miles away for "comparable" sales that really were not comparable.  During the relevant period, this appraiser completed 100+ appraisals for Countrywide and other originators that were over inflated and based on sales that were not "comparable."  Appraisers routinely used more expensive properties with larger lots or square footages, or which had other amenities the appraised property did not have, in order to inflate the value of the appraised property.  Numerous loans in all of the Trusts were

- 48 -

originated in Florida and Countrywide was the originator of many loans in the GSAA Home Equity

Trusts 2007-3, 2007-5, 2007-6, and GSR Mortgage Loan Trusts 2007-OA1 and 2007-4F.

131.    Additionally, in the Order denying the motion to dismiss in the *Wells Fargo* litigation

discussed above, the court found with respect to plaintiff's appraisal allegations that:

> Plaintiffs allege, in other words, that the true loan-to-value ratio frequently exceeded
> 100% because the homes were actually worth far less than their stated appraisal
> value. *Id.*, ¶100.

> Plaintiffs again support their allegations primarily with statements from confidential
> witnesses. *Id.* ¶103 ("CW 2 confirmed that, at Wells Fargo  Home Mortgage,
> representatives constantly pushed the appraisers they worked with to inflate the value
> of the real estate underlying the mortgage loans"); ¶107 ("CW 1 remarked that
> 'appraisals were very inflated,' and observed that the retail officers 'always managed
> to get the value they wanted'"); ¶108 (CW 7, a former Senior Underwriter with
> Wells Fargo  Home Mortgage, "estimated that 70% of the loans CW7 worked with
> had an LTV over 95%"). Plaintiffs additionally cite to a 2007 survey which "found
> that 90% of appraisers reported that mortgage brokers and others pressured them to
> raise property valuations to enable deals to go through," and to congressional
> testimony in which Alan Hummel, Chair of the Appraisal Institute, stated that loan
> appraisers had "experience[d] systemic problems of coercion." *Id.* ¶¶104-05.
> Plaintiffs' allegations concerning the allegedly improper appraisal practices are
> sufficiently specific to state a claim with respect to the securities at issue in this case.
> In particular, plaintiffs have alleged that Wells Fargo's practices permitted the
> pervasive and systematic use of inflated appraisals, affecting all types of mortgages.

Order Granting in Part and Denying in Part Defendants' Motions to Dismiss, *Wells Fargo*, at 16-17.

132.    A separate lawsuit filed against Wells Fargo, *Sound Appraisal and Savage Appraisal*

*Services, Inc. v. Wells Fargo Bank, N.A.*, No. 09-CV-01630 CW (N.D. Cal. Apr. 14, 2009), further

confirms the offering documents' false and misleading statements regarding Wells Fargo's purported

underwriting practices, by confirming Wells Fargo's regular practice of pressuring and intimidating

appraisers into providing falsely inflated that met the bank's objectives.  Specifically, the complaint

in that action alleges:

> As part of its corporate objective to abandon underwriting standards in order
> to maximize market share and profits, Wells Fargo and Rels Valuation have together
> engaged in a practice of pressuring and intimidating appraisers into using appraisal

techniques that produce appraisals that meet Wells Fargo's business objectives even if the use of such appraisal techniques is improper and in violation of industry and regulatory standards. If appraisers fail to "play ball" as Wells Fargo demands, Wells Fargo, through Rels Valuation, removes the appraiser from the list of approved appraisers, which essentially "blacklists" the appraiser. Once an appraiser is blacklisted, Wells Fargo and Rels Valuation will no longer request appraisals or accept appraisals from these persons and companies.

*Id.*, ¶7.

133.     A False Claims Act lawsuit brought by the U.S. Government against Countrywide and appraisal firm Land Safe Appraisal Services, Inc. ("Land Safe") also confirms that Countrywide routinely violated its stated underwriting guidelines by using falsely inflated appraisals. *See* Complaint, *United States, ex rel. Kyle W. Lagow v. Countrywide Fin. Corp.*, No. 1:09-cv-02040-RJD-JMA (E.D.N.Y. May 13, 2009) ("*Lagow* Complaint"). According to the allegations of this action, which are based on the testimony of Kyle Lagow, a former LandSafe employee, Countrywide and LandSafe conspired together to systematically inflate appraisals. According to Lagow, Countrywide and LandSafe systematically inflated appraisals for Countrywide loans by, among other things: (a) paying above-market fees to appraisers who provided inflated appraisals; (b) rewarding appraisers that provided inflated appraisals with significant amounts of additional work; (c) black-listing, retaliating against and firing appraisers that refused to provide inflated appraisals; (d) improperly requiring appraisers to rely on information outside the relevant market that justified inflated appraisals; (e) providing appraisers with false information concerning "comparable" properties that led to inflated appraisals; and (f) retaliating against anyone who questioned or criticized Countrywide's and LandSafe's appraisal inflation scheme. *Lagow* Complaint, ¶9. This action was settled, as part of a global $1 billion settlement, with Countrywide's parent company, Bank of America Corp.

