UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
NECA-IBEW HEALTH & WELFARE FUND, :   Civil Action No. 1:08-cv-10783-LAP
Individually and On Behalf of All Others         :
Similarly Situated,                                            :   "ECF Case"
                                                                       :
                                          Plaintiff,         :   <u>CLASS ACTION</u>
                                                                       :
                     vs.                                         :
                                                                       :
GOLDMAN, SACHS & CO., et al.,                    :
                                                                       :
                                          Defendants.   :
———————————————————— x
                                                                       :
POLICE AND FIRE RETIREMENT SYSTEM :   Civil Action No. 10 Civ. 4429-LAP
OF THE CITY OF DETROIT, Individually       :
and On Behalf of All Others Similarly Situated, :   "ECF Case"
                                                                       :
                                          Plaintiff,         :   <u>CLASS ACTION</u>
                                                                       :
                     vs.                                         :
                                                                       :
GOLDMAN, SACHS & CO., et al.,                    :
                                                                       :
                                          Defendants.   :
———————————————————— x


DECLARATION OF ARTHUR C. LEAHY IN SUPPORT OF (1) PLAINTIFFS' MOTION
FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF
ALLOCATION AND (2) PLAINTIFFS' COUNSEL'S MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND EXPENSES


1115635_3

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   FACTUAL SUMMARY OF NECA'S CLAIMS ....................................................5

III.  RELEVANT PROCEDURAL HISTORY ..............................................................7

      A.    The Commencement of the *NECA* Action and the Appointment of NECA
            as Lead Plaintiff .............................................................................................7

      B.    Three Rounds of Motions to Dismiss in a Rapidly Developing Area of
            Securities Litigation .......................................................................................9

      C.    NECA's Appeal to the Second Circuit ..........................................................15

      D.    NECA's Fourth Amended Complaint and Defendants' Motion to Dismiss..........20

      E.    NECA's Motion for Class Certification and Settlement..................................23

IV.   INVESTIGATION AND DISCOVERY ...............................................................26

      A.    Investigation....................................................................................................26

            1.    Dr. Joseph Mason..................................................................................28

            2.    Dr. Nelson Lipshutz ..............................................................................28

      B.    Discovery .........................................................................................................29

            1.    Party Document Discovery ....................................................................29

            2.    Discovery Disputes Between the Parties ...............................................32

            3.    Third-Party Discovery ...........................................................................35

            4.    Depositions ............................................................................................39

V.    THE SETTLEMENT .............................................................................................39

      A.    Settlement Negotiations and Terms.................................................................39

      B.    Preliminary Approval Order ...........................................................................41

      C.    Notice to the Settlement Class Meets the Requirements of Due Process
            and Rule 23 of the Federal Rules of Civil Procedure ....................................43

      D.    Plan of Allocation ...........................................................................................45

- i -

**Page**

E.   Questions of Law and Fact Added Risks and Uncertainty ...................................47

　　1.   Challenges to Class Certification and Maintaining a Class Through Trial..................................................................................................47

　　2.   Establishing Liability .........................................................................49

　　3.   Defendants' Affirmative Defenses .........................................................50

VI.   THE SETTLEMENT IS IN THE BEST INTERESTS OF THE SETTLEMENT CLASS AND WARRANTS APPROVAL......................................................................51

VII.   PLAINTIFFS' COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES.................................................................................................52

A.   Application for Attorneys' Fees........................................................52

　　1.   The Requested Fee Is Reasonable.............................................................53

　　2.   The Time and Labor Expended by Plaintiffs' Counsel ............................55

　　3.   The Settlement Achieved .......................................................................56

　　4.   The Risk, Magnitude and Complexity of the Litigation...........................56

　　5.   Quality of the Representation ...............................................................57

　　6.   The Reaction of the Settlement Class to Date ..........................................58

B.   Plaintiffs' Counsel's Litigation Expenses............................................59

1.      I, ARTHUR C. LEAHY, am an attorney duly licensed to practice before all of the courts of the State of California, and I have been admitted in this case *pro hac vice*.  I am a member of the firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), Lead Counsel for Lead Plaintiff and Class Representative NECA-IBEW Health & Welfare Fund ("NECA") in the action entitled *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co., et al.*, Civil Action No. 1:08-cv-10783-LAP (the "*NECA* Action"). [1]  Robbins Geller is also class counsel to the Settlement Class.  I have been actively involved in the prosecution and resolution of the *NECA* Action, am familiar with its proceedings and have personal knowledge of the matters set forth herein based on my active supervision and participation in all material aspects of the *NECA* Action.

2.      I submit this Declaration in support Plaintiffs' motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for approval of: (a) the Settlement, which provides for a cash payment of $272,000,000 (the "Settlement Amount"); and (b) the proposed Plan of Allocation.  I also submit this Declaration in support of Plaintiffs' Counsel's application for an award of attorneys' fees and expenses.

## I.      PRELIMINARY STATEMENT

3.      This Settlement, in the amount of $272,000,000, if approved, resolves the two-above captioned class actions and would represent the culmination of over seven years of hard-fought and extremely complex litigation.  The Settlement ranks among the largest residential mortgage-backed securities ("RMBS") settlements on record.  Plaintiff NECA (in the *NECA* Action) and Plaintiff Police and Fire Retirement System of the City of Detroit ("PFRS") in the action entitled *Police and Fire Retirement System of the City of Detroit v. Goldman, Sachs & Co., et al.*, Civil Action No. 10

---

[1]     Capitalized terms not otherwise defined in this Declaration have the same meaning set forth in the Stipulation and Agreement of Settlement which was previously filed with the Court (the "Stipulation") (Dkt. No. 216).

- 1 -

Civ. 4429-LAP (the "*PFRS* Action") were unyielding in their resolve to effectively prosecute every stage of the litigation against Defendants, who were vigorously represented by two of the most prestigious defense firms in the world.[2]

4.   With respect to NECA and its counsel, Robbins Geller, they achieved this Settlement through enormous effort, which included, *inter alia*: (i) an extensive investigation of the case; (ii) opposing Defendants' four motions to dismiss; (iii) fully and successfully litigating an appeal to the Second Circuit Court of Appeals, which resulted in groundbreaking precedent for Plaintiffs, the Settlement Class and other RMBS investors; (iv) propounding and responding to class certification discovery and moving for class certification with support from experts and consultants; and (v) fighting to obtain over 7.4 million pages of documents produced by Defendants and third parties. Because the body of law related to RMBS was dynamic and constantly evolving during the litigation, NECA was faced with new arguments and novel defenses at every step of the case.

5.   Despite the strength of NECA's case, which was further supported by the fruits of Robbins Geller's discovery efforts, NECA still faced significant hurdles and challenges that could have resulted in the complete dismissal of its claims or, at a minimum, a diminution in the recovery for the Settlement Class.  In particular, Defendants' arguments on the issues of class standing, legally cognizable losses under Section 11 of the Securities Act of 1933 ("Securities Act"), and the statute of limitations, presented ongoing and continuous threats throughout the litigation.  NECA's decision to settle was thus informed by its and counsel's careful evaluation of the continued threat of these, and other, risks.

6.   The parties were able to agree to the Settlement with the assistance of the Honorable Daniel Weinstein (Retired), a mediator skilled in RMBS settlements and negotiations.  The

---

[2]   The *NECA* Action and the *PFRS* Action are collectively referred to herein as the "Actions."

negotiations occurred over a multi-year period, were hard fought, and at arm's length. The $272,000,000 Settlement is an exceptional recovery, and as a percentage of the Certificates' original face value, it is among the largest recoveries in any RMBS class action to date, as reflected in the following table:

| Case[3] | District | Total Settlement | Average Recovery per Dollar of Initial Face Value[4] |
|---|---|---|---|
| 1. JP Morgan II | S.D.N.Y. | $388,000,000 | $38.77 per $1,000 |
| 2. RALI | S.D.N.Y. | $335,000,000 | $32.32 per $1,000 |
| 3. Goldman Sachs I | S.D.N.Y. | $26,600,000 | $30.52 per $1,000 |
| 4. CWALT | C.D. Cal. | $500,000,000 | $24.96 per $1,000 |
| *5. Goldman Sachs II* | *S.D.N.Y.* | *$272,000,000* | *$24.90 per $1,000* |
| 6. Nomura | D. Mass. | $21,200,000 | $18.92 per $1,000 |
| 7. Bear Stearns | S.D.N.Y. | $500,000,000 | $18.89 per $1,000 |

---

[3]    *J.P. Morgan Chase & Co.*, No. 1:09-cv-03701-JPO-JCF (S.D.N.Y.) ("JP Morgan II"); *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08-cv-8781-KPF (S.D.N.Y.) ("RALI"); *Public Employees' Retirement System of Mississippi v. Goldman Sachs Group, Inc.*, No. 1:09-cv-1110-HB (S.D.N.Y) ("Goldman Sachs I"); *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-cv-00302-MRP (C.D. Cal.) ("CWALT"); *Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 1:08-cv-10446 (D. Mass) ("Nomura"); *In re Bear Stearns Mortgage Pass-Through Certificates Litigation*, No. 1:08-cv-08093-LTS (S.D.N.Y.) ("Bear Stearns"); *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group PLC*, No. 08-5093-LAP (S.D.N.Y.) ("Harborview RBS"); *Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co. Inc.*, No. 08-cv-10841-JSR-JLC (S.D.N.Y.) ("Merrill Lynch"); *In re IndyMac Mortgage-Backed Securities Litigation*, No. 09-cv- 04583-LAK (S.D.N.Y.) ("IndyMac"); *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*, No. 08-cv-1418 (E.D.N.Y.) ("Citi"); *Mass. Bricklayers & Masons Trust Funds v. Deutsche Alt-A Sec., Inc.*, No. 08-cv-3178-LDW-ARL (E.D.N.Y.) ("Deutsche"); *Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, No. 09-cv-300-JB (D.N.M.) ("Thornburg"); *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp.*, No. 08-cv-1713-PKC (E.D.N.Y.) ("J.P. Morgan I"); *In re Wash. Mut. Mortg.-Backed Sec. Litig.*, No. C09- 0037-MJP (W.D. Wash.) ("WaMu"); *In re Wells Fargo Mortg.-Backed Certificates Litig.*, No. 09-CV-1376-LHK (N.D. Cal.) ("Wells Fargo"); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09-cv-2137-KBF (S.D.N.Y.) ("Morgan Stanley"); *In re Lehman Brothers Mortgage-Backed Securities Litigation*, No 08-CV-6762-LAK (S.D.N.Y.) ("Lehman").

[4]    The average recovery per dollar of initial face value is a metric that allows for comparison of settlements across RMBS purchaser class actions on a normalized basis. Because the size of the offerings covered by RMBS class actions varies considerably, comparison of the aggregate dollar amount of RMBS settlements can lead to skewed results.

| 8. Harborview (RBS) | S.D.N.Y. | $275,000,000 | $16.73 per $1,000 |
| 9. Merrill Lynch | S.D.N.Y. | $315,000,000 | $15.57 per $1,000 |
| 10. IndyMac | S.D.N.Y. | $340,000,000 | $14.42 per $1,000 |
| 11. Citi | E.D.N.Y. | $24,975,000 | $13.25 per $1,000 |
| 12. Deutsche | E.D.N.Y. | $32,500,000 | $12.80 per $1,000 |
| 13. Thornburg | D.N.M. | $11,250,000 | $12.10 per $1,000 |
| 14. J.P. Morgan I | E.D.N.Y. | $280,000,000 | $11.95 per $1,000 |
| 15. WaMu | W.D. Wash. | $26,000,000 | $10.66 per $1,000 |
| 16. Wells Fargo | N.D. Cal. | $125,000,000 | $2.70 per $1,000 |
| 17. Morgan Stanley | S.D.N.Y. | $95,000,000 | $2.63 per $1,000 |
| 18. Lehman | S.D.N.Y. | $40,000,000 | $0.37 per $1,000 |

7. The seven-year prosecution of the *NECA* Action required my firm and our professional support staff to perform over 21,000 hours of work. Robbins Geller has at all times assumed the responsibility of litigating the *NECA* Action on a wholly contingent basis and has advanced all expenses association with this action, including prosecuting the appeal to the Second Circuit, and opposing Defendants' petition for certiorari to the Supreme Court. More than that, my firm committed itself and advanced the *NECA* Action on a contingency basis at a time ***before*** other RMBS class actions were being filed, let alone surviving motions to dismiss. Robbins Geller's only prospect of getting compensated was thus securing a recovery for the benefit of the Settlement Class by settlement or judgment. As the declarations of PFRS' counsel filed concurrently herewith attest, they and PFRS similarly litigated the *PFRS* Action. Therefore, Plaintiffs' Counsel are now applying for attorneys' fees in the amount of 21% of the Settlement Amount.

8. In entering into the Stipulation, NECA was fully aware of the legal and factual strengths and weaknesses of the *NECA* Action. Based upon an evaluation of the facts and the law, and a cost-benefit analysis taking into account the risks of ongoing litigation, both NECA and Robbins Geller concluded that the Settlement was an excellent result for the Settlement Class. Accordingly, I respectfully submit that the proposed Settlement is fair, reasonable, and adequate.

