UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
NECA-IBEW HEALTH & WELFARE FUND, :    Civil Action No. 1:08-cv-10783-LAP
Individually and On Behalf of All Others         :
Similarly Situated,                                          :    "ECF Case"
                                                                       :
                                      Plaintiff,           :    CLASS ACTION
                                                                       :
          vs.                                                      :
                                                                       :
GOLDMAN, SACHS & CO., et al.,                   :
                                                                       :
                                      Defendants.       :
                                                                       :
———————————————————— x
POLICE AND FIRE RETIREMENT SYSTEM :    Civil Action No. 10 Civ. 4429-LAP
OF THE CITY OF DETROIT, Individually       :
and On Behalf of All Others Similarly Situated, :    "ECF Case"
                                                                       :
                                      Plaintiff,           :    CLASS ACTION
                                                                       :
          vs.                                                      :
                                                                       :
GOLDMAN, SACHS & CO., et al.,                   :
                                                                       :
                                      Defendants.       :
                                                                       :
———————————————————— x

DECLARATION OF ARTHUR R. MILLER

I, Arthur Miller, declare as follows:

1.      I submit this declaration in support of: (1) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and (2) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses in the *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co., et al.*, Civil Action No. 1:08-cv-10783-LAP (the "*NECA* Action"). I am personally knowledgeable of the facts set forth herein and, if called as a witness, would testify competently thereto.

2.      In 2012, I was retained by Lead Plaintiff NECA-IBEW Health & Welfare Fund ("NECA," the "Fund" or "Lead Plaintiff") to serve as a special counsel in connection with its service as lead plaintiff under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). In providing advice to NECA regarding this matter and performing my duties as Special Counsel to the lead plaintiff, I was involved with various aspects of the prosecution of the case, including settlement discussions and the structuring of a fee grid to maximize the net recovery to the class, and had discussions with Fund representatives and counsel regarding the facts set forth herein.

## I.      Qualifications

3.      I am a University Professor at New York University and a faculty member of its Law School and an Associate Dean of its School of Professional Studies. Before that, I was the Bruce Bromley Professor of Law at Harvard Law School in Cambridge, Massachusetts. I graduated from Harvard Law School magna cum laude in 1958 and practiced law in New York City until 1962. Since then, I have taught full-time at the University of Minnesota, the University of Michigan, and, between 1971 and 2007, the Harvard Law School. I have taught the basic first-year course in American Civil Procedure for more than 55 years and advanced courses and seminars in advanced procedure, complex litigation, and copyright most of those years.

4.      I am the author or co-author of more than 40 books and treatises, including Federal Practice and Procedure, which has been the leading multi-volume treatise on practice in the United

- 1 -

States Federal Courts for more than four decades. That treatise has been cited thousands of times by the Supreme Court and other federal courts throughout the Nation. I also am the co-author of New York Civil Practice, a leading multi-volume treatise on New York jurisdiction and procedure. In addition, I am the author or co-author of at least 30 law review and other articles and monographs on a range of subjects, including United States constitutional law, many aspects of federal court litigation, class actions, attorneys' fees, transnational procedure, international judicial assistance, intellectual property issues, legal aspects of computer technology, legal protection for ideas, and the right of privacy.

      5.      I served as a member of the Special Advisory Group to the Chief Justice of the United States on Federal Civil Litigation (by appointment of Chief Justice Burger); as the reporter and then as a member of the Advisory Committee on Civil Rules of the Judicial Conference of the United States (by appointment of Chief Justice Burger and reappointment of Chief Justice Rehnquist); as reporter for the United States Court of Appeals for the Third Circuit Attorneys' Fee Study Report, which is published at 108 F.R.D. 237 (1985); as special consultant to the original *Manual for Complex Litigation,* published by the Federal Judicial Center; as reporter of the Advisory Group on Civil Justice of the United States District Court for the District of Massachusetts; as a member of the American Bar Association Special Committee on Complex and Multidistrict Litigation; and as a member of numerous other professional committees and organizations. I also was the reporter for the American Law Institute's Complex Litigation Project, which led to the adoption and publication by the Institute of Complex Litigation: Statutory Recommendations and Analysis with Reporter's Study (1994). I served as a member of the Board of Overseers of the RAND Institute for Civil Justice, which completed an in-depth study of class actions. More recently, I served as an advisor to the American Law Institute's Project on Aggregate Litigation.

6.      I was one of the drafters of the Uniform Interstate and International Procedure Act and served as the Associate Director of the Columbia Law School Project on International Procedure and drafted several rules on international judicial assistance, which became part of the Federal Rules of Civil Procedure. I have testified before numerous subcommittees of the United States Senate and House of Representatives on constitutional, procedural, privacy, and other issues.