- 50 -

134.    The appraisers knew that the appraisals they supplied were not accurate but rather were inflated and false because they had either been bribed or threatened into providing such false appraisals.  Accordingly, the appraisers knew their appraisals had no reasonable basis in fact and did not believe such appraisals to be true at the time they provided them.

**Defendants Misrepresented that the Loan Documents**
**Were Not Falsified and Did Not Contain Any Untrue Statements**

135.    The January 31, 2007 Registration Statement represented:

> ***The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact*** or omit to state a material fact required to be stated in them or necessary to make the information and statements in the documents, instruments and agreements not misleading.  ***No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a mortgage loan has taken place on the part of any person, (including without limitation, the mortgagor, any appraiser, any builder or developer, or any other party involved in the origination or servicing of the mortgage loan)***.

\*    \*    \*

> All the documents executed in connection with the Mortgage Loan . . . ***are free of fraud and any misrepresentation . . . .***

136.    Additionally, in the Prospectus Supplement for the GSAA Home Equity Trust 2007-10, defendant GSMC represented, with respect to the Conduit Program, that "[t]o the best of [its] knowledge, ***there was no fraud involved in the origination of any Mortgage Loan by the mortgagee or the mortgagor, any appraiser or any other party involved in the origination of the Mortgage Loan***."  The Prospectus Supplements for GSR Mortgage Loan Trusts 2007-3F, 2007-4F and 2007-5F also represented that "***[a]ll the documents executed in connection with the Mortgage Loan  . . . . are free of fraud and any misrepresentation*** . . . ."

137.    The foregoing statements were false and misleading because, as alleged above, borrowers and loan originators were systematically and routinely falsifying the incomes and debts of the borrowers in order to qualify them for loans they could not otherwise qualify for or afford to pay.

- 51 -

In addition, property appraisals were systematically inflated by appraisers who were being pressured by loan originators. The loan documentation also contained other misrepresentations understating borrowers' assets and debts, and misrepresenting borrowers' employment status and the occupancy of the purchased properties. Defendant GSMC and the other defendants were aware of the misrepresentations and fraud in the loan documents prior to offering the Certificates for sale. GSMC and GS Mortgage performed due diligence on the loans before purchasing them from originators and, thus, they and the other defendants became aware of the misrepresentations and omissions at that time.

138.    Based on an analysis of information from and related to the actual loans within the GSAA Home Equity Trust 2007-5 and 2007-10, plaintiff estimates that at least 90% of those loan files were falsified and/or contained misrepresentations.

**The LTV Ratios Stated in the Offering Documents Were False**

139.    The Prospectus Supplement for each Trust contained detailed, voluminous information concerning the LTV ratios of the loans within the Trust. Such information is very material to investors, as a lower LTV ratio indicates less risk with respect to the loans, while a higher LTV ratio indicates riskier loans. Information about the LTV ratios was spread throughout the Offering Documents. For example, the Prospectus Supplement for the GSAA Home Equity Trust 2007-5 represented that the "Weighted Average Original LTV Ratio" for "Group I" loans was 74.47% while the "Weighted Average Combined Original LTV Ratio" was 84.39%. With respect to "Group II" loans, the Prospectus Supplement stated that the "Weighted Average Original LTV Ratio" was 76.35% while the "Weighted Average Combined Original LTV Ratio" was 85.75%. The Prospectus Supplement further stated that "[a]pproximately 3.10% of the Group I Mortgage Loans and approximately 4.40% of the Group II Mortgage Loans had [LTV] ratios in excess of 80%." An

example of the extensive LTV ratio information contained with the Prospectus Supplement for the

GSAA Home Equity Trust 2007-5 is set forth below in an excerpt from page A-1-27 of Schedule A-

1 of the Prospectus Supplement:

## Distribution by Current Principal Balance

| Current Principal Balance | Number of Loans | Principal Balance | Pct. Of Pool by Principal Balance | Weighted Avg. Gross Coupon | Weighted Avg. Current FICO | Avg. Principal Balance | Weighted Avg. Original LTV | Weighted Avg. Combined LTV | Pct. Full Doc | Pct. Owner Occupied |
|---|---|---|---|---|---|---|---|---|---|---|
| 50,000 & $ Below | 9 | $412,275 | 0.12% | 7.631% | 677 | $45,808 | 63.01% | 74.40% | 12.11% | 24.19% |
| 50,001- $75,000 | 61 | 4,039,466 | 1.19 | 7.246 | 697 | 66,221 | 69.42 | 79.04 | 32.74 | 58.11 |
| 75,001- $100,000 | 84 | 7,464,432 | 2.20 | 7.216 | 701 | 88,862 | 70.61 | 81.32 | 29.58 | 71.05 |
| 100,001- $125,000 | 112 | 12,703,637 | 3.74 | 7.060 | 699 | 113,425 | 71.29 | 81.82 | 27.64 | 75.73 |
| 125,001- $150,000 | 121 | 16,733,055 | 4.93 | 6.980 | 694 | 138,290 | 72.52 | 83.32 | 32.23 | 83.09 |
| 150,001- $200,000 | 187 | 32,549,853 | 9.59 | 6.938 | 696 | 174,063 | 74.72 | 84.29 | 25.66 | 88.23 |
| 200,001- $250,000 | 148 | 33,370,785 | 9.83 | 6.800 | 704 | 225,478 | 73.82 | 82.13 | 23.91 | 84.88 |
| 250,001- $300,000 | 100 | 27,570,107 | 8.12 | 6.718 | 700 | 275,701 | 71.93 | 82.31 | 17.97 | 86.22 |
| 300,001- $350,000 | 75 | 24,496,198 | 7.22 | 6.864 | 701 | 326,616 | 76.31 | 86.93 | 10.64 | 85.40 |
| 350,001- $400,000 | 52 | 19,414,008 | 5.72 | 6.697 | 706 | 373,346 | 73.54 | 81.25 | 11.80 | 80.65 |
| 400,001- $450,000 | 58 | 24,716,634 | 7.28 | 6.770 | 701 | 426,149 | 75.89 | 87.37 | 11.94 | 96.68 |
| 450,001- $500,000 | 53 | 25,311,880 | 7.46 | 6.786 | 716 | 477,583 | 78.60 | 89.36 | 18.93 | 100.00 |
| 500,001- $550,000 | 42 | 22,245,632 | 6.55 | 6.688 | 722 | 529,658 | 75.52 | 83.43 | 16.42 | 95.15 |
| 550,001- $600,000 | 39 | 22,492,620 | 6.63 | 6.695 | 721 | 576,734 | 77.12 | 87.63 | 23.20 | 97.49 |
| 600,001- $650,000 | 22 | 13,858,123 | 4.08 | 6.844 | 722 | 629,915 | 76.82 | 91.24 | 18.39 | 100.00 |
| 650,001- $700,000 | 13 | 8,768,557 | 2.58 | 6.827 | 701 | 674,504 | 74.46 | 83.20 | 7.75 | 84.45 |
| 700,001- $750,000 | 12 | 8,721,337 | 2.57 | 6.975 | 710 | 726,778 | 78.10 | 88.03 | 16.83 | 100.00 |
| 750,001- $800,000 | 8 | 6,205,789 | 1.83 | 6.564 | 717 | 775,724 | 72.49 | 80.98 | 24.97 | 87.19 |
| 800,001- $850,000 | 6 | 4,957,624 | 1.46 | 6.854 | 730 | 826,271 | 70.64 | 78.88 | 0.00 | 100.00 |
| 850,001- $900,000 | 4 | 3,523,261 | 1.04 | 7.031 | 675 | 880,815 | 70.92 | 75.91 | 0.00 | 100.00 |
| 950,001- $1,000,000 | 5 | 4,890,414 | 1.44 | 7.254 | 710 | 978,083 | 73.43 | 86.74 | 0.00 | 79.55 |
| $1,000,001 & Above | 12 | 14,957,835 | 4.41 | 6.947 | 706 | 1,246,486 | 70.74 | 79.89 | 8.02 | 91.98 |
| **Total:** | **1,223** | **339,403,522** | **100.00%** | **6.841%** | **706** | **$277,517** | **74.47%** | **84.39%** | **18.48%** | **89.12%** |

140.    The purported LTV ratios of the loans in the Trust were set forth extensively and repeatedly throughout the GSAA Home Equity Trust 2007-5 Prospectus Supplement.  *See, e.g.*, pages S-26, S-55, A-1-1, A-1-27 through A-1-32, and A-2-24 through A-2-31.

141.    Similarly, the Prospectus Supplement for the GSAA Home Equity Trust 2007-10 also contained voluminous, detailed, similar information on the LTV ratios for the loans within that Trust.  An example of the LTV ratio information contained within this Prospectus Supplement for the GSAA Home Equity Trust 2007-10 is set forth below in an excerpt from page B-1 of Appendix B of the Prospectus Supplement:

### Distribution by Current Principal Balance – Collateral Group 1

| Current Principal balance | Number of Loans | Principal Balance | Pct. Of Pool by Principal Balance | Weighted Avg. Gross Coupon | Weighted Avg. Current FICO | Avg. Principal Balance(1) | Weighted Avg. Original LTV | Weighted Avg. Combined LTV | Pct. Full Doc | Pct. Owner Occupied |
|---|---|---|---|---|---|---|---|---|---|---|
| 50,001–$75,000 | 1 | $74,649 | 0.16% | 5.750% | 730 | $74,649 | 34.09% | 34.09% | 0.00% | 100.00% |
| 75,001–$100,000 | 2 | 53,299 | 0.11 | 6.705 | 738 | 85,834 | 64.58 | 64.58 | 100.00 | 100.00 |
| 100,001–$125,000 | 4 | 230,653 | 0.48 | 6.658 | 693 | 115,398 | 81.76 | 86.58 | 87.56 | 87.11 |
| 125,001–$150,000 | 10 | 1,081,391 | 2.25 | 6.196 | 716 | 139,739 | 52.61 | 52.61 | 33.82 | 46.50 |
| 150,001–$200,000 | 12 | 1,237,002 | 2.57 | 6.470 | 735 | 179,920 | 82.35 | 86.79 | 38.77 | 89.42 |
| 200,001–$250,000 | 9 | 1,224,033 | 2.54 | 6.280 | 704 | 221,434 | 67.85 | 73.71 | 42.20 | 80.45 |
| 250,001–$300,000 | 7 | 1,254,600 | 2.61 | 6.395 | 714 | 285,610 | 79.60 | 96.65 | 7.30 | 100.00 |
| 300,001–$350,000 | 15 | 2,453,462 | 5.10 | 6.449 | 734 | 318,361 | 78.02 | 95.31 | 6.34 | 87.43 |
| 350,001–$400,000 | 15 | 3,317,450 | 6.89 | 6.362 | 726 | 380,537 | 77.34 | 87.74 | 0.00 | 80.05 |
| 400,001–$450,000 | 2 | 768,703 | 1.60 | 6.157 | 760 | 438,101 | 76.23 | 82.03 | 41.95 | 58.05 |
| 450,001–$500,000 | 17 | 5,349,922 | 11.11 | 6.310 | 736 | 482,564 | 70.62 | 73.12 | 18.31 | 24.06 |
| 500,001–$550,000 | 16 | 5,414,376 | 11.25 | 6.356 | 749 | 527,251 | 74.91 | 79.01 | 9.76 | 51.79 |
| 550,001–$600,0001 | 11 | 4,263,980 | 8.86 | 6.202 | 748 | 570,752 | 71.50 | 76.09 | 0.00 | 33.15 |
| 600,001–$650,000 | 4 | 1,923,536 | 4.00 | 6.333 | 702 | 640,504 | 66.14 | 77.83 | 0.00 | 33.19 |
| 650,001–$700,000 | 10 | 5,370,857 | 11.16 | 6.261 | 745 | 686,992 | 67.66 | 69.65 | 6.83 | 45.55 |
| 700,001–$750,000 | 5 | 2,170,103 | 4.51 | 6.437 | 766 | 721,394 | 77.80 | 81.05 | 0.00 | 32.99 |
| 750,001–$800,000 | 1 | 752,000 | 1.56 | 5.875 | 786 | 752,000 | 80.00 | 90.00 | 0.00 | 100.00 |
| 800,001–$850,000 | 1 | 844,780 | 1.75 | 6.250 | 784 | 844,780 | 54.52 | 54.52 | 0.00 | 0.00 |
| 850,001–$900,000 | 2 | 1,321,093 | 2.74 | 6.164 | 779 | 877,329 | 67.25 | 67.25 | 32.82 | 0.00 |

- 54 -

783368_1

| Current Principal balance | Number of Loans | Principal Balance | Pct. Of Pool by Principal Balance | Weighted Avg. Gross Coupon | Weighted Avg. Current FICO | Avg. Principal Balance(1) | Weighted Avg. Original LTV | Weighted Avg. Combined LTV | Pct. Full Doc | Pct. Owner Occupied |
|---|---|---|---|---|---|---|---|---|---|---|
| 950,001 $1,000,000,000 | 3 | 1,480,729 | 3.08 | 6.458 | 731 | 987,457 | 64.27 | 64.27 | 0.00 | 16.88 |
| $1,000,001 & Above | 7 | 7,558,000 | 15.70 | 6.266 | 771 | 1,449,999 | 57.45 | 58.55 | 12.75 | 0.000 |
| **Total:** | **154** | **$48,144,617** | **100.00%** | **6.305%** | **745** | **$467,771** | **69.48%** | **74.31%** | **11.34%** | **40.98%** |

(1) This Column represents the average of the scheduled principal balance of the mortgage loans contributing cash flows to this Collateral Group (even if such mortgage loans also contribute to another collateral Group).

142.     The purported LTV ratios were set forth extensively and repeatedly in the GSAA Home Equity Trust 2007-10 Prospectus Supplement as well. *See, e.g.*, pages S-10, and B-1 through B-12 of the Prospectus Supplement.

143.     Each of the Prospectus Supplements at issue herein contained similar information about the LTV ratios of the loans within the Trusts.

144.     The foregoing LTV ratios in the Offering Documents were inaccurate, false and misleading because they were calculated using the false and inflated property appraisals alleged herein.  Incorporating an inflated appraisal into the LTV calculation will result in a falsely lower LTV ratio.  For example, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000 or 90 percent.  If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to 75% ($90,000/$120,000).  Because the LTV ratio can only be calculated by using the appraisal value of the property, and because the property values in the appraisals were inflated, this resulted in false, lower LTV ratios for the loans in the Trusts.  Thus, the LTV ratios, as represented in the Offering Documents, were understated while the actual (undisclosed) LTV ratios were much higher.  The Offering Documents made it appear to investors that the Certificates were safer and less risky than they actually were because a lower LTV ratio indicated there was more equity in the property, thereby protecting the

- 55 -

loan holder in the event of a default or foreclosure, and making it appear that borrowers would not likely default on the loans since they had equity in the properties.