- 4 -

9.      From the outset of the litigation, NECA supervised Robbins Geller, participated in all material aspects of the litigation, remained informed throughout the settlement negotiations, and ultimately approved the Settlement.

## II.      FACTUAL SUMMARY OF NECA'S CLAIMS

10.      The *NECA* Action asserted claims brought pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act on behalf of all persons or entities who acquired asset-backed certificates in various RMBS offerings of the Defendants issued pursuant and/or traceable to a false and misleading Registration Statement, along with its accompanying false and misleading Prospectus Supplements filed during 2007 and 2008, each of which was expressly incorporated by reference into the Registration Statement.

11.      The Certificates that are the subject of the Settlement were issued out of the following 14 Trusts: GSAA Home Equity Trust 2007-3; GSAA Home Equity Trust 2007-4; GSAA Home Equity Trust 2007-5; GSAA Home Equity Trust 2007-6; GSAA Home Equity Trust 2007-7; GSAA Home Equity Trust 2007-8; GSAA Home Equity Trust 2007-10; GSAMP Trust 2007-HE1; GSAMP Trust 2007-HE2; GSR Mortgage Loan Trust 2007-OA1; GSR Mortgage Loan Trust 2007-OA2; GSR Mortgage Loan Trust 2007-3F; GSR Mortgage Loan Trust 2007-4F; and GSR Mortgage Loan Trust 2007-5F.

12.      Defendants are Goldman, Sachs & Co. ("Goldman Sachs"), the underwriter in the sale of the Certificates; Goldman Sachs Mortgage Company ("GSMC"), the sponsor of the Certificate offerings; GS Mortgage Securities Corp. ("GS Mortgage"), the depositor and issuer of the Certificates; and three individuals – Daniel L. Sparks, Michelle Gill and Kevin Gasvoda (the "Individual Defendants") – who served as officers or directors of GS Mortgage during the relevant time period.

1115635_3

13. On January 31, 2007, Defendant GS Mortgage caused a Registration Statement to be filed with the U.S. Securities and Exchange Commission ("SEC") in connection with and for the purpose of issuing billions of dollars of Certificates. The Certificates were issued pursuant to Prospectus Supplements, each of which was incorporated into the Registration Statement (collectively, the "Offering Documents").

14. The *NECA* Action alleged that Defendants caused the Offering Documents to contain materially false and misleading statements and omissions concerning the Certificates and the loans underlying them, in violation of the Securities Act. Specifically, the Offering Documents were alleged to contain false and misleading statements and omissions concerning: (1) underwriting guidelines purportedly used to originate the mortgage loans underlying the Certificates; (2) the appraisal of the properties underlying the loans; (3) the loan-to-value ("LTV") ratios of the loans; and (4) the credit ratings assigned to the Certificates.

15. By mid-2008, the dismal performance of the mortgage loans that secured the Certificates began to be publicly revealed, and the Certificates' credit ratings were downgraded. In September 2010, the Financial Crisis Inquiry Commission revealed Defendants had lied about the Certificates and loans in the Offering Documents.

16. At the time the *NECA* Action was filed in 2008, the "AAA" rated Certificates that NECA had bought had been downgraded or put on negative watch. The Certificates were no longer marketable in the secondary market at prices anywhere near the prices paid by NECA and the class in the *NECA* Action. In fact, the value of the Certificates at the time the *NECA* Action was filed had plunged to fractions of the prices paid for them, thereby causing recoverable damages under the Securities Act.

### III.    RELEVANT PROCEDURAL HISTORY

#### A.    The Commencement of the *NECA* Action and the Appointment of NECA as Lead Plaintiff

17.     On December 11, 2008, NECA filed the Initial Complaint in the *NECA* Action, a putative class action captioned *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co., et al.*, No. 1:08-cv-10783-MGC, originally assigned to Judge Cedarbaum.  The Initial Complaint alleged claims under the Securities Act on behalf of all persons or entities who had acquired asset-backed certificates in 17 offerings pursuant and/or traceable to GS Mortgage's January 31, 2007 Registration Statement (Registration No. 333-139817) and its accompanying Prospectus Supplements that were filed with the SEC between 2007 and 2008 ("Initial Complaint").  Dkt. No. 1.

18.     The Initial Complaint named as defendants Goldman Sachs, GSMC, GS Mortgage, the Individual Defendants, and 17 RMBS trusts that issued certificates (the 14 listed in ¶11, above, plus GSAMP 2007-FM2, GSAMP 2007-HSBC1, and STARM 2007-4).

19.     On February 9, 2009, NECA moved to be appointed lead plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §77z-1, *et seq*., and sought the Court's approval of its selection of Robbins Geller (then known as Coughlin Stoia Geller Rudman & Robbins LLP) as lead counsel.  Dkt. Nos. 3-6.

20.     On the same day, the Public Employees' Retirement System of Mississippi ("MissPERS") also moved to be appointed lead plaintiff.  Dkt. Nos. 7-10.  MissPERS had filed a separate class action three days earlier in this District which was assigned to Judge Cedarbaum as "possibly similar" to the *NECA* Action.  Dkt. No. 8; *see generally Public Employees' Retirement System of Mississippi v. Goldman Sachs Group, Inc.*, No. 09-cv-1110 (the "MissPERS action").  MissPERS explained that its motion for appointment as lead plaintiff in the *NECA* Action was filed

- 7 -

"out of an abundance of caution" to preserve its right to be granted lead plaintiff status "should the cases be deemed related and consolidated." Dkt. No. 8 at 9.

21.     On February 23, 2009, the Court entered the parties' stipulation that Defendants' obligation to respond to the Initial Complaint would be excused until the Court appointed a lead plaintiff and that the parties would subsequently confer regarding the operative pleading in the *NECA* Action. Dkt. No. 11.

22.     NECA filed its opposition to MissPERS' lead plaintiff motion on February 25, 2009, and on March 3, 2009, filed its reply in further support of NECA's competing motion. Dkt. Nos. 13, 19.

23.     At a March 5, 2009 hearing on the lead plaintiff motions, the Court issued an oral ruling that the MissPERS action was not related to the *NECA* Action. Accordingly, MissPERS subsequently withdrew its lead plaintiff motion in the *NECA* Action. Dkt. Nos. 21-22. At the March 5, 2009 hearing, the Court also ruled that NECA must first effectuate service on each of the 17 RMBS trusts named as defendants in the Initial Complaint for its lead plaintiff motion to be heard, and denied the lead plaintiff motion "as premature." Dkt. No. 23.

24.     On March 11, 2009, after meeting the Court's service requirements, NECA submitted its amended motion for appointment as lead plaintiff in accordance with the Court's prior order. Dkt. Nos. 24-25.

25.     On April 2, 2009, the Court issued an oral ruling appointing NECA as lead plaintiff and approving its selection of Robbins Geller as lead counsel. The Court then recognized the exceptional nature of the *NECA* Action in that no other law firm was willing to assume the risk of prosecuting this case, "I think this is the first purported class action I've ever had where there was no competition for lead plaintiff." Dkt. No. 40 at 20:10-14.

- 8 -

B. **Three Rounds of Motions to Dismiss in a Rapidly Developing Area of Securities Litigation**

26.     On May 15, 2009, NECA filed an 88-page Amended Complaint for Violation of Sections 11, 12 and 15 of the Securities Act of 1933 ("Amended Complaint"). Dkt. No. 41. The Amended Complaint asserted claims related to the same 17 offerings identified in the Initial Complaint, and alleged that the Registration Statement and the 17 Prospectus Supplements (each of which was explicitly incorporated into the Registration Statement) misrepresented: (i) the underwriting standards used in connection with the origination of the underlying mortgage loans; (ii) the appraisal practices used in connection with the properties underlying the mortgage loans; (iii) the LTV ratios of the underlying mortgage loans; (iv) the debt-to-income ("DTI") ratios on the loans; and (v) the credit ratings of the Certificates. The Amended Complaint contained detailed allegations about residential mortgage lending, the secondary market for mortgage loans, the securitization process, and the market for sub-prime and Alt-A loans such as those held by the RMBS trusts. The Amended Complaint also pled each of the allegedly misleading statements in the Offering Documents, and set forth in detail why those statements were false and misleading. It further alleged that the misstatements and omissions were the cause of NECA's and the class in the NECA Action's losses. The Amended Complaint named as defendants Goldman Sachs, GSMC, GS Mortgage, SunTrust Robinson Humphrey, Inc. and the Individual Defendants.

27.     On August 19, 2009, Defendants filed a motion to dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(1) based on lack of standing, and under Rule 12(b)(6) based on failure to state a claim and barred by the statute of limitations. Dkt. Nos. 57, 60-61. Defendants argued, *inter alia*, that NECA lacked standing to assert claims on behalf of purchasers of securities that it did not itself purchase, and that the Amended Complaint was insufficient in that it failed to plead a cognizable economic loss or actionable misstatements. Dkt. No. 60.

- 9 -

28.     On September 9, 2009, NECA filed a 45-page opposition memorandum to Defendants' motion to dismiss, arguing, *inter alia*, that NECA had standing to assert claims on behalf on an entire class of proposed investors because each investor purchased pursuant to the same Registration Statement, that the Amended Complaint adequately stated a claim as the misrepresentations and omissions alleged were material, and were not disclosed to investors as false and misleading, contrary to Defendants' contentions.   Dkt. No. 62.   NECA also argued that Defendants' statute of limitations argument was meritless, as none of the information about the lending industry pointed to by Defendants would have reasonably put NECA on notice of the facts giving rise to its claims more than one year before the *NECA* Action was filed.   *Id.*

29.     On September 17, 2009, the Court issued an oral ruling granting Defendants' motion to dismiss the Amended Complaint with leave to amend, affording NECA leave to file a "clearer and more specific" amended complaint.   The Court also ordered supplemental briefing on whether NECA could assert claims on behalf of purchasers in RMBS offerings from which it did not itself buy.   Dkt. No. 67 at 38:8-41:9.

30.     On October 1, 2009, NECA submitted a supplemental memorandum in support of its standing to assert claims on behalf of all purchasers of the certificates from offerings that were issued pursuant to one Registration Statement.   Dkt. No. 68.   The same day, Defendants also submitted supplemental briefing arguing that NECA did not have standing.   Dkt. No. 69.

31.     On November 9, 2009, NECA filed the Second Amended Complaint ("SAC").   Dkt. No. 71.   On December 11, 2009, Defendants moved to dismiss the SAC on four main grounds: (i) NECA's purported lack of standing to assert claims under Sections 11 or 12(a)(2) with respect to securities it did not itself buy; (ii) NECA's purported failure to plead a cognizable economic loss; (iii) NECA's purported failure to identify any actionable misstatements or omissions; and (iv) the

- 10 -

statute of limitations, which, Defendants argued, barred NECA's claims because a "sea of public information" was available to NECA more than one year before the Initial Complaint was filed which would have put NECA on "inquiry notice." Dkt. No. 74. NECA filed a 60-page opposition to Defendants' motion on January 6, 2010. Dkt. No. 75. Defendants filed their reply on January 15, 2010 (Dkt. No. 77), but the continuous evolution of the law in RMBS cases required the parties to file notices of recent authority for the Court's consideration, up until January 27, 2010, a day before the motion to dismiss hearing.

32.     At the hearing on January 28, 2010, the Court issued an oral ruling granting Defendants' motion to dismiss the SAC, holding that NECA lacked standing to assert claims on behalf of purchasers of certificates in 15 of the 17 offerings alleged in the SAC because NECA did not purchase certificates in the 15 offerings. Dkt. No. 86 at 40:5-43:24. The Court recognized that NECA's argument that it had standing for all 17 offerings was at that time "a very unusual position under our law." *Id.* at 5:23-25.

33.     At the hearing, the Court also found that the SAC's allegations "do not support any conceivable damages." Dkt. No. 86 at 41:22-24. NECA was granted leave to amend and ordered to include facts sufficient to permit an inference that it suffered a cognizable loss, including facts alleging the existence of a market for the certificates at issue, and to verify what specific certificates it purchased and whether it purchased in the offerings. The Court also ordered NECA to replead its claims with respect to only the two offerings from which it purchased, thus ordering NECA to discontinue alleging claims on behalf of the 15 other offerings in which it did not purchase certificates. *Id.* at 40:5-45:6; 26:14-17.

34.     On March 31, 2010, NECA filed the Third Amended Complaint ("TAC"). Dkt. No. 88. The TAC alleged claims on behalf of purchasers from the two offerings in which NECA

- 11 -

purchased.  On April 26, 2010, PFRS sought leave to intervene as a named plaintiff in the *NECA* Action to represent purchasers of GSR 2007-4F trust, a trust among the 17 that were included in the Amended Complaint but later dismissed pursuant to the Court's ruling on standing.  Dkt. No. 89. The Court denied PFRS' motion to intervene during a hearing on May 27, 2010, but allowed PFRS to file its own class action.  PFRS subsequently did file its own action, which is known as the *PFRS* Action and which is part of the Settlement now before the Court.