7.      Throughout my years in academia, I have maintained my contacts with the Bench and the practicing Bar in order to understand the actual operation and functioning of the civil justice system. I have participated in a great number of judicial conferences in various United States Courts of Appeal and in educational programs conducted by the Federal Judicial Center and state judicial organizations as a lecturer or a discussion leader on a wide variety of subjects. These have included federal jurisdiction, civil practice, class actions, attorneys' fees, and complex litigation. Over the years I have appeared as a lawyer or as an expert in more than 50 class actions and complex cases in state and federal courts throughout the country, on behalf of both plaintiffs and defendants, with regard to issues of the propriety of class certification, the fairness, reasonableness, and adequacy of settlements, attorneys' fees, subject matter and personal jurisdiction, the sufficiency of pleadings, discovery, choice of law, preemption, jury trial, and appealability. Those cases have involved a range of substantive contexts, such as mass disasters, product defects, toxic substances, invasions of personal rights, antitrust, security frauds, consumer deception, consumer financing, RICO, mail fraud, wire fraud, copyrights, and patents. This experience has included oral argument before the United States Supreme Court, all of the United States Courts of Appeals, numerous United States District Courts, and many state trial and appellate courts.

## II.      Background

8.      NECA's initial complaint in this action was filed on December 11, 2008. The *NECA* Action was one of the initial class actions alleging false and misleading statements in RMBS

offering documents. At the time of NECA's initial complaint, there was little, if any, jurisprudence concerning the viability of such claims, or addressing crucial procedural issues such as whether an MBS certificate purchaser possessed the requisite standing to represent a class of investors in multiple RMBS offerings underwritten by the same defendants, or whether such a plaintiff could satisfy Fed. R. Civ. P. 23's requirements with respect to a class of investors who purchased the specific RMBS tranches that the named plaintiff itself had purchased.

9.      By 2010, the law on many of these issues had moved distinctively against MBS certificate purchasers. For example, in 2009 and 2010 numerous district courts dismissed actions in which the plaintiffs pled claims for certificates that were not purchased by the named plaintiffs or for failure to plead adequately that the plaintiff was damaged. These included:

- *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 303 (D. Mass. 2009) (Stearns, J.) ("[h]ere, the named plaintiffs are incompetent to allege an injury caused by the purchase of Certificates that they themselves never purchased");

- *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 490-91 (S.D.N.Y. Feb. 17, 2010) (Kaplan, J.) (dismissing §11 claims for 85 (of 94) offerings for lack of standing; dismissing claims related to allegations of conflicts of interest between Lehman and the rating agencies and inadequate credit enhancements for failure to state a claim; sustaining §15 claims);

- [*Harborview*] *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, 720 F. Supp. 2d 254, 258 (S.D.N.Y. Mar. 26, 2010) (Baer, Jr., J.) (dismissing claims for 12 (of 14) offerings for lack of standing; dismissing all claims against ratings agencies; dismissing claims related to allegations of conflicts of interest between the RBS Defendants (primary issuers and underwriters) and the rating agencies, as well as claims related to allegations of outdated rating models and inadequate credit enhancements);

- *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 U.S. Dist. LEXIS 47512, at *23 (S.D.N.Y. Mar. 29, 2010) (Crotty, J.) (dismissing claims for 3 (of 4) offerings for lack of standing and dismissing allegations "relating to appraisals and appraisal practices, loan-to-value ratios, and ratings and rating methodology");

- [RALI] *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2010 U.S. Dist. LEXIS 32058, at *13 (S.D.N.Y. Mar. 31, 2010) (Baer, Jr., J.) (dismissing claims for 55 (of 59) offerings for lack of standing; dismissing claims related to allegations of

outdated rating models and inadequate credit enhancements for failure to state a claim);

- *City of Ann Arbor Employees' Retirement System. v. Citigroup Mortgage Loan Trust, Inc.*, 703 F. Supp. 2d 253, 260-63 (E.D.N.Y. Apr. 6, 2010) (Wexler, J.) (dismissing claims for 16 (of 18) offerings not purchased by a named plaintiff for lack of standing instructing plaintiffs to re-plead allegations of a cognizable loss pertaining to the two remaining trusts; "[i]n particular, Plaintiffs shall state whether their damages claims arise from the non-payment of amounts due under the Certificates or the inability to sell their interests in those Certificates in a secondary market");