**The Credit Ratings Assigned to the Certificates Falsely**
**Portrayed The Certificates as Much Safer Investments**
**Than They Really Were**

145.    The January 31, 2007 Registration Statement represented that in order to be issued, the Certificates must be assigned AAA to BBB+ or Aaa to Baa 1 ratings from the ratings agencies. Eventually, nearly all of the Certificates in all of the Trusts were given investment grade ratings from Standard & Poors Rating Services ("S&P") or Moody's Investor Service, Inc. ("Moody's").  For example, the Certificates for the GSAA Home Equity Trusts 2007-5 and 2007-10 were all rated at "investment grade" – AAA to BBB – by S&P in the Prospectus Supplements for those Certificates.

146.    Nearly 100% of all of the classes of Certificates for all the other Trusts that were offered for sale to the investing public contained the same or similar high, safe, "investment grade" ratings from S&P, Moody's or Fitch Rating.

147.    The ratings, which defendants voluntarily chose to include in the Registration Statement and Prospectus Supplements, were inaccurate, false and misleading because they were based on outdated assumptions, relaxed ratings criteria, and inaccurate loan information.  These flaws produced artificially high credit ratings for the Certificates, making them appear safer and less risky than they really were.

148.    Moody's and S&P used models to produce the ratings for the Certificates.  The models were based upon loan performance *prior* to the year 2000.  However, an unprecedented decline and deterioration in mortgage lending standards occurred *after* 2000 which the models did not account for.  This decline in lending standards and an increase in riskier exotic mortgage products during the 2001 through 2005 time period rendered Moody's and S&P's pre-2000 loan

- 56 -

performance data obsolete.  Thus, by the time the agencies provided "investment grade" ratings to the Certificates, their historical data no longer reflected the reality that mortgage credit quality was rapidly deteriorating.

149.    In addition to using flawed models to generate ratings, Moody's and S&P repeatedly eased their ratings standards in order to capture more market share of the ratings business.  This easing of ratings standards was due in large part to the fact that rating agencies like Moody's and S&P were compensated by the very entities, *i.e.,* the defendants, that they provided ratings to, and the fact that those entities were free to shop around for the rating agency that would provide them with the highest ratings.

150.    In addition to the eroding rating standards and the flawed rating models alleged above, Moody's and S&P's ratings were also based on inaccurate information.  The rating agencies rated the Certificates based in large part on data about each of the mortgage loans that defendants provided to them – including borrowers' incomes, debts, debt-to-income ratios, "FICO" scores, property appraisal values and LTV ratios.  As alleged above, much of this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income and debt falsification, and the other facets of defective underwriting alleged herein.  Neither Moody's nor S&P engaged in any due diligence or otherwise sought to verify the accuracy or quality of the loan data underlying the loan pools they rated.  Nor did they seek representations from defendants that due diligence was performed.

151.    Because Moody's and S&P were using flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk.  Certificates were given "investment grade" ratings when in reality they were not of investment grade quality but

- 57 -

actually were much riskier, junk grade investments or worse.  As such, the Offering Documents, which affirmatively set forth the false and misleading ratings, were themselves false and misleading.

152.    Given that the credit ratings agencies were using outdated, inaccurate models, and inaccurate information about the loans, the "investment grade" credit ratings assigned to the Certificates had no reasonable basis in fact and were grossly false.

**Defendants Did Not Disclose That at the Same Time They
Were Selling the Certificates They Were Betting That
Loans Like Those in the Trusts Would Not Be Repaid**

153.    As set forth in the U.S. Senate's Levin-Coburn Report, and the FCIC Report, at the same time most of the defendants were selling the Certificates to plaintiff, they were also selling the same types of investments "short."  Defendants never disclosed this to plaintiff.

154.    Defendants made ***billions*** of dollars from betting that investments like those they sold to plaintiff would decline in value at the same time that they were selling them to plaintiff.  This demonstrates that defendants' statements in the offering documents, that the Certificates were investment grade securities, were false and misleading and that defendants knew it.  After all, if defendants really believed the Certificates were prudent investment grade securities, they never would have shorted them in the huge way that they did.  In fact, defendants received ***$14 billion*** in payments from AIG and AIG-related entities alone related to Goldman Sachs' shorting of the Certificates.  *See* FCIC Report at 376-78.  Defendants made ***millions*** in additional profits by shorting the Certificates through the "ABX Index," an index that tracked the Certificates.  ***In fact, in the first quarter of 2007, Goldman Sachs earned "a record $266 million" through its mortgage business, "driven primarily by short positions, including a $10 billion short position on the bellweather ABX BBB Index***."  FCIC Report at 236.  ***In January 2007, defendant Daniel Sparks, head of***