35.     During the May 27, 2010 hearing denying PFRS' motion to intervene, the Court requested that NECA and Defendants each submit supplemental authority in support of their respective positions on what constituted a legally cognizable injury under the Securities Act.  Dkt. No. 94 at 39:1-3.  NECA submitted a letter on June 10, 2010 in response to the Court's request, pointing out that: (i) the TAC alleged damages under Section 11, as a plaintiff did not need to sell its securities in order to suffer a legally cognizable loss, so long as the plaintiff alleges a decline in the value of its securities; (ii) the TAC alleged a cognizable claim under Section 12, as NECA offered to tender its securities back to Defendants; and (iii) in any event, the sufficiency of damage allegations is not properly resolved on a motion to dismiss.

36.     Thereafter, Defendants moved to dismiss the TAC.  Dkt. Nos. 97-99.  NECA filed a 55-page opposition on August 10, 2010 (Dkt. No. 100), and Defendants replied on August 11, 2010 (Dkt. No. 102).

37.     On September 22, 2010, the Court heard argument on Defendants' motion to dismiss and issued an oral ruling denying Defendants' motion as to NECA's Sections 12 and 15 claims. Dkt. No. 106 at 57:6-20.  The Court reserved judgment on NECA's Section 11 claims and took them under submission.  *Id.*  On October 4, 2010, NECA filed a supplemental memorandum in response to Defendants' argument asserted for the first time at the September 22 hearing that a plaintiff who

- 12 -

continues to hold its securities at the time of suit may only state a claim for damages under Section 11 if the securities are traded in an efficient, or actively traded market.  Dkt. No. 104.

38.     On October 15, 2010, the Court entered a written order dismissing the Section 11 claims, holding that NECA had no legally cognizable injury because (a) the TAC did not allege an actual failure to receive the periodic payments due under the certificates, and (b) NECA had not sold its certificates at a loss.  Dkt. No. 107.

39.     On October 29, 2010, NECA moved for reconsideration of the Court's dismissal order with respect to its Section 11 claims.  Dkt. Nos. 114-115.  Defendants filed an opposition on November 12, 2010.  Dkt. No. 116.  On November 16, 2010, the Court denied NECA's motion. Dkt. No. 118.

40.     On December 9, 2010, NECA filed a Motion for Entry of Final Judgment Pursuant to Rule 54(b) or, Alternatively, Certification of an Interlocutory Appeal Pursuant to 28 U.S.C. §1292(b).  Dkt. Nos. 120-121.  NECA argued that entry of final judgment as to its Section 11 claim was warranted because the Court's October 15, 2010 dismissal order as to NECA's Section 11 claim and the subsequent denial of NECA's motion for reconsideration constituted a "final" judgment that was "separable and extricable from any remaining claims" and that "there was no just reason for delay[ing]" entry of judgment.  Dkt. No. 121 at 3.  Defendants filed their opposition to NECA's motion on December 23, 2010, arguing, *inter alia*, that NECA failed to meet the standard for a final judgment, and the presence of overlapping issues between NECA's dismissed Section 11 claim and its remaining Sections 12 and 15 claims would result in "piecemeal appeals" if NECA's interlocutory appeal was certified.  Dkt. No. 123.  NECA's reply in further support of its motion, filed on January 6, 2011, highlighted the finality of the Court's previous rulings with respect to the Section 11 claim, and argued that certification of an interlocutory appeal was appropriate because the

- 13 -

Second Circuit would be able to resolve the question "quickly and cleanly without having to study the record." Dkt. No. 124 at 6 (internal citation omitted).

41.     On December 10, 2010, Defendants filed their Answer to the TAC.  Dkt. No. 122.

42.     At a January 11, 2011 hearing, the Court denied NECA's request to enter judgment or certify an interlocutory appeal.  Dkt. No. 126; *see also* Dkt. No. 125 (Memo Endorsement denying NECA's motion, entered January 14, 2011).

43.     On February 8, 2011, NECA filed its Motion for Leave to File an Amended Complaint and for Relief Pursuant to Fed. R. Civ. P. 60(b).  Dkt. Nos. 128-129.  In the motion, NECA informed the Court that on November 22, 2010, it sold GSAA 2007-10 certificates for 68% of their face value, realizing a substantial loss from its initial purchase price of 99.44% of face value. NECA requested leave to amend the TAC to allege the sale of the certificates at a loss, and for the Court to reinstate its cause of action under Section 11 since the Court had previously suggested that a sale at a loss would allege a legally cognizable injury under Section 11.  *See, e.g.*, Dkt. No. 106 at 16:1-13; 17:6-10.  Defendants filed an opposition on February 23, 2011 (Dkt. No. 133).  NECA filed its reply in further support of its motion on March 1, 2011.  Dkt. No. 135.

44.     At a hearing on March 3, 2011, the Court denied NECA's motion to amend or reinstate its Section 11 claims and also suggested that all of NECA's claims, including its Section 12 rescission claims may have been extinguished due to NECA's sale of its certificates.  Dkt. No. 142 at 14:21-15:25; Dkt. No. 137.  The Court indicated that NECA would be able to file a formal application for the entry of judgment.  *Id.* at 15:24-16:9.

45.     On April 5, 2011, NECA moved alternatively for clarification of the Court's March 3, 2011 Order, or for entry of final judgment.  Dkt. No. 144.  On May 5, 2011, the Court held a hearing

on NECA's motion, and on June 10, 2011, the Court entered an order, granting NECA's motion for entry of a final judgment, and judgment was entered.  Dkt. Nos. 145, 151.

### C.   NECA's Appeal to the Second Circuit

46.   On July 6, 2011, NECA filed a Notice of Appeal to the United States Court of Appeals for the Second Circuit from: (a) the September 18, 2009 Memo Endorsement dismissing the Amended Complaint with leave to amend (Dkt. Nos. 66-67); (b) the January 28, 2010 Memo Endorsement dismissing the SAC with leave to amend (Dkt. Nos. 85-86); (c) the October 14, 2010 Opinion dismissing NECA's Section 11 claims (Dkt. No. 107); (d) the November 16, 2010 Memorandum Order denying NECA's motion for reconsideration of the October 14, 2010 dismissal (Dkt. No. 118); (e) the January 14, 2011 Memo Endorsement denying NECA's motion for entry of judgment under Rule 54(b) or, alternatively, for certification of an interlocutory appeal pursuant to 28 U.S.C. §1292(b) (Dkt. Nos. 125-126); (f) the March 3, 2011 Memo Endorsement denying NECA's motion for leave to file an amended complaint and for relief pursuant to Rule 60(b) (Dkt. No. 137, 142); and (g) the Amended Order entered on June 10, 2011 directing final judgment. (Dkt. No. 151).

47.   NECA's 65-page opening appeal brief was filed on August 24, 2011.  *See* Brief of Plaintiff-Appellant, *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., et al.*, No. 11-2762-cv (2d Cir. Aug. 24, 2011).  In the brief, NECA argued that the District Court erred by dismissing the TAC for failure to state a claim under Sections 11, 12 and 15 of the Securities Act. *Id.* at 42-53.  As opposed to complaints alleging fraud claims, which would be subject to heightened pleading standards, NECA maintained that Sections 11 and 12 merely requires a plaintiff to meet the "minimal burden" of alleging that a registration statement or prospectus contained a false and misleading statement.  Thus, by setting forth each Defendant's false and misleading statement in the

TAC and explaining why it was false, NECA argued that it had made a *prime facie* showing and met its burden for stating a claim. *Id.* at 42-45. Further, NECA maintained that it had stated a cognizable claim for injury under Sections 11 and 12(a)(2) of the Securities Act by alleging diminution in value of the certificates it purchased. *Id.* at 45-53. NECA put forth case law to support the proposition that "plaintiffs who retain possession of securities at the time of suit – like [NECA] here – need only allege a decline in value in order to state a cognizable claim for injury under §11," and that the continued receipt of monthly payments did not undermine its contention. *Id.* at 49-51 (collecting cases). Further, NECA argued that it had alleged the existence of a secondary market which was sufficient to gauge the decline in the value of the certificates, regardless of whether the secondary market was efficient. *Id.* at 51-53.

48. Further, NECA argued that the District Court erred by ruling that NECA lacked standing to allege claims on behalf of investors with respect to certificates flowing from the same Registration Statement that NECA did not itself purchase. *Id.* at 53-65. NECA argued that it had standing to represent purchasers of certificates from trusts from which NECA did not itself purchase because the certificates from those trusts were all traceable to and issued pursuant to the very same Registration Statement that NECA had purchased its certificates from. *Id.* at 55-56. Further, NECA argued that the single Registration Statement common to all the purchasers' certificates was "rife with misstatements," which meant that each of the misstatements and omissions were common to "*every* Trust – and to *every* Certificate issued." *Id.* at 58 (emphasis in original). NECA put forth authority that showed under similar factual circumstances, courts have not limited standing to only those securities purchased by plaintiffs. *Id.* at 55-61. Similarly, NECA argued that the District Court's standing rulings were prematurely addressed at the motion to dismiss stage of the litigation,

citing cases where courts have addressed Article III standing only at the class certification stage.  *Id.* at 62-65.

49.    Goldman Sachs filed its 58-page response brief on September 30, 2011.  *See* Brief for Defendants-Appellees, *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., et al.*, No. 11-2762-cv (2d Cir. Sept. 30, 2011).  First, Defendants argued that the District Court correctly ruled that NECA did not have standing to bring claims on behalf of investors of certificates from trusts that NECA did not purchase, and indeed went one step further to suggest that the District Court limited NECA's standing to only the tranches that NECA purchased.  *Id.* at 12-22.  Second, Defendants challenged the adequacy of the TAC, arguing that Section 11 requires NECA to suffer actual losses from missed monthly payments rather than a reduction in value.  *Id.* at 27-31. Defendants argued that even if pleading a decline in value was sufficient under Section 11, NECA failed to allege facts supporting a permissible inference that the value of the certificates had declined.  *Id.* at 31-34.  Third, Defendants put forth alternative grounds for the Second Circuit to affirm the dismissal of the TAC, arguing, *inter alia*, that NECA's claims were time barred because of its supposed "inquiry, if not actual, notice of the alleged misrepresentations challenged here well before [a year prior to bringing this action]."  *Id.* at 37-56, 40.  Fourth, Defendants argued that the District Court's decision denying NECA leave to file a Fourth Amended Complaint was not an abuse of discretion.  *Id.* at 56-58.

50.    NECA's 34-page reply brief was filed on October 12, 2011.  *See* Plaintiff-Appellant's Reply Brief, *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., et al.*, No. 11-2762-cv (2d Cir. Oct. 12, 2011).  NECA's Reply began by reasserting that its loss allegations were sufficiently pled under Section 11, and that NECA had standing at the "offering" level, "tranche" level, and at the "Registration Statement" level.  *Id.* at 2-14.  NECA also addressed Defendants'

alternative grounds for the Second Circuit to affirm the dismissal of the TAC. *Id.* at 15-31. Lastly, NECA addressed Defendants' leave-to-amend arguments and requested that the Second Circuit order that NECA be allowed to amend after deciding the appeal. *Id.* at 31-33.

51.     On February 3, 2012, the Second Circuit heard oral argument. *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., et al*., No. 11-2762-cv (2d Cir. Feb. 3, 2012).

52.     Defendants also filed two letters pursuant to Federal Rule of Appellate Procedure 28(j), advising the Court of pertinent and significant authorities that came to their attention after the appeal was fully briefed. These two letters and NECA's responses, filed November 1, 2011 and June 28, 2012, respectively, further illustrate the evolving nature of the law on issues related to RMBS and throughout the *NECA* Action.

53.     On September 6, 2012, the Second Circuit affirmed the District Court's prior rulings in part and vacated them in part, remanding the *NECA* Action for further proceedings. *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1624, 185 L. Ed. 2d 576 (Mar. 18, 2013). In a huge win for NECA, the putative class it sought to represent, and RMBS investors, the Second Circuit held that NECA had "class standing" as to certain securities in which it did not invest, namely those that implicated the "***same set of concerns***" as the securities that NECA did purchase. *Id.* at 162-65 (emphasis added). Further, the Court of Appeals held that "[i]n the context of §§11 and 12(a)(2) claims alleging misstatements about ***origination guidelines***, we think that differences in the identity of the originators backing the Certificates matters for the purposes of assessing whether those claims raise the ***same set of concerns***." *Id.* at 163 (emphasis added and in original). Applying this sweeping new standard to the facts of the case, the Second Circuit explicitly reinstated five additional offerings, finding that NECA had sufficiently alleged the commonality of originators between the two offerings in which it

- 18 -

purchased (GSAA 2007-5 and GSAA 2007-10) and five additional offerings from which it did not purchase (GSAA 2007-3, GSAA 2007-4, GSAA 2007-6, GSAA 2007-7, GSR 2007-3F).

54.     The Second Circuit also held that NECA sufficiently pled injury under Section 11 by alleging diminution in value of the certificates. *Id.* at 166 ("NECA, as it was required to do, plausibly pled a cognizable injury – a decline in value – under §11.").