- *Mass. Bricklayers & Masons Fund v. Deutsche Alt-A Securities*, 2010 U.S. Dist. LEXIS 33976 (E.D.N.Y. Apr. 6, 2010) (Wexler, J.) (dismissing claims for 12 (of 14) offerings which plaintiffs did not purchase for lack of standing);

- *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 965 (N.D. Cal. Apr. 22, 2010) (Illston, J.) (dismissing all claims against the rating agencies; dismissing claims for 37 offerings that the named plaintiff did not purchase for lack of standing);

- *Public Employees' Retirement System of Mississippi v. Merrill Lynch*, 714 F. Supp. 2d 475 (S.D.N.Y. June 1, 2010) (Rakoff, J.) (dismissing with prejudice all claims for 65 offerings not purchased by any named plaintiff, all claims against underwriters and sponsors, and a §15 claim against one of the subsidiaries; dismissing with prejudice all claims against investment firm and two subsidiaries and dismissing §12(a)(2) claim against another subsidiary);

- *In re IndyMac Mortgage-Backed Securities Litig.*, 718 F. Supp. 2d 495, 501 (S.D.N.Y. June 21, 2010) (Kaplan, J.) (dismissing §11 claims for 91 (of 106) offerings that named plaintiffs did not purchase for lack of Article III standing);

- *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2010 U.S. Dist. LEXIS 84146, at *16 (S.D.N.Y. Aug. 17, 2010) (Swain, J.) ("WVIMB therefore lacks standing to pursue its claims concerning any certificates other than [the single certificate it purchased]"); and

- *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1163 (C.D. Cal. Nov. 4, 2010) (Pfaelzer, J.) (dismissing claims for 346 (of 427) offerings for lack of standing; holding tolling applied only to securities named plaintiffs had standing for; holding purchasers did not adequately plead reliance on *American Pipe* tolling; granting leave to amend).

10.   Consistent with several of these decisions, Judge Cedarbaum dismissed the first three amended complaints filed in this action, eventually holding that NECA lacked standing to assert claims on behalf of purchasers of certificates in 15 of the 17 offerings included in those complaints

because NECA had not purchased certificates sold in 15 of the offerings. *See, e.g.*, *NECA* Action Dkt. No. 86 at 40:5-43:24. On October 15, 2010, the Court also dismissed NECA's §11 claims for the two remaining offerings, holding that NECA had no legally cognizable injury. *NECA* Action Dkt. No. 107.

11.    Faced with complete dismissal of its case, on July 6, 2011, NECA filed a notice of appeal to the Second Circuit. *NECA* Action Dkt. No. 155.

## III.    The Second Circuit Decision

12.    On September 6, 2012, the Second Circuit issued its opinion in this case, affirming in part and vacating in part the Court's orders dismissing the action. *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012). Defendants filed a Petition for *Writ of Certiorari* to the Supreme Court of the United States. That petition was denied on March 18, 2013.

13.    The Second Circuit's opinion in *NECA* was a landmark decision that articulated the standard for class standing in RMBS securities class action cases. Specifically, the Second Circuit held that a plaintiff who had invested in multiple securities issued under the same shelf registration statement could, as the representative of a putative class, bring claims based on securities in which it had ***not*** invested so long as all of the relevant claims implicated "the same set of concerns." 693 F.3d at 162-64. Applying this rule, the court held that NECA's allegations that the offering documents for the securities it purchased contained "nearly identical misrepresentations" concerning "origination guidelines" raised "the same set of concerns" as those securities it did not purchase but issued under the same registration statement, to the extent that the securities "were backed by loans originated by [common] originators." *Id.*

14.    As many courts have recognized, the *NECA* decision "'constitute[d] a change in controlling law' concerning class standing in securities cases." *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653 (PAC), 2014 U.S. Dist. LEXIS 35326, at *5 (S.D.N.Y. Mar.

17, 2014); *In re Harbinger Capital Partners Funds Investor Litig.*, No 12 Civ. 1244 (AJN), 2013

U.S. Dist. LEXIS 142268 (S.D.N.Y. Sept. 30, 2013) (holding *NECA* was a change in the controlling

law); *In re Indymac Mortg.-Backed Sec. Litig.*, No. 09 Civ. 4582 (LAK), 2013 U.S. Dist. LEXIS

103576 (S.D.N.Y. July 23, 2013) (same); *In re: Lehman Bros. Sec. & ERISA Litig.*, No. 09 MD 2017

(LAK), 2013 U.S. Dist. LEXIS 13999, at *20 (S.D.N.Y. Jan. 23, 2013) (same).