***Goldman Sachs' mortgage department, bragged internally to fellow Goldman Sachs colleagues***

***that Goldman Sachs had made "'some lemonade from some big old lemons****.'"  Id.*

155.    As set forth in the FCIC Report, beginning in December 2006, Goldman Sachs began

to reduce its exposure by selling all the Certificates in its inventory that it possibly could, and by also

shorting them.  With respect to Goldman Sachs' attempts to sell its inventory, Goldman Sachs CEO

Lloyd Blankfein internally and derisively referred to Goldman Sachs' Certificates – the same

Certificates that Goldman Sachs was selling to plaintiff – as "'***dogs***.'"  FCIC Report at 236 (February

11, 2007 e-mail from Blankfein to Goldman Sachs colleague Tom Montag stating: "[A]re we doing

enough right now to sell off cats and dogs . . . ?'").  Other Goldman Sachs' employees were even

more blunt about the poor quality of Goldman Sachs' Certificates.  In another instance, in October

2006, a Goldman Sachs trader referred to Goldman Sachs certificate offerings as "'***junk***.'"  Levin-

Coburn Report at 543 n.2374.

156.    It was very clear from the FCIC Report that Goldman Sachs ***knew*** the Certificates

were not good investments, and ***knew*** in fact that there was "'major risk'" in such investments.

FCIC Report at 235.  Thus, Goldman Sachs, "[i]n addition to selling its subprime securities to

customers [such as plaintiff], . . . took short positions using credit default swaps . . . [and] short

positions on the ABX indices and on some of the financial firms with which it did business." *Id*. at

237.  And, as noted above, Goldman Sachs made ***billions*** from shorting the very investments it sold

to plaintiff.  Defendants never told plaintiff that they considered Goldman Sachs' Certificates to be

"big old lemons," "dogs," "shitty deal[s]" or "junk," at the same time they were selling them to

plaintiff, or that they were shorting them.  According to the Levin-Coburn Report, defendants

shorted their LBMLT 2006-A offering while they sold the same offering to plaintiff.  *See* Levin-

Coburn Report at 488-514.  According to the U.S. Senate investigation, Goldman Sachs made net revenues of *$3.7 billion* from its undisclosed shorting activities alone.  *Id*. at 382.

157.    The FCIC made the following observations about Goldman Sachs' shorting activities:

Goldman has been criticized – and sued – for selling its subprime mortgage securities to clients while simultaneously betting against those securities.  *Sylvain Raynes, a structured finance expert at R&R Consulting in New York, reportedly called Goldman's practice "the most cynical use of credit information that I have ever seen," and compared it to "buying fire insurance on someone else's house and then committing arson*."

FCIC Report at 236.

158.    Indeed, even Goldman Sachs' CEO admitted that such conduct was "improper":

*During a FCIC hearing, Goldman CEO Lloyd Blankfein was asked if he believed it was a proper, legal, or ethical practice for Goldman to sell clients mortgage securities that Goldman believed would default, while simultaneously shorting them.  Blankfein responded, "I do think that the behavior is improper and we regret the result – the consequence [is] that people have lost money*."

*Id*.

159.    The U.S. Senate Subcommittee's Report was equally damning of Goldman Sachs' conduct:

*Goldman Sachs . . . underwrote securities using loans from subprime lenders known for issuing high risk, poor quality mortgages, and sold risky securities to investors across the United States and around the world.  [Goldman Sachs] also enabled the lenders to acquire new funds to originate still more high risk, poor quality loans.  [Goldman Sachs] sold CDO securities [which contained RMBS like those sold to plaintiffs] without full disclosure of the negative views of some of their employees regarding the underlying assets and . . . without full disclosure that it was shorting the very CDO securities [which contained RMBS like those sold to plaintiffs] it was marketing, raising questions about whether Goldman complied with its obligations to issue suitable investment recommendations and disclose material adverse interests*.

Levin-Coburn Report at 11.

## DISCLOSURES EMERGE ABOUT PROBLEMS WITH
## LOANS UNDERLYING THE CERTIFICATES

160.    After the Certificates were issued, the ratings on nearly all of the Certificates within each of the Trusts were downgraded.  Downgrades to the overwhelming majority of Trusts did not occur until 2008.  In some instances, Certificates that received the highest rating of AAA at issuance have fallen many notches and are now rated CCC – a rating many levels below the threshold for "junk status."  In fact, the Certificates plaintiff purchased experienced just such downgrades.

161.    These downgrades occurred because the original ratings did not accurately reflect the risk associated with the assets (the loans) underlying the Certificates.  Further, the delinquency rates on the underlying mortgage loans have skyrocketed.  In nearly half of the Trusts, the 60+ day delinquency rate is ***in excess of 30 percent*** (the "60+ day delinquency rate" includes loans that are foreclosures, loans that are 60 days or more delinquent, and loans in which the real estate collateral was retaken by the lender).  In 11 of the 14 Trusts, at least one in ten loans has experienced foreclosure.  These massive foreclosure rates and extraordinary delinquencies have further confirmed defendants' misrepresentations concerning the lending practices detailed above.