55.     The Second Circuit's decision in *NECA* was recognized as a significant victory for RMBS investors, with very positive implications for expanding class action standing. *See, e.g.*, Michael Carlinsky & Alexei Tsybine, *Second Circuit Breathes New Life Into Class Standing*, N.Y. Law Journal, Oct. 30, 2012, at 4 ("The Second Circuit's decision in NECA permitting a broader class of investors to be joined into a single class action is a potential game changer for future lawsuits involving alleged securities fraud. . . .   In short, on many levels, the Second Circuit's NECA decision is pivotal . . . breathing new life into RMBS lawsuits brought by investors.").   Indeed, Defendants also begrudgingly conceded the magnitude of NECA's success. *See* Petition for a Writ of Certiorari, at 2-3 ("The stakes implicated by the Second Circuit's new and expansive standard for class standing are difficult to overstate. . . .   Moreover, the new standard threatens to expand the scope of class actions in many other areas of the law."); *NECA*, 133 S. Ct. 1624 (Mar. 18, 2013).

56.     Defendants' Petition for a Writ of Certiorari to the Supreme Court was filed on October 26, 2012.  Defendants spared no expense in their bid for Supreme Court review, employing a team of the nation's top appellate advocates, led by former Solicitor General of the United States Theodore Olson and Mark Perry of Gibson, Dunn & Crutcher LLP.

57.     NECA filed its Brief in Opposition to Petition for a Writ of Certiorari on February 19, 2013.

58.     The Supreme Court denied Defendants' petition on March 18, 2013.

59.     The significant efforts of NECA and its counsel in undertaking the appeal is noteworthy, and included, *inter alia*: (i) the initial phase of the appeal process consisting of analyzing the record, evaluating relevant issues and arguments, analyzing the Federal Rules of Appellate Procedure and Local Rules and Internal Operating Procedures of the Second Circuit, preparing the record on appeal, conferring with the Court of Appeals and Defendants; (ii) researching and drafting the Opening Brief, responses to both of Defendants' Rule 28(j) letters, and the Reply Brief; (iii) preparing for and presenting oral argument to the Second Circuit; (iv) analyzing the Second Circuit's decision and anticipating Defendants' potential petitions for rehearing, rehearing *en banc*, or for certiorari to the Supreme Court; and (v) researching and successfully opposing Defendants' petition for certiorari.  The *NECA* decision from the Second Circuit was a groundbreaking ruling which clarified the law of standing for RMBS investors in this Circuit and in fact greatly expanded the scope and number of investors entitled to sue in not only the *NECA* and *PFRS* Actions, but in numerous RMBS class actions throughout the nation.

### D.     NECA's Fourth Amended Complaint and Defendants' Motion to Dismiss

60.     On October 1, 2012, shortly after the Second Circuit's opinion was issued, this Court held a status conference and directed NECA to file an amended complaint within 30 days.

61.     On November 5, 2012, while Defendants' certiorari petition was still pending, NECA filed the Fourth Amended Complaint for Violation of Sections 11, 12 and 15 of the 1933 Act ("FAC") pursuant to the Court's instruction.  Dkt. No. 157.  The FAC alleged claims regarding 14 Offerings: seven Offerings that the Second Circuit had explicitly reinstated from the SAC ("Reinstated Offerings"), and seven additional Offerings that raised the "same set of concerns" in accordance with the Second Circuit's opinion ("Additional Offerings").  NECA alleged that loans originated by Defendant GSMC – all underwritten to the same uniform purchasing guidelines – were

- 20 -

prominently included in all 14 Offerings, thereby raising the "same set of concerns" and giving NECA standing as to all of the Offerings.

62.     Immediately after Defendants' certiorari petition was denied, the parties resumed the meet-and-confer process regarding the status of the litigation, including the parties' positions regarding the scope of both the *NECA* Action and Defendants' anticipated motion to dismiss the FAC.  On May 7, 2013, the Court held a status conference, in which it instructed the parties to meet and confer to narrow the issues in Defendants' forthcoming motion to dismiss to only those not previously addressed in the Court's prior dismissal orders.  On August 7, 2013, the parties submitted a joint letter containing their respective positions.  The parties agreed that Defendants may seek dismissal on standing grounds for all claims related to the Additional Offerings, but were unable to agree on whether this Court had previously considered and addressed Defendants' alternate grounds for dismissal involving: (a) NECA's credit rating allegations; (b) NECA's misrepresentation allegations; (c) NECA's appraisal allegations; (d) NECA's LTV allegations; (e) NECA's underwriting allegations; and (f) Defendants' statute of limitations arguments.  On February 25, 2014, the parties appeared before the Court to discuss the joint letter.  The Court evaluated the parties' positions and directed Defendants to file their motion to dismiss pursuant to a briefing schedule agreed to by the parties.

63.     Defendants' motion to dismiss the FAC, dated April 18, 2014, centered around whether the "mandate rule" – which provides that a district court is obligated to follow the decision of the appellate court on remand – precluded NECA's standing for the seven Additional Offerings. Dkt. No. 167.  Defendants also argued that the Section 11 claims against GSMC and the Individual Defendants should be dismissed because those parties are not "enumerated parties" subject to Section 11 liability under existing case law.  *Id.* at 8-13.  Defendants also raised various alternate

- 21 -

grounds for dismissal that the Court addressed in the *PFRS* Action, which was decided during the pendency of parties' meet and confer efforts in the *NECA* Action.  *Id.* at 13-17; *see also Police & Fire Ret. Sys. of Detroit v. Goldman, Sachs & Co.*, No. 10 Civ. 4429 (MGC), 2014 WL 1257782 (S.D.N.Y. Mar. 27, 2014).

64.     NECA's opposition, dated May 20, 2014, argued that the mandate rule would not apply because the additional information alleged by the FAC – namely the allegation that GSMC was a common originator across all 14 Offerings – clearly satisfied the Second Circuit's new test for class standing.  Dkt. No. 169 at 8-13.  Further, NECA argued that the FAC sufficiently pled a Section 11 claim against GSMC and the Individual Defendants.  *Id.* at 13-18.  Lastly, NECA reasserted its position that Defendants' various alternate grounds for dismissal had all been disposed of and rejected by this Court in previous written and oral rulings.  *Id.* at 18-25.  On June 10, 2014, Defendants filed their reply.  Dkt. Nos. 170-171.

65.     On July 10, 2014, the Court issued a series of oral rulings substantially upholding NECA's claims for the seven Reinstated Offerings, but dismissing its claims for the seven Additional Offerings.  Dkt. No. 177 at 31:11-32:7.  The Court indicated that it was bound by the mandate rule, but the question of whether NECA can re-plead its claims for the Additional Offerings was an appropriate matter for the Second Circuit to decide on a future appeal:

> MR. OLTS: Clearly at the time that we pled the second amended complaint, there was no reason for us to plead the standing rule that NECA set forth.  And what we're simply saying is we should be given at least one opportunity to meet that pleading standard.
>
> MR. KLAPPER: Well, your Honor, the mandate rule precludes that.
>
> THE COURT: That's the whole point of it, right?
>
> MR. OLTS: The mandate rule is inapplicable in cases where there's been a change in the law.  And I don't think Mr. Klapper can argue that NECA wasn't a change in the law.  His own petition for certiorari says it multiple times.

THE COURT: That you'll have to argue to the Court of Appeals.  You can't argue it to me.  I am bound by what the Court of Appeals has said.

Dkt. No. 177 at 5:22-6:11.  The Court also dismissed NECA's Section 11 claims against GSMC but upheld them against the Individual Defendants.  *Id.*  Further, the Court dismissed NECA's credit ratings allegations but denied Defendants' remaining grounds for dismissal.  *Id.* at 32:1-5.

66.    On July 28, 2014, NECA filed a motion requesting certification of an interlocutory appeal of the July 10, 2014 Order, arguing that "the issue of whether plaintiff has standing for the [Additional] Offerings is uniquely well suited for interlocutory review" under 28 U.S.C. §1292(b).  Dkt. No. 181 at 1.  Defendants opposed the motion, arguing that strict §1292(b) standards require that there be a "substantial ground for difference of opinion [as to a controlling question of law]," which was not present there.  Dkt. No. 183 at 2.  On November 13, 2014, the Court held a hearing on NECA's motion but reserved judgment.  *See* Dkt. No. 190.

67.    On January 6, 2015, the Court entered an order denying NECA's motion, finding that it did not meet the standard for immediate appellate review as set forth by 28 U.S.C. §1292(b).  *See* Dkt. No. 192 at 10 ("Because of the lack of substantial ground for difference of opinion as to whether NECA may replead claims based on the [Additional] Offerings, NECA's motion for interlocutory appeal is denied.").

68.    Defendants filed their Answer to the FAC on September 30, 2014, during the pendency of NECA's motion for interlocutory review.  Dkt. No. 189.

E.    **NECA's Motion for Class Certification and Settlement**

69.    On January 30, 2015, the parties filed an Amended Rule 26(f) Conference Report proposing, among other dates, a class certification motion deadline of March 23, 2015, a fact discovery cut-off of August 14, 2015, and a deadline to file and serve dispositive motions of August 1, 2016.  Dkt. No. 196.

- 23 -

70.     Prior to filing its class certification motion, NECA's counsel engaged in extensive discovery on NECA's behalf aimed at establishing numerosity.  Counsel: (i) obtained transactional information from the Depository Trust Company, which provides clearing and settlement information for RMBS, including limited ownership records for the RMBS at issue;[5] (ii) served subpoenas on broker-dealers active in trading RMBS, whose internal records were believed to reflect holdings and transactions in the certificates; (iii) reviewed files Defendants produced in discovery for information about the initial purchasers of the certificates sold in the offerings; and (iv) served subpoenas on investment managers identified in the subpoenaed broker-dealer records and Defendants' files.

71.     In accordance with the Amended Rule 26(f) Conference Report stipulated to by the parties (acknowledged by the Court but not entered[6]), NECA filed its Motion for Class Certification and Appointment of Class Representative and Class Counsel on March 23, 2015.  Dkt. No. 197. NECA moved the Court to certify a class of all persons or entities who acquired the RMBS Certificates issued by GSMC through the seven Reinstated Offerings.  In support of its motion, NECA served the expert report of Dr. Joseph Mason, which established that the elements of Fed. R. Civ. P. 23, such as numerosity, commonality, typicality and predominance, were satisfied.  Dr. Mason's report also included a thorough analysis of the structure and interrelatedness of the certificates at issue.  NECA submitted extensive exhibits, including internal Goldman Sachs documents, trading data obtained from third-party discovery, and excerpts from Defendants' Rule 30(b)(6) witness testimony in support of its motion.  *See* Dkt. Nos. 198-199.

---

[5]     *See* Dkt. No. 199-1, at 30-31.

[6]     *See* Dkt. No. 195 at 22:5-11.

72.     On March 26, 2015, the Court's Chambers contacted the parties to inform them that the hearing on NECA's class certification motion would be on June 18, 2015.  Unable to reach a mutually-agreeable briefing schedule to comply with the Court's hearing date, the parties wrote to the Court, proposing respective schedules.  Dkt. Nos. 201-202.  The Court endorsed NECA's proposed schedule, ordering that: (i) Defendants' opposition be filed by May 19, 2015; (ii) the deposition of any experts Defendants submit in support of their opposition take place before June 5, 2015; and (iii) NECA's reply be filed by June 16, 2015.  Dkt. No. 203 at 3.  Defendants petitioned the Court for reconsideration, which NECA opposed.  *See* Dkt. Nos. 204-205.  The Court did not rule on Defendants' request.

73.     On May 8, 2015, Defendants took the deposition of Dr. Mason.  In addition to defending the deposition, Robbins Geller spent significant time preparing Dr. Mason for his deposition, as well as collecting, reviewing and producing documents relevant to Dr. Mason's opinions.  On May 12, 2015, Defendants took the Fed. R. Civ. P. 30(b)(6) deposition of Steven L. Myers, the Fund Administrator and corporate designee for NECA.  Robbins Geller prepared Mr. Myers and defended his deposition, which included questions on the following topics, all relevant to class certification: NECA's investment processes and procedures; damages NECA sustained on the purchase of certificates; and NECA's knowledge of the mortgage industry and the housing market. On May 13, 2015, Defendants took the deposition of Brian Wrubel, president of Marquette Associates, an investment manager for NECA.  Robbins Geller was present to defend NECA's interests.

74.     On May 19, 2015, Defendants filed their opposition to NECA's motion for class certification.  Dkt. Nos. 209-212.  Defendants raised several contentions, including a novel statute-of-repose argument based on the Second Circuit's decision in *Police & Fire Ret. Sys. of Detroit v.*

- 25 -

*IndyMac MBS, Inc*., 721 F.3d 95 (2d Cir. 2013) ("*Indy Mac*"), several attacks on NECA's showing of "predominance," and attacks on NECA's satisfaction of the "typicality" and "adequacy" prongs of Rule 23.  *See* Dkt. No. 209.  Defendants' opposition to NECA's motion was also supported by the Expert Report of Professor Christopher M. James and the Report of Charles Grice.

76.     On June 4, 2015, Robbins Geller deposed Charles Grice on behalf of NECA regarding his opinions related to NECA's class certification motion.

76.     Concurrently with the briefing of NECA's motion for class certification, the parties continued their years-long settlement negotiations (*see infra* §V.A.).  An agreement-in-principle to settle was ultimately reached, but not until just days before the deadline to file NECA's reply brief.  At that point, Robbins Geller had already substantially drafted its reply, and was nearly done working with Dr. Mason on his expert rebuttal report, which was to be filed in support of NECA's reply.