     15.    It goes without saying that the Second Circuit's *NECA* opinion had a favorable impact

on the previously dismissed case, and also had a resoundingly favorable impact for RMBS investors

involved in class actions pending throughout the country.  For example, in the following class

actions alleging violations of §11 of the Securities Act of 1933, the district courts reconsidered their

previous orders dismissing claims for lack of standing, and reinstated plaintiffs' claims for numerous

RMBS offerings:

- *In re Indymac Mortgage-Backed Secs. Litig.*, 2013 U.S. Dist. LEXIS 103576 (S.D.N.Y. July 23, 2013) (noting that defendants stipulated to reinstatement of 36 offerings following *NECA* and ordering 6 additional offerings to be reinstated);

- *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2013 U.S. Dist. LEXIS 61874 (S.D.N.Y. Apr. 30, 2013) (the *RALI* Action) (reinstating claims for 37 RALI offerings);

- *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2013 U.S. Dist. LEXIS 12640, at *2 (S.D.N.Y. Jan. 23, 2013) (reinstating one offering);

- *N.J. Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 2015 U.S. Dist. LEXIS 15980 (S.D.N.Y. Feb. 5, 2015)) (reinstating five offerings);

- *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, 2012 U.S. Dist. LEXIS 132057 (E.D.N.Y. Sept. 14, 2012) (court *sua sponte* modified its previous motion to dismiss order to sustain claims for 30 offerings, after applying a tranche-based standing approach to dismiss claims against all but five certificates. *See Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp.*, 2012 U.S. Dist. LEXIS 24106, at *67 (E.D.N.Y. Feb. 23, 2012);

- *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 09-CV-3701 (JPO), Dkt. No. 197 (S.D.N.Y. January 4, 2013) (reinstating claims for ten offerings);

- *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2013 U.S. Dist. LEXIS 5285 (S.D.N.Y. Jan. 11, 2013) (granting plaintiffs' motion to amend to assert claims on behalf of 13 additional offerings that were previously dismissed due to lack of standing, stating "it appears that MissPERS had standing under [*NECA*] as of the time of the Initial Complaint to sue on behalf of purchasers of each of the 14 offerings").

16.   My review indicates that, as of the date of this declaration, five of the seven cases listed above have settled and yielded more than $1.5 billion in recoveries for MBS investors.

17.   The Second Circuit's *NECA* decision also has been applied by district courts in a way that is favorable to plaintiffs outside the 1933 Act context.  For example:

- *Okla. Police Pension & Ret. Sys. v. United States Bank Nat'l Ass'n*, 291 F.R.D. 47, 60 (S.D.N.Y. 2013) (in case alleging violations of the Trust Indenture Act of 1939 and breaches of contract under New York law, court applied *NECA* to sustain claims for violation of for 14 trusts where defendant argued that the plaintiff may only assert claims relating to the two trusts in which it has owned securities and lacked class standing to assert claims relating to the remaining trusts);

- *In re Winstar Communs. Secs. Litig.*, 290 F.R.D. 437, 450-51 (S.D.N.Y. 2013) (finding that *NECA* allows lead plaintiff common stock purchasers to have class standing to assert claims on behalf of bond purchasers);

- *Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1164 (N.D. Ohio 2013) (same);

- *In re Frito-Lay N. Am., Inc.*, 2013 U.S. Dist. LEXIS 123824, at *42 (E.D.N.Y. Aug. 29, 2013) (applying *NECA* in a consumer-fraud class action to determine that plaintiffs' Article III standing is not limited solely to claims on behalf of purchasers of product they purchased); and

- *Landesbank Baden-Württemberg v. RBS Holdings USA, Inc.*, 14 F. Supp. 3d 488, 512 (S.D.N.Y. 2014) (applying *NECA* to determine that plaintiff's failure to sell certificates on which its claim is based does not defeat its ability to show cognizable damages).

18.   As the above opinions demonstrate, *NECA* has had a wide-ranging impact on the issue of standing in class action litigation, and greatly enhanced the ability of plaintiffs to vindicate the rights of injured investors and consumers.

- 8 -

19.     One example of the *NECA* opinion being helpful in securing the return of hundreds of millions of additional dollars to injured investors is the settlement recently approved in the *RALI* Action, in which the impact of *NECA* was to allow the plaintiffs to reinstate the vast majority of the claims back in the action. *See New Jersey Carpenters Health Fund, et al., v. Residential Capital, LLC, et al.*, No. 08-cv-8781-KPI, Dkt No. 354. After the *NECA* decision, the court reinstated the plaintiffs' claims for 37 of those offerings. Only after the claims for the 37 offerings were reinstated were the plaintiffs able to secure a $335 million recovery. Without the *NECA* decision expanding the *RALI* Action from 4 offerings to 41 offerings, it is very unlikely that the plaintiffs would have recovered anything close to the $335 million they ultimately recovered for *RALI* investors.