162.    Because of the downgrades, as well as other information that was unknown to investors at the time the Certificates were issued, the value of the Certificates has diminished greatly since their original offering, as has the price at which members of the Class can dispose of them in the secondary market for these Certificates.  These diminutions in value and price have caused damages to the plaintiff and the Class.

163.    There is a secondary market for the purchase and sale of the Certificates.  There has been a market for the resale of the investments like the Certificates since at least 2007.  The trading volume of Certificates like those at issue was at least $1-$1.5 billion during December 2008, the time at which the first of the actions asserting the claims herein was filed.  In a non-forced sale in the

- 61 -

secondary market in December 2008, plaintiff would have netted, at most, between 35 and 45 cents

on the dollar for its Certificates.  In other words, a sale on the date the first lawsuit was filed would

have resulted in a loss of at least 55 to 65 cents on each dollar amount purchased.  The value of

Certificates from the other Trusts alleged herein have experienced similar declines in value.

164.    Defendant Goldman Sachs, however, fared much better.  After selling the Certificates

to plaintiff and the Class at inflated prices caused by defendants' misrepresentations, and pocketing a

hefty profit, Goldman Sachs made ***tens of billions*** of dollars in additional profits on its undisclosed

credit default swap bets it made against the loans underlying the Certificates.  Plaintiff and the Class,

on the other hand, have watched their Certificates plummet in value.

## FIRST CAUSE OF ACTION

### Violations of §11 of the 1933 Act
### Against All Defendants

165.    Plaintiff repeats and re-alleges the allegations set forth above as if set forth fully

herein.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that

could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based

solely on claims of strict liability and/or negligence under the 1933 Act.

166.    This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of

plaintiff and the Class, against all defendants.

167.    The Registration Statement for the Certificate offerings, including the Prospectus

Supplements which were incorporated therein, were inaccurate and misleading, contained untrue

statements of material facts, omitted to state other facts necessary to make the statements made not

misleading, and omitted to state material facts required to be stated therein.

168.    Defendant GS Mortgage, as Issuer of the Certificates, is strictly liable to plaintiff and the Class for the misstatements and omissions complained of herein, even if such misstatements and omissions were innocent.

169.    Defendant Goldman Sachs owned and controlled the other defendants and assisted in drafting the Registration Statement.  In addition, Goldman Sachs acted as an underwriter for each of the offerings and failed to perform adequate due diligence, thereby permitting the false and misleading statements and omissions included in the Registration Statement to be disseminated.

170.    Defendant GSMC was the Sponsor, and assisted in drafting the Registration Statement.  In addition, GSMC acted as an underwriter of the Certificate Offerings, and also made misrepresentations and omissions in the Registration Statement as alleged herein

171.    The Individual Defendants signed the Registration Statement, which was false due to the misstatements and omissions described above.

172.    None of these defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were not false and misleading or did not omit material facts that rendered statements made therein not false and misleading.

173.    By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, §11 of the 1933 Act.

174.    Defendant Goldman Sachs was the underwriter for the following issuances:

| | |
|---|---|
| Asset-Backed Certificates, Series 2007-3 | Mortgage Pass-Through Certificates, Series 2007-HE1 |
| Asset-Backed Certificates, Series 2007-4 | Mortgage Pass-Through Certificates, Series 2007-HE2 |
| Asset-Backed Certificates, Series 2007-5 | Mortgage Pass-Through Certificates, Series 2007-OA1 |

- 63 -

| | |
|---|---|
| Asset-Backed Certificates, Series 2007-6 | Mortgage Pass-Through Certificates, Series 2007-OA2 |
| Asset-Backed Certificates, Series 2007-7 | Mortgage Pass-Through Certificates, Series 2007-3F |
| Asset-Backed Certificates, Series 2007-8 | Mortgage Pass-Through Certificates, Series 2007-4F |
| Asset-Backed Certificates, Series 2007-10 | Mortgage Pass-Through Certificates, Series 2007-5F |

175.    Plaintiff acquired the Certificates pursuant and/or traceable to the Registration Statement.  Plaintiff and the Class have sustained damages as the value of the Certificates has declined substantially subsequent to the disclosures of defendants' wrongdoing.  Plaintiff has also suffered damages as a direct result of the sale of its 2007-10 Certificates at a substantial loss.

176.    At the time of their purchases of the Certificates, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the middle of 2008.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that the initial complaint in this matter was filed.  Less than three years has elapsed between the time that the securities upon which this claim is brought were offered to the public and the time the initial complaint was filed.

## SECOND CAUSE OF ACTION

### Violations of §12(a)(2) of the 1933 Act
### Against Defendants Goldman Sachs and GS Mortgage

177.    Plaintiff repeats and re-alleges the allegations above as if set forth fully herein.  For purposes of this cause of action, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act.

- 64 -

178.    By means of the defective Offering Documents, defendants Goldman Sachs and GS Mortgage promoted and sold the Certificates to plaintiff and other members of the Class.  Plaintiff purchased its Certificates for the GSAA Home Equity Trust 2007-10 directly from Goldman Sachs, with GS Mortgage as the Issuer, in a public offering.  Defendants Goldman Sachs and GS Mortgage solicited sales of the Certificates for financial gain, as they benefitted financially from the sale of the Certificates.