77.     Over the next several months, NECA, PFRS and Defendants diligently negotiated the Stipulation, and exhibits thereto, including the Notice of Pendency of Class Action and Proposed Settlement and Final Approval Hearing ("Notice"), and the Plan of Allocation, addressing and overcoming numerous potential issues.

## IV.     INVESTIGATION AND DISCOVERY

78.     NECA's decision to enter into the Settlement was informed by a thorough understanding of the strengths and weaknesses of its claims, and Defendants' defenses, with respect to the Offerings covered by the Settlement.

### A.     Investigation

79.     In prosecuting the *NECA* Action, NECA's counsel undertook extensive efforts to meet the relevant pleading standards.  Robbins Geller's efforts included, *inter alia*, (i) conducting an

extensive investigation, including consulting with experts in RMBS securitizations; (ii) retaining experienced private investigators that located and interviewed witnesses, such as former employees of the Defendants, former employees of Goldman Sach's outside due diligence providers, and former employees of key loan originators; (iii) reviewing and analyzing publicly available information, such as court filings, media reports, performance reports related to the Offerings, testimony from members of Congress and the Financial Crisis Inquiry Commission, regulatory filings, press releases and public statements regarding each Defendant; (iv) conducting an extensive investigation of the loan originators identified in the Offering Documents, which included a thorough review of media and investigative reports relating to the originators and an extensive nationwide review of court dockets and filings relating to private litigation and government actions related to them; (v) investigating the rating agencies retained by Defendants that rated the Certificates as "investment grade"; and (vi) researching the applicable law related to NECA's claims and Defendants' potential defenses.

80.     In addition to the above, NECA and its counsel also engaged the services of experts and consultants to: (i) identify, review, and re-underwrite a sample of the loans at issue; (ii) opine on the propriety of statistical sampling of mortgage loans to determine whether the testing of those loans would support the conclusion that the sample is representative of the loan pools as a whole for purposes of establishing liability; (iii) explain and investigate the mortgage origination and underwriting processes; (iv) determine the appropriate sample size of loans to re-underwrite; (v) assist in the analysis of potential damages and issues related to rebutting Defendants' "negative causation" defense; (vi) assist in the preparation of the proposed Plan of Allocation; and (vii) provide NECA with guidance, independent of Robbins Geller's, on the likelihood of NECA's success on the merits in light of the risks of ongoing litigation for the purpose of evaluating offers of settlement.

These experts and consultants were retained to provide guidance and advice regarding issues that arose in this matter throughout the course of the litigation. These services contributed materially to the benefits achieved for the Settlement Class. Among the experts and consultants involved in the *NECA* Action, the following are particularly noteworthy:

### 1.   Dr. Joseph Mason

81.   Dr. Joseph R. Mason of Precision Economics LLC was retained to conduct numerosity, commonality, and damages analyses in support of class certification, and to serve as a liability and damages expert. Dr. Mason is a Professor of Finance and the Hermann Moyse, Jr. / Louisiana Bankers Association Endowed Chair of Banking at the Ourso School of Business at Louisiana State University, and a Senior Fellow at the Wharton School of Business at the University of Pennsylvania. Assisted by his staff at Precision Economics, Dr. Mason submitted an expert report in support of class certification and at the time of settlement was preparing to rebut Defendants' class certification experts. In his expert report, Dr. Mason and his staff analyzed over 26 trade runs produced by Defendants and non-party financial institutions to tabulate the number of potential class members during the class period, reviewed various transaction documents to determine the interrelatedness of hundreds of securities across the offerings at issue, and devised a methodology for the calculation of class-wide damages. Dr. Mason established a cohesive and common valuation methodology for the calculation of Section 11 damages by devising a hierarchical approach to valuation. As part of the valuation process, he and his staff researched IDC pricing for the certificates at issue and meticulously analyzed the structural features of the relevant offerings.

### 2.   Dr. Nelson Lipshutz

82.   Dr. Lipshutz of Regulatory Research Corporation was retained as an expert in statistical sampling. He is the President of the Regulatory Research Corporation, and has over 40

- 28 -

years of experience in conducting economic, financial and statistical studies.  He has considerable experience conducting statistical sampling and analysis and giving testimony in litigation involving RMBS.  Dr. Lipshutz's work in this litigation was focused on the creation of representative loan samples to facilitate NECA's mortgage loan re-underwriting process.  Dr. Lipshutz created statistically significant representative samples for each of the offerings at issue, using approximately 2,600 mortgage loans, or over 15% of the 14,971 loans underlying the Certificates.  To do so, Dr. Lipshutz analyzed the disclosures made in the Prospectus Supplements for the Offerings, as well as the loan tapes, with each loan tape containing thousands of mortgage loans and identifying several dozen loan characteristic fields for each loan.  Upon drawing a loan sample using the Mersenne Twister algorithm, Dr. Lipshutz conducted both chi-squared and Fisher's Exact tests on 16 loan characteristic variables to ensure that no statistically significant difference existed between each sample's distribution and the corresponding offering's distribution.  As a result, each sample had a margin of error of less than five percent.

## B.    Discovery

83.    NECA aggressively sought to commence discovery into Defendants' alleged wrongdoing.  However, as a result of the mandatory discovery stay set forth in the PSLRA, NECA's discovery efforts were delayed during the pendency of Defendants' four rounds of motions to dismiss, requiring extensive negotiations between the parties to facilitate discovery for every claim and offering surviving the respective dismissal orders and appellate review.  This resulted in piecemeal discovery for several years.

### 1.    Party Document Discovery

84.    On November 2, 2010, NECA served its First Request for Production of Documents to Defendants, seeking documents regarding the GSAA 2007-5 and GSAA 2007-10 trusts, the two

- 29 -

trusts that NECA had itself purchased, shortly after the Court upheld NECA's Sections 12 and 15 claims for those trusts.

85.     On March 2, 2011, NECA served its First Set of Interrogatories to all Defendants.

86.     On April 2, 2014, NECA served its Second Request for Production of Documents from Defendants, seeking documents regarding the seven Reinstated Offerings.

87.     On April 16, 2014, Defendants served their First Notice to NECA to Produce Documents, setting forth 41 document requests to which NECA responded on May 19, 2014.

88.     On March 12, 2015, Defendants served their First Set of Interrogatories to NECA, seeking information relevant to Defendants' "knowledge defense," and to class certification issues.

89.     Robbins Geller engaged in numerous meet-and-confer discussions on behalf of NECA with counsel for Defendants to discuss their objections to the document requests and interrogatories, to negotiate the scope of discovery and to arrange the form and schedule of the production of documents.  Given the scope of discovery sought and disputes about relevancy, burden and privilege, this required extensive coordinated efforts and expenditures of substantial time and resources on Robbins Geller's part.  The parties worked cooperatively to resolve their discovery disputes whenever possible, but on several occasions were unable to resolve their disputes.  In those instances, the parties sought the Court's guidance.

90.     Between 2011 and mid-2015, Defendants produced over seven million pages of documents.  Given the number of individuals, entities, and time periods involved in issuing the offerings, the documents came in a wide variety of formats and styles.  The effective review of documents required the analysis of not only emails and other routine correspondence, but also detailed analyses of spreadsheets and other complex compilations of financial data.  To organize and

search the documents, Robbins Geller used a sophisticated electronic system to categorize the documents by issue, prepare witness files, and identify documents supporting NECA's claims.

91.     The documents addressed many issues that were critical to the litigation, including, for example: the process through which the mortgages were originated or acquired through Goldman Sachs' loan "conduit"; the process through which mortgages were acquired in "whole loan transactions"; the selection and approval of the counterparties in these whole loan transactions, including many of the originators described in the complaints; the evaluation and due diligence performed on the mortgages prior to purchase; communications between the Defendants and other relevant parties, including the rating agencies, outside due diligence firms, and loan originators; the approval of variances from underwriting guidelines that were identified through this due diligence process; the selection of mortgages for inclusion in the trusts at issue herein; the structuring of the trusts and the certificates; the marketing and sale of certificates to investors; the monitoring of the performance of the mortgages through the securitization process and beyond; the evaluation of the quality of loan originators that sold Defendants' loans; and Defendants' evaluations of potential breaches of representations and warranties made about the loans they purchased.

92.     Discovery in this action required the production of confidential information, including certain non-public, personal financial information protected from disclosure under the Fair Credit Reporting Act, 15 U.S.C. §1681, *et seq*., and the Gramm-Leach-Bliley Act, 15 U.S.C. §6801, *et seq*. Accordingly, one of the first issues that the parties faced prior to collecting and exchanging documents was the appropriate scope of a stipulation governing the treatment of confidential information.  The parties were able to reach agreement on the pertinent terms of the confidentiality stipulation, including the treatment of personal financial information.  The parties submitted the stipulation to the Court, which entered the Protective Order on May 10, 2011.  Dkt. No. 149.

- 31 -

93.     Due to the volume and complexity of the information at issue, Robbins Geller took care to establish an effective and efficient method for searching and collecting electronically-stored information ("ESI") in the parties' possession.  After an extensive meet and confer process, the parties came to a final agreement regarding ESI on February 10, 2015 (the "ESI Protocol").  The ESI Protocol contained configurations of appropriate search terms, document custodians, date ranges, and other relevant data points to be used in the collection process for each subset of information relevant to Defendants' alleged conduct.  The parties undertook enormous effort in crafting this agreement to enable NECA to meaningfully develop its claims without imposing an undue burden on Defendants.  Unique search parameters were employed for each of the offerings as a result of parties' efforts at the outset of the initial tier of discovery to identify relevant deal-specific attributes to utilize in agreeing to an ESI protocol.

94.     In addition to the documents identified through the search protocol, Robbins Geller negotiated for and reviewed documents from other cases concerning the offerings at issue and Defendants' alleged misconduct.  In particular, NECA reviewed over 85,000 pages of testimony and exhibits contained in 87 deposition transcripts from civil suits related to RMBS and government investigations.

## 2.     Discovery Disputes Between the Parties

95.     On December 9, 2010, Defendants wrote to the Court requesting relief from NECA's discovery requests to various third parties.  Defendants maintained that 11 subpoenas served by NECA were "unreasonable and overly broad."  They argued, among other things, that NECA's subpoenas were not explicitly limited to the categories of documents concerning, or entities that had a role in, the GSAA 2007-10 offering, the only securitization that was upheld at the time.  NECA responded on December 15, 2010, maintaining that its requests to the third parties were appropriate,

and that Defendants' challenges were unnecessary and premature as many third parties had not yet responded or produced documents, and that, in any event, any challenges and objections ought not be left to Defendants but to the subpoenaed third parties, which were sophisticated financial institutions. This discovery dispute was mooted by the Court's subsequent dismissal of all NECA's claims.

96.     On April 5, 2013, shortly after Defendants' petition for certiorari to the Supreme Court was denied, the parties wrote to the Court regarding a dispute between the parties concerning the proper scope of discovery during the pendency of Defendants' then-forthcoming motion to dismiss. NECA maintained that it should be allowed to conduct full discovery on all of the Offerings; Defendants, however, took the position that more limited discovery was appropriate until the Court ruled on the inclusion of the seven Additional Offerings. The Court held a conference on May 7, 2013 to address, among other things, the discovery issues set forth in the April 5, 2013 letter. The Court instructed the parties to continue their meet and confer process. Still unable to resolve their dispute, the parties wrote to the Court again on August 7, 2013. NECA requested that the Court "compel defendants to cooperate in setting a schedule and at least "engage in *full and complete* discovery on th[e] seven [Restricted] [O]fferings immediately" (emphasis added). Defendants reiterated their position that discovery be limited, excluding the "inherently intensive e-mail discovery phase," until the Court ruled on Defendants' motion to dismiss. The parties continued to meet and confer and were able to resolve their dispute, with the help of the Court's guidance given during a February 25, 2014 conference.

97.     On July 1, 2014, the parties separately wrote to the Court, seeking assistance in resolving several discovery disputes which precluded an agreement on a scheduling order. First, the parties disagreed on the necessity and benefit of exchanging Initial Disclosures pursuant to Rule

26(a)(1).  Second, the parties disputed the schedule for class certification briefing and expert discovery.  Third, Defendants sought to extend the third-party discovery deadline for a period of time after NECA served its "reunderwriting" expert reports; NECA argued that such a deviation from the norm of closing fact discovery prior to the submission of any expert reports was unwarranted.  Lastly, the parties were unable to agree on the timing of expert reports; NECA sought a simultaneous exchange of expert reports and rebuttal reports while Defendants maintained that the party bearing the burden of proof, *i.e.*, NECA, should submit all experts reports first.  Each party submitted its own proposed Rule 26(f) Report in accordance with its respective positions.  The Court held a discovery hearing on this matter on July 10, 2014, during which the parties informed the Court that they have been making significant progress during their meet-and-confer process, and sought to resolve or significantly narrow the issues in dispute.  Accordingly, on August 21, 2014, the parties were able to reach a consensus on most of the disputed issues and filed a joint Rule 26(f) Report.  Dkt. No. 182.