**IV.     The Settlement**

20.     While the Second Circuit appeal was pending, NECA and Goldman Sachs engaged in a series of settlement negotiations. At the end of those negotiations, the parties reached a point in the settlement discussions where if NECA had opted to settle the *NECA* Action, the case would have yielded tens of millions of dollars for the class. And had it been agreed to by the Lead Plaintiff, that recovery would have represented at the time the second largest recovery ever in an RMBS purchaser class action, although it represented just a fraction of the proposed settlement now before the Court. Regardless, the Fund made the decision not to settle the *NECA* Action until after a decision by the Second Circuit.

21.     NECA retained me to act as Special Counsel in connection with its execution of its duties under the PSLRA. To that end, NECA worked with me to assess the risks and merits of the litigation, including: (1) the scope of the available claims in light of the *NECA* decision; (2) the procedural hurdles, including class certification; and (3) the challenges associated with proving defendants' liability and class-wide damages.

22.     NECA structured a fee grid that utilized a tiered fee structure designed to align the interests of class members and counsel in order to maximize the net recovery to the class (the "Fee Agreement").  The Fee Agreement was negotiated between the Lead Plaintiff – a sophisticated investor – and Lead Counsel, as contemplated by the PSLRA.  I independently reviewed and endorsed the Fee Agreement prior to its execution, and my opinion is that the Fee Agreement was designed to, and did, incentivize Lead Counsel to maximize the recovery received by the class.

23.     The passage of time has borne out that the fee structure used by the Lead Plaintiff achieved exactly what it was designed to achieve.  Specifically, the fee grid negotiated by NECA properly recognized the recovery the class could have had prior to the Second Circuit decision and awarded a 19% fee for that amount.  The Fee Agreement provided that Lead Counsel would receive no fee at all on the next $15 million recovered – an incremental amount equal to an additional 37.5% of the $40 million base amount.  In this way, NECA insured that any future proposed settlement amount would have to exceed $40 million by a material amount for Lead Counsel to receive any additional fee at all.  Looked at another way, the overall fee to be paid to counsel pursuant to the fee grid on the first $55 million was just over 13.75%.

24.     After nearly two additional years of hard-fought litigation, and extensive settlement negotiations facilitated by the Honorable Daniel Weinstein (Ret.), NECA was ultimately presented with a mediator's proposal of $272 million to settle the case.  Once again, NECA conducted an evaluation of the risks and merits of the litigation, including:  (1) the risk associated with Lead Plaintiff's outstanding motion for class certification, and the defenses that Goldman Sachs had raised in its opposition to that motion; (2) the risk associated with having to prove each element of its case; and (3) the size of the proposed settlement relative to the outstanding risks and possible recoveries.

After careful consideration, and with the benefit of input from counsel, including myself, NECA agreed to the terms of the settlement as set forth in the Stipulation on behalf of the Class.

25.     NECA's performance as Lead Plaintiff in this case was remarkable.  Not only is the size and scope of the proposed settlement an astonishing success, but the wide-ranging favorable impact for investors in the form of class action jurisprudence and the intangible benefits rendered to investors and consumers across the country cannot be overstated.  Faced with a dismissal of all of its claims, and a developing state of case law that was decidedly hostile to plaintiffs in RMBS actions, NECA made the very difficult decision not to enter into a substantial settlement and instead to pursue its appeal to the Second Circuit.  NECA believed that declining that offer could yield a significantly greater recovery for class members in this action.  This was a prudent, well considered, and fateful decision.  Despite having a substantial financial interest in any recovery, NECA took the course of action that it believed was in the best interest of all class members.

26.     As a result of NECA's thorough, responsible and engaged leadership and decision making throughout this litigation, the members of the class will, if this settlement is approved by the Court, share in a recovery that is hundreds of millions of dollars greater than the recovery that would have been achieved had NECA decided to settle the then-dismissed case.  NECA's actions in this case, including its oversight of the litigation, its decision to appeal the dismissal of the action, and the negotiation of a fee structure designed to maximize the recovery received by the class, is the embodiment of what Congress called for 20 years ago when it passed the PSLRA.

- 11 -

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 16th day of February, 2016, at New York, New York.

ARTHUR R. MILLER

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 18, 2016, I caused the foregoing Declaration of Arthur R. Miller to be served electronically on all ECF participants.

s/ Arthur C. Leahy
_____
ARTHUR C. LEAHY