179.    The Offering Documents contained untrue statements of material fact, and concealed and failed to disclose material facts, as alleged above.  Goldman Sachs and GS Mortgage owed plaintiff and the other members of the Class who purchased the Certificates pursuant to the Offering Documents the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Goldman Sachs and GS Mortgage, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Offering Documents, as set forth above.

180.    Plaintiff did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Documents at the time it acquired the Certificates.

181.    By reason of the conduct alleged herein, Goldman Sachs and GS Mortgage violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased the Certificates pursuant to the Offering Documents sustained substantial damages in connection with their purchases of the Certificates.  Accordingly, plaintiff and the other members of the Class who hold the Certificates issued pursuant to the Offering Documents have the right to rescind and recover the consideration paid for their shares, with interest

- 65 -

thereon, and hereby tender their Certificates to Goldman Sachs and GS Mortgage.  Plaintiff and

other Class members who have sold their Certificates seek damages to the extent permitted by law.

### THIRD CAUSE OF ACTION

**Violations of §15 of the 1933 Act**
**Against Defendants Goldman Sachs, GSMC and the Individual Defendants**

182.    Plaintiff repeats and realleges each and every allegation contained above.  For

purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be

construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on

claims of strict liability and/or negligence under the 1933 Act.

183.    This Count is brought pursuant to §15 of the 1933 Act against Goldman Sachs,

GSMC and the Individual Defendants.

184.    GSMC owns GS Mortgage, the Issuer of the Certificates.  Goldman Sachs, in turn,

owns GSMC.  By virtue of their complete ownership of GS Mortgage, defendants Goldman Sachs

and GSMC had the power to, and did, direct GS Mortgage, and were control persons of GS

Mortgage.

185.    Each of the Individual Defendants was a control person of GS Mortgage and of the

Trusts by virtue of his or her position as a director and/or senior officer of GS Mortgage.  The

Individual Defendants were responsible for the preparation and contents of the Registration

Statement and signed the Registration Statement, which incorporated by reference the statements in

the Prospectus Supplements.

186.    Defendants Goldman Sachs, GSMC and the Individual Defendants prepared,

reviewed and/or caused the Registration Statement and Prospectus Supplements to be filed and

disseminated.

- 66 -

187.     Thus, Goldman Sachs, GSMC and the Individual Defendants were each participants in the violations alleged herein, based on their ownership of GS Mortgage and their having prepared, signed or authorized the signing of the Registration Statement and having otherwise participated in the consummation of the offerings detailed herein.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying plaintiff as Class representative;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a jury trial.

- 67 -

DATED:  October 30, 2012

ROBBINS GELLER RUDMAN
  & DOWD LLP
ARTHUR C. LEAHY
THOMAS E. EGLER
JONAH H. GOLDSTEIN
SCOTT H. SAHAM
SUSAN G. TAYLOR
RYAN A. LLORENS
NATHAN R. LINDELL
IVY T. NGO
L. DANA MARTINDALE


                    SUSAN G. TAYLOR

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
artl@rgrdlaw.com
tome@rgrdlaw.com
jonahg@rgrdlaw.com
scotts@rgrdlaw.com
susant@rgrdlaw.com
ryanl@rgrdlaw.com
nlindell@rgrdlaw.com
ingo@rgrdlaw.com
dmartindale@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
ctorres@rgrdlaw.com
jcharo@rgrdlaw.com

Lead Counsel for Plaintiff

- 68 -

783368_1

CAVANAGH & O'HARA
PATRICK J. O'HARA
407 East Adams Street
Springfield, IL 62701
Telephone: 217/544-1771
217/544-9894 (fax)

Additional Counsel for Plaintiff

783368_1

<u>DECLARATION OF SERVICE BY MAIL AND ELECTRONIC MAIL</u>

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.      That on October 30, 2012, declarant served the **FOURTH AMENDED COMPLAINT FOR VIOLATION OF §§11, 12 AND 15 OF THE SECURITIES ACT OF 1933** by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List. The parties were also served via electronic mail.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 30, 2012, at San Diego, California.

CHRISTINE CLARK

783368_1

GOLDMAN SACHS MORTGAGE
Service List - 10/30/2012  (08-0245)
Page 1 of  1

**Counsel For Defendant(s)**

Richard H. Klapper
Theodore  Edelman
D. Andrew Pietro
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004-2498
  212/558-4000
  212/558-3588 (Fax)


**Counsel For Plaintiff(s)**

Patrick J. O'Hara
Cavanagh & O'Hara
407 East Adams Street
Springfield, IL  62701
  217/544-1771
  217/544-9894 (Fax)

Samuel H. Rudman
David A. Rosenfeld
Mario  Alba Jr.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY  11747
  631/367-7100
  631/367-1173 (Fax)

Arthur C. Leahy
Thomas E. Egler
Susan G. Taylor
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
  619/231-1058
  619/231-7423 (Fax)