98.     In December 2014, the parties called the Court to request a conference regarding several outstanding discovery issues.  The parties continued to work diligently and cooperatively in the following weeks, attempting to resolve as many outstanding issues as possible without the Court's intervention.  For instance, the parties achieved a global resolution of their dispute regarding the production of deposition transcripts just hours before the January 7, 2015 discovery hearing.  The sole outstanding dispute requiring the Court's guidance centered around the format of production of ESI, specifically as it relates to the metadata contained in e-mail strings.  NECA maintained that each of the e-mails contained in an e-mail chain should be produced, along with the corresponding metadata.  Defendants maintained that it would be overly burdensome to produce all of the requested data.  At the January 7, 2015 hearing, the Court facilitated the resolution of this dispute by

suggesting an arrangement whereby Defendants would preserve all such metadata and would produce it to NECA upon request, if it was reasonable for that particular request.

99.     On April 8, 2015, NECA wrote to the Court, seeking guidance regarding the parties' dispute concerning the briefing schedule for NECA's class certification motion.  Dkt. No. 201.  The parties had stipulated to the Amended Rule 26(f) Conference Report (Dkt. No. 196), which proposed an extended briefing schedule for class certification, but the Court had not entered it and ordered that the hearing on NECA's motion – filed on March 23, 2015 (Dkt. No. 197) – be held on June 18, 2015.  The parties were unable to agree on the allocation of the remaining briefing in the 12 weeks between NECA's motion and the hearing, and submitted competing proposals to the Court.  *See* Dkt. Nos.  201-202.   On April 14, 2015, the Court endorsed NECA's proposal, which allowed approximately eight weeks for Defendants to conduct their Rule 30(b)(6) deposition of NECA and draft their opposition brief, and approximately four weeks for NECA to depose Defendants' experts, prepare rebuttal expert reports and draft its reply brief.  Dkt. No. 203 at 3.

100.     On April 22, 2015, Defendants wrote to the Court concerning the parties' dispute regarding the schedule of the deposition of NECA's expert, Dr. Joseph R. Mason.  Dkt. No. 206. Defendants sought to depose Dr. Mason on May 8, 2015 in New York.  *Id.* at 1.  NECA responded that Defendants provided no basis why Dr. Mason should be deposed in the forum most convenient for Defendants rather than his requested forum.  Dkt. No. 207 at 1-2.  The Court granted Defendants' request.  Dkt. No. 208 at 2.

### 3.     Third-Party Discovery

101.     NECA also served document subpoenas on the following 61 third parties between 2009 and 2015:

- Allstate Appraisal, L.P.

- 35 -

- Avelo Mortgage, LLC

- Bank of America Corporation

- Bank of America, National Association

- The Bank of New York Mellon Corporation

- Barclays Capital, Inc.

- Blackrock, Inc. (including its capacity as successor to Barclays Global Investors)

- Bohan Group, Inc.

- Cantor Fitzgerald, LP

- Capital One Bank (USA), N.A. (including its capacity as successor to ING Direct USA)

- Capital One Financial Corporation (including its capacity as successor to GreenPoint Mortgage Funding, Inc.)

- Charles Schwab & Co., Inc.

- Citibank N.A.

- Citigroup Alternative Investments, LLC

- Citigroup Global Markets Inc.

- Clayton Holdings, LLC

- Comerica Securities, Inc.

- CoreLogic, Inc. (including the entities f/k/a BasePoint Analytics, LLC, C&S Marketing)

- Countrywide Home Loans, Inc.

- Credit Suisse Securities (USA), LLC

- Deutsche Bank AG

- Deutsche Bank Securities, Inc.

- Federal Deposit Insurance Corporation as Receiver for First National Bank of Arizona

- 36 -

- Federal Deposit Insurance Corporation, as Receiver for IndyMac Bank, F.S.B.

- Fiserv, Inc.

- Fitch Ratings, Inc.

- Harding Advisory LLC

- Headstrong, Inc. (including the entity f/k/a Lydian Data Services, LLC)

- Interthinx

- J.P. Morgan Securities LLC

- JPMorgan Chase Bank, N.A. (including its capacity as successor to Washington Mutual Bank)

- Keybank National Association (including its capacity as successor to Key Trust Company of Ohio)

- Kroll Factual Data, Inc.

- Lender Processing Services, Inc., (including the entity f/k/a/ Hansen Quality, LLC)

- Massachusetts Mutual Life Insurance Company

- Merrill Lynch, Pierce, Fenner & Smith Inc.

- Mesirow Financial, Inc.

- Mizuho Securities USA, Inc.

- Moody's Corporation

- Morgan Stanley & Co., LLC

- Mutual of Omaha

- National City Mortgage Co.

- Ocwen Financial Corp.

- OneWest Bank

- Opus Capital Markets Consultants LLC

- Pacific Investment Management Company LLC

- 37 -

- PHH Mortgage Corporation

- Raymond James Financial

- RBC Capital Markets, LLC

- RBS Securities, Inc.

- Single Source Property Solutions, LLC

- Standard & Poor's Rating Services, Inc.

- State Street Corporation

- Stifel, Nicolaus & Company, Inc.

- The Northern Trust Company

- The PNC Financial Services Group, Inc. (including its capacity as successor to National City Mortgage Co.)

- Trust Company of the West

- U.S. Bank National Association

- UBS Securities LLC

- Wells Fargo Bank, N.A.

- Western Asset Management Company (WAMCO)

102. After serving the subpoenas on the entities identified above, Robbins Geller communicated at length with almost every one of these entities regarding their responses to the subpoenas and, in many instances, met and conferred extensively before receiving any documents. When discovery was halted, not all of the above-named third parties had yet produced documents in response to the subpoenas, but those who did collectively produced over 449,000 pages of documents, including massive excel spreadsheets containing relevant data.

### 4. Depositions

103.    At the time of the agreement-in-principle to settle, depositions relating to the parties' class certification briefing were ongoing, and five depositions had already been taken:  a Rule 30(b)(6) deposition of Defendant Goldman Sachs; a deposition of Defendants' class certification expert; a deposition of NECA's class certification expert; a Rule 30(b)(6) deposition of NECA; and a deposition of an investment advisor to NECA.  The parties' agreement-in-principle occurred just days before Defendants' second expert, Christopher M. James, was scheduled to be deposed, after Robbins Geller had substantially completed its preparation to take the deposition.

104.    The agreement-in-principle to settle was reached just prior to the commencement of fact depositions.  The parties conducted an extensive meet-and-confer process concerning deposition planning and were finalizing a stipulation and proposed order regarding the number of depositions each party would be entitled to take and the limitations on deposing third parties.  At the time of the agreement to settle, Robbins Geller was in the process of preparing for numerous merits depositions.

## V. THE SETTLEMENT

### A. Settlement Negotiations and Terms

105.    The settlement negotiations that ultimately led to the Settlement of the Actions began several years ago, and started with discussions between NECA and Defendants, through counsel. NECA and Defendants first discussed settlement in December 2011, during the pendency of NECA's appeal to the Second Circuit.  At the time of these negotiations, all of NECA's claims had been dismissed.  Despite this fact, a substantial amount was offered by Defendants to settle the *NECA* Action prior to oral argument of the appeal.  I understand that the amount offered by Defendants would have been, at that time, the second largest RMBS class action recovery ever approved by a court.  After consulting with its counsel, and careful consideration of the risks and

possible greater recovery that could be obtained if the appeal was successful, NECA decided that it was in the best interest of the class to decline Defendants' offer and pursue the appeal.

106.    Settlement discussions resumed after NECA's victory in the Second Circuit. Although the parties conducted settlement discussions in good faith, it was clear that the parties' perceptions of the value of the case were vastly divergent, and accordingly, so were the monetary values they placed on them.

107.    Starting in 2012, the Honorable Daniel Weinstein (Retired), a skilled and respected mediator, became involved in the negotiations, engaging in shuttle diplomacy and effectively communicating the parties' positions and facilitating negotiations.

108.    The settlement talks continued intermittently over the ensuing years, through both communications with Judge Weinstein and direct talks between the parties, even after several unsuccessful attempts to reach a settlement.  NECA expended substantial efforts in connection with these negotiations, including working with damages consultants who performed detailed and comprehensive damage analyses.

109.    During settlement negotiations in the *NECA* Action, it became apparent that the *PFRS* Action was inextricably intertwined with any settlement of the *NECA* Action due to the fact that at different times during the Actions, they were both asserting claims as to some of the same offerings. Accordingly, PFRS and PFRS' counsel became involved in the settlement negotiations.

110.    Ultimately, Defendants, PFRS and NECA agreed to settle both the *PFRS* Action and the *NECA* Action in one settlement, resulting in the Settlement.

111.    The settlement amount of $272 million is many multiples higher than the settlement offer made by Defendants during the pending of the NECA appeal.

112.     Darren Robbins, Lucas Olts, and I led the settlement negotiations for NECA.  We each have years of experience in the prosecution and resolution of complex class actions.  I understand that PFRS' counsel does as well.  Richard Klapper of Sullivan & Cromwell LLP led the defense team.  Defense counsel's reputation, credentials and skill are apparent and unquestioned.

### B.     Preliminary Approval Order

113.     After the Settling Parties reached an agreement-in-principle to settle, Plaintiffs' Counsel worked diligently to prepare preliminary approval papers and negotiate the complex Stipulation with counsel for Defendants.  The Stipulation is the result of vigorous and protracted arm's-length negotiations.  In my estimation, the compromise with the Defendants embodied in the Stipulation represents a fair and successful resolution of two complex and risky class actions.

114.     On August 13, 2015, NECA and PFRS submitted their unopposed motion for preliminary approval of the Settlement, a supporting memorandum, and the Stipulation.  Dkt. Nos. 215-217.  The preliminary approval motion also sought certification of the Settlement Class, approval of notice to the Settlement Class, and the scheduling of a Final Approval Hearing.  Dkt. Nos. 215-216.

115.     On November 6, 2015, a Notice of Case Reassignment was entered, indicating that the *NECA* Action was reassigned from Judge Cedarbaum to the Honorable Loretta A. Preska.  The *PFRS* Action was also reassigned to Judge Preska.

116.     On December 30, 2015, Judge Preska issued the Order Certifying a Settlement Class, Preliminarily Approving the Settlement, and Providing for Notice (Dkt. No. 220) ("Preliminary Approval Order"), which:

        (a)      preliminarily approved the Settlement, pending a Final Approval Hearing on the Settlement;

(b)      preliminarily certified the Actions as a class action for settlement purposes. With respect to the Settlement Class, the Court preliminarily found that for settlement purposes, the prerequisites for a class action under Federal Rules of Civil Procedure Rules 23(a) and (b)(3) have been satisfied;

(c)      scheduled the Final Approval Hearing for April 13, 2016, at 10:00 a.m., to determine whether, *inter alia*:  (1) the proposed Settlement, on the terms and conditions provided for in the Stipulation, is fair, reasonable and adequate to the Settlement Class and should be approved by the Court; (2) the Order and Final Judgment, as provided in paragraph 1.26 of the Stipulation and Exhibit B thereto, should be entered, and whether the releases set forth in the Stipulation should be ordered; (3) the proposed Plan of Allocation should be approved; and (4) the application by Plaintiffs' Counsel for an award of attorneys' fees and litigation expenses should be approved; and the amount that each Lead Plaintiff should be reimbursed for its expenses including lost wages;

(d)      approved Gilardi & Co. LLC ("Gilardi") as the Claims Administrator to supervise the notice procedure and process claims; and

(e)      approved the form, substance and requirements of the Notice, Summary Notice, and the Claim Form.  The Court also found that the procedure for mailing and distributing the Notice, and for publishing the Summary Notice was adequate under applicable law.

117.     Upon final approval of the Stipulation and Settlement by the Court and entry of a judgment that becomes a final judgment, the Net Settlement Fund will be distributed according to the Plan of Allocation (described below) to Settlement Class Members who submit valid, timely Claim Forms.  Further terms of the Settlement are set forth in the Stipulation.  A summary of the Settlement was set forth in the Notice.

C.     **Notice to the Settlement Class Meets the Requirements of Due Process and Rule 23 of the Federal Rules of Civil Procedure**

118.   As required by the Court's Preliminary Approval Order, beginning on January 14, 2016, the Claims Administrator, Gilardi, mailed copies of the Notice to potential Settlement Class Members. Robbins Geller obtained the identity of certain known holders of the Certificates and researched the contact information for the investors. Specifically, to identify potential Settlement Class Members, Robbins Geller: (i) reviewed Defendants' internal files for information about the initial purchasers of the RMBS; and (ii) previously served subpoenas to dozens of major custodial banks whose internal records reflect holdings and transactions in the RMBS at issue. *See also* ¶70, *supra*.

119.   Gilardi obtained from the transfer agent for Goldman Sachs a list of 275 unique names and addresses of known holders of the Certificates. The list was supplemented by a proprietary database maintained by the Claims Administrator, containing the names and addresses of over 5,500 of the largest and most common U.S. nominees (*i.e.*, brokerage firms, banks, and institutions who hold securities in the name of the nominee, on behalf of the beneficial purchasers). The Court-approved Notice requires nominees, within 10 business days, to either (i) send a copy of the Notice and the Claim Form to the beneficial owner of such Certificates, or (ii) provide to Gilardi the names and addresses of such persons.

120.   The Notice provides Settlement Class Members with information on: (a) the essential terms of the Settlement, including the procedure for opting out of the Settlement Class; (b) their right, and the procedure, to object to any aspect of the Settlement, the Plan of Allocation, or Plaintiffs' Counsel's fee and expense application; (c) the date, time and place of the Final Approval Hearing; and (d) the procedure by which a Claim Form should be submitted to the Claims Administration. The Notice also contains information regarding Plaintiffs' Counsel's fee and

- 43 -

expense application and the proposed plan of allocating the Net Settlement Fund among Authorized Claimants.

121.     Filed herewith is the Declaration of Carole K. Sylvester Regarding (A) Mailing of the Notice of Pendency of Class Action and Proposed Settlement and Final Approval Hearing and the Proof of Claim and Release Form, (B) Publication of the Summary Notice, (C) Internet Posting, and (D) Requests for Exclusion Received to Date ("Sylvester Decl."), submitted herewith.  Ms. Sylvester is an employee of Gilardi who oversaw the notice services provided by Gilardi for this case.

122.     In the aggregate, as of the date of this Declaration, Gilardi has disseminated over 5,800 copies of the Notice to potential Settlement Class Members and their nominees.  Sylvester Decl., ¶11.

123.     In addition, a Summary Notice was published in the national edition of *Investor's Business Daily* and transmitted over the *PR Newswire* on January 26, 2016.  *See id.*, ¶14. Information regarding the Settlement, including downloadable copies of the Notice and Claim Form, was posted on the website established by the Claims Administrator specifically for this Settlement, www.GoldmanSachsMBSSettlement.com,     as     well     as     on     Robbins     Geller's     website, www.rgrdlaw.com. *Id.*, ¶13.  This method of giving notice, previously approved by the Court, is appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]." Fed. R. Civ. P. 23(e)(1).

124.     As explained in the accompanying Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation, the Notice fairly apprises Settlement Class Members of their rights with respect to the Settlement and therefore is the best notice practicable under the circumstances and complies with the Court's Preliminary Approval Order (Dkt. No. 220), Federal Rule of Civil Procedure 23, the PSLRA, and due process.

- 44 -

### D. Plan of Allocation

125. The Net Settlement Fund will be distributed to Settlement Class Members who, in accordance with the terms of the Stipulation, are entitled to a distribution and who submit a valid and timely Claim Form, *i.e.*, Authorized Claimants. *See* Dkt. No. 216-2, Appendix A at 1. The amount each Authorized Claimant may recover under the Plan of Allocation is based generally upon the statutory measure of damages under Section 11 and depends on several factors, including (i) the aggregate value of the Recognized Claims; (ii) when the Authorized Claimant's Certificates were purchased or acquired and the price on the date of purchase; (iii) any principal payments the Authorized Claimant received; (iv) whether the Authorized Claimant's Certificates were sold, and if so, when they were sold and for how much; (v) whether the Court sustained the claims asserted on behalf of purchasers of certain Certificates; and/or (vi) if held on the applicable date of suit identified for each of the Certificates, the price of the Certificates on that date. *See id*. To prepare the Plan of Allocation, we engaged Brett Brandenberg, a Director in the professional services firm AlixPartners, LLP ("AlixPartners"), a firm of senior business and consulting professionals. *See* Declaration of Brett Brandenberg in Support of Plan of Allocation ("Brandenberg Decl."), submitted herewith. Mr. Brandenburg has consulted on the design and analysis of plans of allocation related to court-approved settlements of several RMBS class actions. *Id*. In addition, to reflect the reduced likelihood of success on claims related to the Offerings that were not sustained by the Court (arising from their dismissal and referred to here as "Dismissed Certificates"), the Plan of Allocation applies a 70% discount to the value of the claims related to the Dismissed Certificates. *See, e.g.*, *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 429 (S.D.N.Y. 2001) ("Allocation formulas, including certain discounts for certain securities, are recognized as an appropriate means to reflect the comparative strengths and values of different categories of the claim.").

- 45 -

126.    The Plan of Allocation, as set forth in the Notice, is based on the statutory calculation methodology embodied in Section 11(e) of the Securities Act.  As explained in the Brandenberg Decl., in lay terms, that methodology first establishes a cost basis for each purchase, which can be no greater than the offering price of a security.  Then there is a calculation of what is received, which is measured by the value of the Certificates if they were sold (and when), or if they were held.  This methodology then accounts for the fact that RMBS pay back principal.  In other words, the securities essentially entitle the security holder to cash flow payments as the mortgages are paying back principal, which reflects the fact that the mortgages amortize over time.  The payment of principal reduces the amount outstanding on the security, which, under the Plan of Allocation, is credited against the calculated loss.

127.    Although the precise language of the Plan of Allocation is necessarily technical, the language utilized is consistent with industry terminology.  In addition, specific illustrative examples of how to calculate under various hypothetical scenarios are included in the Plan of Allocation for clarification.

128.    In sum, the proposed Plan of Allocation takes into account: (i) the statutory damages permitted under Section 11, (ii) the increased risk to claims which are based on the Dismissed Certificates, and (iii) the payment of principal, all of which was explained in the Notice sent to Settlement Class Members.  It was prepared in consultation with a damages consultant, tracks the theory of damages asserted by Plaintiffs, and is necessarily fair, reasonable and adequate to the Settlement Class as a whole.

129.    In response to over 5,800 Notices, there have been no objections to date of the proposed Plan of Allocation.

E.      **Questions of Law and Fact Added Risks and Uncertainty**

130.    Based on publicly available documents, information and internal documents obtained through our investigation, our discussions with consultants and through the extensive fact discovery conducted in the *NECA* Action, Robbins Geller believes that the claims asserted in the Actions had merit.  Robbins Geller also realized, however, that NECA, PFRS and the Settlement Class faced considerable risks and defenses in continuing the Actions.

131.    At the time the *NECA* Action was commenced, and during the first several years of its pendency, there was no clear precedent for asserting class claims on behalf of purchasers of RMBS.  Therefore, our theory of liability was largely untested at the time the *NECA* Action was filed, creating substantial uncertainty and risk.  Part of this risk was realized when the Court dismissed the action in 2010, and NECA was forced to appeal to the Second Circuit in hopes of reinstating its claims.  NECA and Robbins Geller carefully considered these and other risks, discussed below, during the months leading up to the Settlement and throughout the settlement discussions with Defendants.

1.      **Challenges to Class Certification and Maintaining a Class Through Trial**

132.    NECA faced considerable challenges to its motion for class certification (Dkt. No. 197), which was pending at the time the agreement-in-principle to settle was reached.  Defendants' opposition (Dkt. No. 209) put forth several arguments, including a novel standing argument which, if accepted by the Court, would eliminate any recovery for all other Members of the Settlement Class.  Indeed, Defendants' primary argument was that no class could be certified because claims of all class members other than NECA were barred by the three-year repose period of Section 13 of the Securities Act, which, according to Defendants, was not subject to the class action tolling doctrine under the Second Circuit's decision in *IndyMac*.  Dkt. No. 209 at 18-23.  While NECA was

- 47 -

confident in its ability to prevail over Defendants' argument, District Courts had not yet interpreted the Second Circuit's *IndyMac* decision in that context, which created considerable uncertainty as to whether the *NECA* Action could proceed as a class action.

133.    Furthermore, Defendants challenged NECA's showing that that the predominance requirement of Rule 23(b)(3) was met.   Goldman Sachs argued that the offerings were not interrelated, undermining the predominance of common issues because, according to Defendants, "[m]ore than 80 different originators underwrote the mortgage loans underlying the Offerings pursuant to different sets of underwriting guidelines; the characteristics of those loans differ significantly; and the structural features of the Offerings differ." Dkt. No. 209 at 3.  The differences in the structure and collateral of the Offerings, Defendants maintained, raised individualized liability issues that would turn on very different proof.  *Id.* at 28-30.  In addition, Defendants argued that varying levels of knowledge about the mortgage market and offerings during the class period created disparate investor knowledge which undermined predominance.  *Id*. at 30-31.  Although NECA believed it would defeat Defendants' predominance challenge, at least one District Court denied class certification on the grounds that different putative class members had different levels of knowledge regarding the underwriting guidelines based on their respective levels of sophistication at the time of purchase.  *See N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 168 (S.D.N.Y. 2011).

134.    In addition, Defendants maintained that NECA failed to satisfy the typicality and adequacy requirements of Rule 23(a).  Defendants maintained that NECA's claims were not typical of those putative class members that purchased after mid-2008, at which time Defendants claimed that NECA was on notice of the alleged misstatements.  Dkt. No. 209 at 35-36.  The timing of NECA's purchase, Defendants claimed, would create an intra-class conflict.  Defendants also

claimed that NECA's adequacy was in question because its alleged knowledge of the misstatements subjected it to unique defenses. NECA believed these arguments were meritless, but Defendants were vigorous in their opposition. *Id.* at 37-38.

135. Lastly, Defendants argued that NECA had failed to put forth an adequate class-wide damages model, claiming that Dr. Mason's proposed damages methodology was identical to the one rejected by the court in *Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co*, 301 F.R.D. 116, 141-42 (S.D.N.Y. 2014) (granting class certification on liability but not on damages). Dkt. No. 209 at 39-40. NECA thus faced the very real risk that the Court may not certify a damages class, adding further uncertainty to continued litigation.

136. Furthermore, class certification decisions can be reviewed and modified at any time during the litigation. Thus, even if NECA's motion for class certification was granted, there was no guarantee that the *NECA* Action, or particular claims in the action, would be maintained as a class through trial. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").

### 2.  Establishing Liability

137. Assuming NECA was successful in obtaining class certification, significant hurdles still existed in prevailing on the merits. Proving the alleged systematic disregard of the underwriting guidelines would have required that the Court accept NECA's methodology of the sampling loan files and that a jury believe that NECA's experts' opinions were more credible than Defendants' experts.

138. In order to recover under Section 11, NECA would have to prove to a jury that the statements made by Defendants in the offering documents were materially false and misleading. Specifically, NECA had to prove that the following representations by Defendants were false: (i) that

- 49 -

the loans underlying the certificates were originated in accordance with stated underwriting standards; (ii) that the properties securing the loans had been appraised in accordance with USPAP standards; and (iii) that the LTV and DTI ratios stated in the offering documents were accurate. NECA intended to prove these claims in large part through expert witnesses.  While NECA believed that it would be able to successfully defeat Defendants' inevitable *Daubert* challenges to its experts, the process of doing so would, even in the best case, entail significant time and expenses.  In the unfortunate event that any of Defendants' inevitable *Daubert* challenges succeeded, NECA's case could have become significantly compromised.  Assuming that NECA prevailed in such challenges, it could not be certain which experts' views would be credited by the jury and who would prevail at trial in this "battle of the experts."

### 3.     Defendants' Affirmative Defenses

139.    In addition to proving liability, NECA would also have to defeat Defendants' affirmative defenses in order to succeed at trial.  Defendants have maintained several affirmative defenses throughout the litigation which, if successfully established, could have undermined NECA's claims entirely.  For example, Defendants have asserted a "due diligence" defense, arguing that they had a reasonable process in place to ensure that information provided to investors through the offering documents was accurate and complete, and thus they reasonably believed in the truth of the representations made in the offering documents.  Although it would be Defendants' burden to establish this defense, NECA would be required to put forth considerable evidence to rebut Defendants' assertion of the defense.

140.    Defendants have also asserted a "negative loss causation" defense which, under Section 11, could significantly decrease or even extinguish NECA's recovery.  Section 11 provides that damages may be reduced or eliminated if the jury finds that some or all of the claimed losses

- 50 -

were attributable to causes other than the misstatements or omissions (the "negative causation"

defense). Defendants maintained that the poor performance of the certificates was driven, not by the

quality of the loans, but by external causes such as the collapse of the global economy, falling

national housing prices, and increasing national unemployment rates.

141.    Lastly, Defendants have claimed that NECA had actual knowledge of the alleged

facts giving rise to its claims at the time it bought the Certificates, a full defense to claims brought

under Section 11. *See* 15 U.S.C. §77 k(a); ¶¶133-134, *supra*. Defendants argued that the offerings

were issued after housing prices in the U.S. had begun to decline, mortgage delinquencies had begun

to increase, and the news media had published numerous stories on mortgage originators (including

those involved in the offerings) issuing toxic loans that never should have been issued. While this

Court and others in the Second Circuit have held that investors must be shown to have had

knowledge about the specific defects in the specific loans at issue in order for an "actual knowledge"

defense to succeed, it is possible that Defendants could convince the Court or a jury that NECA

possessed the requisite knowledge.

142.    In sum, the parties disagreed on the merits of this case, including whether or not

damages were suffered and recoverable. Defendants deny that they are liable in any respect or that

NECA or the class suffered any injury. Accordingly, recovery of any amount at trial was far from

certain. NECA's success at trial depended on unpredictable variables, such as which witness's or

expert's testimony a jury found most credible, and given the lack of jury trial precedent in the RMBS

context, the likely outcome of a trial was very uncertain.

## VI.    THE SETTLEMENT IS IN THE BEST INTERESTS OF THE SETTLEMENT CLASS AND WARRANTS APPROVAL

143.    While NECA believes it could have prevailed on the merits of its case, the

Defendants were just as confident that NECA would fail. There were very real risks, as discussed in

- 51 -

greater detail above, in proving liability and damages, preventing Defendants' affirmative defenses from limiting or preventing recovery, obtaining and maintaining class status, and surviving summary judgment and/or trial.  Additionally, any judgment in NECA's and the class' favor would guarantee that Defendants would appeal, which would add years to an ultimate resolution while providing the risk of reversal.

144.   Having considered the foregoing, and evaluating the likelihood of prevailing at class certification, at summary judgment, at trial, and on appeal, it is the informed judgment of Robbins Geller, based upon all proceedings to date and our extensive experience in litigating securities class actions, that the proposed Settlement is fair, reasonable and adequate, and in the best interests of the Settlement Class.

## VII.   PLAINTIFFS' COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

### A.   Application for Attorneys' Fees

145.   Plaintiffs' Counsel are applying to the Court for an award of attorneys' fees and expenses in connection with the services rendered in the Actions.  Specifically, Plaintiffs' Counsel are applying for a fee of 21% of the Settlement Amount, and for $1,236,390.04 in litigation expenses and charges, plus interest at the same rate and for the same time as that earned on the Settlement Fund.

146.   District courts are guided by the six factors articulated by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) in determining whether a requested award of attorneys' fees is fair and reasonable.  These factors include: (i) the time and labor expended by counsel; (ii) the magnitude and complexities of the litigation; (iii) the risk of the litigation; (iv) the quality of representation; (v) the requested fee in relation to the settlement; and (vi) public policy considerations.  *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000)

- 52 -

(summarizing *Grinnell* factors). Based on an analysis of the foregoing factors, and as further discussed below and in the accompanying Memorandum of Law in Support of Plaintiffs' Counsel's Motion for an Award of Attorneys' Fees and Expenses (the "Fee Memorandum"), filed herewith, I respectfully submit that Plaintiffs' Counsel's requested fee should be granted.

### 1.  The Requested Fee Is Reasonable

147. As set forth in the accompanying Fee Memorandum, the percentage method is an accepted method for determining a reasonable fee because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the class in achieving the maximum recovery in the shortest amount of time required under the circumstances, is supported by public policy, has been recognized as appropriate by the Supreme Court for cases of this nature and represents the overwhelming current trend in the Second Circuit and most other Circuits.

148. Robbins Geller submits that a 21% fee award is justified in view of the substantial result achieved for the Settlement Class, the extent and quality of work performed by Plaintiffs' Counsel, the substantial risks of the litigation and the contingent nature of the representation. As discussed in the Fee Memorandum, a 21% fee is fair and reasonable for attorneys' fees in common fund cases such as this, and is well within the range of percentages typically awarded in securities class actions in this Circuit.

149. Importantly, the requested fee was negotiated between NECA and Robbins Geller several years before the Settlement was reached. Immediately after the case was reinstated by the Second Circuit in 2012, NECA retained class action expert Professor Arthur Miller to serve as special counsel to NECA in connection with its service as lead plaintiff under the PSLRA, specifically to: (i) advise NECA in negotiating an optimal fee structure which maximizes the recovery of the Settlement Class; and (ii) provide guidance independent of Robbins Geller on the

- 53 -

decision whether to agree to a settlement.  *See* Miller Decl., ¶¶2, 22.  NECA's intention was to properly align the interests of class members and Robbins Geller to maximize the net recovery to the class.

150.   After the parties reached an agreement-in-principle, as part of their ongoing fiduciary duties to the Settlement Class, NECA and Robbins Geller consulted on the proper amount of the fee request.  Although Robbins Geller was entitled under the terms of the fee agreement to seek an award of up to 22% of the Settlement Amount, NECA requested that counsel limit their request to 21%, and Robbins Geller agreed.

151.   Over the more than seven years that the *NECA* Action was litigated, the work undertaken in prosecuting this case has been challenging and the outcome has constantly been uncertain.  This case has at all times been pursued on a fully contingent basis by Robbins Geller, and we have not received any payment for our services in pursuing claims against Defendants on behalf of the Settlement Class.  At the time the *NECA* Action was filed, Robbins Geller was not aware of any court having ever sustained similar securities law claims relating to RMBS, certifying a class of RMBS investors that purchased in multiple offerings over a span of years, or addressing any of the numerous other legal and factual issues presented by this litigation.  Given the uncertainty in the law at the time Robbins Geller began prosecuting the *NECA* Action, it was unclear whether NECA would overcome Defendants' anticipated motions to dismiss, let alone obtain class certification, survive summary judgment, and convince a jury to award them damages.

152.   As described in detail above, the *NECA* Action was vigorously litigated and settled only after Robbins Geller had, *inter alia*: (a) conducted an extensive factual investigation regarding NECA's claims; (b) amended its complaint four times; (c) opposed multiple motions to dismiss which raised multiple complicated and novel legal issues; (d) litigated a fifteen-month appeal in the

Second Circuit after the District Court's dismissal of NECA's claims, which likewise involved multiple complex legal issues; (e) completed extensive fact discovery, obtaining and reviewing over 7.4 million pages of documents produced by Defendants and third parties; (f) consulted with experts in RMBS securitizations, mortgage underwriting, statistics, and damages; (g) moved for class certification; and (h) engaged in prolonged settlement negotiations spanning several years with the assistance of a skilled mediator.

### 2.  The Time and Labor Expended by Plaintiffs' Counsel

153.  Plaintiffs' Counsel have expended a total of over 28,170 hours litigating Plaintiffs' claims.  The total lodestar for Plaintiffs' Counsel is $14,580,626.50.  Accordingly, the requested fee of 21% of the Settlement Amount would result in a 3.9 multiplier on Plaintiffs' Counsel's total lodestar.  The fees and expenses sought by Plaintiffs' Counsel are fair and reasonable, and justified by the specific facts and circumstances in the Actions.

154.  As instructed by the Court in its December 30, 2015 Order (Dkt. No. 219), Plaintiffs' Counsel's fee application groups the time that Plaintiffs' Counsel have expended by timekeeper, by month, and by activity (factual research, legal research, pleadings, drafting memoranda of law, discovery, court appearances, settlement and appeal) with monthly totals by timekeeper and by activity.  *See* the Declaration of Arthur C. Leahy Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("RGRD Decl."), the Declaration of Denis F. Sheils Filed on Behalf of Kohn, Swift & Graf, P.C. in Support of Application for Award of Attorneys' Fees and Expenses ("Kohn Swift Decl."), and the Declaration of Lawrence P. Kolker in Support of Plaintiffs' Counsel's Motion for Attorneys' Fees and Reimbursement of Expenses Filed on Behalf of Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein Decl."), filed herewith.

- 55 -

### 3.    The Settlement Achieved

155.    As discussed in detail above, the $272 million Settlement was achieved as a result of extensive efforts on the part of Plaintiffs' Counsel, including investigations, discovery, complicated motion practice, and Robbins Geller's tenacity in pursing NECA's claims on appeal to the Second Circuit.   As a result of this Settlement, Settlement Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement.

### 4.    The Risk, Magnitude and Complexity of the Litigation

156.    Courts have recognized that the risk, magnitude and complexity of the issues in a case are significant factors to be considered in making a fee award.  The contested issues in the Actions involved difficult issues of fact and law regarding the Defendants' alleged misstatements or omissions of material fact in the offering documents.  In addition, there were extremely difficult and complex issues related to damages, affirmative defenses, standing, class certification and causation.

157.    There are numerous cases where class counsel in contingent fee cases such as this, after expenditures of tens of thousands of hours and significant expenses, have received no compensation whatsoever.  The fact that Defendants and their counsel know that members of the plaintiffs' bar are actually able to, and will, go to trial even in high-risk cases gives rise to meaningful settlements in actions such as this.  The losses suffered by class counsel in other actions where insubstantial settlement offers are rejected, and class counsel ultimately receive little or no fee, should not be ignored.  Robbins Geller knows from personal experience that despite the most vigorous and competent of efforts, including trials to jury verdict, success in contingent litigation such as this is never assured.

158.    As discussed in greater detail above, the *NECA* Action was fraught with significant risks.  Defendants disputed whether a class could be certified, and whether NECA could establish a material misstatement or omission or prove damages.  Were this Settlement not achieved, and even if NECA prevailed through trial, NECA and the Settlement Class faced potentially years of costly and risky appeals, with ultimate success far from certain.  It is also possible that a jury could have found no liability and/or no damages.  We respectfully submit that Plaintiffs' Counsel are entitled to a fee of 21% of the Settlement Amount, or $57,120,000, because of the significant risk factors in the Actions.

### 5.        Quality of the Representation

159.    I maintained daily control and monitoring of the work performed by my firm in the *NECA* Action.  While I personally devoted substantial time to this case, other experienced attorneys at my firm undertook particular tasks appropriate to their levels of expertise, skill and experience, and more junior attorneys, paralegals and others worked on matters appropriate to their experience levels.  A task breakdown, describing the principal time activities in which each timekeeper was involved, is included in Exhibit B to my declaration filed concurrently herewith in support of Plaintiffs' Counsel's application for an award of attorneys' fees and expenses.

160.    Robbins Geller is the nation's largest plaintiff-shareholder litigation firm and has served as lead or co-lead counsel in some of the most prominent shareholder cases ever successfully concluded.  It represented The Regents of the University of California in *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (S.D. Tex.), recovering $7.3 billion for investors, as well as California Public Employees' Retirement System in In *re UnitedHealth Group Inc. PSLRA Litig.*, No. 0:06-cv-01691-JMR-FLN (D. Minn.), recovering $925 million in a stock option backdating litigation, and recovered

- 57 -

$600 million for investors in *In re Cardinal Health, Inc. Sec. Litig.*, No. C2-04-00575(ALM) (S.D. Ohio).

161.    The quality of the work performed by counsel in attaining a settlement should also be evaluated in light of the quality of opposing counsel.  Robbins Geller was opposed in this litigation by very skilled and highly-respected counsel.  The Defendants were represented by Sullivan & Cromwell LLP, who spared no expense or argument in the defense of its clients.  Defendants also retained preeminent defense firm Gibson, Dunn and Crutcher LLP for their petition for certiorari to the Supreme Court, employing a team of the nation's top appellate advocates, led by former Solicitor General of the United States Theodore Olson.  In the face of this knowledgeable and formidable defense team, Robbins Geller was nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle on terms that are favorable to the Settlement Class.

### 6.    The Reaction of the Settlement Class to Date

162.    While the time for Settlement Class Members to exclude themselves from the Settlement or object to the fee and expense application or the Settlement does not expire until March 4, 2016, to date, not a single objection has been received and no Settlement Class Members have excluded themselves from the Settlement Class.  Sylvester Decl., ¶15.  Should any objections to the fee and expense application be received, Plaintiffs' Counsel will address them in reply papers to be filed on March 21, 2016.

163.    In sum, given the complexity and uniquely challenging nature of the *NECA* Action and the *PFRS* Action, the responsibility and risk undertaken by Plaintiffs' Counsel, the difficulty of proving liability and damages, the experience of Plaintiffs' Counsel and counsel for Defendants, and the contingent nature of Plaintiffs' Counsel's agreement to prosecute the Actions, Plaintiffs' Counsel respectfully submit that the requested attorneys' fees are reasonable and should be approved.

- 58 -

1115635_3

### B.   Plaintiffs' Counsel's Litigation Expenses

164.   Plaintiffs' Counsel also requests an award of $1,236,390.04 in litigation expenses and charges incurred in prosecuting the *NECA* Action and the *PFRS* Action for the benefit of the Settlement Class; *see* RGRD Decl., Kohn Swift Decl., and Wolf Haldenstein Decl.  Plaintiffs' Counsel respectfully submit that this amount is appropriate, fair, and reasonable, and should be approved.

165.   Plaintiffs' Counsel understood from inception of the Actions that, in the event that Plaintiffs' claims were not successfully resolved, Plaintiffs' Counsel would not recover any of their expenses.  They further understood that, even if Plaintiffs were ultimately successful, an award of expenses would not compensate them for the lost use of the funds advanced to litigate the Actions.  Thus, in addition to their fundamental concern – furthering the interests of the class – Plaintiffs' Counsel had additional motivation to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the effective and efficient prosecution of the Actions.

166.   In total, the application for expenses is well within the limit of $1,500,000 contained in the Notice mailed to Settlement Class Members.  As noted above, in response to over 5,800 Notices, there were no objections to the expenses as of the date of this Declaration.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on February 18, 2016, at San Diego, California.

s/ Arthur C. Leahy
_____
ARTHUR C. LEAHY

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 18, 2016, I caused the foregoing Declaration of Arthur C. Leahy in Support of (1) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and (2) Plaintiffs' Counsel's Motion for an Award of Attorneys' Fees and Expenses to be served electronically on all ECF participants.

s/ Arthur C. Leahy
_____
ARTHUR C. LEAHY
